# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| INFODELI, LLC. *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:15-cv-00364-BCW |
| v. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| WESTERN ROBIDOUX, INC., *et al.*, | ) | |
| | ) | ***DAUBERT* EVIDENTIARY HEARING** |
| Defendants. | ) | **REQUESTED** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF MICHAEL EDGE

## I. Introduction

Recognizing that part of Plaintiffs' damages calculation relies upon the expert report of Michael Edge, Defendants claim that it should be excluded for a panoply of reasons, none of which are factually or legally supported. For this reason, Defendants' motion should be denied in its entirety.

Defendants' motion twists and contorts Plaintiffs' evidence and damages theories in an effort to exclude them, claiming they do not "fit" the case. Simply stated, Defendants' arguments are out of touch with reality. A brief summary of Plaintiffs' evidence will show what the Defendants did to Mr. Burri and the damage caused. First, WRI underpaid Breht Burri several hundreds of thousands of dollars in breach of the joint venture from 2010-2014. Although Breht obtained a verdict for over one million dollars in a State court action, WRI has not satisfied that verdict and indicated that it intends to file post-judgment motions and possibly appeal.

Second, Cindy Burri, Brian Burri, and Peter Burri convinced (or tricked) Breht's mother to underpay Breht from 2010 to 2014. In January of 2014, Breht attempted to force WRI to provide him with the financial information to see how much he was owed and get paid. In response, his brothers and sister-in-law convinced his Mother to hire Engage, build replacement software, and string Breht along to buy time for Engage to build the software. ECF #694-5. This plan fell apart after Breht posted the Terms of Use on the Literature Store websites on March 11, 2014. After the TOU went up, WRI's Jill Williams (who agreed to the TOU) downloaded over 10,000 files of Curated Content from the InfoDeli Platform server on March 11, 13 and 14 of 2014. Nathan Haley also accessed parts of the InfoDeli databases through the FileMaker modules installed on WRI's computers and obtained both data compilations and insight into Breht's software. Breht shut down access to his server sometime after March 15, 2014.

Third, the Burri Defendants and WRI, rather than making good on the hundreds of thousands of dollars they owed Breht, instead implemented plans to take as much information

1

and Curated Content from Breht as possible and give that information to Engage so that Engage could create replacement software as rapidly as possible. WRI paid Engage $5,000 for an all-day strategy session meeting held on March 4, 2014. The Burri Defendants *sans* Breht's mother attended the meeting. They demonstrated Breht's software and other snapshots to Engage personnel and Liz Corbin for the express purpose of creating replacement software.

The next day, March 5, 2014, Cindy Burri sent her usernames and passwords for the Literature Stores along with a live Vectrarebate.com code to Nathan Haley. The purpose: so Engage could access and see the "user experience" of the Plaintiffs' websites. Cindy Burri also promised to send snapshots or any other information Haley needed. On March 6, 2014, Liz Corbin accessed Plaintiffs' sites and placed two orders. Cindy forwarded her confirmation email to Nathan Haley, and Haley forwarded it to Liz Corbin. Haley used the Vectrarebate code to scrape Breht's website into a file called **vectrarebate.com.zip**, which was uploaded to a Google Drive and used by another Engage contractor to "replicate" Breht's website.

Fourth, Plaintiffs lost far more than Curated Content, scraped code and specific data compilations - they lost their negotiating power with BIVI, CEVA and WRI based upon their unique solutions that they created and carefully maintained from at least 2002. Breht's efforts to negotiate a solution in March of 2014 with WRI were doomed from the start, because his brothers and sister-in-law didn't want to share the profits of the Joint Venture business that he was instrumental in building. They wanted a third-party solution so that they could control the software *and the money*. Defendants complained they were held "hostage" by Breht's demands to be paid according to the terms of the Joint Venture, but in fact, Breht was always reasonable and honorable in his dealings with the Burri Defendants as shown by the State court verdicts. Breht lost all negotiating power due to the Defendants' actions, along with all of his business with BIVI, CEVA and WRI. Breht also lost all of the goodwill he generated since the late 1990s, when he first started doing work for BIVI. This loss of business occurred at a time when

2

the earnings of the joint venture were skyrocketing such that Breht set to earn roughly one-half million dollars per year.

In sum, at the end of March of 2014, Breht was 51 years old, cheated out of hundreds of thousands of dollars by his family, unceremoniously tossed from the Joint Venture, and forced to watch his family steal the crown jewel of his working career - the InfoDeli Software Platforms. While Defendants portray the facts as Breht losing a few bits and bytes of data, which they allegedly own, nothing is further from the truth. Without taking the Curated Content from Breht, without using Breht's schema, without replicating Breht's Vectrarebate.com website and tricking him into providing his entire database to Fairchild on a thumb drive, WRI's plan to oust Breht would never have worked because the delay in replacing Breht's software would have been too long and CEVA would not have tolerated redemptions from the coupon campaign not being fulfilled. Just as WRI needed **both** CEVA's and BIVI's agreement and backing in its endeavor to kick Breht to the curb, so too did WRI need to take as much Curated Content, code and other information that it could gather to replace Breht's systems rapidly.

## II. Argument

### A. Legal Standards

The Defendants seek to exclude the opinions of Michael Edge, advising the Court that it should also exclude Dr. Levy's report "because he relied upon Edge's valuation to calculate Plaintiffs' damages." ECF #644, p. 2, n. 1. Defendants' note reveals an overall strategy to win this case based upon procedural attacks as opposed to the merits. Moreover, not all of Dr. Levy's opinions rely upon Mr. Edge's opinions; his tortious interference opinion stands by itself and was unchallenged by the Defendants.

In any event, the Court should be mindful that the purpose of a *Daubert* motion is to exclude junk science – weaknesses do not serve as a basis for a *Daubert* motion. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 923 (9th Cir. 2017). Proper *Daubert* motions focus on evidence

3

that the scientific methodology is wrong or the expert lacks the qualifications to render the opinions at issue. Defendants' motion fails on both points. The biggest challenge for the Court is to distinguish between disabling problems with the proposed testimony, which are grounds for exclusion, and weaknesses in the testimony, which are properly resolved at the trial itself on the basis of evidence and cross-examination. *Apple Inc. v. Motorola, Inc.*, Case No. 11-cv-08540, 2012 WL 1959560, at \*1 (N.D. Ill. May 22, 2012) (Judge Posner, sitting as a district court judge, excluded the expert damages opinions and was subsequently reversed by the Federal Circuit in *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014)).

When dealing with damages, a degree of speculation is permitted in their calculation. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981). This is especially true when the defendant's wrongful conduct has made the calculation of damages difficult. *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 658 (7th Cir. 2004).

### B. Mr. Edge's Opinions are Factually Supported, Legally Relevant and "Fit"

As with every other issue in this case, Defendants have aggressively attacked Mr. Edge's expert report. Their criticisms are baseless and their motion should be denied. When the Court sees how Defendants' actions devastated Mr. Burri's life, it is astounding that they would claim that the conservative damages opinions don't "fit" the crimes.

### C. Mr. Edge's Opinion on "Saving Time" is Helpful to the Jury

Defendants first claim that Mr. Edge's opinion that Defendants saved time and developed their software more quickly would not be helpful to the jury. Why? Because Mr. Edge purportedly cannot quantify the amount of time saved. Edge definitely testified that it is faster to copy than create. Ex. 1 at p. 82:723. Of course, Defendants do not address the fact that it is now impossible, due to the spoliation of significant amounts of information (see ECF #664 and #665 describing the *known* items spoliated) to determine with certainty how much time was saved. Indeed, Defendants claim, "To perform such a quantification, Edge would have needed, among

4

other things, to assess the *extent* to which Defendants improperly accessed and copied from the InfoDeli Software Platforms rather than simply assuming, as Edge did, that the Defendants' alleged acts were such that they allowed Defendants to 'gain speed' and 'move quickly' in developing replacement software." ECF #644 at p. 3 (emphasis in original). The spoliated Trello files, databases and project managers' hard drives contained critical information needed to assess the *extent* of Defendants' improper accesses, copying and other actions that violated Plaintiffs' rights. Plaintiffs are clearly prejudiced by this spoliation as highlighted by Defendants' argument to exclude Mr. Edge.

Moreover, common sense indicates that having a known solution that works, being able to reference that solution and having use of the misappropriated Curated Content would save time. Mr. Edge's opinion may not even be "expert" in that sense, but just opinion testimony guided by Rule 701. In any event, with over thirty-five years of experience in computer science, Mr. Edge is certainly qualified to render his opinion. Further, Mr. Edge has provided estimates on the amount of time he would expect it to take to build the software from scratch whether in a clean room or not, because the contractor-hours estimated for the clean room portion of his opinion, *i.e.*, the functional specification, can simply be subtracted from his estimate to determine the estimate without a clean room. As a rough estimate of the time needed, the jury can simply subtract the hours spent by Engage as documented in Harvest (assuming the Harvest hours were not materially altered or spoliated) from the hours that they decide it would take to build the replacement software. Thus, Defendants' "not helpful" argument is meritless.

**D. Mr. Edge does not need Extensive Experience with Clean Rooms for his Opinion**

Defendants also contend that Mr. Edge lacks the qualifications to estimate the number of contractor-hours needed to build replacement software. ECF #644 at p. 6. Without citation, Defendants incorrectly claim that Mr. Edge "admittedly has no expertise with the InfoDeli Software Platform or the 'clean room' method he uses to estimate the amount of time it would

5

take another developer to create an equivalent software solution." *Id*. Defendants ignore the fact that Mr. Edge's opinion relies upon the unchallenged opinions of Jason Eaddy. Ex. 2 at p. 16, n.4 citing to ¶ 63 of the December 23, 2016 Eaddy report on use of a clean room. Second, Mr. Edge has clean room experience in software development and an excellent understanding of the process. Ex. 1 at pp. 47:1-9, 54:8-25-56:1-2, 58:4-25-59:1-17, 62:20-25-63:1-12, 66:13-25-68:1-11, 75:15-25-76:1 and 25 and 80:1-19. While Defendants claim a single clean room engagement is insufficient experience, Defendants do not cite authority or offer a factual foundation for their contention. One experience *is* sufficient to aid the jury and the extent of experience goes to the weight of the opinion, not its admissibility. *Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-cv-03770, 2015 U.S. Dist. LEXIS 147843 at \*20-23 (N.D. Ill. Nov. 1, 2015), *Ecimos, LLC v. Carrier Corp.*, Case No. 2:15-cv-2726-JPM-cgc, 2018 U.S. Dist. LEXIS 122059 \*8-9 (W.D. Tenn., May 20, 2018). Third, Mr. Edge studied the InfoDeli Software Platforms and accused software extensively. See Ex. 2 at pp. 5-9, 15-17 and 19-20 and exhibits B and C thereto.

Defendants also contend that Mr. Edge's opinion rests on the "faulty presumption" that Defendants were obligated to use a clean room in developing replacement software. ECF #644 at pp. 4-5. As to the argument that Defendants may not have to use a clean room, that remains to be seen and is a fact question for the jury. In *Ecimos, LLC v. Carrier Corp.*, Case No. 2:15-cv-2726-JPM-cgc, 2018 U.S. Dist. LEXIS 173063 \*24-27 (W.D. Tenn. Oct. 9, 2018), the Court granted a motion for a permanent injunction in a trade secrets/copyright case, holding that the defendant Carrier Corp. infringed the copyrighted database scripts of the plaintiff and its trade secrets, enjoined the use of the software, and appointed a special master to oversee Carrier's development of replacement software in a clean room. Exs. 3 and 4 (reports of special master on Carrier's implementation of clean room). Defendants incorrectly argue that Plaintiffs have presented no expert testimony or other relevant authority that Defendants were legally obligated to use a clean room (ECF #644 at p. 5); the *Ecimos* case is just such an authority.

6

After Defendants opted to take short cuts and violate the CFAA, the MCTA and the Terms of Use (Mr. Edge's opinion assumes liability and this brief does too), Defendants put themselves in the position where the only way that they can legally continue using software in their business is to implement a clean room and redevelop their software. Plaintiffs seek a permanent injunction in this case and if it is granted, we expect that the Court will appoint a special master to oversee the Defendants' implementation of clean room processes to redevelop their software. Thus, Defendants' claims of not having to use a clean room are unfounded. Moreover, if Defendants had used a clean room, they would have had an absolute defense to the claims in this case. However, the crisis that Defendants placed themselves in by ending their relationship with Breht Burri and InfoDeli did not allow sufficient time for a clean room so the Defendants opted to press forward and hope Plaintiffs could not bring suit.

### E. Mr. Edge's Methodology of Time Estimation is Both Reliable and Accurate

Without citation to legal authority showing that Mr. Edge's methodology constitutes "junk science", Defendants claim that Mr. Edge's opinion is not based upon sufficient facts or data, is not the product of reliable principles and methods that are reliably applied to the facts of the case. Defendants' shotgun attack on Mr. Edge is meritless and contrary to long-established precedent. In support of their shotgun attack, Defendants cite to *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007). *Shuck* is not a software or computer programming case – it dealt with a fire and the qualifications of the fire causation and mechanical experts to testify.

In fact, the methodologies that Mr. Edge employed are well-known and have been employed by United States military since at least the 1980s. For example, in *Northrup Grumman Corp. v. U.S.*, 47 Fed. Cl. 20 *37, 2000 U.S. Claims LEXIS 125 **3-4 (Ct.Cl. 2000), the Government prepared a software baseline estimate that estimated new lines of code to be developed by the contractor at 52,200 to 121,200, and the total lines of code would be 182,000 to 240,000. The difference between the two estimates? The existing code that could be reused. In

7

generating the LOC estimate, Joseph Cotellessa, Grumman's Manager of the Battle Management Subsystem for ATACC, used the computer model called COCOMO (the Constructive Cost Model). ***COCOMO is described as "a widely accepted estimating tool"***. *Id*. at *27, **5-6. Mr. Edge verified his estimates using the updated COCOMO II as a reality check. Ex. 2 at pp. 63-65.

In *DynaLantic Corp. v. U.S.*, No. 91-1162, 1991 U.S. App. LEXIS 21110 * (Fed. Cir. September 10, 1991)[1], bidders on a contract estimated that they could program anywhere from 3-12 lines of code per day. The Government approved 3 lines of code per day as the standard. DynaLantic sued, and proved at trial that 3 lines of code had never been used as a standard and this "established" standard was created by individuals with no expertise. *Id*. at *5-7. DynaLantic's computer experts testified that an acceptable and reasonable range of software development and production of computer software of the complexity in that contract was 3.8-15 LOC/day. *Id*. at *7. (The lower the number of lines of code per day, the longer it takes to write the program and the more expensive it is to create it.) Mr. Edge used a *generous* 25 lines of code per day as his standard for his estimate, showing the conservative nature of his opinions.

In *In re Unimet Corp.*, 74 B.R. 156, *162; 1987 Bankr. LEXIS 781, **18-19 (N.D. Oh. Feb. 25, 1987), the litigants were valuing software. One expert opined that 4 LOC/day for a program of similar complexity was proper (*id.*); the other expert opined that 150-200 LOC/month (7.5-10 LOC/day assuming 20 work days/month) was appropriate. *Id*. at *163, **22. In *U.S. v. Ameri*, 412 F.3d 893, 900 (8th Cir. 2005), the Eighth Circuit approved testimony from an employee of a contractor opining that the fair market value of a copy of a software program was over $1,000,000. The defendant challenged the valuation and the Eighth Circuit upheld it because (a) there was a contract that placed the value of the software substantially above the figure adopted by the court, (b) the contractor's employees testified as to their

---

[1] This case is unpublished and considered not precedent. The Plaintiffs cite to it for the factual events therein, not as legal precedent.

estimates of development costs and their estimates of the value of a single copy of the software in light of the development costs and a contract with the state of Arkansas. "The software professionals in the present case * * * testified as to the market for a specialty product that was the subject of a recent transaction." *Id*. at 900. Obviously, the Defendants' motions *in limine* go way too far as to what *Daubert* requires for admissible testimony on software valuations.

Defendants also attack Mr. Edge's experience, which is clearly uncalled for. ECF #644 at p. 9. Mr. Edge is highly educated, graduating *cum laude* with a dual degree in Electrical Engineering and Computer Science from Princeton University in 1987. Ex. 2, exhibit A thereto. Mr. Edge's experience is excellent - he has worked at several companies as a programmer, as vice-president of production, as a business manager and an owner before coming to Aon in 2011. *Id.* Mr. Edge prepared numerous competitive proposals for software jobs over the course of his career. Ex. 1 at p. 86:5-12. He prepared his estimate in this case as a conservative bid just as he would in the real world – a fact that Defendants do not challenge. *Id*. at p. 273:11-25.

**F. Mr. Edge's Opinion Gave Defendants Every Benefit of the Doubt**

In Mr. Edge's original and rebuttal reports, he explained how he filtered numerous aspects of the project to arrive at his contractor-hours estimate. First, he removed all code that was unrelated to core functionality ("Scaffolding Code"). Ex. 5 at p. 8. Edge always assumed that any new solution would include a large proportion of "off-the-shelf" code and did not include any such code in his estimate. *Id*. at 9. When determining how many LOC were needed, he had two working solutions to choose from – the Plaintiffs' and the Defendants'. He chose the Plaintiffs' solutions, because it had the smaller code base. *Id.* He also filtered out all of the "backend" code because it was in FileMaker and the graphics for the websites. Ex. 5 at pp. 159-160 and 162-165. Edge filtered out everything but actual, necessary code written by a human.

Mr. Edge also explained why Dr. Kursh's criticisms of his estimates using LOC/day are flawed. *Id.* at pp. 11-14. In fact, it looks like Dr. Kursh simply did a Google search on "lines of

code per day" and then cited the negative hits.  See Ex. 5 at p. 14 (Dr. Kursh's citation to a "wiki" article, along with Kursh ignoring the positive commentary on LOC/day analysis.)

Moreover, Defendants wrongly criticize Mr. Edge for allegedly having no experience in Lasso (ECF #644 at p. 9) (pretending he needs experience in Lasso to render his opinions), but they ignore Mr. Edge's testimony that Lasso is virtually identical to PHP (Defendants did not ask Mr. Edge how much experience he has with PHP). Ex. 1 at p. 147: 3-11 ("Lasso is essentially PHP…. And PHP and Lasso are virtually the same thing."). Regardless, Mr. Edge does not need experience in Lasso to estimate the amount of effort it takes to recreate the software without the benefit of the Curated Content, scraped code and viewing Plaintiffs' software.  He can base his solution off the LOC in the working solutions and use his 35 years of experience. *Caterpillar, Inc.*, 2015 U.S.Dist. LEXIS at *32-34 (testability is not a necessary characteristic of an experienced expert's methodology because the *Daubert* factors are nonexhaustive, even for the admission of scientific expert testimony).  Edge's estimates were validated by COCOMO II and the Defendants' claims that Mr. Edge's opinions are "finger-in-the-wind" ignore his two extensive reports (Exs. 2 and 5), supporting documentation and COCOMO II reality check.

### III. Conclusion

Defendants' *Daubert* motion is well-written but factually meritless.  It does articulate the correct legal standards for a *Daubert* motion, but fails to cite to analogous case law to support their exclusionary arguments. Admissibility is the general rule – not exclusion. As shown by the Plaintiffs' legal citations to cases involving estimates of the amount of effort needed to build software costing millions of dollars for the military, use of LOC/day is a long-established, tried and true methodology, which Mr. Edge appropriately applied. Moreover, his estimates of contractor-months matched up nicely with the results of COCOMO II. Defendants' motion should be denied in its entirety. Should the Court have any doubt on the admissibility of Dr. Levy's Opinions or Mr. Edge's, Plaintiffs request that the Court hold a *Daubert* hearing.

10

11

Respectfully submitted,

CAREY, DANIS & LOWE

By: \_\_\_\_/s/ Paul A. Maddock
    Jeffrey J. Lowe
    Paul A. Maddock
    Of Counsel
    8235 Forsyth Blvd., Ste. 1100
    St. Louis, MO 63105
    Telephone: 314-678-1205
    Facsimile: 314-339-8393
    pmaddock@careydanis.com

WILLIAMS DIRKS DAMERON LLC

    Eric L. Dirks, MO State Bar No. 54921
    Email: dirks@williamsdirks.com
    1100 Main Street, Suite 2600
    Kansas City, Missouri 64105
    Telephone: 816/876-2600
    Facsimile: 816/221-8763

CALDWELL LAW FIRM, P.C.
    Kenneth N. Caldwell,
    1201 NW Briarcliff Pkwy, 2nd Floor
    Kansas City, MO 64116
    Telephone: (816) 673-7655

 LAW OFFICE OF JOSEPH K. EISCHENS, LLC
    Joseph K. Eischens
    8013 Park Ridge Drive
    Parkville, MO 64152
    Telephone: 816-945-6393

ATTORNEYS FOR THE PLAINTIFFS
BREHT C. BURRI and INFODELI, LLC

12

**CERTIFICATE OF SERVICE**

   I hereby certify that on May 31, 2019, a true and correct copy of the foregoing was served on opposing counsel via the CM/ECF system and by email if sent to the Clerk.

Mr. Sean Colligan
Stinson Leonard Street LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
sean.colligan@stinsonleonard.com
Counsel for CEVA and Mr. Fairchild

Mr. Peter Knops
14617 Pawnee St.
Leawood, KS
pknop55@gmail.com
Counsel for Engage Mobile, certain Engage Mobile employees, certain ex-employees and certain Engage Mobile contractors.

| | |
|---|---|
| Mr. Daniel E. Blegen | Mr. Nicholas B. Clifford |
| German, May PC | Tucker Ellis, LLP |
| 1201 Walnut Street, Suite 2000 64106 | 100 South Fourth Street, Suite 600Kansas City, MO |
| Dan@germanmay.com | St. Louis, MO 63102 |
| | Nicholas.Clifford@tuckerellis.com |

     /s/ Paul A. Maddock
     Paul A. Maddock

13