IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

CIVIL ACTION NO. 4:15-cv-003564-BCW

```
* * * * * * * * * * * * * * * * * * *
INFODELI, LLC, ET AL.,                     :
              PLAINTIFFS                    :
                                           :
 v.                                        :
                                           :
WESTERN ROBIDOUX, INC., ET AL.,            :
              DEFENDANTS                    :
* * * * * * * * * * * * * * * * * * *
```

DEPOSITION OF MICHAEL EDGE, a witness called on behalf of the Defendants and Counterclaim Plaintiffs, Western Robidoux, et al., pursuant to the provisions of the Federal Rules of Civil Procedure, before Lisa McDonald, (CSR #130093), a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Ropes & Gray, LLP, Prudential Tower, 800 Boylston Street, 48th floor, Boston, Massachusetts 02199-8004, on Tuesday, April 9, 2019, commencing at 9:33 a.m.

Page 2

APPEARANCES:

CAREY DANIS & LOWE
8235 Forsyth Boulevard, Suite 1100
St. Louis, Missouri  63105
BY:  James J. Rosemergy, Esquire
     jrosemergy@careydanis.com
     800.721.2519
     314.678.1064
          Attorneys for the Plaintiff


GERMAN MAY, P.C.
1201 Walnut Street, 20th Floor
Kansas City, Missouri  64106
BY:  Daniel E. Blegen, Esquire
     danb@germanmay.com
     816.471.7700
          Attorneys for the Defendants and
Counterclaim Plaintiffs, Western Robidoux, Inc.,
Peter E.Burri, Brian P. Burri, Cindy Burri, and
Connie S. Burri

STINSON LEONARD STREET
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
BY:  Sean W. Colligan, Esquire
     sean.colligan@stinson.com
     816.842.8600
          Attorneys for the Defendant,
Ceva Animal Health, LLC


TUCKER ELLIS, LLP
100 South 4th Street, Suite 600
St. Louis, Missouri  63102
BY:  Nicholas B. Clifford, Jr., Esquire
     nicholas.clifford@tuckerellis.com
     314.571.4962
          Attorney for the Defendant,
Boehringer Ingleheim VetMedica

Page 3

APPEARANCES CONTINUED:

HOVEY WILLIAMS, LLP
435 Nichols Road
Kansas City, Missouri 64112
BY:  Peter C. Knops, Esquire
     pknops55@gmail.com
     816.668.8376
          Attorney for the Defendants,
Engage Mobile Solutions, certain Engage Mobile
employees, certain ex-employees and certain
Engage Mobile contractors

Page 4

                I N D E X

WITNESS      DIRECT   CROSS   REDIRECT   RECROSS

MICHAEL EDGE

BY MR. BLEGEN   5

BY MR. CLIFFORD         223

BY MR. COLLIGAN        267

BY MR. KNOPS           274


              E X H I B I T S

No.        Description                      Page

Exhibit 625   Notice of Deposition Duces Tecum    10

Exhibit 626  -- Hard Drive -- (withdrawn) --      21

Exhibit 627   7/30/15 Engagement letter with      23
              Elysium

Exhibit 628   Michael Edge's Time Record          23

* EXHIBITS GIVEN TO REPORTER TO APPEND TO TRANSCRIPT *

Page 5

              P R O C E E D I N G S
                  MICHAEL EDGE
    A witness called for examination, having been
    duly sworn, testified as follows:
              DIRECT EXAMINATION
BY MR. BLEGEN:
Q   Morning, Mr. Edge.
A   Good morning.
Q   Have you ever had your deposition taken before?
A   I have not.
Q   Okay.  I wondered because I saw your CV and you've
    testified a few times but never by deposition.
A   That is correct.
Q   All right.  Well, you may have been given kind of
    a primer, but just to make sure we're on the same
    page, I'm going to ask you a series of questions.
    Some of the gentlemen to my left may ask you
    questions after I'm done.  It's possible Mr.
    Rosemergy may ask questions when we're all done.
        Your job is to answer the questions.  The
    court reporter's job is to take them down.  To
    make her life easier, I will try very hard to not
    start asking a question while you're still
    answering one.  I'd ask that you try not to start
    answering before I'm done asking.  That way the

Page 6

transcript is clean and easy. Do you understand that?

A Yes, I do.

Q Okay. Answers need to be verbal. Nods, shakes, uh uhs, uh huhs don't show up on the transcript. Okay?

A Understood.

Q Okay. And if I correct you on that, I'm not being mean. I just want to make sure the transcript is clean. Okay?

A Understood.

Q Great. If -- this is going to be on some technical topics. We may miss each other on terminology. I may use terminology you're not familiar with. I may misuse terminology you are familiar with. If at any point in time you're not sure what I'm asking, just let me know. Okay?

A Understood.

Q And if you don't, and you just answer the question, we're all going to have to assume later that you heard and understood the question, and your answer was intended to be responsive. Okay?

A Understood.

Q Great. Is there any reason today why you might have difficulty answering questions; you on any

Page 7

medication, have a cold?

A I have a cold, but I believe I can perform properly at deposition.

Q Okay. Great. I'm going to hand you -- this is a copy of what we were provided on your expert disclosure with attachments, Exhibits A, B and C. I'm just going to hand it to you in case you want to refer to it throughout the day. I may refer to it throughout the day.
     In there, you cite various reports of Jason Eaddy. Do you recall that?

A I do.

Q Okay. If, at any point in time, you want to look at those reports to help you answer a question, I have copies of those you can look at too, okay?

A Excellent.

Q I'm just not going to junk up the table by pulling them all out.
     A couple of questions on your CV, which is Exhibit A. Some of the various pieces I think are pretty obvious, but what is Ledge Multimedia?

A That was a consulting company I started in the early '90s. We provided consulting software services for multimedia development primarily, and we developed applications.

Page 8

Q So was it actually programming?

A It was programming and content development.

Q Okay.
     Go ahead.

A That is accurate, programming and content development.

Q Okay. And Dataware Technologies, what's Dataware Technologies?

A Dataware Technologies was a database company which purchased Ledge, and we built a division for providing multimedia-based services for their clients, and continued developing applications similar to what we had developed before.

Q Now, in this time period here in the '90s, is that -- was this early internet stuff or was this pre-internet stuff?

A This is both. CD-ROM, internet. I imagine there were other applications, but primarily those two.

Q Okay. And Synthespia?

A Synthespia was a startup in San Francisco where we provided -- it was a bit of a moving target. The original intent was to develop systems with synthetic actors essentially, and the idea was to do applications and communication pieces for businesses, and the primary goal was to use

Page 9

information they had about their clients.
     CRM had just become very common back then. So the idea was, like, we could do targeted messaging using information clients had on their customers, using a CRM system with our application.
     In practice what happened is, we never actually did actors, and we would develop messaging campaigns and websites and pieces that combined different elements based on information we had from a database on their customers.

Q Okay. And then you moved on from there to Simply Sold Carolina. What is that?

A That was an eBay drop shop. I had moved to South Carolina. My mother had passed away and I wanted to be near my father, and there is not a lot of high tech in South Carolina. So for a few years, I was running a business to help other people sell things on eBay.

Q Okay. Was that in the programming world or is that --

A I did a little development, but it was essentially just a services business.

Q Okay. And then Elysium Digital, is that a company you joined or is that a company you started?

Page 10

A   That's a company I joined.  So I'm --
Q   Go ahead.
A   I joined in I believe 2011.
Q   Yeah.  And is that -- did you join in the Carolinas or did you join here in Boston?
A   That was here in Boston.
Q   And then they were acquired by Stroz, and Stroz has been now acquired by AON, right?
A   That is correct.
Q   Going to hand you Exhibit 625.
        (Document marked Exhibit 625 for
         identification.)
Q   625 is a Notice to Take Deposition Duces Tecum of you, correct?
A   Correct.
Q   Have you seen this before?
A   Yes.
Q   Okay.  Now, this deposition notice has eleven items in Exhibit A that we asked you to bring with you today, right?
A   Correct.
Q   And you've brought a hard drive with you, right?
A   Yes.
Q   I understand there's been objections asserted last evening to the scope of this.  Did you refer to

Page 11

the 11 items here when you were gathering information to provide today?
        MR. ROSEMERGY:  I don't have an objection, but I do want to caution you to not disclose any communications that you've had with counsel as you're answering these questions about the deposition notice, but you can go ahead.
A   Understood.
        I did refer to this document when collecting materials.
Q   Okay.  Are there any items on Exhibit A to Exhibit 625 that you skipped over and didn't bother to provide?
A   Yes.
Q   Which items did you choose not to provide?
        MR. ROSEMERGY:  Objection to the form.  You can respond.
A   I did not include emails, and I did not include notes.
Q   Okay.  Do you have emails?
A   I have emails.
Q   Do you have emails that are not with counsel?
A   I have emails that are not with counsel.
Q   And who did you email about your expert opinion in this case other than counsel?

Page 12

A   I emailed Breht Burri under counsel's direction, with counsel cc'd.  I emailed Christopher Rucinski, who is a team member, and Julio Amodeo, who is a team member.  And I have emailed Jessica Carlson, not about specifics of the case, but about going to deposition, and case meta things rather than case specific things.
Q   And who is Jessica Carlson?
A   Oh, sorry, she's -- I'm actually not certain of her title.  She is one of the two people in charge of our division at this point.
Q   So she's with AON?
A   She's with AON.  Sorry.  She is my boss's boss at AON.
Q   And Christopher Rucinski?
A   Yes.
Q   How do you spell Rucinski?
A   R U C I N S K I, I believe.
Q   That's better than I was getting.
        And the other name, Julio?
A   Julio Amodeo.
Q   How do you spell Amodeo?
A   A M O D E O, I believe.
Q   And you said Christopher and Julio were team members?

Page 13

A   Yes.
Q   Did they do work at your direction?
A   Yes, they did.
Q   And they provide you the results of their work?
A   Yes.
Q   And did you rely upon the work they did in forming your opinions in this case?
A   Their work was -- at my direction was part of how I developed my opinions.  Yes.
Q   Okay.  And what work did Christopher Rucinski do at your direction?
A   Primarily, document lookup.  I came onto the case later, so he would know where documents were or documents that related to a particular subject.
Q   And had Christopher Rucinski been supporting Eaddy?
A   I believe so.  I don't know details.
Q   So he was in the case before you were in the case.
A   Yes.  Yes.
Q   And Julio Amodeo, what did Julio do for you?
A   Similar work.  He would also help me run scripts and, when looking at code, but primarily document lookup.
Q   When you say "document lookup," what do you mean?  What kind of documents?

Page 14

A    I might say: Oh, well, I'm trying to remember which document dealt with Vectra Rebate when they specified something. So I would give some description of the document I was looking for, and they could usually say: Oh, here it is, or here is the directory where you should look.

As you know, it's -- there is a lot of data in the case.

Q    That is true. What about Breht Burri, what did you and Breht Burri email about?

MR. ROSEMERGY: I'm going to object and instruct him not answer. It was at the direction of counsel in preparation of his report.

Q    Are you going to -- I would assume if he instructs you not to answer, you're not going to answer?

A    I will obey my lawyer, or I will obey counsel.

Q    Did you receive any information from Breht Burri that you relied upon in preparing your report or forming your opinions?

A    Yes.

Q    What information did you receive from Breht Burri that you relied upon in forming your opinions?

A    Essentially, the history of the case where he described the sequence of events that happened, what he believed were materials that may have

Page 15

been -- that were accessed that he thought had value.

So I gained an insight into the structure of the InfoDeli software platforms and insight into aspects of the database, and the, what I use the phrase "curated content," the content on the site. So he provided a quite -- a range of information on the workings of the InfoDeli software platform.

Q    And you relied upon what Breht Burri told you about those topics?

A    Yes. I often -- there would be corroborating evidence in other areas, but he would -- my first introduction to much of the system came from him. There was a call early on in December.

Q    So you were first involved in this case in December of 2018?

A    Yeah. I think the first call I got was last day of November of 2018, and then I began being actively involved with the case in early December.

Q    Okay. And what were you asked to do when you first were involved in the case?

A    I was asked to determine whether the defendants might have gained abilities to develop replacements for the InfoDeli sites more quickly by having access to materials, and then I was

Page 16

asked to opine on, if they hadn't had access to those materials, what sort of effort would be required to make a competing or replacement solution that did not violate any intellectual property or content of the plaintiffs.

Q    Okay. Now, getting back to your communications with Breht Burri, did you independently verify what he told you about what materials had been accessed?

MR. ROSEMERGY: Before you respond, I'm okay with the line of questioning with respect to strictly factual information that he provided to you. I just want to caution you, as you move forward, to not get into anything having to do with communications with counsel, but you can proceed.

A    Understood. I did not take anything that Breht Burri said on face value. Most -- while he was my initial introduction to the case, much of my understanding of the details came from the reports of Jason Eaddy.

Q    Did you independently verify what you saw in the Eaddy reports that you were going to reply upon for your opinion?

A    I looked at materials and I looked at databases.

Page 17

Everything I saw was consistent, but I was not tasked with and did not attempt to verify the Eaddy reports.

Q    As part of that, did you review the Eaddy deposition?

A    Yes.

Q    Did you review the motions, or order on the motions to exclude Eaddy as an expert?

A    I believe I glanced at those. I do not recall them in depth.

Q    Did you review the order to evaluate whether you could rely upon whatever you were relying upon in the Eaddy report?

A    I was directed that I could rely upon the Eaddy report. I understand that his report was excluded, forgive me if that's the wrong phrase, initially.

Q    Was there more?

A    My understanding is that was for legal reasons, not technical reasons. But that's -- that is not -- I am not a lawyer.

Q    Okay. Now, some of this information that you got from Breht Burri, was some -- was some of the information you got from Breht Burri in emails he sent to you?

A   Yes.

Q   Okay.

A   To the best -- 90 percent sure.

Q   Okay.  And are these emails on the hard drive you brought?

A   They are not.

Q   But you relied upon them for at least assistance in forming your opinion?

A   Yes, I did.

Q   Okay.  Now I want to include email communications you may have had with counsel.  Putting aside logistics types things, did you receive information from any of the lawyers in the case that you used or relied upon in forming your opinions or preparing your report?

       MR. ROSEMERGY:  And again, we're talking here strictly about, you know, factual information, not opinions or --

A   Certainly.

Q   I disagree with that.  If you relied upon -- and I don't care whether it's a fact or an opinion or legal argument.  If you relied upon them, I want to know about it.

A   I received emails, primarily attachments of documents that I already had but, you know, these

would typically be follow-up discussions of:  Oh, if you want to know about X, here is a document that you should look at.

Q   Were those in response to questions that you asked:  I want to know about X, or were these --

A   It could have been -- I'm certain there were times when it was in response to a specific question.  Often it would be follow-up after a phone call or other dialogue.

       And I expect there were some that were just like:  Oh, look at this, but --

Q   So if I'm understanding you correctly, some of these emails from counsel were in response to -- were in reaction to conversations you were having.  Some of them were volunteered to you outside of a conversation you were having, right?

A   I believe so.

Q   And did you rely upon the emails and what you received from counsel?

       MR. ROSEMERGY:  Objection to the form of the question, but you can respond.

A   I imagine there were documents that were sent to me that I relied upon.  Again, all of those documents I already had, so yes, I believe, is the clearest answer.

Q   Okay.  And are any of those emails on this hard drive you brought?

A   No.

Q   Are those emails readily available to you on your computer?

A   To the best of my knowledge.

Q   Are the emails from Breht readily available to you on your computer?

A   To the best of my knowledge.  Qualifier: As part of all these acquisitions, our email system has migrated a few times.  I believe I have all my old emails, but I cannot guarantee that -- whenever there is a migration, there is always some chance, but to the best of my knowledge, I should have all of these emails.

Q   Okay.  And you could have gathered them and put them on the hard drive when you were putting everything else on the hard drive.

       MR. ROSEMERGY:  Objection to form.  You can respond.

A   Yes.

Q   Speaking of which, why don't you hand me that hard drive.

       All right.  And you've handed me a Seagate hard drive with an evidence sticker for case

number 2436-0001.  Is that this case, at least as far as Stroz Friedberg is concerned?

A   To be honest, I'm not certain.

Q   Did you fill out the case client and client matter?

A   No.  Julio Amodeo copied the materials at my direction and made the hard drive.  I added the "Highly Confidential Attorneys Eyes Only" disclaimer.

       (Hard drive marked Exhibit 626 for identification.)

Q   Okay.  I'm going to put an Exhibit sticker on that.  That's Exhibit 626.  Do you see that?

A   Yes.

Q   Will you confirm for me that Exhibit 626 is the hard drive of materials you brought to the deposition today?

A   Yes.  These were copied last night, so I haven't gone through this hard drive.  I gave a list of what should be put on here.  I didn't have time this morning to verify everything is on there.  I expect that there is, but I have not -- I did not have time to go through the hard drive.

Q   Okay.

A   If there's anything that we missed -- and this

Page 22

hard drive is encrypted, and here is the password and the name of the encryption program, and normally, you don't keep those together, obviously. And here is the cable for the hard drive and the antistatic bag.

Q All right.

A I'm a techy.

Q All kinds of stuff for the hard drive.

A I also brought some paper materials.

Q Okay.

A Sorry, should I speak with counsel for a moment or --

Q Do you need to?

MR. ROSEMERGY: Well, there's no question pending, so.

Q I mean, if you have a privilege question, that's fine. If you brought documents that you believe are responsive to our request, then --

A These are documents responsive to the request that weren't on the hard drive.

Q Okay. Well, then why don't you --

MR. ROSEMERGY: Can I take a quick look at this first?

MR. BLEGEN: Sure.

MR. ROSEMERGY: I think I know what this is.

Page 23

I just wasn't sure.

Q I believe this is two documents, right?

A That is correct.

Q You stepped on me.

A Sorry. My apologies.

Q That's all right. We'll get used to it.

Okay. Then I am going to -- and we'll paperclip these later, but I am going to mark Exhibit 627 and ask you to identify what that is.

(Document marked Exhibit 627 for identification.)

A This is the engagement agreement, to the best of my knowledge, between Elysium and Carey Danis. This was from many years before I was involved in the case, but there was not a new engagement agreement for when I became involved.

Q You just became part of the existing?

A I became part of the existing team.

(Document marked Exhibit 628 for identification.)

Q Now I'm going to hand you Exhibit 628 and ask if you can identify that.

A These are an output of the hours I've tracked for this case through I believe Friday. And the only caveat is, this didn't come from AR, so this was a

Page 24

printout I did. I believe it is accurate, but this is not reflective of what was actually sent to the client. This was from -- I don't have privileges for high accounting, but I was able to get my hours. So to the best of my knowledge, those are accurate hours of what I've spent on the case to date.

Q Okay. So -- and is this document, Exhibit 628, is this something that you just maintain on your person?

A No. That's actually an output. We have a time tracking system that we put hours into, and that's an export from that system, but I don't have the administrative rights to do an official output. So I was able to get an output from -- of my hours. I copied and pasted into Excel. So that's why I have the disclaimer: This was not an official output from AR. That would take days to get, and I wanted to be able to bring something to deposition.

Q But as far as you understand how the system works, these are the hours that you personally billed on this matter.

A Yes. It wouldn't reflect if there were any changes done later for whatever reason.

Page 25

Q Sure. If someone in accounting or finance.

A Sure. So, if for example, if sometimes some hours are written down as a courtesy, that would not appear on here. This I believe is the most accurate reflection of my effort, not necessarily the most accurate reflection of what the final bill is.

Q Got it. Before we dive into your report, I want to talk about some general principles.

Are you familiar with the acronym COTS?

A I am normally familiar with the acronym COTS, and I am now blanking. I apologize.

Q Does commercial off-the-shelf sound familiar?

A Yes, sorry, commercial off-the-shell software is -- I normally think of it as off-the-shelf software.

Q And what is commercial off-the-shelf software, in your understanding?

A Commercial off-the-shelf software, it can mean -- it can typically mean two things; one is, actual software that you buy, say Microsoft Word, et cetera. So it's a completed application aimed at the users. It is often used also to explain a package you might buy in order to implement, if you want to think of it as an instance.

Page 26

So for instance, you might buy a software package to allow you to build a website, and if it's a complete solution where you should do little to no programming, you would consider that a commercial off-the-shelf package.

Q  Would that be, for example, the first option, as you said, is like Microsoft Word?

A  Certainly.

Q  And the second option is like Microsoft 365, which is web based.

A  Yes.  Or there are many, many platforms.

Q  What about SAAS, does that acronym mean anything to you?

A  It does.  Again, I apologize, I am blanking on -- that's not software -- is that software as a service, or is that another one?

Q  That's my understanding, software as a service.

A  Yes.  Sorry, I'm -- I apologize for being nervous. I often again think of that as just SAS, software as a service.  So software as a service is when instead of selling, that often the software is hosted on a system and you're gaining access to it, and there may be maintenance going on, et cetera, but the idea is, instead of having just bought a package, you're getting continuing use of

Page 27

the software that is live that you may use in many different ways, either integrating or as a solution to needs you have.

Q  Okay.  Can you give me just an example of something that the jury might be familiar with?

A  Oh, actually, if you are using a website for doing tax returns, given the time of year, that could be considered software as a service.

Q  So Turbo Tax.

A  Turbo Tax.  If you do Turbo Tax off a website, as opposed to having bought the CD ROM, you would argue the one off the website is software as a service.  The CD ROM was a consumer product. Arguably.

Q  Okay.  What about open source, what is open source?

A  Open source is when you have access to the actual source code.  So you might -- so most famous is probably Linux where you get a software package that runs, typically, but most importantly, you get the source code so you can make changes.

Q  And Magento would be considered open source?

A  Magento, to the best of my knowledge, is open source.

Q  So you could access it and you could run it, or

Page 28

you could access it and you could modify it to do what you needed it to do?

A  That is correct.

Q  What is custom software?

A  Custom software is when you've taken something such as open source and you have customized it -- sorry for being repetitive -- where you have made additions or changes to meet the particular needs of your client.

So for instance, if you needed a version of Linux that ran on a new platform, you might customize Linux to run on that platform.  That's probably not the best example, but I believe the idea comes across.

Q  Now, would starting from scratch also be considered custom software, or in your view, is that another thing?

A  No, I would at least colloquially describe software from scratch as custom software.

Q  So custom software could either be made from scratch or made by modifying open source software.

A  Certainly.

Q  In the -- when someone needs a software solution, what factors go into whether they'd use a off-the-shelf software, or an open source

Page 29

software, or a custom software?

A  Oh, how large an answer do you want?

Q  As large as you think it needs to be.

A  Okay.  There are many factors.  Usually, the main reason for going with open source is that it will be easier later to make changes as opposed to using a custom -- an off-the-shelf package that's not open source.

The -- if there is -- again, some of this is a matter of personal preference.  Typically, if there is open source software that can be used as a basis for developing an application, the preference would be to take open source software, make modifications or additions to it, in order to meet your needs.

If there is not open source software that meets your needs at all, then it would make more sense to do a custom development, or if there was an off-the-shelf program that -- there is the possibility of doing a wrapper that -- for instance, you might have some -- an off-the-shelf software that does limited things, and then you would write a layer on top of it, even though you don't have access to its source code, to allow it to do more.

Page 30

So what I am trying to say is that software applications are often quite large; you may mix and match pieces. So for instance, you might say: Oh, well, we want this core and there is an open software package that works. We will use that as the core. There is some functionality that there is no open software package that meets it, and it would be expensive to write for scratch, but for just that one piece or pieces, we can buy some off-the-shelf software that meets that particular piece, and then the top layer combining all of these would typically be a custom application.

So was that relatively clear?

Q I think so. Is there anything else you want to add?

A No, I think that gives a good answer to that question.

Q All right. So there is a lot of different ways you could do it if you needed a software application.

A Yes.

Q And one of the issues on deciding that has to do with whether there is something readily available that -- right?

A Correct. When you can, you buy off-the-shelf or

Page 31

open software that meets your needs. Don't reinvent the wheel.

Q And that is in part because it's less expensive than starting from scratch, right?

A Less expensive and possibly higher quality. If it's a package that's been used for many years, it's been tested, the bugs have been found, so in general, you would tend to choose packages that have been around, or applications that have been around longer rather than shorter, expecting there to have been quality control over that time.

Q Is time a factor that you might consider in deciding which one of these to use?

A Yes.

Q And in that instance, open source, where you're starting from something that's already been done, the bugs have been worked out of it, is going to be a quicker answer in most instances, right?

A Yes.

Q This concept of writing a layer on top of OTS software, would that be like Microsoft SharePoint; you could take Microsoft SharePoint, and you could write an interface layer on top of it?

A That is accurate.

Q Microsoft SharePoint is not open source, so you

Page 32

couldn't change the code, right?

A To my knowledge, Microsoft code is not open source.

Q Are you familiar with the E-commerce software industry?

A Yes.

Q Have you worked in the E-commerce software industry?

A I have not.

Q Have you ever developed E-commerce software?

A Not to the best of my recollection.

Q Would you consider the InfoDeli software platform to be E-commerce?

A I do not.

Q And how is it different from E-commerce?

A It's not involving financial transactions.

Q Is there any other differences?

A It actually does quite a bit more than an E-commerce site in terms of -- I'm trying to think of the different platforms. There is the InfoDeli software platforms have a lot of knowledge about, business knowledge of what happens for getting rebates, for choosing marketing materials, et cetera. An E-commerce site tends to be: You've selected an item and you're paying for it. And

Page 33

much of the focus is on the financial transactions, credit cards, banking information, et cetera, taxes. So there is -- they are different animals, or different software applications.

Q Okay. Well, I want to put aside -- you understand there's two -- there's three pieces of software, but there is two different types of software at issue in this case, right?

A Could you clarify?

Q Sure. You've got the BIVI Literature Store, you've got the CEVA Literature Store, and you've got the CEVA Vectra Rebate site, right?

A Yes.

Q Okay. So there's three. But the BIVI and CEVA Literature Stores, while they have differences, are the same kind of thing. The Vectra is a different thing, right?

A I would agree with that at the top level.

Q Yeah. And I know there's a lot more detail we can get into, but --

A Yes, that's good.

Q -- just talking about the Literature Store side, would you consider those to be an E-commerce application?

(913) 385-2699                                    mail@aaacourtreporters.com
AAA COURT REPORTING
Case 4:15-cv-00364-BCW    Document 695-1    Filed 05/31/19    Page 9 of 99

Page 34

A   I do not.

Q   Okay.  And is it just because they don't have the financial transaction?

A   No.  The -- one of the benefits, if you are to use an E-commerce application, is that it's typically -- if you were to use an E-commerce solution such as Magento, that one of the main things it brings is that you would consider the value add is all of the information it has on billing, taxes, et cetera.

For the InfoDeli sites, it's really more of an information navigation site.  You are looking up products, you are getting materials, you may or may not have rights.  You may or may not have the ability to -- you might have limits on what you can select, but it's very different.  Like, if I go to Amazon, you know, it typically doesn't say, well, you can only buy three of these, unless they're out of stock.

The InfoDeli site, depending on who you are, there may be limits on how many materials you can order.  So there is a lot of business knowledge -- because it's not a transaction, it's not -- you're not making a purchase.  It's part of an ongoing agreement or relationship where you are receiving

Page 35

marketing materials.

It's -- I can understand how at first glance you say, Oh, it just looks like an E-commerce site.  It's -- it is different.

Q   And what is your experience with the InfoDeli software that you are using to base this -- that opinion on?

A   My reviews of the source code, different screenshots, information from deposition, information from the various expert reports.  So I believe I have -- it was not my goal to redesign or re-implement the InfoDeli site, but to have an idea of the scope and the scale to have a sense of what it takes to develop.

Q   Are you aware of anyone you would consider a competitor to InfoDeli in 2014?

A   No.

Q   As part of your review to kind of get your knowledge of the InfoDeli software, did you ever run the InfoDeli Literature Store?

A   I did not run the InfoDeli Literature Store.

Q   Did you ever do a sample transaction to see how it worked?

A   No.  Everything I did was based on examining the code and looking at the different expert reports

Page 36

and depositions.

Q   And why did you not run the InfoDeli software?

A   To be honest, I just didn't feel the need.

Q   You didn't think it was relevant to your analysis of the case, and your opinions, that you actually run the software and see how it works?

MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

A   I was examining the code and the documents, and felt I believed I understood the complexity, and didn't think of any unanswered questions when dealing with the scope of the project.

Q   Do you have any thoughts, opinions, on -- and let's talk about the 2014 time period.  Do you have any thoughts or opinions in that time period on what percentage of people who needed an E-commerce platform would build one from scratch versus using open source or using something else?

MR. ROSEMERGY:  Objection.  Outside the scope.

Q   Go ahead.

MR. ROSEMERGY:  You can respond.

A   I have no opinion.

Q   You used the phrase "software platform" in your report.  What in your mind makes software a

Page 37

platform?

A   So it can be many things.  It might be that you have the front end that's a website talking to a database, the fact that you're hosting it.  There might be other support services.  I believe in my report I have a bullet list of some of the things I describe.

Q   That you believe make it a -- well, let's make sure I understand your answer there.  You have bullet lists in your report of things that you believe are part of the software platform?

A   Of the -- there is a bullet list in my report of some of the specifics for this application, when I describe the InfoDeli software platform.  When I'm describing it generally, it's the combination of providing and maintaining the software, hosting, having it communicate with a database, or perhaps other services, and there may be back end work involved with providing software, with the software platform.

So that, I think the simplest way I would phrase it is that a software platform typically involves maintenance and support as opposed to a shrink-wrapped package.

Q   Okay.  Are you aware of the InfoDeli system being

Page 38

used by anyone other than the defendants in this case?

A   I am not.  Not to the best of my recollection.

Q   Do you agree that software tools and resources since 2013, 2014 have gotten more robust and powerful?

A   I don't know if I honestly believe that.  There have been some advances in software tools. Certainly, there's always something new coming out.  Often something that is new, you then find out there are problems.

So in general, I think there is value -- I may have misunderstood the question.  I believe there are continuing advances in technology, especially in software.  Often, the latest solution is not always the best, perhaps not always immediately obvious.

In general, you, for instance, if you were choosing a database, there might be a new database that claims to have many great qualities, and then you might find once you're using it, there are bugs and issues that other people had not yet discovered, whereas if you'd used an older database, even if they didn't have the new bells and whistles, it would have met your needs and you

Page 39

would not have had those challenges.

Did that answer your question?

Q   I'm thinking about your answer.

I guess there's two concepts there.  One is that just because it's new doesn't mean it's better, and that's true everywhere.

A   Yeah.

Q   And then there is the general concept of, over whether software tools and resources have gotten more robust and powerful since the InfoDeli software at issue was put together.

A   I would not challenge or disagree with that.  I don't know if I would opine on that.  If that makes sense.

Q   And why is it you may not opine on that?

A   It was not something I researched to the level that I would want to have in order to testify on that.

Q   Okay.  In your experience, how common is the InfoDeli architecture, including how it uses Lasso in the software?

MR. ROSEMERGY:  Objection to the form of the question, but you can respond.

A   So not -- I mean not uncommon.  I mean Lasso and FileMaker, I mean these are all tools that have

Page 40

been around.  I know many people who have used FileMaker, so it is custom, but it is not unusual. Certainly it's not -- I mean, I can't give you a definition or a percentage on what unusual would mean, but I was not surprised by the implementation.  It is a reasonable standard approach to development.

Q   I guess I'm trying to understand, because you say you weren't surprised by it.

A   I mean, it wasn't something like, you know, someone might have built a great system out of tinker toys, and I would be like, wow, that works, that's a great system, but I never would have expected that.

This is not unusual in that manner.

Q   Okay.  But I guess part of my question is, would this have been a common method for building such a piece of software in the 2010 to '13/'14 time period?

A   It might depend on your definition of "common," but I would say yes; maybe not 50 percent, but not an unusual way of developing.

Q   Do you have any estimate as to how many websites were using Lasso during this '13/'14 time period?

MR. ROSEMERGY:  Objection.  Scope.  You can

Page 41

respond.

A   I do not.

Q   Have you ever used Lasso to program?

A   I have not used Lasso.

Q   Okay.  What -- you have identified -- this is back to Exhibit A, if you want to look at it, but you have identified giving testimony in four matters.

A   Oh, yes.  Sorry, my -- when I think of testimony, I think of being actually at trial or arbitration.

I was -- I'll stop now.

Q   So anyway, on your CV, you've identified four instances where you've been retained and have given either written or verbal testimony, right?

A   That is correct.

Q   And are there any other that maybe, reaching back in history, just aren't on here, or is this it?

A   No, to the best of my recollection, this is all of the testimony I have performed.

Q   Okay.  And I just want to get a sense of the areas in which you were opining on these.  And I understand there could be confidential information, I don't want to get into that, but I do want to get an understanding of what the scope was and what the industry was.  So on this Gimme Vending versus VendSys, can you give me a little

Page 42

bit more detail about what that is?

A   Yes, it was mostly a contract dispute over an SDK, so, which is -- a software developer kit is best thought of as a small software package that has an interface that you might lease or license to incorporate into a larger application.
     One company had licensed an SDK from another, they had stopped using it, and then they had come out with something that looked very similar.  So there was some contention about whether or not there had been any misappropriation.
     The defendant had claimed that they never actually used it or incorporated it.  I showed that they had at least incorporated it into their source code and that, in fact, that the shipping product had libraries that included elements of the material.
     So this was software analysis looking through two code bases:  A, looking for similarities, but actually, also looking at libraries and binary files, decompiling them, and then showing that there was a link.
     So it was software and program analysis looking for misappropriation, arguably

Page 43

misappropriated materials.

Q   So in that case, you were actually comparing code base --

A   Yes.

Q   -- for looking for actual copyright infringement?

A   I can't remember if we claimed it was copyright, but I was looking for code that had been misappropriated.

Q   Okay.  Did you do any analysis in that case that you're doing in this case, any of the same kind of analysis?

A   Let me think a moment, just -- no.  I do not think they were similar in terms of the sorts of analysis I did.

Q   The Bartech case in 2016, 2017?

A   Yes.

Q   Tell me about that case.

A   That was essentially a bad leaver case; an employee of Bartech left and was coming out with a competing product, and developed in a very short timeframe.  We -- I went in, showed that there were files and code from the old system that were in the new system.  There had been changes, like names had been changed, the ordering had been changed, but I was able to show pretty

Page 44

conclusively that actual code had been taken.  And then we also went into -- pardon me, I'm blanking on the word.  When it's not copyright, but it's -- trade secrets, the trade secrets had also been appropriated.
     I don't believe we necessarily -- actually, I forget how much analysis we did on the trade secrets, but we also did trade secret.  I also did trade secret analysis.

Q   Did any of that analysis, did any of the types of analyses you performed in this case, did you perform in the Bartech case?

A   Again, this was a code analysis.  I don't believe they were the same.  I did not do a code compare in the current case.

Q   All right.  Now, the 2016 matter says: Confidential Arbitration.  Without telling me who the parties were, can you give me a little more detail as to what you did?

A   Sure.  It was a large dispute over a delivered software platform which I described as an enterprise software platform, and the plaintiffs were complaining about the quality, basically saying this system doesn't work, it's terrible.  They had lots of anecdotal evidence of why the

Page 45

system was terrible.
     I did a code review, but then more importantly, I got data on -- what had happened on the system was sort of refunds had been done with the previous system, as well as the current system, and showed by data analysis that the new system had roughly the same failure rate and issues as the old system.  So that the -- while some of the anecdotal stories may have been compelling in and of themselves, they were actually not representative of the overall performance of the system.

Q   In that matter, did you do any of the types of analyses you've done in this matter?

A   No.

Q   And then finally, the 2013 matter, Symantec Corporation versus Acronis, tell me about what you did in that case.

A   Oh, sorry, that was so long ago.
     It was a -- basically, I was essentially doing what we call code review, where the other side is providing the source code in escrow.  I went and was looking for examples of similar code and/or code that may have been copied -- may have been covered by patents, and so I was doing an

Page 46

abstract analysis of the code for the litigation.
So it was primarily a code analysis matter.

Q   Okay.  And did you do any of the types of analyses
you did in this case in the Acronis case?

A   Not to the best of my knowledge, but since that
was a little longer ago, I may not be remembering
all details.

Q   Now, if I remember right, you were asked to
determine whether, number one, whether the
defendants might have gotten the ability to
develop the replacement software more quickly, and
number two, if there was no access, how much time
would it take to develop it, right?

A   That is correct.

Q   Okay.  Have you ever testified as to those types
of analyses in any other matter?

A   I have not.

Q   Have you ever been retained as an expert on those
kinds of analyses in any other matter?

A   I have not.

Q   Have you ever done those kinds of analyses in any
other matter?

A   I -- yes.

Q   How many times have you done those kind of
analyses?

Page 47

A   Sorry, let me clarify.  I have been involved in
re-implementing sites that required content, et
cetera.  There is -- which is a little -- sorry, I
answered overly broadly to your question.
I have supervised one matter at AON which
was a clean room implementation where you were --
where we were implementing a new solution via the
methods I describe in my report, of having an
isolated team.

Q   Okay.  So your prior experience, prior to your
expert report in this case, is one instance in
which you implemented a clean room, which I think
you discuss in here and we'll get into, but
effectively, to show it can be done, right?

A   Yes.  But I may have misinterpreted your first
question.  I have done many cases where I've
ported a program and have done content development
either of existing programs or for a large program
that -- but that's a little different than
analysis.

Q   Can you back up and tell me, give me a little more
detail what you're talking about.

A   Sorry.  So as part of my experience as a software
developer, I have project managed, programmed,
supervised many projects.  Many of these projects

Page 48

involved re-implementing an application.  One
example is, there is the computer game Mist that
was originally written on an Apple Macintosh.  We
ported it to another platform called a compact
disc interactive player.  That involved rebuilding
the entire application in a new language.  It
involved going to the original source materials
for that application and reprocessing them so they
can work on the new platform.
I've done similar -- I'm trying to remember
the other ones I reference in here.  I had done a
port of a system called DOSE, Display Oriented
Structure Editor, from one system to another.  I'm
probably answering overly broadly.

Q   And I just want to make sure -- I think I'm
following here.  What you're talking about are
these porting and re-implementing, is you're
taking an existing application, and you're trying
to do the same thing in a different format,
different code, or something like that.

A   Yes.

Q   In any of these -- I think I may have covered this
but I'm going to ask just in case I haven't.  In
any of your prior experience, have you or any of
the developers you were managing ever used Lasso

Page 49

for any of these?

A   No.

Q   You talked about the difference between InfoDeli
and E-commerce.  Can you run through me what
specific features you believe InfoDeli had that
are not E-commerce features?

A   Well, number one is, you have to log in.  So with
an E-commerce site, you can often check out as a
guest.  It's not a controlled environment.
So InfoDeli, you have users, you log in, and
then each user has different rights, and there
is -- and we can go into more detail in my report
and to the report of Jason Eaddy, but there is
actually a lot of work in terms of what each sales
rep, reps can see, and what they have the rights
to access.  And that's fairly complicated because
there are thousands -- there is I believe
thousands-plus reps.
So that's a lot of data with a lot of
business nuances about what rights each person
has.  And that's all very different than what you
would see in an E-commerce site.

Q   Is there anything else that you see that is
specific features that InfoDeli had that other
E-commerce sites do not?

Page 50

A  Well, you're saying other E-commerce sites, and as
I've said, I don't believe InfoDeli is an
E-commerce site.

Q  And just to be clear, that's what I'm getting to.

A  Sure.

Q  You say it's not, and I'm asking you what features
InfoDeli has that you don't see in an E-commerce
site.

A  Understood.  There are various features in terms
of rights you can get to -- I'm sorry, I'm
blanking on the terminology.  The -- that it is
limited to what each user can see and select.  A
user has limits on how many items they can select
in a certain timeframe.  The users may get,
collect points and things to allow them to collect
other items.  Users might -- sorry, I'm just -- be
able to look for ancillary products, ancillary
materials.  Users are able to select and download
materials for free.
      I think I will pause there for the moment.

Q  Okay.  Is that all you can think of as we sit
here?

A  That's all I can think of as I sit here.

Q  Okay.  If the InfoDeli software had a problem and
Breht was not available to fix it, are you aware

Page 51

of anyone who could have fixed the software?

A  He had some people who were working with him.  At
this moment, I can't recall their names, so I
believe other members of InfoDeli could fix the
software, depending on the complexity.

Q  Okay.  And what about outside of people who worked
for Breht Burri?

A  I am certain you could find someone who could
learn and change -- so InfoDeli's system used
standard tools.  There should be many people who
could very quickly look at the system, figure out
how to repair it.  It's always going to take
longer if it's someone who hasn't seen it before.
      Did that answer your question?

Q  So what you're saying is, that it's possible you
could find someone who has the technical knowledge
to understand -- to find and fix a problem, but
they would need to dig in and learn the system?

A  If they had not worked with the system before,
yes.

Q  And isn't that an advantage of open source or
off-the-shelf software, that it's standardized
and...

A  Yes, with the caveat, depending on what
customization and what layers have been put on

Page 52

top, again, you would probably have to learn
those.  Not to be difficult, but just because
something is based on open source doesn't mean
that a random person can come in and repair it.
There might be elements of it that they could, but
if the problem dealt with the customization,
that's going to involve the same sort of learning
curve.

Q  And if the problem involved the open source, like
from in this instance, Magento, then someone
associated with Amazon is available to fix
anything that arises, right?

A  I don't know if I would go to Amazon to fix
Magento.  There are certainly Magento-specific
consultants who would help with Magento problems.

Q  If you were a customer of a software developer,
and there were limited options available for
support to fix problems, would that concern you as
the user?

A  Could you please restate the question?

Q  Sure.  If you were responsible, if you were the
company using a software platform, and there were
limited options available to you for support,
would that concern you as the person responsible
for managing that software?

Page 53

A  Yes.

Q  In your development experience, have you ever
developed a site that had a log-in required?

A  I've developed sites where the admins needed to
log-in.  I don't -- at this time, I do not recall
a site where users had to log-in.

Q  Okay.  Have you ever developed a site, and this
may be part of that, that had limited rights in
access areas depending on who you were?

A  No.  Not that I recall at this time.

Q  Have you ever been involved in developing or
developed a site where people could download
materials for free?

A  I believe so, to the -- I'm trying to -- it's been
a few years.  I believe yes.

Q  And how many?

A  That would have been on the order of three to
five.  Again, there were a couple of sites, I'm
trying to remember which did which, on the order
of three to five.

Q  And what kind of materials were available?

A  It would have been brochures, marketing materials.

Q  Okay.  And that's a -- there are many, many sites
where -- on the internet where you can download
marketing materials or other types of information,

right?

A   Yes.

Q   That's a pretty common issue?

A   Being able to download is very common.  On the InfoDeli site, the fact that you have nuanced layers of who has rights to what, that's the more complex business knowledge.

Q   Sure.  Tell me about clean room, what do you mean by "clean room"?

A   So a clean room is when you want to develop an application where there is no question that it does not involve intellectual property of another company, and as I mention in my report, the famous case is the Phoenix BIOS, where many companies had tried coming out with essentially a clone of the IBM PC BIOS and they all failed.  They all, you know, lost legally.

So what Phoenix did is they very carefully had one team write up a very, very precise description of exactly what the BIOS needs to be done.  And this is the pattern that companies have, that people have followed since if they're trying to have a defensible development.  They then hand this product specification to another group who has had no contact and has no insight or

knowledge of the previous implementation, and in the Phoenix case, they actually used someone who never even programmed an Intel chip.  Then you have that team, typically, develop a plan of exactly what you're going to build.  And then typically, a larger team will implement that plan and build according to the design plan.

And the idea is that a third party such as IP attorneys can look at the specification plan, can look at the design plan, and say, Okay, this only describes ideas.  It doesn't describe any implementation details.  It doesn't describe any of the actual IP or, you know, trade secret knowledge, et cetera; none of the privilege information of the competing product is described in the specification, and the design document clearly comes off of the specification.

For example, if you had a case where the design document has some designs in it that aren't in the specification, and are in the original product, then it could be suspect and you would say, well, where did this information come from, where did this -- you know, this part of the design, you know, if it's not in the specification plan, then it would be suspect that the separation

between the specification and the design had not been properly maintained.

Q   Okay.

A   Was that relatively clear?

Q   Yeah, no, I understand.

In the specification process, are the people involved in the specification process allowed to have used the software that you're trying to cordon off?

A   Yes.

Q   Are they allowed to refer to that software when developing this detailed specification?

A   Some of that might be a legal opinion.  That is not within my domain.  Typically, my understanding is that people involved in the specification phase, some of them may have been exposed to the -- to information or to the system that's being copied, and that the main thing is that -- and it's perhaps hard for them to know what information they had is privileged and what is not.  And the information in the document -- the document is the contract, and that none of that information makes it into the specification; that the specification itself doesn't have anything that was privileged knowledge.  And that would

typically be confirmed by a third party such as an IP attorney.

Q   And that's -- I'm not sure I understand that last thing you said.  You've got a specification document that's handed off to someone who is not familiar with the software to develop a design document, right?

A   Who is not familiar -- who is familiar with the software in general but not familiar with -- does not have any privilege knowledge of the -- you know.  So I typically -- someone who has not worked for or worked with companies that may have had knowledge of that system.

Q   Fair enough.  But you talked about something being in a contract not being in a specification.  What are you talking about?

A   Sorry, I use the word contract as an engineer.  That was perhaps a poor choice.  If the reporter could read back exactly what I said, I could clarify it.

Q   Well, and maybe rather than doing that we just kind of come at it in another direction because the question was --

A   Sure.

Q   -- because the question was, kind of broadly, what

Page 58

can the people putting the specification document together know about the preexisting software?

A   In theory --

Q   And the more specific question I asked is:  Could they refer to the software when they come up with the specifications that they want the clean room thing to --

A   So they can't refer to the software in the specification.  So in the specification --

Q   And that was an inartful question.  Let me ask it again this way.

    Can they -- for example, you're putting your specification document, you're thinking of all the things you want the software to do.  Can you pull up the existing software and say:  Oh, I forgot it does that.  I'm going to put it in my specification document?

A   Yes, but it has to be very clear that it's a specification, not an implementation.  So for example, you might say:  Oh, we need to be able to control which users have access to the system.  You might say they need the ability to log-in.  You would not say how that works.
    Or you might say, you need to be able to bring up images, but you should not at all

Page 59

describe, oh -- and it should be, you know -- it should not -- there should not be anything in the description that reveals how it was done.  So you want to talk about what needs to be done; you need a system where can you order brochures; you need a system where it can send to another house for printing, you know.  So these top level functions.  But it shouldn't have anything that's, like:  Oh, here is how they did it, because for almost anything that you want to do, there might be dozens of -- you know, a myriad number of ways of specific implementation.  There shouldn't be any specific implementation description in the specification.  But the people who are developing the specification may have been, and typically would have had some exposure to the previous system.

Q   Okay.  So, and when you say you can't include implementation, let's just talk about a website.

A   Okay.

Q   Implementation, are you talking about -- because using your example:  Log-in is implementation; it should have a log-in screen that provides certain levels of access, or is implementation more the code to how it is done and how it is correlated?

Page 60

A   So it's not just the code, but it's anything that goes towards the logic of how it was done.  So for instance, if you knew that your log-in information has lots of information about the companies and products you're involved with, and if there is something that changes as a result of that, anything that was unique about that, which was something that the programmer came up with that wasn't necessarily part of the original -- that wasn't part of the top level function, for example, if there was something clever that made you do it faster, that information should not be revealed.

Q   Okay, so --

A   If it involved some logic of implementation, something -- I'm trying to avoid the word "secret sauce," but colloquially, when people say, well, often a secret sauce in how something is implemented, and that is what you're trying to protect.

Q   And since we're talking about log-in, let's just talk about real word here.  The who could access what and order what on these Literature Store sites was something directed by BIVI and CEVA, right?

Page 61

A   Yes, the fact that there were levels.

Q   And they wanted a system whereby, if you had this credential associated with a log-in, then that credential gives you access to A, B and D, but not C, for example.

A   Sure, but how that's implemented could vary greatly.

Q   Sure.  I understand.
    How it's coded could vary greatly.

A   Yes.  And how it's stored.

Q   Sure, and how the database stores it.  But as far as knowing that when you are logging in, that log-in is going to trigger something so you only get access to certain subsets of the data.

A   Then that is a "what" that is specified in the specification document.  Yes.

Q   And that would have been perfectly okay in this case.

A   Yes.

Q   Your concern is the, in this case, the code and the schema?

A   Not just the schema, but how you use the fields in the records in the database.  Just for example, let's say you had students, and you might decide to record their grades as A, B, C, D, or you might

Page 62

just decide to record their grades as 1, 2, 3, 4, a trivial example, but they are different. Unless there was something from the end client that specified how that should be, that's a choice of how the information was stored, and then it might have implication about what sort of work you can do on the data.

If it's stored numerically, then it's relatively trivial to give an average, or a medium or, you know. And if it's stored A, B, C, D, then you would have to do more code to perhaps give information. So how the information is stored is often privileged information and not something that would be -- I can imagine situations where that would be specified by the client, but typically, that's the sort of nuance I'm talking.

An example of the nuance I'm talking about, implementation versus specification.

Q Okay.

In the clean room concept, does that always involve the development of custom-coded software?

A Oh, no. I mean, you could certainly do a clean room with open source software, you know, using at least partly open source software. That certainly -- clean room does not imply you have to

Page 63

write everything yourself. It does imply that -- the design and custom software. But certainly elements of the custom software could be off-the-shelf or could be open source.

Q So a developer, given a specification from which a design document is developed, could implement using off-the-shelf, or Lasso -- sorry, not Lasso, or Magento, open source kind of thing, right?

A Yes. That is -- that could easily be part of a clean room solution. Caveat: Assuming that there was no question about the open source or off-the-shelf software.

Q Did you, in your analysis, compare the features of Magento and InfoDeli?

A I looked at some of the features of Magento, but in truth, I wasn't really trying to analyze Magento. So a cursory examination of the features.

Q Okay. Did you come to any conclusion or realization as to overlap of features between those two?

A Not a strong conclusion. Other than -- there are many frameworks you could have chosen to implement a new system that which would give you an advantage. It's not clear to me that -- I didn't

Page 64

see anything with Magento that made me think I would want to use Magento rather than the others, but I didn't see anything that made me think, Oh, this other system would have been better.

So I guess the way I would phrase it is, if you were developing a new system, there was -- Magento would be an acceptable solution. There wasn't any, anything magic about Magento that would make it much easier, apart from the fact, if you've used it before.

Programmers tend to choose software environments that they know so as to reduce that learning curve.

Q If you had an existing piece -- first off, just to use terminology to make sure we're on the same page, I don't think I'm describing it in the most efficient way possible, when you're talking "clean room," how do you describe the existing piece of software? Is it just "the existing software"?

A The existing software, or the application or technology to be re-implemented.

Q Okay. So say you've got the existing software that has, just to use round numbers, 10 features.

A Okay.

Q And you already have a piece of software that

Page 65

pre-exists that has nine of those 10 features, and you want to develop the one feature that's missing from yours that's in the existing software, is clean room applicable in that scenario?

MR. ROSEMERGY: Object to the form the question. You can respond.

A Yes. And in fact, as I said before, a clean room does not assume you're not using any open source software. Now, when you say nine out of 10 features, that's really a problem of how you count because today, almost all software is based on some SDK, or framework.

So for instance, the fact that you use Magento, that did a lot of the heavy lifting in terms of setting up, you know, the website, and you know. So you might say, for any website you do, 90 percent of the functionality is similar to other websites; you have to be able to communicate; you know, you just -- and then, so no one is writing, to my knowledge, no one, or virtually no one is developing a new site from scratch. Everything is being based on these frameworks. So then when you're talking about features, you're usually talking about the customized software that's sitting on top of this

Page 66

very large code base.

So now, when you're talking about the features, when we go in the design document, in the specification document, usually they're not necessarily talking about these things which are coming from commonly available packages. They're talking about the actual business purpose and the user experience, et cetera. If you -- and for any of those, if there is any off-the-shelf software or publicly -- public domain software, source software, pardon me, that helps meet those needs, it is certainly very reasonable to include it.

Q  And just looping back to something we talked about a few minutes ago. In this situation, you've got Western Robidoux employees who've worked extensively with the existing software.

A  Yes.

Q  And you've got BIVI and CEVA who've worked extensively with the existing software.

A  Yes.

Q  Could those people be involved in this clean room process of developing this process?

A  Oh, yes, I describe them as being involved in the process.

Q  And so they don't have to not remember or ignore

Page 67

their knowledge of what they've learned about the InfoDeli software in developing specifications, is that right?

MR. ROSEMERGY: Objection to the form of the question. You can respond.

A  No. So the idea is that it is typically expected there will be members of the specification team who have had exposure, and unfortunately, you can't just tell someone: Oh, forget what you've seen.

So that's why you have to have a very clear document, and that a third party reviews the document, saying: Oh, everything that person had, even though they've had exposure to materials that are privileged, that information did not make it into this document. This document describes how a system should work, everything that the client might need. You know, it's -- this is actually an opportunity to design the product, perhaps design it better or -- you know, there's many up sides. But the whole point is that you want to make certain that the people who develop the new product don't have any information that they shouldn't have. The way you do that is by having a team -- that includes people who are polluted,

Page 68

tainted, whatever, you know, who have been exposed to proprietary information -- that they do a specification that, what meets the needs of what they need their application to do, doesn't reveal anything that they may or may not have been exposed to.

It comes down to, people often think: Oh, I'll be careful, and in practice, you have to have something that you can examine to be clear that you didn't by accident use information you had that you did not have rights to.

Q  Okay. Have you, as part of your analysis in this case, done any comparison of the old InfoDeli platforms to the new platforms?

A  I've looked at the -- of InfoDeli as opposed to BMS -- EMS'?

Q  Yes.

A  So I've looked at the different versions of InfoDeli and saw how it grew, and that it -- you know, it was developed organically over time. Sorry, I'm anticipating the question. I have looked at different features of InfoDeli at different snapshots.

Q  And sorry, I may have asked an inartful question. I'm talking about, have you compared what existed

Page 69

in March 1, say, of 2014 to what was developed by EMS and implemented later?

A  Yeah. I mean, are you asking, did I look at the system -- the InfoDeli system in question and have I looked at the implementation by EMS?

Q  Yes.

A  Yes. I mean, I didn't run them but I looked at the source code. I looked at screenshots, et cetera.

Q  Okay. Did you compare features as between those two implementations?

A  I saw that there were many similar features, and that -- so unfortunately, EMS also had different versions. So there's Vectra Rebate 1, Vectra Rebate 3, and -- so in my comparison, I looked at all of the Vectra Rebate code bases, and I looked at the InfoDeli Vectra Rebate code base for that comparison. And then for BIVI and CEVA, I did comparisons, both -- I did a comparison of one and then I did a comparison of the deltas of the others.

Q  And just to be clear on this, are you -- because your report doesn't address it -- are you expecting or intending to give an opinion on the specific comparison of the two implementations?

Page 70

A    No.

Q    Okay.

MR. ROSEMERGY:  Off the record.

(Recess taken.)

BY MR. BLEGEN:

Q    Okay.  We're back.

I want to talk about your report now specifically.  The first is, you have these Exhibits B and C to your report which purport to be lists of files for InfoDeli versus EMS?

A    Or InfoDeli and EMS.

Q    Well, InfoDeli is B, EMS is C?

A    Right.

Yes.

Q    And what are these files?

A    So these are the files of where I considered it to be custom code.  So we were talking earlier about how applications are built on frameworks, et cetera, et cetera.  Sometimes they're set up where all of your code is in just one place, and in some cases, or if you're having to make a lot of modifications to the framework, then you're doing custom development in a variety of files that aren't just collated.

So when I was doing the analysis of how much

Page 71

effort was done by InfoDeli and by EMS, I have a very detailed description of how I filtered that down; that I start with the directories.  And this is not meant to be exhaustive, but I threw away things that weren't actually computer files.  I took out files that were clearly from libraries or frameworks that would not have been -- and even though there may have been some modifications done by EMS or InfoDeli, that the majority of that code would have been preexisting library code.

So basically, these are the files where, after I've gone through all of those things and trying to discount everything that was not actually written by the two parties, to get the code base of what I believe is the human written code at stake in the case.

Was that relatively clear?

Q    Yes, it was.  To me at least.

And we talked a little bit ago about what you were asked to do.  If you could just summarize for me what your opinions that you anticipate giving in this case.

A    Okay.  Number one is that by EMS and WRI having access to the InfoDeli system and materials, that instead of going through a design, you know, a

Page 72

design and implementation phase, that they were able to start development more quickly, essentially using the existing site as a blueprint.

Secondly, by copying materials, actual period content from the InfoDeli system, they gained even more speed, more time, and had to exhibit less effort because they didn't have the effort and the time necessary to recreate those materials.

Thirdly, I opine that if they, if they were to have done this without access to the InfoDeli materials, having done so in a clean room situation, that it would take ideally somewhere, like 9,900 and something something, just under 10,000 hours, to roughly 12,200 something something hours, in an ideal situation, taking 14 to 15 months, and that I felt that that would be the most efficient, would have required the least effort and have -- give the highest likelihood of success and the highest quality.

I was asked to consider what it would take if they were under time pressure and had to do it more quickly, and I opined that if you tried doing it as quickly as four to five, five to six months,

Page 73

that range, and if you brought in much more manpower, the cost would be more in the range of up to 21,000 and change, and more importantly, that because of the contracted timeframe with the complications of communication between the team, and the -- and that there's just no room for slippage, that the likelihood of success in that timeframe is low.

So that if I were -- and the mindset I was using was, okay, if I'm bidding on this project, someone has come to me and asked me to develop it, and I would say, I believe we need a 14, 15-month timeframe, I believe we need a four-person team for a year, we need these other people to do the content work, and if we do that, while there are no guarantees, I have a high confidence that we can make the ship date, perhaps with minor changes, or just miss the ship date slightly.

If you try it with a larger team in a very contracted timeframe, I would be very hesitant about that.  I mean, if you have absolutely no other option and that's a business necessity, you can try, but I would not want my reputation to be -- you know, even if you tell a client it's a very low probability of success, maybe 25 percent,

maybe less, they tend not to hear you.

So I would be very hesitant to suggest that for -- colloquially, that's a Hail Mary; if you had to do it quickly, that's what you would try. You would much rather go the more reasonable timeframe.

One thing I always emphasize to clients is, nothing replaces time. If we decrease time, regardless of what resources we bring to bear, there is likely to be some impact on quality and the probability of success goes down, just to make it clear that money alone couldn't buy you a very short timeframe.

I believe that's an accurate summary of my opinions.

Q Okay. And --

A I may have merged one or two of them.

Q I understand. And I think I heard three.

A I think the last two got combined. So number one was, by having access to the InfoDeli system, they used it as a blueprint, they got to develop it more quickly, less effort.

Number two, by copying the content, which is in addition to using it as a blueprint but actually copying content and not having to

recreate the content, that saved time and effort.

Number three is, if you did it as a clean room or similar but, you know, if you did a new implementation not using the materials as a blueprint, we're talking ideally 14 to 15 months and the hours I quoted of effort.

And then a fourthly, that with the reduced timeframe, it is -- that is not meant to be saying: Oh, you could do it in this for that money. It's like: You might be able to do it for this and that money, but the likelihood of success is relatively low. Whereas, the likelihood of success of the first one, while not guaranteed, is very high.

Q And so, would I be correct to group these into two opinions having to do with saving time by having access, and two opinions having to do with the but-for world of doing this in a clean room?

A Yes.

Q Okay.

A That is reasonable.

Q And the majority of the 154 paragraphs relate to the clean room opinions, right?

A Yes. For good or ill. I went into a lot of detail on the clean room and the analysis of the

code.

Q Yeah. And the analysis of the code is to determine how many lines of code to use in estimating the time it would take to do the clean room, right?

A Yes.

Q Now, the clean room opinion -- I'm just going to call items three and four the clean room opinion. Does that work?

A I'm comfortable with that.

Q The clean room opinion, you come up with ranges of man hours, right?

A Contractor hours, yes.

Q Contractor hours. I should have used modern terminology.

A We're in Boston.

Q And do you understand that your estimate of contractor hours has been used by other experts in the case for their purposes?

A Yes.

Q Okay. Have you talked to the other experts about that?

A We had one or two conversations but that -- limited.

Q Now, the first two opinions having to do with the

access and the advantage it may have given, did you estimate a number of contractor hours of savings for those two worlds?

A Yes, when I talk about -- that's actually incorporated in the clean room approach, but what I talked about in the clean room approach is, here is the effort we take to replicate the assets and database information that people -- that EMS had access to. So I give an estimate of effort on coding, on design specification coding. I give an estimation of effort on different aspects of the content.

Q Okay. And I understand that you put a -- for those two opinions, the design and implementation moving more quickly and the copying of curated content saving them time, you have a time estimate for how much it would have taken in a clean room for those two steps, right?

A Yes. Could you state the question again? I believe I understood you, but --

Q Sure. Let's start with the first one. You said by EMS having access, instead of doing -- instead of starting from the clean room world, the design and implementation could have moved more quickly.

A And implementation, yes. Yes.

Page 78

Q  And my question is, and what I see in your report in the clean room section, is a estimate of how many hours it would take to do the design and implementation, right?

A  That is correct.

Q  Okay.  Is that — do you do any other analysis of savings, or is that it?

MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

A  Yeah, sorry, I'm not trying to be difficult.  I'm not -- could you state the question one more time?  Sorry.

Q  Sure.  There is a certain amount of -- you provide an estimate in your report of how many hours it would take to do the design and implementation in a clean room environment, right?

A  Yes.  And more specifically, the only part of that that's "truly clean room" is that you have to have this specification document; in general, what I describe in terms of the design and implementation, assuming you're not using something else as a blueprint, but that you're actually designing something from scratch.  So there's designing from scratch and there's using some things as blueprint, and then there is a

Page 79

clean room.  So we have three things.

What I'm describing in terms of the designing and implementation would be true whether or not it's a clean room, if you're not using an existing system as a reference.

Did that make sense?

Q  I think so.  Why don't you turn to -- maybe this will help.  Turn to page 62, paragraph 145.

A  Yes.

Q  You were talking about how much time the design and implementation would have taken in a clean room process.  Which lines of this chart represent those hours?

A  Well, they all do.  Not trying to be difficult, but that is what the clean room process -- you have the functional specification.  So that would be true only in a clean room.  Everything else is true for independent implementation, i.e., if you don't have access to materials, you have to make them yourself.  On some, that's orthogonal to a clean room, that if you don't have access, you're creating the materials from scratch.  And what I had said earlier, and maybe I wasn't clear, was that by having access to materials, that it taints you, so that you -- so there's two separate

Page 80

things.  There's one, by having access of materials, you learn about how the program was implemented, but secondly, by copying the materials, you are circumventing the time necessary to create them; to go to the original sources, edit, all of that, and the reason we're in a clean room.  But that's typically what you do in any development process when developing a new application.

So I'll rephrase.  The functional specification phase is perhaps a little additional because of clean room, but normally, you would do something very similar if you were building anything from scratch.  Everything else is what you would do if you were developing it from scratch.  Say the original InfoDeli had never existed, and WRI had gone to EMS and said: Hey, we need a website that can do X Y Z.  Everything else in there is what you would do.

Q  Okay.  And let's back up.

A  Sure.  Certainly.

Q  You said your first opinion is by EMS having access to the InfoDeli platform, they could move more quickly in the design and implementation phase.

Page 81

A  Yes.

Q  And my question for you is, do you quantify how much more quickly?

A  No.  I do not.

Q  Okay.  And the quantification in paragraph 145 in the chart is a separate quantification from the idea that EMS moved more quickly.  It is a, let's assume, just they started from scratch.

A  This is tabula rasa, this is what it would take, with the caveat that you want to have a very clear functional specification because you're trying to make sure you're not infecting anything, trying to make clear you're not bringing over any intellectual information that you do not have rights to.

MR. CLIFFORD:  It would be helpful if you slow down a little bit.

Q  And we're being helpful to her.  I can follow you.

A  I understand.  I'm a techy.  I talk fast.

Q  So in the second opinion, by copying the curated content, EMS saved time, right?

A  Yes.

Q  Did you quantify for that opinion how much time was saved?

A  No.

Page 82

Q  Okay.

A  I give a description.

Q  But you did quantify, if they had not had any of that, how much time you think it would have taken to create all of that content?

A  Yes.  And may I qualify?

Q  Which part?

A  When you say -- your first question of I didn't do a comparison.

Q  Yeah, you didn't quantify the how much time savings.

A  Correct.

Q  What's your qualification?

A  That it is much faster to copy than create, to the point where it's like -- while there was some time spent on copying, it is close enough to zero that the time to do creation is essentially the time saved.

    I may not have made that entirely clear in my report because I did not have firm numbers for how much time was spent copying, but as a general rule, the time spent copying would be relatively trivial.

Q  Okay.  Let's go back to the beginning of your report.

Page 83

A  Certainly.

    Sorry, I've combined two documents.  Give me 10 seconds.

Q  In fact, we can probably take --

A  I'm going to take out the Exhibits for now just to keep them separate.

Q  Yeah.  Set them aside.  Yes.

    Perfect.  That will be easier.

A  I am now at the beginning of my report.

Q  Right.

    You drop a footnote, Footnote One, about InfoDeli acquiring the assets of TooBaRoo, right?

A  Yes.  That is my understanding.

Q  Where did you get that understanding?

A  I got that either from Breht Burri or from Paul. If you look at -- and actually, also from the reports of Jason Eaddy.  If you look at some of the metadata he was looking at, it talks about TooBaRoo, and so it was explained to me that TooBaRoo and InfoDeli are essentially the same entity.  But then, sometime when I'm doing my research, I might see one for me to understand that it is the same entity.

Q  So you were told to assume that InfoDeli owned everything at issue in the case?

Page 84

    MR. ROSEMERGY:  Objection to form.  You can respond.

A  That seems overly broad.  My understanding is that InfoDeli owns its software, its -- you know, my understanding is that TooBaRoo and InfoDeli, whatever TooBaRoo owned, InfoDeli owns.  I don't necessarily --

Q  And I don't mean to load anything into that one, but your understanding and your assumption for your opinion is that whatever software platform information TooBaRoo owned is now owned by InfoDeli?

    MR. ROSEMERGY:  Same objection.

A  Yes.  That is my -- that whatever TooBaRoo owned, InfoDeli owns is my understanding.

Q  Okay.  Paragraph three in the Dispute/Scope of Report section, talking at the top of page two now --

A  Understood.

Q  -- you say that you've been asked to assume "that plaintiffs owned the rights to the materials, including the right to certain information in the databases and on the servers that powered the InfoDeli Software Platforms."

A  Yes.

Page 85

Q  What are you referring to there?

A  That for this report, I was asked to assume that InfoDeli owns the software and owns the copies of data that has been manipulated on their site.  So they own that version of the data in the database, et cetera.  And then, yes, so that all rights for materials on the InfoDeli platform is the property of InfoDeli.

Q  Okay.  And so when you say "including the right to certain information in the databases," is there other information you're excluding by saying that?

A  I could imagine there could be information in the databases that they don't have rights to, but I had not considered that question before and don't have an opinion.

Q  So your assumption for purposes of your report is that any content that has been uploaded or inputted to the InfoDeli database system, be it pictures, documents, or names and addresses, is owned by InfoDeli?

    MR. ROSEMERGY:  Objection to the form of the question, but you can respond.

A  Owned by InfoDeli or at least that other people don't have the rights to access it.

Q  Okay.  In your Background section, in paragraph

five, you talk about, you managed a successful clean room. And is that the clean room you talked about earlier?

A   Yes.

Q   Okay. And is that the only time you ever did a clean room?

A   That is the only time I did a formal clean room. I imagine -- I have done many, many proposals of projects. I believe I have discussed clean room, you know, a clean room proposal as a solution that was not implemented, but that's a memory as opposed to a fact I can point to.

Q   Do you have any specialized training or degrees in clean rooms and their implementation?

A   I am an accomplished computer scientist. I'm very familiar with clean room implementation. In general, I'm not aware of there necessarily being particularly courses in that. It's -- different people have different skills based primarily on experience. I do not have any specific qualifications.

Q   Have you ever authored any publications on clean rooms?

A   I have not.

Q   Have you ever done academic research on clean

rooms?

A   I have not.

Q   Are you giving an opinion in this case that a clean room was necessary in this situation?

A   I'm giving an opinion that it is the clearest way of solving this. I could imagine other hypotheticals, but for my primary purpose, I did not propose alternatives.

Q   Are there alternatives?

A   So number one is you could do it without a clean room, and then you have the problem that if there is a conflict later, it's -- and there is any question, it's like, well, here is some aspect that looks like it was lifted; your people had access. That's difficult.

I'm not a lawyer, but in the technical community, it's understood that if you are working on a project where there is this issue, that the safest, cleanest, most appropriate solution is a clean room.

Q   But there are alternatives.

A   I don't know of any alternatives that someone would -- that someone I would respect have ever suggested, or have ever suggested would withstand a legal challenge.

Q   And your concern is the ability to withstand a legal challenge rather than the legalities of whether it's required, right?

MR. ROSEMERGY: Objection to the form of the question.

A   Again, I am not a lawyer. My understanding and the understanding of other experts in the state of the art is that a clean room is the solution to show that there has been no appropriation of intellectual property. That's -- I have not heard of any other solution that has ever been posited as, you know, an alternative.

Q   Okay. But the lack of a clean room does not automatically mean there was a violation of the intellectual property.

A   So you could say -- so the classic example is: Someone develops a program. Someone sues them and says, Oh, well, you've stolen materials from me, you didn't do a clean room, and they say, Well, but was there evidence that we had access to source code or et cetera.

You know, so I guess the way I would say is, certainly, you can imagine a hypothetical where something was not developed with a clean room and therefore did not, you know, violate any issues,

but when you have parties involved that have been exposed, a clean room is the mechanism to show that none of that knowledge transferred. And I don't know of another mechanism to see that knowledge was not transferred.

Q   Okay. Now, if -- just make sure we're on the same page.

There are, as a software developer, you have a copyright if you file the paperwork and get a copyright, correct?

A   Yes.

Q   And you may have license rights if you have a license that's agreed to by the user of your software, correct?

A   Correct.

Q   But absent one or the other of those, anyone who wants to is welcome to copy your software and reverse engineer it or otherwise recreate it, correct?

MR. ROSEMERGY: Objection. Calls for speculation. It's outside the scope. You can respond.

A   Yeah, that's really, that is beyond my -- that is beyond the scope of my report.

Q   And it may be. I'm just making sure we're on the

Page 90

same page here because you talk about the need for
a clean room and other alternatives.  I'm just
backing up a little bit to why.

A   Okay.

    MR. ROSEMERGY:  Same objection.  Go ahead.

A   Sorry.

Q   So the question is, if you don't have a copyright
argument, and you don't have a, some kind of
license agreement that restricts the ability of a
software developer to reverse engineer, reproduce
your software, a software developer could just
reverse engineer your software, right?

    MR. ROSEMERGY:  Same objection, but you can
respond.

A   My understanding is that while certainly people
might be influenced by other platforms, that in
general, if you're reverse engineering, that you
don't have those rights.  It might vary.  It might
if there was a terms of service when you used.
Almost all software, whether it's on the web or on
a CD-ROM, will have some language about not having
the rights to reverse engineer.

    I certainly would not assume someone had the
rights to reverse engineering something just
because there wasn't a displayed copyright.

Page 91

Q   But you are aware that the prohibition on reverse
engineering is based upon the existence of a
license agreement or terms of use, correct?

    MR. ROSEMERGY:  Same objection.  Go ahead.

A   That is within my understanding.

Q   Yeah, in fact, even if you have a copyright,
someone can reverse engineer your software
provided they don't violate your copyright,
correct?

A   So copyright usually involves actual copying of
code and trade secrets, and others are about
intellectual property.

Q   Yeah.  And in fact, software engineers', software
developers' reverse engineering of somebody else's
software is a fairly common practice, right?

A   Yes.  Again, you -- people get sued all the time.
You want to be careful.

Q   Sure.  I mean, no one really wants to get sued,
but there is no -- I mean, but people do reverse
engineer software legally.

    MR. ROSEMERGY:  Objection.

Q   It's possible to reverse engineer software
legally, right?

    MR. ROSEMERGY:  Objection.  Calls for
speculation.  You can respond.

Page 92

A   Well, but -- so, often, even if there isn't a
copyright, people will choose to do something
along the lines of a clean room in order to
protect themselves.

Q   Obviously someone can, anyone can do a clean room
for anything they want.

A   Sure.

Q   But there is no legal prohibition on reverse
engineering absent a license agreement.

A   So the problem is that you want to be careful,
that you might say, oh, if I go to some site and
there's no copyright and there's no terms of use,
I'll just reverse engineer it.

    If a client came to me and ask me to do
that, I would ask:  Do we have the rights.  I'm
not trying to be difficult, but perhaps because I
now work in the legal profession, I myself tend to
be very, very conservative and cautious.  I
believe I would consult an attorney before
attempting to reverse engineer anything that I did
not know I had rights to.  I realize that's not
necessarily what every other engineer would do.

Q   Okay.  And once again, I'm not talking about
practice, best practices, what you would do.  It
is possible to legally reverse engineer software.

Page 93

A   If there is not a copyright and if there is not a
terms of use.

Q   Or even if there is a copyright, as long as you're
not violating what is copyrighted, you could
reverse engineer the software if there is no terms
of use, correct?

    MR. ROSEMERGY:  Objection.  Calls for
speculation.  You can respond.

A   I'm not a lawyer, but I don't know of anything to
contest that opinion.

Q   And what is your -- so make sure we're on the same
page here, what is your definition of "reverse
engineering" in the world of software?

A   Well, there's quite a wide range.  So reverse
engineering can mean you look at an application,
you look at outputs from that application, and you
work out how that happened.

    So for instance, if you had -- trying to
think of a good -- trying to think of an
accessible example.  You can reverse engineer an
application without looking at source code.  So,
often, if you're trying to say -- if there is an
application that does something, and you look at
inputs, you look at outputs, clearly the owner of
that application doesn't necessarily own inputs

Page 94

and outputs. By examining those, you determine how the application provides value. That's typically what I think as reverse engineering.

If you're -- if you disassemble the application and you're looking at the code, that's also reverse engineering, but that has gone one step farther. So there is reverse engineering that is "safe," and then there is reverse engineering which -- where you might be violating rights. They're both reverse engineering. So at the top level, reverse engineering is figuring out how something works and building a similar product.

Q Okay. And if in this instance, putting aside everything else, if somebody had used this software and saw that, based upon your user level, you can see certain products or not see certain products, and they said: I like that idea, I'm going to develop software that does that, would they be reverse engineering at that point?

MR. ROSEMERGY: Objection. Incomplete hypothetical. You can respond.

A Just the ability to have levels with access, I would not -- I don't know -- to be honest, I don't know if I would call that reverse engineering as

Page 95

much as I would call it specification.

I don't want to get lost in terminology here, but there is a little bit of a difference between figuring out how a program works and what options and values it provides. So if you say: Oh, well, I need a program that has the ability, the option of setting user levels, I think of that as a specification issue. That's not -- you might discover that by reverse engineering, but that's kind of a different thing.

So to answer your question, if someone had used that application, had seen, oh, you have users who have different levels of access, that is reasonable for that information to make it into a new product.

Did that answer your question?

Q Yes, that did.

A And then just to clarify, if there was any information about how that's done, that's where you get into at least the grey zone, if not worse.

So I'm talking about specification versus implementation. So the ability to have user levels, that's a specification. That's -- you know, that would go into the specification -- you know, if you were doing a clean room, that would

Page 96

go into the specification document. That's not privileged knowledge. How it's done might be privileged knowledge.

Q And in this instance with the InfoDeli software, what is the "how it's done" piece for the access levels, or do you know?

A It's the database. It's the -- there is actually this whole -- again, it's primarily in the Jason Eaddy report. They have this whole system dealing with access levels that was relatively opaque. So EMS had the problem that they actually had that part of the database, didn't know how it worked, they wrote to WRI, WRI explained how that information in the database gives access levels, and gave that information back to EMS.

So that, to be honest, is one of the, you know, one of the clearest points of, that there was information about how something was implemented being shared, and if that information is not -- if you did not have the rights to the information, then that's problematic. I am not opining on whether or not there were rights.

Q Okay. Are you opining on whether or not there was reverse engineering in this case?

A I don't use those words. I am opining that by

Page 97

having access, they were able to develop it more quickly; whether or not that's reverse engineering or just -- for example, if you are, you are developing the new application and something is not working, there is a bug, you go to the old site, you run it, or you look at content or the database and say, oh, wait a minute, here is how it was solved before. This piece of information in the database shows me how access levels were done.

So in this case -- sorry, I'm talking so much, I forgot your question.

Q And the question was -- I do think we got off there, so let's get back to the question. And I think you answered it at the beginning and then you went off on another tangent, but my question here really is whether you're giving an opinion in this case that any particular thing was reverse engineering, or is that outside the scope of your opinions?

A That I believe is outside the scope of my opinion.

Q Okay. Paragraph 13 on page five is where you are talking about this DOSE application porting.

A Yes.

Q And this is a 50,000 line program, and you ported

Page 98

it from one platform and language into another, right?

A  That is correct.

Q  So in this instance, you had access to the code and everything, and you were converting it to a different platform.

A  Yes.

Q  In paragraph 16, the Materials Considered, you have very, very broad categories here. That hard drive you gave us, does that have more specificity on exactly what --

A  No, it pretty much mirrors this, and it has more, but I didn't want to leave anything out.
        So, we have in our server, basically what we call the canonical productions of everything we had and that I looked at. And there's some things that are not on this list that I specify in the report in particular, such as the Expert Report of Jason Eaddy, the source code, and those are included on the drive, including the Expert Report of Breht Burri.

Q  Is there anywhere -- I know there are some specific citations to specific documents at various places in your report, but is there anywhere where you have set out or grouped

Page 99

together the documents you've relied upon in forming your opinion?

A  No, I mean partly because so much of what I do is programmatic that -- you know, so I'll do searching through a whole set of documents. So there is -- I can say clearly, the citation show the documents that I am citing to for specific issues, specific materials, but I don't have a separate collection of documents.
        I certainly -- you know, the most obvious one would be the expert report of Breht Burri in addition to the expert reports of Jason Eaddy. Actually, I think those may be in a separate folder of expert reports.

Q  Did you rely upon the Breht Burri report in forming your opinions in this case?

A  Again, that was mostly for background to understand how everything went together. I did not take it at face value, things that Breht Burri had said or written, but it showed me where to look. I certainly relied upon the report of Jason Eaddy.

Q  Okay. And did you see, in preparing your report and your opinions, both Breht Burri reports, or just the old one, that really long one?

Page 100

A  I'm certain I read the really old one. Which one do you mean by the "new one"?

Q  The one that was provided to us the same day yours was provided to us.

A  I have not read that one. And I have not read Jason Eaddy's new report.

Q  All right. Paragraph 19, starting at the bottom of page seven is about the Curated Content.

A  Yes.

Q  What all do you include within the Curated Content?

A  So it's anything that wasn't just copied on to the InfoDeli site, or at least -- so the most obvious example are images, where an image of a product would be acquired by whatever means. It would be edited in two sizes, it would be having a naming convention that the database could find, and then more importantly, there are elements in the database that point to materials that were also marketing materials, et cetera, some of which may be renamed, some of which may be associated with government products, et cetera, et cetera.

Q  So part of the curation is the database side, which tells the program where that particular image might or document might come up in the

Page 101

software.

A  That could vary by implementation. In this case, the -- you have naming conventions that match how products are identified in the database. So the idea is it allows you to find an image associated with a product in the database. There could be other curated content, but that's the most -- that's the clearest way to describe it. And pardon me, but I had another thought and it's gone out of my head. Give me just a moment.
        It will -- I may add to that answer later.

Q  Okay. Just to make sure, I know Curated Content includes pictures like product pictures, right?

A  Correct.

Q  It includes documents like the fliers and other pieces that people can order on these sites, right?

A  Correct.

Q  Are you including the information about users and clinics like name, address and all that as curated content, or is that a different category?

A  It's -- so -- I struggle with that because on one -- so one of the key aspects of curated content is that it's been quality controlled, and one of the important things about content that's

Page 102

in the database is that it's been quality controlled.

So I may not always be consistent in my terminology, but I do think of the database content as curated, that there is value in that it is has been inputted into the system, it is in the correct place, it has been used and presumably corrected if there had been some error. So I do think of the database content as curated.

I realize I may have gone back a little bit. There is -- not trying to be imprecise, but my job is to be precise, and there -- you have to think, there is the entire database and there are pieces of the database. I would definitely say pieces of database would also count as curated content.

Q  And would you consider the schema of the database to be curated content or is that another category?

A  That's another category. The schema is really more about design and -- basically, database design or data design and algorithms make a program. So the idea is that -- and algorithms are a formula.

So depending on how information is stored in the database has a huge impact on how you write your program. So database schema/design is very

Page 103

much linked to design and implementation of the software platform. So I would put that -- I would describe the schema as part of the design and not itself curated content. I may correct that upon reflection, but I think that is, today, that is how I would most honestly try to describe it.

Q  Okay. And do you know for the -- let's talk about the pictures and documents.

A  Yes.

Q  Not talk about the data at this point. Do you know who curated the pictures and documents that are included in the database?

A  I under -- my understanding is that multiple people would have had impact on that, including members of WRI and I believe members of InfoDeli, but I can't say for certain whether or not it was all done just by one group. But my understanding is that WRI certainly would have done, would have been involved in the curating of the content.

Q  What about the quality control process, who all was doing the quality control?

A  So that would be a combination of many parties. Number one is, who first finds the issue. Whether it's someone at WRI, could be someone at BIVI and CEVA, it could be someone at InfoDeli running

Page 104

tests. So my understanding is that a variety of people would give input onto issues. Most corrections I believe would be implemented by InfoDeli.

Q  And you are assuming, for purposes of your opinions, that all of the curated content stored on the servers is the property of InfoDeli, right?

A  Not exactly. I think -- I describe the vast majority of it. I describe, for the Literature URLs, that the vast majority of the content on the Literature URLs, which are essentially, primarily PDFs, they could be other things, but the things other than the pictures, the Literature URLs, I have some numbers, but the majority that were stored on InfoDeli servers and that the material stored on InfoDeli servers should not be copied.

For materials that the database points to that are on other servers, that's a larger question.

Q  And I just want to be clear, maybe we missed each other --

A  Certainly.

Q  -- I was asking about data stored on the AWS server that house the InfoDeli database structure.

A  Okay.

Page 105

Q  Is it your understanding that the InfoDeli software pointed to third-party databases?

A  The Literature URL, not databases, but some of the Literature URLs pointed to third parties. So there -- so there might be a manual for pet medication. The majority of those were stored on the server. A very small percentage pointed to servers that were not InfoDeli.

Q  When you say "URLs," you're talking about U R Ls?

A  U R Ls, Universal Resource Locator. My apologies.

Q  That's fine. I just want to make sure she spells it right. I don't care what term you use.

A  Understood.

Q  So would your opinions in this case change if the defendants were found to own those curated content documents, the pictures and PDFs?

MR. ROSEMERGY: Objection. Incomplete hypothetical. You can respond.

A  My -- I'm working on the assumption that they did not have those rights. So that's -- I really can't offer an opinion. My -- the assumption, my understanding, is -- for this report, is that WRI did not have rights to access those materials, but that's the assumption my report is based on.

Q  Now, the pictures, the images that were -- that

Page 106

you talk about that would have -- that you argue would have been recreated from some other source in the clean room but were, in fact, provided --

A  Yes.

Q  -- what was provided is the picture and a file name for the picture, right?  That's what was available?

A  Could you restate that?

Q  Well, the curated content that was available to EMS that you're saying should have been done in a different way was a folder full of picture files, jpegs that have the jpeg, and they have a filename, right?

A  Sure.  So the jpegs have a file name that is metadata because embedded in the filename is information of how to access it.  It has been resized, and it's been QC'd.  So the idea being that if you were to redo this from scratch and you had, you know, 4000 pictures, I forget the exact number, and if you're collecting 4000 images for products, A, that would take a certain amount of labor, especially -- and if you have to photograph them or go to the original sources, you would have to resize them, you would have to name them properly, but they would all have to be tested.

Page 107

And so a good part of why I call it "curated content" is that it has been quality controlled, and you have a higher understanding that everything is accurate, as opposed to when you're starting from scratch.  Even if you implement quality control procedures, that's not going to be the same as years of active use.

Q  Well, what advantage, what quality control advantage was given by having a folder that had the 300 by 300 jpegs in it, each individual jpeg with its own file name?

A  The fact that the images that are in there have been used, and if there had been a problem, they would have been corrected.

Q  If they weren't -- if it said it was a picture of a hat, and it was a picture of a ball, every one has been QC'd so we know it's a hat, right?

A  Yes.

Q  That's what you're saying.

A  Yes.  Sorry if I wasn't clear.

Q  And you say the metadata, the metadata is the name of the file.  So the picture of the hat might be 92746.jpeg, right?

A  Right.

Q  And it's another database that knows 92746.jpeg is

Page 108

a hat, and it connects to these other pieces of the database, right?

A  So you know that this file, this image file is associated with this product in the database by virtue of its name.

Q  If you have the database.

A  If you have the database.

Q  If all you have is a picture, you have a picture of a hat with 92746.jpeg, right?

A  If you're saying if you have just the image with no other data, yes, you have a picture of a hat with a name.

Q  Yeah.  And no other data, I mean, if you just are downloading a folder full of images, all you have is the image and the name of the image, right?

A  Yes, but the name of the image has information. That's my whole point, was that they weren't grabbing a random directory of images, they were grabbing directories of images that had been named to match the database, and had been tested over time, and had been resized to be too, and that matched -- and these were the images that went with the product information in the database.

And I'm saying that if you're building a new system from scratch, A, you of course would go to

Page 109

your own database from scratch, and B, you would have to collect these images and then name them however you saw fit to work with your system to be found.  I guess there's other alternatives; you could actually load the image into the database, that's certainly an option, but that all of that takes effort.

Whereas, if you have, like, oh, here is a whole collection, and oh, I can work out the naming convention from the filenames, so I can now build a database to match that so that I don't have to recreate or rename all these images, there is a lot of information there.

Q  And is that what Engage did?

A  Yes.  Again, I'm not opining, but the -- my understanding is that Engage got many materials from the InfoDeli, from the InfoDeli servers, there were these fetch directories of thousands of images, and there is details in Jason Eaddy's report.  I'm not opining on that.  I'm working on the assumption, like, oh, if that happened, they were able to build it more quickly.  If that didn't happen, here is the evidence they would need to do in order to develop the product.

Q  So you're not opining that it did happen.  You're

Page 110

opining, if it happened, it would allow them to move more quickly.

A   Yes, I'm working on the assumption that they had access to materials.

Q   And your clean room assumption assumes that they would have no access to any of these jpegs in an organized manner; they would have to go find them or take new pictures?

A   Yes. And that takes effort.

Q   Sure.

A   And has quality control issues.

Q   Do you know who took the pictures that were taken?

A   I don't. There's -- I know that WRI would charge -- whenever a new product came, WRI would charge 75 to $150 to incorporate that. I don't know if that was merely entering into the database and editing the image, or if -- how often the images may have come from the client. There's a range there because I imagine it varied.

Q   Okay.

A   My understanding is that WRI would do the majority of that work.

Q   Okay.

A   And charge for it.

Q   And your assumption, for purposes of your opinion,

Page 111

is that this fetch file of pictures should not have been in the possession of EMS?

A   I'm opining that if they didn't have rights, they should not have had it.

Q   But you're not opining that they didn't. You're opining that "if" they didn't.

    MR. ROSEMERGY: Objection. Vague. You can respond.

A   For my report, I'm assuming they did not have rights to materials on InfoDeli servers. These materials came from the InfoDeli servers.

Q   Starting on paragraph 22, and going on for a period of time I'm going to ask you about, there is this Top Level History, and paragraph 22 indicates, "I have been advised by counsel on the following context described in this section that surrounds litigation at issue."

    My first question is, do you mean paragraphs 23 to 35, or does "this section" continue further?

A   There is -- what I meant to say, I may not have organized it properly, that information on the history of the case I know primarily from counsel, from the reports of Jason Eaddy, the report of Breht Burri, and that's all kind of just to give context of what happened. My opinions are based

Page 112

on: Here is how you do a clean room, here is the difference in source code, et cetera.

    So while that section is primarily through 35, I imagine there may be paragraphs later. I may have moved things around where something was -- it moved; that was based primarily on this same sort of same information.

Q   Okay. So 22 to 35 is stuff that you were advised on by counsel, but there may be things later in the report that you talk about that you were also advised by counsel?

A   I believe so.

Q   And was that in any written form, or was it a verbal advice of counsel on that topic?

A   Oh, it would be a variety of things. There was -- a lot of this is based on conversations I had with Paul and Breht, and just to, you know, get a sense, and then you can see I have a lot of -- I went through a lot of email transcripts and some of the depositions, just enough so that I had an idea of what appeared to have happened.

    Again, I'm not opining on that. I'm just -- and I'm not opining on any rights, but it's, oh, if, you know, it appears that they copied over image files, here is the sort of advantage we get

Page 113

from that. Oh, it appears there was a database dump. Here is the advantage they would get from that.

    If they had the rights to it, I'm not opining on, but the basis of my opinion is assuming that plaintiffs -- defendants did not have rights to these materials.

Q   Paragraph 28, the first sentence, you talk about: The development of InfoDeli took many thousands of hours of developer time by Breht Burri and programmers he hired.

    Have you ever seen any evidence of the time that was used?

A   No. That was again based primarily on conversation, and in a perfect world, there would have been records that gave exact numbers on how much was developed. They didn't exist. Therefore, I relied upon a sense of scope of effort that was given.

Q   Sure. And you understood that as of March of 2014, the version of InfoDeli being used was based upon the original version created in 2002 with changes over time?

A   With changes. I'm not aware of -- there are things call refactoring where like you -- so

Page 114

different versions of software doesn't mean it's all new. So my understanding is that the version of 2014 has a history back to 2002.

Q  Yeah. And in fact, are you aware of any instance of refactoring that occurred in that time period, from 2002 to 2014?

A  I cannot say. No -- I do not recall at this time. That may have been part of a conversation.

Q  And what is refactoring, just for the record?

A  Refactoring is when you look at a code base and you essentially say, Oh, there are some functions that do similar things, we're going to combine them into one function. So it's mostly an idea of winnowing, that otherwise, software might grow beyond bounds.

There's actually a variety of opinions on how important this is, but it's a common computer science term, and people understand what you mean when you talk about refactoring code.

Q  And refactoring code has the effect of reducing the lines of code in the overall program?

A  Yes, it does. And that's usually viewed as a positive.

MR. ROSEMERGY: Off the record.

(Off the record.)

Page 115

Q  In paragraph 33, you have a discussion of the Terms of Use, and you say: I have been instructed by counsel to assume that numerous employees agreed to the Terms of Use.

My question is, does the existence or agreement to Terms of Use matter to your opinion?

A  No. I mean, my opinion is based purely on the assumption and belief that defendants did not have rights. Whether that's by Terms of Use or by some other argument is outside of my report. So my report is purely, if they did not have rights, what does that mean.

Q  And whether the lack of rights comes from the Terms of Use or something else is irrelevant.

A  Yes. I am not a lawyer.

Q  Okay. In paragraph 35, you talk about the Master Services Agreement?

A  Yes.

Q  And then you note, for example, in page 31 of that agreement, some next steps, that include collecting data files and uploading the data files to the Google Drive, right?

A  Correct.

Q  Are you assuming, for purposes of your opinion, that the data in the data files was something that

Page 116

should not have been in possession of --

A  Yes, that is my assumption.

Q  Okay. You go on in that conclusion sentence --

A  Let me qualify.

Q  Sure.

A  There may have been additional data files that they had rights to, but my assumption is that any data files from the InfoDeli servers, they would not have had rights to.

Q  Okay. And you say those materials were used by EMS to develop replacement software for the Vectra Rebate website, right?

A  Yes.

Q  Is that something that you know or is that something that you are relying upon someone else for?

A  So I'm relying on the report of Jason Eaddy, that materials were copied, which are much larger than just this. And that sentence isn't meant to be constrained by the three paragraph quotes above, but that the MSA in general indicated that WRI was supposed to provide or give access to materials to EMS to develop the site quickly, and that my understanding is that EMS did, in fact, have access to materials in the site in order to

Page 117

develop the new replacement quickly.

Q  Okay. That's a good stopping point. Why don't we stop for a minute.

(Recess taken.)

Q  This next section, paragraph -- it's all paragraph 36, is about materials from InfoDeli that you are saying EMS had access to.

A  Yes, it's not meant to be an exhaustive list.

Q  So when you say "at least the following," there may be other things?

A  Yes.

Q  And is this something that you did independent research on, or is this something that you saw based on Eaddy's report?

A  This is based on Eaddy's report and depo transcripts.

Q  Okay. Are you going to give an opinion in this case that this access to materials was had, or are you just citing it here because you then rely upon it later?

A  I just rely upon it, that if they had access, it would have made life easier for them.

Q  Okay. And you are also assuming for your report that all of the categories of things in paragraph 36 are things that EMS should not have had access

Page 118

to, right?

A   That is correct.

Q   Okay.  One of the items you have here is this Website Source Code and you cite to the "scraped contents"?

A   The VectraRebate.com.zip.

Q   And that's the scraped contents of the public facing website, right?

A   That is correct.

Q   Do you have any evidence that any of the code that may have existed in this was actually used?

A   I don't opine on that.  My argument is people often think, oh, they must have used the code, and my argument is, by looking at the code, and more importantly, looking at the structure and the content, that gives you insight, so that actually repurposing the code is not required to gain an advantage.

Q   And had the code been repurposed, it would have been a potential code copyright claim, right?

A   Not within -- not something I'm opining on.

Q   So your point there is that they, by seeing how things had been put together, it may have shaved some time off of the development time.

A   Certainly.  I mean especially, I saw no evidence

Page 119

that EMS ever did any sort of design document.  So my understanding is that they looked at the InfoDeli websites and began building something very similar, as opposed to doing any sort of design phase.

Q   Well, the -- I can't remember the name of it, but the document that set out what Engage was going to be doing for Western Robidoux had some functionality in other specifications.

A   But very high level.  When you're doing a time and materials contract, you might say, Oh, I'll build your website that does these 12 things.  That's not a specification.  That's at best an agreed-upon target.

When I describe a specification document, it's many, many pages long, not giving a hard number, and the idea is that it describes everything the site needs to do that the programmers might need to take into account when designing it.

Q   Okay.  The final bullet point on page 16 is "coupon codes and associated information for the Vectra Rebate program that were created by Breht Burri," right?

A   Yes.

Page 120

Q   Do you have any knowledge, beyond what you cite to in Eaddy's report, that coupon codes that EMS had access to were from Breht Burri?

A   Well, my understanding is that Breht Burri is the one who generates coupon codes and that -- and the whole point is that coupon codes have specific codes so that not any Tom, Dick, or Harry can come and just put in a random number.

So my understanding is the InfoDeli system that generates the coupon codes, and I have that understanding from a variety of sources, Breht Burri's report, I believe it is covered in Jason Eaddy's report, I believe -- it is that fact is mentioned many places.

Q   Okay.  And putting aside that the software that Breht is responsible for may have generated those numbers, do you have any evidence that the list of numbers used by EMS was from, directly from the InfoDeli system?

MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

Q   Just to clarify, maybe this helps.  I think your solution that you cite here is that there may be copies of printed coupons, and someone should go through and re-enter that information, right?

Page 121

A   Or do it mechanically.  I'm not suggesting it be done by hand.  Unless there be --

Q   Individual sheets of paper be machine read and that number --

A   Actually, I believe they have image files that could be batch processed.

Q   Sure.

A   I'm still not sure if I understand what the question is.

Q   Sure.  Well, and what I'm making sure, I want to make sure I understand what your understanding is with regard to what exactly was it that Engage had that had a list of coupon codes that it used in its program.

A   Could we actually bring up the report of Jason Eaddy?  I just want to be accurate.

Q   Sure.  And of course, I don't have the date on the front of this.

A   It's the second report, December 23, 2016.

Q   There it is.

A   So the citation to -- is to massive code import and change database structure.  And then, discuss changes to the coupon code and modify script in respect to those changes.

Q   Okay.  Do you have any other information other

Page 122

than these two paragraphs that cite to a time report by Sai Chow?

A   That's the only -- off the top of my head, that's the only link to Sai Chow that I recall.  I do recall the whole zip drive and I'm -- I just want to be accurate.  I believe these codes -- at this time, I would be conjecturing what other evidence I might have for that.  Not trying to be difficult, but I'd have to recheck to think what else might support that bullet.

Q   Okay.  If in fact whatever coupon codes were used to solve the issue that you address here in your report came from a source other than Breht Burri, that might change your opinion, right?

A   Yes.  That, that is a possibility, depending on the source obviously.

Q   All right.  The next bullet point, top of page 17, refers to files sent by Breht to 10-Power for a mailing campaign.  And that included the database table marketing_data, right?

A   Yes.

Q   Now, you note that relates to database schema and design, but that also relates to data about CEVA and its customers, right?

A   Yes.  So obviously, when do you a dump, you get

Page 123

element of a schema and the design, you know what the fields and tables are, and then there is the actual content.

Q   Okay.  Sure.  And if that content was voluntarily provided to CEVA, are you -- is it your opinion CEVA could not use it for any other purpose?

A   Depending on how much it had been changed.  So often you'll get a data dump, and you might have to do a fair bit of work to upload it into a database.

Assuming that this was processed in that way, and I believe then it would -- I would consider it the content that should not be available.  If I was shown evidence to the contrary, I would be willing to reconsider my opinion.

Q   The final bullet point in that subsection has to do with that flash drive?

A   Right.

Q   Have you seen any evidence that the, whatever was on the flash drive was used by Engage?

A   I do not have an opinion on that.

Q   Okay.  We talked about the Curated Content.  Now, this next section, the next section -- are paragraphs 37 to 55 the paragraphs that directly

Page 124

relate to those first two opinions you talked about earlier?

MR. ROSEMERGY:  Objection to form.  You can respond.

A   There may be others.  Just give me a minute to read just to make certain.

Q   Sure.

A   Yes.  As I said, there may be other paragraphs, but these primarily deal with my first two opinions that we discussed.

Q   Okay.  And actually, I think -- I think maybe, let's narrow it down, because I think when I look at it, paragraphs 37 to 45 are the ones that cover that access to the software and access to the curated content made it -- allowed EMS to develop it more quickly.  Is that --

A   That is, I believe, accurate.

Q   Paragraph 46 actually starts the section on your opinion regarding the clean room solution and then we get into all your calculations, right?

A   Yes.

Q   Okay.  So in that next section there, before we get to the clean room -- I think we've covered most of this, so I'm kind of skimming through it.  Paragraph 40, you identified bullets of actions

Page 125

that provide examples of EMS for Western Robidoux accessing the software platforms' websites, materials or output files, correct?

A   Correct.

Q   Do you know when the Terms of Use were implemented?

A   They were a few days before March 14th.  I can't remember if I quote the date in my report.  It is certainly quoted in Jason Eaddy's report.

Q   I think you may say -- actually, you do.  It's paragraph 14, you --

A   Paragraph 14?

Q   Sorry, page 14, paragraph 33, you say you were instructed by counsel to assume March 11.

A   March 11, yes.

Q   So this first bullet point of paragraph 40, the presentation and the demonstration of the site was prior to the Terms of Use, right?

A   That appears to be accurate.

Q   The second bullet point, Liz Corbin accessing the store on March 6th was prior to the Terms of Use, right?

A   I believe that is correct.

Q   The third bullet point regarding accessing VectraRebate.com webpages, you don't have a date

on it there.

A  No.  I would have to -- off the top of my head, I don't remember the dates for that.

Q  Do you have an understanding as to whether or not there was a Terms of Use on the VectraRebate.com website?

A  I don't recall at this moment.

Q  Okay.  Would that impact your opinion if there was notes on use on the Vectra Rebate site?

A  Again, I'm working on the assumption that the defendants did not have rights for whatever reason, whether it's the Terms of Use or some other legal reason.  If I'm told the defendants had rights to materials, that would alter my opinion.

Q  Okay.

A  But my opinion isn't about rights.  It's about: If you didn't have rights, what you would need to do.

Q  Sure.  And this one, accessing the VectraRebate.com webpages in order to see the process of redeeming a coupon in VectraRebate.com or reordering coupons by veterinarian clinics, that is just seeing how the user experiences the site, not how the site actually works, correct?

A  Depends -- some of that -- I'm trying to remember if there would be areas that would not be publicly accessible.  But that would be primarily about how the site works.  I would need to think longer about if there might be some advantage.

Q  Okay.  But it's more of a function rather than an implementation, right?

A  I believe that is more of a function than an implementation.  I would need to double check to see if there was any activity that might be different, but assuming it was a, just a use, that I believe would be function rather than implementation.

Q  Okay.  Talked about scraping.  The final bullet point, "obtaining the credentials to plaintiffs' software modules at WRI," what are you talking about there?

A  I believe -- I'm thinking a moment.  That's when I believe -- I may be confusing the names -- that Liz Corbin gave credentials for people from EMS to log onto the platforms.  So that -- I forget which email that was, but there was a:  You know, we need to log on and walk through the system, see it works, and Liz Corbin is like, Here they are, do anything you want, place orders, just say "test"

in it so it doesn't go all the way through.

Q  Do you have any opinion, separate and apart from Eaddy and Breht, about paragraph 41, the replication of the software platform's functionality and business logic, or are you relying upon someone else to -- for that issue?

A  So that's -- to be clear, that's my opinion, not theirs necessarily.  What I'm saying is by accessing the sites, and not having a design document, that allowed them to get started more quickly and to do some debugging and figuring things out by having had access to materials.

   I don't think Eaddy actually comments on that.  So what I rely upon him is that they had access to site materials, that -- and what I'm saying is, assuming -- because they had access to the site materials, they skipped any sort of specification or design phase, and went purely into development and, you know, there may have been issues with that, but that's how they got things up -- that's a mechanism to get things up very quickly.

Q  So by EMS having the ability, through these things you cite, to see the websites, it allowed them to skip a specification phase and go right into

design.

A  Sure.  And there is -- and you might argue that there are other ways of attacking it, but my point here is that they gained value by looking at the sites, looking how it's structured, looking at the content; they began developing something very quickly, and more importantly, were able to not go down a lot of dead -- like one thing that happens with software development is, in the beginning, you make some choices.  You go down some dead ends.  You go back up.  By looking at a working version, you have a blueprint of something that works.  That's an advantage.

Q  Sure.  And that's just an advantage.  Whether there is any restriction on that or not is another question.

A  Yes.

Q  You say in 42, "This allowed EMS to begin implementation without fully understanding the details of the solutions and services plaintiffs previously provided."

   What's your basis for saying they didn't fully understand the details?

A  Oh, they had many emails where they would be asking questions.  And again, this is not

Page 130

necessarily wrong if you had the rights, but they began implementing before fully understanding, and during their development process, they would ask details of WRI.

MR. ROSEMERGY: Make sure you let him finish before you jump in.

A  My apologies.

Q  So in your view, it's inappropriate to begin writing the software before you've completed this full design -- specification design phase?

A  Not necessarily. But in this case, they were asking WRI specific questions of how things were implemented, i.e. we don't know how to give access levels, and WRI says, Here it is in the database; here is what it means.

So WRI was using its knowledge of implementation to direct EMS. If you had the rights, that's a very fast and efficient way to do it. And if you don't have the right, it's not a good idea.

Q  And whether or not EMS had that right depends on whether there was anything legally applicable that prevented them from doing it?

A  Which is outside the scope of my report. But I'm partly explaining here is that there was an

Page 131

advantage in doing it that way.

Q  Yeah.

A  And therefore, motivation. Not that I go into motivation.

Q  And I think paragraph 44 kind of summarizes this whole section, that it's always much faster to copy a correctly functioning solution, and you're being asked to assume there was no right to do that.

A  Correct.

Q  And just to be clear, because I think we addressed this earlier, but maybe now that we're in the section, maybe that's what refreshed your recollection.

A  Certainly.

Q  Are you giving any opinion with regard to this discussion, this section we've been talking about, as to how much faster?

A  No.

Q  Okay.

A  Sorry, let me rephrase that.

I don't give a direct comparison. Later on, I talk how long it would take for them to do it if they had done it cleanly, which is a slightly different thing.

Page 132

Q  Sure, because it doesn't take into account how much time they did spend. It just looks at it from the abstract, how much time it would have taken.

A  Certainly.

Q  But it's not a difference. It's a total.

A  Sure. Yes.

Q  Your next section starting at paragraph 46 is an opinion that Engage should have developed a website using a clean room, right?

A  Yes. That if there is a question as to, if you have the rights to materials, the smart thing to do is to do a clean room implementation so that if someone challenges you legally, you have a defense.

Q  Okay.

A  Not that I'm making any legal comments.

Q  And that's what I wanted to clarify. You're not giving an expert opinion that they were obligated to use a clean room. You're saying in your opinion, it would have been smarter to use a clean room.

A  Yes.

Q  And smarter because they might not have ended up in this litigation.

Page 133

A  Yes. And just to clarify, people often think, oh, I don't have to do a clean room, we'll just do it and we'll be careful, and the problem with that is that that's fraught. So while it's possible, the advantage of the clean room is to protect you because otherwise, some engineer makes a mistake and then you have violated materials. So the clean room is a tool but I will -- I'll stop now.

Q  Okay. And to be clear, had a clean room been implemented, Western Robidoux employees would have been able to participate, right?

A  In the specification phase, not in the development and -- not in the design and development phase.

Q  Okay. And BIVI employees would have been able to participate in the specification phase, right?

A  Yes. In fact, I believe I mention they would be ideal.

Q  And CEVA employees would have been allowed to participate in the specification phase.

A  Yes.

Q  Would employees at WRI, CEVA, and BIVI be allowed to participate in the testing phase once software is developed?

A  So after you have a development plan that is based off the specification plan, eventually they're

(913) 385-2699                                              mail@aaacourtreporters.com
AAA COURT REPORTING
Case 4:15-cv-00364-BCW    Document 695-1    Filed 05/31/19    Page 34 of 99

Page 134

going to be involved, you know, at the end; they're going to use the product. They will certainly give bug feedback.

You could get into a sticky situation where the bug feedback reveals something. That's a hypothetical. You expect eventually for members of BIVI, CEVA, and WRI to use the software, obviously. It is possible that they could violate and reveal intellectual property as part of either late term feedback or debugging. I don't know if there is a mechanism to account for that, other than that needs to be tracked and supervised as well.

Q Okay. Are you intending to give an opinion in this case that the defendants copied the InfoDeli software platforms for context?

A Yeah.

Q In paragraph 46, you say, "Given my understanding and assumption that the defendants did not have the rights to the InfoDeli Software Platforms and were prohibited from reverse engineering, copying or recreating the functionality," what I'm wanting to know is, you set forth an understanding and assumption. My question is, are you intending to opine -- and we've talked about reverse

Page 135

engineering.

A Yes.

Q Are you intending to opine that the defendants copied the InfoDeli Software Platform, as that term is used in the Terms of Use?

A No. No. I am commenting on recreating the functionality.

Q Okay. And what is your comment on recreating the functionality?

A What is my comment on recreating? My opinion?

Q You said a minute ago, you're commenting on the functionality.

A Oh, sorry. That EMS, by using the InfoDeli software as a platform, was able to recreate the functionality, was able to create a replacement more quickly and with higher quality than if they had not had access to the materials.

I'm not claiming that it was copied as in chunks of code were copied. They may have been, but that wasn't part of my report, not what I'm opining on, and with reverse engineering, that becomes a bit of a definitional thing of, well, part of what they did could arguably be called reverse engineering.

I don't really comment on that. But I'm not

Page 136

saying it didn't happen. It's part of what might occur as recreating, that depending on what they did from the database, and what they did from the content, and what they did from the HTML files they did see, some of the functionality, while they were recreating it, someone else might say, well, that was reverse engineering.

I don't know if it matters, but I just -- you know, so I'm not saying they're copying. I'm saying there may have been reverse engineering. I don't opine on it, but they certainly recreated, based on, to my understanding, access to materials that they did not have rights to.

Q Okay. And what do you define as "recreating functionality"?

A Recreating functionality, or specifically a replacement site, that it's a site that does something similar. Specifically here, it is a site that does something similar using mechanisms that are not necessarily publicly known.

So they did a replacement, and it was not a replacement based purely on some specification of what it needed to do, that by communication with WRI, and by looking at the database, portions of the database, and by looking at content, and by

Page 137

looking at portions of the websites in the HTML code, they got an insight on how things worked, were able to build a replacement more quickly using intellectual property of InfoDeli, and that to avoid infringing on intellectual property of InfoDeli, if they have these -- if only InfoDeli had the rights, then you would have to do a system where you did not have people who were exposed to the details of implementation as part of a design.

Q And do you have a specific list of functions or functionalities that were copied from InfoDeli to the new platform?

A Well, so the most obvious is the access levels for the reps.

Q Okay, and there's two questions. First question is: Do you have a list? Is it anywhere in your materials?

A I do not have a list.

Q And we talked about the access level functionality.

A Actually, sorry, let me pause a moment. I describe the functionality that a replacement system needs, and the functionality of the replacement system, to the best of my knowledge, exists in both systems or would be needed in both

Page 138

systems.  That's not the same as a list of things that were copied, if that was the question.

Q  Let's come at it from a different direction because I fear we're missing each other in deep rabbit holes here.

A  I'm not trying to be difficult.  I apologize.

Q  Yeah.  Your clean room you're talking about would result in the recreation of functionality, right?

A  Of functionality, not implementation.

Q  Sure.  And so what I'm trying to understanding is, where is your line?  You've got this recreating the functionality being prohibited, but you're saying they could do a clean room which would recreate the functionality.  I'm trying to figure out the line here.

A  Oh, recreating the functionality with using methodology or specific implementation from the previous site that they should not have had access to.  Did that make sense?

Q  Okay.  And what about the previous site is the line?  So for example, let's say there wasn't a clean room, which there wasn't, but the access was, this first bullet point in paragraph 40:  The presentation or demonstration of the Lit Stores on February 26th and March 4th; in a conference room,

Page 139

put it up on a screen, what does it do?

A  Okay.  So your question is, if they access the sites before there was -- if they had the rights to access the sites, was there anything wrong in accessing the site and recreating it without looking at source code or anything?

Q  Yeah.

A  So if they had the rights, then it is -- that is not unreasonable.  If -- I have been asked to assume they did not have rights to access InfoDeli materials.

Q  And I want to be clear, because you talk about InfoDeli materials, and your definition of that includes a lot of stuff in the database and other things.

A  Sure.

Q  And I don't -- I mean, that's a bigger question.  What I'm talking about is -- because you've set forth a clean room that requires some kind of written specification being handed off to someone who then takes and turns in something else.  So what I'm getting to is, in your view, where can they no longer recreate the functionality without using your clean room process?

A  So part of this about terminology, you keep saying

Page 140

functionality, and the purpose of the clean room is to separate functionality from implementation.

So for example, if they are looking at the sites, and communicating to WRI, and getting information on how things worked, so when you show, oh, and here are the reps, and, oh, and here is how the reps do X Y Z, that's fraught.  At that point, you don't have anything to point to, to see if a line was crossed.

The whole point of the clean room is, by having a specification document, you can point to that and say, oh, there is nothing in here that they did not have rights to.  And when you have all of these other activities, it could become fraught.

Now, I understand the question you're asking is, if they had the rights to go to the site, is there a problem.  Like, if they had the rights to go to the site, then I don't believe there is a problem, but that's not what I'm opining on.  I'm assuming they didn't have the rights to the site, and I'm saying, oh, by going to the site, they didn't do a design doc.  They saved time.  By going to the site when they had a question, you know, that wasn't something they had to spend a

Page 141

lot of time working out in the specification design doc; they can go back and say, oh, yeah, here is how they did it.  So I'm not opining on rights.

Q  Do you, at any point in here, give an opinion on the events occurring prior to March 11 versus events occurring after March 11?

A  No.  I state things to give context and history, but I'm not opining on those at all.  I have been asked to assume that the defendants did not have rights to access the materials.  I'm working based on the report of Jason Eaddy and other reports that at least some materials were accessed.  I give some examples of, if these materials are accessed, it would give you an advantage.

I also state there is no specification document.  There is no design document.  The Master Services Agreement says, Look at the site and rebuild it and we'll give you the content.

If you had the rights, that's, you know, a very efficient way to do it, and I've certainly done projects like that.  But they -- but it shows they gained an advantage by doing it that way.  Most importantly, they did it that way because they thought it would be faster, and if they had

Page 142

the rights, that's fine, and I'm not opining on rights.

Q Sure. And what I'm just wanting to make sure, and I'm pretty sure I know the answer, and I want to make sure we're clear on it --

A Sure. Understood.

Q -- something happened on March 11, right? Terms of Use were posted.

A Yes.

Q My question is: Does your opinion here in your report that you're intending to give at trial divide anything -- for example, you have all those hours that it would have taken to do something. Does it -- and you talk about not having access. Do you in any way use the March 11th Terms of Use date as a divider for any piece of your analysis?

A I don't think so, but I may want to -- I may need to think about that longer. Again, my report is based on the concept that they did not have rights, and I'm not opining on details of that.
So I could imagine there could be information there that I might then want to re-examine, but at this point in time, I'm not making any distinction.

Q Okay.

Page 143

MR. BLEGEN: With that, it's 12:58, so why don't we take a lunch break.

(Lunch recess taken.)

BY MR. BLEGEN:

Q When we broke for lunch, we were on page 23 of your report, which begins a section: Industry Standards Regarding Software Estimation and Effort Lines of Code Per Day, and that, I believe that section goes from about 56 to about 66, is that right?

A Yes, I believe again, there may be some paragraphs later that refer back, but that is what I would think of as that section.

Q So that section is kind of where put your baseline that you then applied later in analysis of the lines of code issue here, right?

A Yes. Correct.

Q And you cite in paragraph 57, articles or documents with a various range of estimated lines of code per day for a typical programmer, right?

A Correct.

Q One for '95, one from '06 and one from '12, and then one that doesn't have a date. Do you happen to know the date of B?

A I don't know it off the top of my head. We

Page 144

ordered that report, and there is a link to it down there. I believe it was relatively recent, but I couldn't swear to that.

Q Okay. Have you ever done any analysis of average lines of code per day, or are you relying upon other sources for your knowledge?

A A little of each. I've never done an analysis of lines of code per day, but it is something that you often discuss, and when looking back on projects, think about.
For this analysis, I looked at these four references and then compared that to my own experience, but I have not done a historical analysis myself.

Q Okay. And you adopt a 25 lines of code per day standard, right?

A I do.

Q And how did you get to your 25 lines of code per day standard that you're applying?

A Okay, so mostly when I looked -- so these are people who talk about lines of code per day. Most people, when they talk about their project and how long it takes, almost always quote the 10 lines of code per day. And that seems low to me, and I thought there were two reasons that people might

Page 145

quote that number. One is, of course, they just want to inflate their system. Like, oh, at 10 lines per day, it's X Y Z, and secondly, they may often be talking about really complex systems. I'm thinking in particular about Linux. Many of the references about, if you say, oh, how much would Linux cost, everything I've seen always quotes, at the end of the day, 10 lines per day.
So I felt that was too aggressive. When I was also looking at these range of numbers, some of the higher -- and of course, some of these ranges are quite large, and while in one sense, that may be true, it is not necessarily accurate or useful.
When I looked at some of the lines per code per day that are much larger, it wasn't clear to me what size projects they were talking about, or if they were talking about projects where several people were communicating.
So I, when going through these numbers, thought okay, I want to be conservative, but I don't want to be crazy. So I started by doubling the 10 lines of code per day. That gave me 20. And I thought, okay, I'm thinking a range of 20 to 30. And I was initially thinking of maybe doing

Page 146

an estimate based on that range of 20 to 30, and then a range of code size of the small -- and we'll go into this later, but InfoDeli's is smaller, EMS's is larger.

When I did the code range, and that vast range of that big difference in code sizes, I got a very large range, and while on one level that's true, it's not necessarily useful. It isn't necessarily accurate.

So when deciding to try to make my analysis more focused, I decided to go with just the InfoDeli code base, which is smaller, and therefore the more conservative estimate, and we can get into that later, but what I believe to be the more conservative estimate in terms of the size of the project, and therefore, the effort required, and I chose an average of the 10 to 30 -- 20 to 30 of 25, and I was pondering whether or not I should keep that as a range, and I realized I was talking about multiple programmers, and so that I think the expected value of 25 holds true because some programmers will be a little better, some programmers will be a little worse, but by the fact that you have a group of programmers, it was reasonable to use a single

Page 147

number as part of trying to give a more focused analysis.

**Q Okay. Did any of these standards that you cite here in paragraph 57 have to do with programming in Lasso?**

A Not to my knowledge, but many of them mention multiple languages. Lasso is essentially PHP. Some of them do mention PHP. And PHP and Lasso are virtually the same thing. Not -- for most -- most programmers would consider them similar, if not the same thing.

**Q Okay. Now, you also then provide this port example of the DOSE system.**

A Yes.

**Q Where you -- explain to me what you're talking about with the DOSE system.**

A Okay, so with the DOSE system, we had a large program running -- written in something called Perq Pascal, P E R Q Pascal -- running on a computer called the Three Rivers Corporation machine. This was basically a deprecated system that doesn't -- that, you know, was being discontinued.

So my employer, Siemens Research and Technology Laboratories, wanted to migrate this

Page 148

application, which was quite large, over to a Sun work station. And that was 50,000 to 35,000 lines, depending on how you count, because there were some difference in sizes depending on the language. But let's call it 50,000.

So in order to port that would normally take a very, very long time, and what we did was we got some mechanical tools that did mechanical translation of the code. So we take this Perq Pascal code, make C code out of it, and it wouldn't quite compile, but it would be -- it would do a fair amount of heavy lifting, and then over a period of nine months, I would go through, and I was essentially changing that to make it all work, and then over a period of three months, there were two other programmers, and we did the polishing and got the system into its final state.

So if I remember, if can I count how many months that is...

**Q I think it's on the top of page 26, if that helps.**

A Thank you. Sorry, I just don't want to misquote numbers.

Yeah, so basically, that came out to approximately 18 consultant-months, and that worked out to be roughly 138 lines of code per

Page 149

day. And what I'm saying here is, oh, yeah, there is a case where I wrote 138 lines of code per day, but I wasn't writing from scratch. That was a case where I was translating a program. I had tools. That was -- you know, I wouldn't call that all human written code, and in the earlier paragraphs, I go on to some labor about how this analysis is about code actually written by a person as opposed to code from a library, or code that was written by a tool, and I imagine we will get into that later.

So the whole point of DOSE was to show, oh, yeah, a person can write 138 lines of code per day or more, but that may not -- that typically is an indicator that it's, especially for a large project, that it's not being written from scratch.

**Q Okay. And your, one of your underlying assumptions here is that the hypothetical coder for your hypothetical clean room would not have any access to InfoDeli's code, right?**

A Correct. So the -- again, this gets a little complicated. My hypothetical coder for the replacement to InfoDeli's code wouldn't have access to InfoDeli's code. They would have access to open source, off-the-shelf software; so many

Page 150

things that might bump up the total count of software dramatically.

So just to be clear, I could imagine with the clean room solution that you might have a solution that's a million lines of code, and 22,000 lines of code were written by a person. What matters are the 22,000 lines of code. The other code, and as I showed in my other analysis, we're not counting in terms of the effort required.

Q   Okay. Would it be possible to do the 22,000 lines of code in your opinion at the 138 lines of code per day?

A   Without a reference? That -- when you see something on the order of 138 lines of code per day for a large project over a large period of time, that is usually indicative that it was not written from scratch; that either you had a tool, or you were porting something that you were able to use that code either as a blueprint, or literally transliterate that code. I have other projects like that I can discuss.

Q   Okay. So it would raise flags with you, but it's technically possible to do it, right?

A   It would raise flags with me. It is within the

Page 151

realm of possibility, but highly unlikely.

Q   What about 100 lines of code per day?

A   I understand. In general, I would expect, once a program has been written, debugged, tested, that -- so I'll explain. Often, you have a programmer who will come to you and they've written a program, and they've averaged a hundred lines of code per day, and I'm like: Great. I'll test it. And this was when I was running a large multimedia, and usually, within five or ten minutes, I would break their program and tell them, oh, you have to go back and fix it. And the people would get very upset.

My partner would explain: It's not a question about whether Medge -- my nickname -- can break your program, but how long it will take. So they'll go back. They'll work on it a few more days. Come back. I might break it again. Takes a little longer. Happens a third time.

By the time it is done and I cannot break the program easily anymore, the chances of them having written a hundred lines of code per day are virtually nil. The first version may have been a hundred lines of code today. The tested and debugged version, 25.

Page 152

Are there programmers who might write a hundred lines of code per day, even good code per day? Sure. They are highly unusual. Are there -- do I expect an average programmer to average 25 lines per day once everything is tested and built? Yes, I do.

Q   Do you have any opinion as to the skill level of the programmers at issue at EMS?

A   I am -- for all of my analysis here, I'm assuming good programmers who are well-connected; that typically means co-located.

I think that is the sort of team that would have been put together if they had decided to do a clean room. It is not my -- I have not been asked to give an analysis of the quality of the team that did the other work.

Since we're talking about hypotheticals here, you might assume a difference in quality. If I were to have made such an assumption, I would not assume that is the team that would do a clean room.

Q   Okay. What about, say, 75 lines of code per day?

A   Again, highly unlikely. I would not expect 75 lines of code per day as an average from any group of programmers, unless they were exceptionally

Page 153

skilled, for a completed final project.

Q   What about 50 lines of code?

A   And again, that is unlikely, and more importantly, when I look at the averages that other people have discussed, that's getting into the high end, and no one that I saw quoted numbers like that, that didn't also quote a lower range that was much lower.

Q   Then the next section, starting at paragraph 67, and I think running through maybe 92?

A   It's pretty long.

Q   Yeah. Trying to figure out where.

Yeah, I think it's running through 92. Maybe gets us the -- or maybe it's 88. Is that your analysis -- 67 to 88, is that your discussion of how you got to the 22,000 lines of code that you are using?

A   22,955, but yes, it is. I describe how I arrive at that code base.

Q   Okay. And describe for me how -- your opinion on how you get the 22,000 and change?

A   Okay. So obviously there were productions of source code from both sides. When I did an initial look at those directories, you come up with very large numbers, and as you can see, you

know, millions of lines.

But that isn't all, you know, produced material. So the first thing I did was remove things that weren't actually program files, and they were, like, log files and things. Sorry, I just want to make sure I don't skip any steps.

And then the other thing -- and then at the same time, I went through and removed things like comments or blank lines. So for the next, at the end of paragraph 71, I get to what are actually lines of code for each project. And that's -- you know, again, this is the entire directory; this includes libraries, this includes, you know, many other things.

So the next step then is I de-dup.

**Q Just backing up here, the first thing, removing the nonprogram files, that's what your -- what are your steps here? Seventy is the total, right?**

A Seventy is the total. So actually, from 70 to 71, let me just check. Yeah, there was a log file in -- so I go through and I remove anything that's not code, that I don't recognize as code, and as part of it, there was one file that was a log file that was huge. So that's why Vectra is such an enormous change.

**Q And what is a log file in that paragraph?**

A A log file would be output from a website or a database. So it's usually output from the running of applications you might use later for debugging, but it's not part of the source code. I forget why it was in that directory. Probably not intentional.

**Q Okay. So you took out the log file.**

A Took out the log file, took out any lines that weren't code; so comments, blank lines, et cetera.

**Q Okay. And that gets you down to the numbers that are in 71, right?**

A And that gets me down to the numbers at 71.

**Q Okay. What is the next step?**

A Then the next step is to look for files that are duplicated. You might have the same file in different places in the source tree, so I just went through and removed any duplicate files just -- that is, that that file was written once and then placed somewhere else. So I got rid of all duplicate files.

**Q And how do you do that?**

A Oh, you use a program called Dif. Or actually, there is a couple of ways. I'm trying to remember. I think for this I used CLOC. But the

simplest way is there is something -- are you familiar with the concept of an md5sum?

**Q Yes.**

A Okay. So one way is you take an md5sum of everything, and any files that have the same md5sum, you know it's the same file, because you can't just do it by the size of the file, and you can't just do it by the name of the file. So I used CLOC. And I'm trying to remember, I'm trying to remember the mechanics, but there is a way to tell CLOC to discount duplicate files.

I cannot testify exactly the methodology it uses off the top of my head.

**Q Fair enough. So you took out duplicates. That's 72. What next?**

A Then for 73, I began to remove all of that prefabricated source code I talked about.

So as I mentioned, the whole idea of the line of code analysis is based on code actually written by a person. While you have to spend some effort, for instance, using a tool to generate HTML code, et cetera, that's a very different beast, and it's not included those sorts of analyses.

So what I did here is I excluded any

unmodified lines of the code using Dif, and -- I just want to make sure I didn't race ahead here.

Oh, yes, so what I did here, sorry, what I did here is I ran Dif between the code bases and the vanilla code bases of the frameworks they were based on. For EMS, they used Magento 1.8.0. So what I did is, like, I took an off-the-shelf Magento 1.8.0, did a Dif of that versus our files; for the code that was the same, I threw it away. For the code that was added or different, I kept it. And then I also did that for WordPress 4.1 for Vectra, for their Vectra Rebate, and then earlier version, 3.5.1 for InfoDeli's version of Vectra Rebate.

**Q Did you do any comparisons to off-the-shelf code for InfoDeli's prior Lit Store implementation?**

A Sorry, the -- I did this for the -- when you say prior implementation?

**Q Well, the Lit Store implementation by InfoDeli.**

A Yes, that's included in the -- if you look at the chart for CEVA and BIVI, those are the InfoDeli stores.

MR. ROSEMERGY: Make sure you let him finish his question.

**Q And that wasn't my question. I know that's what**

Page 158

the boxes are. What I'm saying is, did you compare -- for EMS, you compared the code to the preexisting Magento code?

A Magento.

Q Did you compare the InfoDeli code to any preexisting code packs or code sets?

A I did for Vectra, but I didn't for InfoDeli, for the Lit Store for CEVA and BIVI because that wasn't based on a framework in the same way.

So Vectra Rebate by InfoDeli was based on the WordPress framework. EMS used a later version of WordPress for its Vectra Rebate site, and then for the Lit Stores for EMS, they based on the Magento, but later I looked at other packages. But the Lit Store for CEVA and BIVI built by InfoDeli to my knowledge was not built upon a framework.

Q Okay. So you're just talking about framework, not --

A I haven't gotten into libraries and things yet. So Magento is a big framework. Then you can also bring in libraries. And I will address that soon.

Q Great. What did you do next?

A So next, so the main thing here is, this still is including a lot of different type of code; HTML,

Page 159

JavaScript, PHP and Lasso, and others. So, so far I haven't done any analysis based on the type of code.

Q I think you're moving to the next.

A Sorry, you're right. Just a little nervous.

And so the main thing here is there are two types; there's programming languages, which are more about the actual functionality of the site, and there are programming languages, which are more about just display and the basic structure. Most of the stuff for the web base site for just the display come from libraries, come from frameworks, come from tools. So I discounted all of that sort of code, so all the HTML, et cetera, et cetera.

Sorry, I just don't want to race ahead.

Yeah, so in the end, I included just PHP, JavaScript, and Lasso in counting the code that I believed was human written for developing these applications, and I discounted all of the other code -- and this is substantial -- that may have been generated by a tool and may have been brought in by a library.

Q Okay.

A And in addition, on VectraRebate.com, a lot of the

Page 160

back end work was done in FileMaker Pro, and the work in FileMaker Pro is stored internally in binary files. So that doesn't lend itself to line of code analysis. So I also discounted the FileMaker Pro logic in building my conservative estimate.

Q So in all of that, those last few things you talked about, programming languages, FileMaker gets you down to your paragraph 79 total, right?

A That is correct.

Q So what you have left then is PHP, Java, and Lasso, right?

A Correct.

Q And PHP was used by EMS, and Lasso was used by InfoDeli?

A Correct.

Q Now, those are different code languages, right?

A They really -- I don't want to get into a fight, but Lasso is essentially PHP. It's essentially PHP. Not making any comments of -- but I'm just, for accuracy, Lasso is essentially PHP.

Q If you programmed in PHP and parallel programmed in Lasso to do the same thing, would they have the same number of lines of codes?

A They might.

Page 161

Q They might but they might not, right?

A They might not. I'm trying not to speak.

Q Well, do you need to clarify your answer there?

A Well, what I would say is, if you were to take two files of Lasso and PHP and compared them side by side, the vast majority could be identical. Lasso is essentially a flavor of PHP. I'm not trying to make a big point with this, but it's not a different language, the way Java and JavaScript are. I mean, it's essentially a modified PHP. I don't base my analysis on that. It's not an opinion, but I just don't want to go down on record as saying that they are different things when they are only marginally different things.

Q But they could end up with a different line count for the same task.

A Yes. Yes.

Q And then you talk about the back end business logic functionality for the Vectra Rebate that InfoDeli implemented.

A Yes.

Q And you took out FileMaker Pro, but the Engage code, the EMS code to accomplish those same things was left in, right?

A Correct.

Q  So you've taken it out of InfoDeli, left it in EMS, so that's going to -- it's not an apples to apples at that pint?

A  That is fair.

Q  Then we move on.  What's next?

A  This is where I talk about excluding libraries, and so we've already talked about the framework, and here is where I talk about, well, in addition to the framework, there's lots of library code. They tend to live in the community subfolder and plugins subfolder, so again, that may have included code that may have had some changes made to it, but out of what I'm attempting for a conservative estimate, I remove that library code.

Q  Okay.

A  Sorry, just trying to keep my pages straight.

Q  So on Vectra, InfoDeli Vectra implementation, for example, it started with 7.6 million.  You took out the log file, took it down to 378,000, right? Correct?

A  Correct.

Q  Then you took out duplicates, it took it to 373, right?

A  I believe that is correct.

Q  And then you removed the WordPress standard code,

it took it to 179, right?

A  Yes.

Q  And you removed the non-PHP, non-Lasso code, and it took it -- and other things, and it took it down to 146,000 lines of code, right?

A  Correct.

Q  But then, when you removed the third-party plugins that weren't written by Breht, it drops it all the way down to 1291, right?

A  Yes, so that's --

Q  So Vectra really only has 145,000 lines of code that were third party plugins, and only 1291 lines that were original, right?

A  That I believe is accurate.
   May I make a comment?

Q  Is it part of your opinion?

A  It is part of my opinion.

Q  Okay.  And what is your comment as part of your opinion?

A  One thing to remember with the Vectra site is the Lit Stores had a lot of content and a lot of code. The Vectra Rebate site was less, much less content; a little code, a lot of the database.
   So this doesn't reflect the database complexity of the Vectra site, which is a fair bit

of the effort, and of course we've already talked about that the FileMaker Pro was discounted, and it does not reflect that effort, as we had already acknowledged.

Q  Yeah, because it was using FileMaker Pro, which is another software company's software.

A  Right, and something that doesn't lend itself to this sort of analysis.

Q  Because there's no one in a clean room, if they're going to implement it, would have to rewrite the code because they'd just buy FileMaker and configure it the way they want it to work, right? No.  No, actually, you can write logic in FileMaker, but it's not lines of code the way PHP or Lasso is.

Q  So it's configuration logic as opposed to code.

A  Some of it is actually code, is business logic, but it doesn't lend itself to this sort of analysis, and so I took the path of, when in doubt, choose the smaller amount when -- because when I'm estimating the final work, I don't want it to look like I've overestimated anything.  So I believed the conservative path was to discount FileMaker as opposed to try to create an estimate for it.

Q  Okay.  So there we are, we finished with paragraph 80, and then what was your next step of your analysis?

A  Well, so I said, okay, we have two code bases here.  Obviously, the InfoDeli code base is smaller than EMS.  Let me just go -- sorry, just want to see what it actually said in my report as opposed to what I'm thinking in my head.
   I go into some explanation of why they may be different, but then I said, okay, the one thing we haven't done so far is that the two Lit Stores are, in fact, very similar.  So I said, again, in order to have a conservative analysis, I then ran a Dif between the two Literature Stores and only counted the code that had been added or modified.
   So the idea is that -- so let's say each Lit Store was 10,000 lines of code.  I took the 10,000 lines of code from the first one, and on the second one, I took any lines that were changed, or any new lines that were -- new code lines that were added, so as to have a more conservative estimate of the effort necessary to program both sites.

Q  When you say the first one to the second one, what do you mean?

Page 166

A    CEVA to BIVI.

So I did the first –– I did the line counts on the CEVA code, and then for the BIVI code, I only counted the changed lines or the additional lines.

Q    Okay.  And you say "changed" and "additional."

Did it matter for that analysis which platform was developed first?

A    Not really.  I could have done either way.  You would get the count from the first and then the delta from the second.  It really doesn't matter the order.

Q    Did you do it both ways?

A    I don't believe I did.  I only recall doing it the one way.

Q    And so it's possible you would have come up with a different answer if you'd started with BIVI?

A    No, I actually think the numbers would be the same; that –– because you're talking about delta or change, let me think about this a moment.

I would have to go back and look at it again to give a fully correct answer.

Q    Okay.  So you did that comparison, and then you swapped that out for the BIVI boxes, right?

A    Correct.

Page 167

Q    To get the new subtotal?

A    Yes.

Q    And then what did you do?

A    So then I said, okay, so here is what I believe the two code bases are.  It's the code written for CEVA, the delta code written for BIVI, the code written for Vectra, and for both InfoDeli and EMS platforms, I total them up, and I say, okay, right now I believe –– and there's always the chance I missed some libraries –– I believe this counts as an under-count because of so many things that I excluded, but that, at a minimum, these were the lines of code written for the solutions.

Q    And why did you use InfoDeli's instead of what EMS did?

A    I wanted to give a more conservative and therefore defensible estimate, and I thought, well, we know the InfoDeli works.  We know the InfoDeli system matches the specifications of what the solution should be.  That seemed to be the more conservative, to be honest, honest target.

I thought of, as I said, doing a range, but the way EMS wrote their code, I was less certain of the 144 number being accurate than I was of the 22 number for InfoDeli.

Page 168

So I was like, oh, the EMS number, I've done everything I can, but the way they wrote it makes it harder to know for sure, and 144,000 lines is a lot of code.  I don't opine on that.  But because of that, I decided that the more honest conservative code base that I knew met the needs was the InfoDeli code base of 22,955.

Q    Okay.  And once again, this whole analysis is assuming that in the clean room, the code will be written from scratch, right?

A    Written from scratch.  So the way I'll phrase it is, this gives me a target for the clean room, in that you don't know in advance how big a program will be usually when you're doing an estimate.  Here we have a very different situation.  We're actually trying to estimate how long it would take to implement something.

I decided that the most accurate way to do that was to look at the size of the previous implementations and use that as a target.  So in this case, I said, I know the InfoDeli systems work.  I know the InfoDeli systems meet the specifications.  That is my target for the programming effort.

Did that answer the question?

Page 169

Q    I think so.  And moving on from there, are you assuming that InfoDeli, the 22,000 lines, 22,955 lines, is the most efficient solution that this clean room would have come up with?

A    It is –– it seemed to be the most likely, especially in comparison to the EMS solution.  If you're asking me, is there the possibility there would be a solution that was bigger or a solution that was smaller, I mention in my report that when it actually occurs, that would all be based on the design process, and I don't know –– you cannot know necessarily what design decisions EMS and WRI would make.  Given the size of the EMS code base, I thought the 22,955 was a very conservative, reasonable estimate.

Q    Okay.  But it is –– for your analysis, you're taking lines of code in an existing software program and using it as a proxy for lines of code that would have been generated if a complete clean room process had been implemented like you are advocating?

A    Yes.  If I understood you correctly, I believe that is accurate.

Q    Okay.  And if the ultimate developer in the clean room decided to use standard, either open source

Page 170

or off-the-shelf software with standard available plugins that are available, it could make the lines of code significantly less than the 22,000, right?

A  No, I'm actually assuming that they're going to do that, and the idea is that the 22,000 represents the customized code, the business logic code. None of this is the basic code of a framework or even of an E-commerce site; that this is all the custom code that was the business logic that sits on top of many libraries, in open source or off-the-shelf software, that does the heavy lifting of the website.
   Again, when I look at these two number counts, after having removed all libraries, all frameworks, et cetera, and knowing that I took out the FileMaker Pro logic, since it was an easy count, the 22,955 is a very conservative estimate.

Q  Have you -- and then paragraph 88 just takes that 22,955, multiplies it times your 25 lines of code a day number to come up with the programmer hours, right?

A  Sorry, just let me get to the right paragraph.
   Yes.

Q  Okay.  And then you take that 7345.6 hours and it

Page 171

is used later in your analysis.

A  That is correct.

Q  Okay.  Have you ever given an opinion in any case on this 25 lines of code per day or any other lines of code per day number?

A  No, I have not.

Q  And just to confirm, this methodology, paragraph 67 to paragraph 88 on this Lines of Code analysis, you've never used that on any other project?

A  I've done very similar things on other projects where it's not necessarily for line counts, but you're trying to find exactly what you have.
   So the methodology and the way of attacking this, while it was not identical, this is using skills I use all the time when doing code analysis.

Q  Okay, but as far as then applying that analysis to estimate how long it would take to do something, this is the only time you've ever done it, right?

A  This is the only time I've done an estimation like this for a case.

Q  And you don't cite it in here, so is it safe to assume that you can't tell me, you can't cite to me any industry standard that you are implementing in this paragraph 67 to 88 section?

Page 172

   MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

A  You mean in terms of process?

Q  Yes.

A  Oh, no.  I do not cite to any industry standard as to this process.

Q  Okay.  And are you aware of any industry standard as to this process?

A  I am not.  There are many different methods of attack, and again, it's going to be different for every system depending on how it's built.  So this was looking at, you know, systems built on WordPress and with Magento, comparing to vanilla installations, that methodology is very standard.
   Some of the other tweaks I did, that -- there may or may not be an industry standard.  I am not aware of a -- this becomes so broad, I'm not aware of an industry standard recipe that one can use.

Q  If you did not have access to the two pieces of software that you analyzed here, and someone asked you how many lines of code would it take and how long would it take to implement them, or to write them for the solution at issue here, how would you go about doing that?

Page 173

   MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

A  So the question is, if I didn't have access to the code and someone said how long would this take to build?  So then this gets complicated.  You would have to go through the design process I sketch out in the clean room, and so you would have to say: What are the specifications necessary, and how would you build it.
   And then you start entering a world of hypotheticals because without access to WRI, BIVI, and CEVA, I really cannot give an accurate estimate of what the design -- of what the specification and design would be, and therefore, that would impact.

Q  Okay.  And just to be clear, this process that we just went through here, paragraph 67 to 88, you've never published that process in any peer reviewed publication, is that right?

A  I have not.

Q  Are you aware of anyone who has?

A  I am not.
   MR. ROSEMERGY:  Dan, when you get to a stopping point, can we take another quick break?
   MR. BLEGEN:  Yeah.  I think I'll have one

coming up here momentarily.

MR. ROSEMERGY: Sure.

Q So this next section, 89 to 92 is -- you title: Time and Effort Delta.

What's this section covering, just high level?

A High. Just let me reread. So this section is just talking about, that EMS did use an off-the-shelf system, but that it was different enough that they did not appear to quickly -- they did not solve all their problems, and I quote how Ming Yao spent over 560 hours just trying to get the system working at all close to what they needed.

And then I just reiterate that even though there is the word "store" in the title: Lit Store, that that does not actually define what the Lit Store does.

Q Sure. And you talk about Ming Yao's 560 hours, but that's only about seven percent of the programmer hours that you use for your estimate, right?

A That sounds like an accurate number.

Q That's very rough ballpark?

A That's a fine rough ballpark.

Q Okay. And do you have an opinion as to whether 560 hours to customize Magento is more or less than it would have taken to get to the same spot had they started from scratch in this clean room world?

A We're taking -- and this may be my mistake, but we're taking that 560 alone. Obviously, there was a lot of the other effort that EMS brought in terms of --

Q Let me clarify, just to make sure we're on the same page. I don't want any confusion.

A Sure.

Q Ming Yao spent 560 hours to customize Magento to get to a point where you have Magento customized. It may not be all of the things Engage did, but it's some.

A Right.

Q And what I'm trying to do is apples to apples: Customize Magento by Ming Yao versus starting from scratch to get to the same spot, do you have an opinion as to which one would take longer?

MR. ROSEMERGY: Objection. Incomplete hypothetical. You can respond.

A There's actually a little too much of a hypothetical there.

I don't know, if they're doing a clean room, what they would have done. For example, it is conceivable with a clean room that they would decide to use Magento. You know, that is not incompatible with a clean room. If, after they had done a specification design, they realized how to most efficiently customize Magento, that might be a very logical course.

What happened was, they took an E-commerce site, and without having done a specification design phase, tried to hack it to work. I am not commenting on that, but I believe that does reflect the reality.

Q Okay. And to be clear, because you just used the word "hack" in there, there is a lay knowledge of that and there's computer knowledge of that. You've not talking about hacker like --

(Reporter interruption of overlap.)

Q -- you're talking about a computer programmer slang for making something work, right?

A Yes, for programming without a plan, if that's -- just to -- my apologies if that was unclear.

Q So your 22,000 hours took into account that the clean room person may have chosen to start with Magento or something like that, right?

A I'm assuming for those 22,000 hours, that there will be off-the-shelf software, publicly domain software. I do not believe the solution can be written in 22,955 lines of code. I believe the solution can be created with 22,955 lines of code of customized software on top of and integrated with a framework, publicly available, off-the-shelf.

You know, I'm imagining a scenario here of -- I am attempting to imagine the scenario of the most efficient way to implement a replacement site without using any materials. That was my goal, was to give the most conservative, favorable estimate. The lower bound, whenever I made a choice, I believe my report shows that I always tried to give the doubt to the defendant in terms of how much effort would be required to develop a replacement site.

Q Sure. And I guess one of the questions is, assuming that the clean room had decided to start with Magento when customizing, you cite 560 hours on customization. Do you have an opinion on whether that is more than should have been necessary, less than should have been necessary?

A It was just --

Page 178

MR. ROSEMERGY: Objection. Calls for speculation. Go ahead.

A  It mostly implies that -- it shows that Magento didn't meet the needs off the shelf. I did not form an opinion of how much effort should have been taken, but it wasn't 10 hours. It was -- how many weeks is that? 14 weeks? So it took over three months of just his time to get -- to modify Magento.

So the point there was, Magento was not an off-the-shelf solution that met the majority of the needs. How important that is, I guess is the question.

I never opined they should not have used Magento. I merely opined that Magento did not off-the-shelf replace InfoDeli Lit Stores.

Q  But you're not giving an opinion that the 560 hours is anything other than 560 hours, is that fair?

MR. ROSEMERGY: Objection. Vague. You can respond.

A  That -- it's indicative that it was not trivial.

Q  Okay.

MR. BLEGEN: If you need to take a break, this is a good time.

Page 179

(Off the record.)

BY MR. BLEGEN:

Q  Mr. Edge, from 93, paragraph 93 to the end is your analysis of the time and effort needed in the clean room, and then a comparison to something you generated using Cocomo-II, right?

A  That is correct.

Q  Okay. So you have a paragraph on cost estimation and some kind of background information. I want to get to, paragraph 101, you express your opinion that if the time is cut in half for development, there is a 50 percent increase in cost. Correct?

A  That is correct.

Q  And that's an opinion you're going to give in this matter?

A  It is.

Q  And where did you get that number?

A  That is based on my experience, and when clients would push to shorten a timeframe, they'd say, well, you know, put two people on it, and I always say, two programmers for one year is not nearly as effective as one programmer for one year. Three programmers might be. That's the sort of, you know, starting point.

So that is a good metric of how long it

Page 180

takes because of all the things I listed before in terms of communication, that not as much of the program is in your head, and there are limits to this; you can't keep doing this over and over again, but if you have a reasonable timeframe and shrink it to roughly half, I would expect roughly a 50 percent increase in effort on the programming side. On some of the content development side, it does not necessarily scale in the same way.

Q  Okay. What do you mean it doesn't necessarily scale in the same way as content?

A  That it's easier -- with programming, often you have to do one thing before you do the next before you do the next. I go a little bit -- I don't use the phrase "waterfall," but the waterfall is the concept.

You have definition -- sorry, specification, design, implementation, and then on the implementation, you will have pieces; there is, like, oh, you build this library code, and then once the library code is built -- so everything has to follow in a chain. Some things can be put in parallel, but you might start getting less efficient.

On content side, there is much less need for

Page 181

communication, that you're typically doing the exact same thing over and over again. So for instance, if you have 10,000 files that need to be processed, it's not necessarily that much slower -- it's not necessarily that much more costly to have five people do 2000 files each than one person do 10,000 files.

So just the explanation is: For content, you can do more parallelization than you can with programming. With programming, there is a cost in adding more programmers to a team, and more programmer cost in shrinking the time because you have less time to fix things if something goes wrong.

Q  Now, you cited your experience. Are there any written analyses, treatises, industry publications that express this 50 percent increase in time to do it in half the time?

A  No, no, that's my opinion.

Q  Have you looked to see if anyone has expressed an opinion on that?

A  I did, and I did not find any -- I did not find things similar to what I found on lines of code per day in terms of how -- what most people say, when you're talking about time increases, you'll

Page 182

fail. That's the central treatise; sounds like the Mythical Man-Month, is that you can't compress projects too much. You can compress some, but what most people say is if you try compressing a lot, you're going to be in trouble.

Q So, and just to make sure I'm understanding you, so there is some kind of written something you've seen that just flags that there are potential problems with compressing your timeframe, but as far as this 50 percent increase in hours to do it in half the time, that's -- you've never seen anything that supports that, other than your own experience?

MR. ROSEMERGY: Objection to the form of the question. You can respond.

A I did -- there was -- I'm trying to think. I didn't see anything at the time of the report that would indicate that.

Q Have you seen anything since the time of the report?

A I was -- I tried to run Cocomo to get a shorter time analysis, and it was showing rates going up, but I did not have a mechanism to put in these timeframes.

Cocomo, you can't say: I want the project

Page 183

done in six months. So there wasn't -- or X months. So I wasn't able to use Cocomo to get comparable numbers. I wasn't able to use Cocomo to get timeframes that were comparable.

Q Okay. And then as long as we're on the topic, you later talk about, that if -- you said, if you do it in half the time, it takes 50 percent more, right?

A Right.

Q And then you also -- this is paragraph 116, if you want to look at it -- you say that if you have it again, it takes another 50 percent of that, right?

A Yes. And more importantly, I say: And the probability of success goes way down. So it's -- you can't just say, oh, it will cost you more. It's, oh, it will cost more to do it in less time, and the probability of success goes down. If you do it a second time, it's going to cost you a lot more, and the probability of success becomes very low and -- you know, even this is a stretch, it is not something I would normally recommend, but I was asked to show what it would take in a variety of scenarios.

Q Sure. And again, this additional 50 percent increase to shorten it to three months, is that

Page 184

based upon any published standard of any kind?

A No. That is my opinion.

Q Okay. What you end up with at that point in time to get this done in five to six months instead of 14 or 15 months is 225 percent of the original estimated number of hours, right?

A Is that total or is that just for the code?

Q That's for the code.

A Let me look at the page just to be certain.

Q If you want to look at page 62, paragraph 145.

A Thank you.

Q But you could also think about, in terms of, it's 150 percent to do it in half the time, and another 75 percent on top of that to do it in a quarter of the time, right?

A Yes. So I believe those numbers are roughly correct.

Q Okay. Now, back to the narrative, you've got the Functional Specification calculation --

A Sorry, which page are you on?

Q Page 43, starting at paragraph 105.

A Thank you, yes.

Q This is the Functional Specification. These next two paragraphs calculate Functional Specification, right?

Page 185

A Yes.

Q And you come up with a total of 280 to 420 hours. How do you come up with -- where -- how do you get to that?

A Okay. So again, this is based on my opinion, on my experience. I've worked on projects of a similar size, and to do a design, two to three weeks is very accurate. Everyone always thinks, oh, we can design it in a day, and it just doesn't happen.

So what you want is a team of some technical people and some people who are either stakeholders or who know the product to be built, and you go through and you design the product, you specify what the product needs to do, and that's an iterative process; that you start talking about it. You know, you think you know everything on the first day and you don't.

I believe -- and especially here we're talking about a fairly large team because it's not just WRI, but you also have BIVI and CEVA, so you actually have three stakeholders, and that complicates matters because they won't necessarily have the identical needs, but what you want to do is build one specification that meets all these

Page 186

needs because later on when you build the program, you're going to write the program much more efficiently if you're including all the things you need to do at the beginning.

So I've laid out a 10-to-15-day sprint of a technical person and a collection of people from WRI and BIVI and CEVA to come up with a detailed specification phase, and as I mentioned, this is primarily an iterative process. It could take less, it could take much longer because what happens when you're in specification process, is you realize, oh, wait, these two things are almost the same. We can probably combine it. That will be easier to program later. Or you're like, Oh, we haven't done it this way before, but this is what we should do.

So I guess there is the possibility that, you know, it would -- it might be faster to design something slightly different than the existing InfoDeli store. If you said, all you have to do is do exactly what the InfoDeli store did, then you're not certain -- that might actually come up with more complex projects later.

So as part of the design phase, the specification phase, you're trying to think of

Page 187

everything that needs to be done, not reveal any information about how it was done in the previous system, and if you're smart, this is where you spend a little extra time so that you save time later on in the development process.

And I can assure you, I have never thought a project had too much time at the beginning. It's, you know, it's -- because later on, you're always like, why didn't we spend more time and think that through early.

So, you know, I say that you can certainly do a smaller phase, but you may pay -- you would probably pay a greater price later.

Q   And the people you think should be involved in this includes one WRI employee full-time with the deepest knowledge of the current system, right?

A   Yes.

Q   So you think the person at Western Robidoux who knows the most about the current system should be Western Robidoux's representative in this process?

A   Yes, even though they have knowledge.

Q   Sure. And for this, in this instance, do you know very much about which -- the relative knowledge of the Western Robidoux employees?

A   I'm bad with names. I want to say Jill. So I am

Page 188

aware of two employees at WRI who would probably be a fine candidate for this, and probably a few others who would be an okay candidate. But I do recall two people who, I'd like, oh, that is, all else considered, the person you'd want.

So WRI definitely has someone who is qualified for that position as opposed to describing a person who doesn't exist.

Q   For example, was Jill Williams one of the names?

A   I believe it was Jill Williams.

Q   So Jill Williams could be one of the people who works with the specification?

A   On the specification side, not the design side.

Q   Sure.

And what about Cindy Burri, is that a name you're familiar with?

A   Oh, I'm very familiar, and she knows a lot. I believe Jill knows more, but I'm not opining on the knowledge of individual -- but there are at least two or three WRI employees who would meet that -- the recommended bar for that position.

Q   And BIVI and CEVA, you think the employee from each with the deepest knowledge of their respective company needs would be -- should participate in this process?

Page 189

A   Ideally, you want a stakeholder who really knows how the system works, and then I mention later, that there are probably needs that that person doesn't know about, so you want to have access to another person. Just for any large organization like the -- you know, let's say the person who had the deepest knowledge was in marketing, there could be someone in delivery who, you know, has different needs. So you want to make sure that you're not on too narrow a path.

So for this phase, it's very important to gather as much information as possible from as many different parties as possible, even if that seems to take too long, so that at the end of the day, when you have a specification, there are no surprises later on, and that's just -- clients always push back on this.

You want the early design phase -- and I'll use the word design and specification word a little here if you're not doing ring room, but clients always think they can skimp on this phase, and it's a mistake.

The cheapest way to build this is to have a good phase in the beginning.

Q   And one of the things you said is, in this phase,

Page 190

people should be thinking about how they want it to be different than the existing solution, right?

A  That, that, in a perfect world, you might come up with a more efficient solution if you do it that way.  So for instance, InfoDeli grew organically, the Literature Stores and Vectra Rebate grew organically over time.  This is an opportunity to say, oh, we need to replace it, and if you just did a blind, oh, we're going to build the exact same thing, even though that would save you some time on this phase, it might lead to more work in the latter phase.

Q  Is it okay if you want to make it different than the existing software, to show what you don't like about the software to the software architect?

A  Yeah, obviously.  The software you're building here is for you.  You know, in other words, that this software, we say, oh, this is a replacement software for the InfoDeli system.  That's not really accurate or that's not a full picture.

A full picture is, we want to develop a new software platform to meet WRI and BIVI and CEVA's needs.  The old InfoDeli platforms are going away.  On one level, this is a replacement, but it's quite possible to say, there are things we didn't

Page 191

like that we want to change.  It is quite possible to say, oh, here are things that we can do that would save us money -- even if the website cost more, might save us money down the road, and then there might be times where you say, oh, here are these features that were actually very similar.  If we combine them, it would be easier to program later on, and that will save us money in the development.

But that's where it all becomes a hypothetical where I can't tell you what the results of this process would be.  I can tell you what I believe the most reasonable and accurate path to get there is, and that's to have a group of people similar -- I mean, you could have a different group than I described here.  This is what I thought of is the minimal group that I thought would do a good job.

Q  But -- I'm not sure if you actually -- you may have, but I'm not sure you answered my question.  If, in this specification document, the client wants something to be done differently than the existing system, is it okay to show to the software architect in the specification phase what it currently does so they can understand what you

Page 192

don't want?

A  Yes.  And again, I would lean on the side of showing what it does rather than how it does it.  I would -- obviously, many people from WRI have knowledge of how things are implemented.  You can't shield this architect from that entirely, but it will be easier to have a very clean document if you do.  But in terms of functionality, if you say, oh, here is how the old InfoDeli site does something, let me show you the interface, and well, we think there is a better way to do it, we think it should be X, that counts as a what, not a how.

And certainly -- so the only caveat I might give is, if you don't currently have rights to access the site, you shouldn't access the site to show it, if you don't have rights at that time.

Q  But if you have rights to access it, you can show it to show what you want to change, as well as to show what you want to keep, as long as you're not showing the how.

A  If you have rights, you might be able to do more.  I'm not opining on that, but --

Q  Okay.  Now, the detail design document is -- do you then, in your opinion, do you have to take the

Page 193

software architect who may have seen something to develop the spec document, out of the system and not have them involved?

A  Yes, that is absolutely required.  So I mean, in theory, you could do a specification without an architect.  It would be a mistake, but you could have done it, in theory, with just the WRI and CEVA and BIVI people; in practice, you want a technical person there because they're going to say, Here is the way you need to describe the specification so that techies can use it.  That cannot be the same person who is on the detail design document because he will have been tainted by intellectual property knowledge from the previous implementation.

Q  So the design phase, you come up with 480 to 640 hours based upon -- and this is in paragraph 110.

A  Yes.

Q  -- based upon the scope of the Functional Specification we just talked about, right?

A  Yup.

Q  The actual lines of code of the previous implementation, which is the paragraph 88 total of 22,000 and change, right?

A  Correct.

Page 194

Q   And then a database of approximately 25 to 50 tables related to the business logic, which is consistent with InfoDeli Software Platforms, right?

A   Correct.

Q   Now, did you assume that it would require -- for purposes of the design phase calculation, did you assume that it was going to require approximately the same number of database tables?

A   I was trying to -- in terms of thinking of the complexity and the size, I was looking at the size of the program, 22,000 lines. I was looking at 25 to 50 database tables. You might do a different implementation. But for the basis of this analysis, I was, like, let's assume a similar code base and a similar complexity of database table for the new solution.

Q   Sure. And is there -- is this once against based upon your experience?

A   This is based upon my experience. Yes.

Q   Okay. Is there any written basis, written or published standards that you're using when you come up with the 480 to 640 hours?

A   No. I was thinking of projects I've worked on of a similar size. I was thinking of projects that

Page 195

had a similar design specification phase. Again, you tend not to always use specification design in the same way if you're not talking clean room development, but I was thinking of similar projects, and again, in the same way where I discuss that the specification phase is a process, this is a process. And you don't know when you start, necessarily, how big your application will be. You have a target, but until you actually start doing the design phase, you don't know how long the design phase will take because of the things you discover as you design.

     So that's why that is a range here. Again, it could take a little more, it could take a little less, but it's not one to two weeks. And ideally, it's not, you know, two to three months; that there's always going to be the desire to let it grow too large.

     I believe this, in my experience, is what I would expect to occur for designing a project of this size.

Q   But again, you're using other pieces of your analysis, this Lines of Code thing and the existing databases, as opposed to how would you as a software engineer approach the design phase?

Page 196

A   Yes, it's -- it is a little different because what we're doing here is we're not building -- we're not actually building a new project. We are analyzing what the effort would be that it would take. And in a real world, I would have to do the specification phase and the design phase, which we can't actually do here without access to WRI, BIVI, and CEVA. So instead, we're saying: Here is what we believe the process these guys -- how long the process they would take to do the design, and then we're working on the assumption that the most favorable proxy that I can think of right now is the smaller code base of the two previous code bases that I'd be using for how large I believe the final project would be.

Q   Now, you note paragraph 111, there is a possibility that the EMS Design Team would come up with a more complicated and longer design, right?

A   Yes.

Q   It's possible too, they could develop a more efficient and less lengthy design time, right?

A   I was thinking of that, but given that their previous code base was so much larger than InfoDeli's, I thought it was -- and of course it may be a different team. So you're now getting

Page 197

into the world of many, many hypotheticals -- I thought it was more likely that they might come up with a more complicated design. I just wanted to say that I believe this is a conservative estimate based on what I had discussed earlier in my report.

Q   Sure. But it also, it could be shorter if they developed a more efficient process.

A   Yes.

Q   Then we get into the Code and Database Implementation Phase, and this is just taking the 22,955 lines of code, multiplying times 25 -- well, dividing by 25 lines a day, and coming up with 7346 programmer hours, right?

A   Correct.

Q   And then we get into the 50 percent increase, and 50 percent increase we've already talked about, right?

A   Yes.

Q   Then we get into repopulating the content of the site on paragraph 119 to, I think this takes us all the way to 144. Right?

A   That looks correct. Yes.

Q   Okay. And one question I had, in 119 a.ii., you have in quotation marks, "State" Database Content?

A   Yes.

Q   What did you mean by that?

A   Perhaps I should have gone into more detail earlier in the report.

So EMS was not just tasked with building a replacement to the InfoDeli Lit Stores.  They were tasked with repopulating the content and the state of the site, by which I mean, information about resellers, information on products that you -- you know, so there's -- one way of thinking of these applications is there is the actual service, platform application, whatever you want to call it, that's the code, and the database and everything that works, but then there is the state of that, which is the content of the database that reflects user orders, et cetera, and the other content that's been loaded that the programmer in the database can access, and that's actually separate from the actual site.

If you think of a website, or in this case, as being a framework that has certain functionality, and then you load content into it, to actually use.

So I guess I would -- I don't want to be too far with analogies, but the idea is that you

needed to reload the database with information, or CEVA and BIVI wouldn't be able to use the site properly; most importantly, would not be able to service their current customers.

Q   Yeah.

A   And that's typically referred to as "state" information.

Q   Okay.  And is there -- is it your opinion that BIVI and CEVA had to go back to some other source and find all of those customer and reseller information?

A   I'm working on the assumption that they should not have taken a dump -- a database dump from the InfoDeli sites and used any portion of that in repopulating.  That is one of the assumptions I'm working on.

So arguably then, what they need to do is go back to BIVI and CEVA, the original authors, get information from them, and repopulate that site, that information to the site.

Q   Okay.  Paragraph 122 is talking about the product data.

A   Yes.

Q   The databases, you talk about 4352 products, and then under databases, you've got 515,000 product

related records.  Are you counting each cell of the database table as its own product related record?

A   Yes.  So that those wouldn't all be input separately, but some of them may be calculated, but that was just to give a sense of how large these databases are.

Q   Okay.  Now, paragraph 123, you're talking about text information in a database about the products, right?

A   Correct.

Q   Now, what you list there:  Product name, item code, access level, brand name, product type, et cetera, is information stored in a database about the product, right?

A   That is correct.

Q   And the stuff in 123a, the sub-pieces there are not available in the fetch file of images, right?

A   That is correct.

Q   Okay.  That's a separate database table that contains this information that's in 123a?

A   Could you rephrase that?  That wasn't -- technically that didn't quite make sense.

Q   I think we've covered this, but I want to make sure we're on the same page.  You've got 123a is

talking about the cells of information in the rows, or in the columns in a database table about each of the products that are in the jpeg images or the PDF documents, right?

A   So these are entries in the database about the product.  That's kind of -- there are also jpeg images that would refer to the same product based on their naming convention.

Q   Yeah, and I just wanted to make sure we're talking about two different things.

A   Yes.

Q   There's been discussion of this download with fetch of a whole lot of jpegs and PDFs and video files, right?

A   Correct.

Q   And as we talked about, those downloads capture the file itself and its file name, right?

A   Correct.

Q   Okay.  Separately, there is a database table that has that file name and connects it to lots of other information about the product, right?

A   Roughly, yes.

Q   Okay.  And 124, you've got a screen cap that you date as August 11, 2014.  Is this something out of the InfoDeli database?

Page 202

A  No, actually, I believe this is from EMS. I forget if it's BIVI or CEVA. Forgive me. This was just meant to show as a representation of the sort of data, and I should have cited it and I do apologize. But yeah, so this is just an example of a screenshot of -- from the Lit Store showing the sort of information that's stored in the database.

Q  Okay.

A  Databases can be abstract, so I wanted some people to be able to see, oh, that's what the database is talking about.

Q  And then 125 is actually talking about the -- what is 125 talking about as compared to 122?

A  Oh, so it's a little different. So earlier we were talking about, there's the database, there is a lot of information about the product. Forgive me, I forget about exactly where I talk about the images, but I talk about how images need to be curated.

    This is something else; that of the 4352 products, approximately, there are 1836 references to other materials which we will often colloquially refer to as literature, and they are stored as a literature URL in the database, but

Page 203

it's essentially a pointer to other materials linked to the product; typically, a brochure in PDF. It could be almost anything.

Q  Is this what you're talking about with links to outside databases?

A  Not outside databases, but outside data, yes.

Q  So for example, if there is a manufacturer of something, and it's on the manufacturer's website, it might point you to that manufacturer's website.

A  Yes.

Q  But it's not stored within the InfoDeli's --

A  Some of them might be. Sorry, I want to read the whole thing because I want to make sure I'm not confusing -- pardon me, I may be confusing this with another section.

Q  Well, is it possible that 122, 23 and 24 is referring to the jpegs of product in the associated data, and 125 is referring to the literature pieces which are like fliers about certain meds?

A  It is. I thought I had a qualifier with these. I believe there is another section probably when I'm talking about repurposing. Sorry, I've been confused on this before. There is another section that's very similar where I have some other

Page 204

caveats. I think I am just confused what section of the report it's in right now. But for the moment, yes, these are describing literature materials which are associated with the products in the database as -- though by a different mechanism, in the same way that the images stored on the server are also associated with products in the database.

Q  And then paragraph 126, you're going through the steps in this hypothetical clean room that would need to be taken to add one of these products to the new clean room store, right?

A  Correct.

Q  Do you know which of the steps in 126, A through H, if any, were not undertaken in this actual implementation, not the clean room?

A  My understanding is that much of the content on the new -- on the replacement sites were copied from the old site. There were the fetch directories on the Google Drive, and my understanding is that instead of doing this work, that they grabbed the images off the old site, which already had a naming convention.

    I wasn't -- I'm not 100 percent sure how they're integrated. I saw different emails that

Page 205

talked about how they would access them, but that they knew -- since they knew the logic of how they were named, they would be able to map them to a new naming system, i.e. if you knew the old one was using, I forget what the product identifier was, but if you have the old database and the product identifiers, and you know the images are using that product identifier, you can use it in a new database, even if it has a different product identifier, by essentially having a lookup table; so that programmatically, you can correctly load the correct image, even if you're not using the same naming convention by having a lookup table in your database.

    That -- you're -- so my short answer is, my understanding is that the vast majority of the content was copied over and -- that some percentage of the content was copied over and used on the new site as opposed to being created in this method.

    Whether or not they had to do some small aspect of this method to make it work on the new system, I don't have insight into that.

Q  So your understanding is that the data about one of the jpegs was brought over from the old site

Page 206

rather than being put in by someone for the new site?

A  For the images, I am relatively confident that many of the images and the work associated with them was brought across. That I am relatively certain of.

Q  Okay. And I guess I'm not sure what you mean by "relatively certain." I want to make sure we're talking about the two pieces, because one piece is the jpeg itself, which was downloaded using fetch and stored in the folder. The other is the database information about what you see in that jpeg.

A  Okay. I am -- I have seen evidence that leads me to believe that thousands of jpeg images were brought over to the new site. Whether that was all of them, whether they had to, for some set of them, make changes; whether for some set, they had to create new ones from scratch, I don't have clear insight.

The evidence indicates that a large amount of the jpeg images that had been curated and had information in the name revealing what product they were associated with, was brought across.

Q  Okay. That's the images, right?

Page 207

A  That's the image pages.

Q  What about the database information about those images?

A  I am not -- I'm trying to remember what database dumps their -- can I see the report of Jason Eaddy again for a moment?

Q  Which one, the second?

A  Let me start with the second. Thank you. You're asking me a question that's not in this part of the report, so.

Actually, could I see the first report of Jason Eaddy? I think that's the one I was thinking of. Thank you.

Q  There you go.

A  Yes, so in Jason Eaddy's report, beginning on paragraph 88, he has lot of information about similarities between the InfoDeli and the EMS databases that indicate that there was likelihood of at least some of the databases being dumped.

Q  Does that specifically refer to the database involving the names of the products that are associated with the database?

A  I believe it does because it has information such as the item number, brand, brand name, product ID. So I believe that is -- while there could be other

Page 208

tables, much of the information in that table is I believe relevant here.

But in fact, I wanted to answer your question, but I don't believe I actually opine on whether or not -- I don't opine on how much time EMS spent in rebuilding this part of the site. I'm talking about how long it would take to do from scratch, but I don't give any numbers on how much time EMS spent on that.

Q  And once again, your numbers on how long it would take from scratch are based upon the assumption that they wouldn't have a right to any of the information that they may have used?

A  That is correct. That if they had rights, you're dealing with a very different hypothetical.

Q  Now, you also acknowledge that Western Robidoux may already have some of the information that would need to be included, but you don't consider that in your calculations.

A  No. I say that actually, the scenario -- these scenarios are reflected by the lower bounds of time necessary, in my expert opinion. So when I say 20 to 40 minutes per product, if they have to go and photograph every product, it's not 20 minutes per product. If some percentage of the

Page 209

products have images already stored, so you're just resizing them, et cetera, then 20 is a more reasonable number.

If you have to go, and if CEVA and BIVI have images of all these products, that's somewhere in between. So I gave a range because it is an unknown how much -- you know, what WRI had in-house, and again, that was not information that was available to me.

Q  Okay. And this 20 to 40 minutes per product that you've used to arrive at the 1450 to 2900 hours, where is that from?

A  Again, that's from my experience, from many, many, many years of content development, which I referred to earlier in the report. So the sort of scenario that I laid out in paragraph 126 is very much a human effort. There is, much of this cannot necessarily be automated or gained from scale, especially if it involves manually taking pictures. But even just going to, like, the original manufacturer's website, grabbing a stock photo, resizing that into two sizes, giving the names, that that just always takes time.

And as I mention, WRI used to charge 75 to 150 whenever adding a new product to the system,

Page 210

and that was very consistent with this sort of effort analysis.

Q   Are you aware of any published standards on that topic?

A   No.  I have read many, many articles about asset production but nothing that could be quantified this way.  There are certainly -- people are always trying to automate, and I have been very involved with automation of media production pathways.  But that -- you have to have a very consistent source in order to automate a system.

Q   Okay.  Starting in around 135, you're talking about coupon codes, right?

A   Yes.

Q   And what is your opinion with regard to the time involved for coupon codes?

A   Simply, that if they were to try to replicate the information that were on the InfoDeli sites, it would be incredibly expensive and take a very long time.  So what I said was, okay, it would not be cost effective.  There would not be a business decision to actually try to do that, and I didn't want to inflate any figures by suggesting they were.

So what I suggested was, okay, they have on

Page 211

the order of roughly 2 million plus images of coupon codes that have been printed.  One solution would be to acquire those image files, build up a process to scan them, build a database, and you would now have a database of a subset of the coupon information that would hopefully be enough to get you to launch.

And that, in my opinion, that would be a much, much smaller effort than trying to replicate all of the other information that, if they did not have rights to the InfoDeli system, might be very difficult for them to acquire.  So this was meant to be a conservative estimate on what you could do as an acceptable substitute that CEVA and BIVI might accept for launch.

Q   And if you'll turn to page 62, the chart 145?

A   Yes.

Q   Which line is this code, rebate code total?

A   That's database entry for Vectra Rebate, I believe.

Q   And I was having trouble finding a total of 160 to 320 anywhere in your report.  I'm confused on that.

A   I said four to eight-person weeks of effort.  I should have translated that into hours.  So in

Page 212

paragraph 142, four-person weeks at 40 hours a week is 160.  Eight-person weeks at 40 hours a week is 320.  So that's where the 160 to 320 comes from.  I apologize for the error.

Q   Okay.  Now, all of this discussion of these rebate codes is because out in the world, there are codes on coupons that might be handed out to customers who may want to redeem them, right?

A   Correct.

Q   And one option could have been to stop processing old codes through the website and require everyone to mail in their coupon, right?

A   Yes.  Or -- there's a variety of things one could do.

Q   But what -- the problem that needs to be solved in this section is just to try to have a system by which people can redeem their coupons when the system is being changed over to a new provider.

A   So this was not to -- so the idea was to allow previous users to still use the system, even if there wasn't all the information on the previous.

Q   And your solution, it revolves around the fact that Western Robidoux actually printed all these coupons, right?

A   That is correct.

Page 213

Q   And so you're thinking that a 106 or 320-hour effort would be required to scan these electronic copies of these various coupons and QC them, and get them all organized such that they can be in a spreadsheet and uploaded into the system, right?

A   Yes, and as I mentioned, that's just a very rough estimate, and there may be some other work involved that I haven't thought of at this time, but that was a -- again, while I did not know fully how long it would take to try to repopulate all the information from the old site, it was clear to me very quickly that that would not be a doable solution, and I was trying to give an estimate for a doable solution that the client could have done without using information that, for this report, I'm assuming they did not have access to.

Q   Sure.  And you talk about 18 million database records.  There may have been 18 million codes generated inside the InfoDeli database, but unless they're sent to be printed and then printed, they're irrelevant, right?

A   That is my understanding.  I may need to correct that later, but that was my assumption here.

Q   Okay.  And so the solving the problem of the

Page 214

coupons, you just need a list of the coupon codes that were printed on coupons and sent out, so you can put them in the system so they can be redeemed?

A  That is my current belief as a solution, or as the possibly most cost-effective solution.

Q  Okay.  And if, in fact, the computer that printed the coupon codes just had a list of coupon codes, it would solve this whole problem, right?

A  If there was a source of data that had all of the information that you were trying to acquire by scanning the printed coupons, yes, that is a possibility.  I am not aware of such a hypothetical but that is a hypothetical.

Q  Okay.  But you're not aware of the facts, but if the facts exist, then that would solve the problem?

A  I'm only aware of what was produced in the case. If there are -- if there is information relevant to the case that was not produced, that might affect my opinion.

Q  Or information produced in the case that you don't understand its relevance, that might affect your opinion?

A  Fair enough.

Page 215

Q  Now, looking at 145, I just want to make sure we've covered everything.  The -- in your chart, paragraph 145, the Functional Specification 280 to 420 is the same regardless of how long the process takes, right?

A  That is correct.

Q  And we talked about that earlier, correct?

A  Yes.

Q  The Design Document, 480 to 640, is the same amount of time regardless of implementation time, right?

A  Yes, in both cases you're designing the same product.

Q  And we talked about that previously, right?

A  Yes.

Q  And the Code Implementation is the 22,955 times 25 lines of code per day number, right?

A  Correct.

Q  Which, in column one is straight out of paragraph 88, right?

A  Yes.

Q  Column two is 50 percent more, right?

A  Correct.

Q  Column three is 50 percent more of that total.

A  Correct.

Page 216

Q  The Database Entry for Lit Stores, 280 to 480, is I think in paragraph 134, which is how many hours you think would take to recreate the databases, right?

A  Yes.  Though I want to make certain we're talking about the same database.  Sorry, I just -- our previous conversation now has me thinking many different things.
       But yes, that is the time for -- yes.

Q  We're talking about the data about people, not the data about products or the Vectra Rebate coupon codes, right?

A  Correct.

Q  The next line, Database Entry for Vectra Rebate, the 160 to 320 is what we just talked about with coupon codes, right?

A  That is correct.

Q  Lit Store Content Creation, does that take us all the way back to paragraph 129, and that's the curated content jpegs and PDFs?

A  Yes, that is correct.

Q  Okay.  Now, you come up with the totals, which actually are at the top line, for the three different time estimates, right?

A  That is correct.

Page 217

Q  And you understand that those totals have been then taken by another expert and used to calculate a damage number.

A  Yes, I do.

Q  Do you have any opinion on the damage number or its applicability to particular causes of action in the case?
       MR. ROSEMERGY:  Objection.  Scope.

A  Could you repeat?

Q  Sure.  And I think the answer is no, but my question is, you've come up with these numbers, you've handed them off.  They've been turned into dollars and applied to particular causes of action in the lawsuit.  My question is, do you have an opinion you're intending to testify to --

A  No.

Q  -- as to the dollar value and which causes of action it applies to?

A  I have no opinion -- I'm expressing no opinion on that matter.

Q  Okay.  Now, you've explained this Likelihood of Success in Given Timeframe that's at the bottom of the chart on 145, and my question for you is, how does that factor into your opinions in the case?

A  The way it would factor into my opinion is that it

Page 218

would be very, very difficult for the defendants to get a working system up in five months.  You can try, but it is by no means, by no means guaranteed, and as you can see, would be much more expensive.

So I believe -- and I understand there are business reasons that might affect this, and that's not part of my opinion, but it is my belief that the 14 to 15-month effort makes the most sense; in terms of cost and likelihood of a high quality success, that's the way you want to go.  And in general, whenever I've given estimates to a client, the thing I emphasize is that there's no replacement for time.  Certainly there are pressures where -- there are real world pressures that force you, but in general, if you have the ability to have fewer people and a longer development time, it will cost you less, you will have a higher quality product.  It is so the way to go.  You don't have to go insane, but in this case, I was recommending a team of four people for a year.  I really believe that's ideal; that enough people, that you have a new set of eyes; few enough people that lines of communication are very clear.  Everyone has the majority if not all

Page 219

the program in their head.  That's a very efficient way to do this.

The other solutions, where you have many more people, that -- eight to nine months, you could -- it could work, but it's -- I would, again, I would emphasize to the client that it's not guaranteed.  The five to six months, you only do that if you absolutely have to.

Q   And these estimates are based upon using a clean room with the restrictions that you're implementing in a clean room?

A   Yes, but they would also be true if you weren't re-implementing.  So if you're just doing a new program, this would also be true.  So the only thing that would allow you to do this in less time is if you had a working program that you had some access to.  It might vary if you had access the whole time, but that if you were -- if you had the rights to the system and were writing a new version, essentially porting it, then suddenly, five to six months is very reasonable.  But that's a very -- that's not what this hypothetical is, and but just to, you know, reiterate the themes of my report, one is, it's much faster to develop a solution if you have access to the old solution

Page 220

for testing, debugging, figuring things out.  That's just a huge win.

As I said when I did the port of DOSE, you know, I was averaging 130-odd lines per day, we had a working system in a year.  There is no way we could have built that system in a year without access to the old system, even with a great design doc.

So what I'm saying is that part -- there's some slight overhead in here because of it's a clean room, but this mostly reflects the time it takes to develop a new application.  I just want to be certain that distinction is not lost.

Q   Okay.  And then without getting into too much detail, what is your analysis using Cocomo-II?

A   So I used Cocomo-II essentially as a sanity check.  So it's the constructive cost model, but basically, I fed in the most favorable program terms I could into Cocomo-II and did two analyses; one for a very high skilled level -- there's one level higher, but I believe that would be like if you had Breht Burri, you know, or someone who built this application before, so I chose as the more optimistic, and therefore conservative in terms of final values, the very high skill set.

Page 221

And then I also did a nominal skill set for comparison, and I found that the results of the very high skill set were very similar to my analysis, and more importantly, I was, you know, gratified to see that actually recommended a similar schedule and staffing.

Cocomo's a little more pessimistic than I am, but it was quite close.

Q   And what inputs is -- is that 22,955 lines of code?

A   22,955 lines of code.  I set the skill level to a very high nominal, and then there's other factors like communication and how well understood.  So all the other factors I set to the most favorable setting.  I should have done a screenshot but -- or the screenshot doesn't show that pop-up window, but basically, I used Cocomo to use the most favorable settings for a very high skill set and for a nominal skill set.

Q   Do you -- you said something a minute ago about Breht Burri.  Do you believe Breht has a very high skill set, or did you mention that just because he happens to be familiar with the InfoDeli?

A   Yeah, so I'm not opining on Breht's skill set.  That's not part of my report.  But certainly if

Page 222

you had a programmer who had built exactly what you want before, let's say if you were building, you know, a database, you either have some fine programmers who had never built a database before, and you had a programmer who's just built five, you go with the programmer who's just built five; you know, he will have benefited from the learning curve.

So when I said, since there is a skill set above very high skill set -- you know, as an example, oh, if you had someone who already built InfoDeli once, all right, that person might hit that qualification. Other than that, you're talking really good people who haven't necessarily built exactly what you want.

I was not meaning to actually comment on Breht Burri when I was giving that analysis, just showing the analysis of someone who had huge amounts of experience.

Q   Okay.

Why don't we take a break.

MR. ROSEMERGY:  Sure.

(Recess taken.)

MR. BLEGEN:  I'm going to pass the witness at this time.

Page 223

CROSS-EXAMINATION

BY MR. CLIFFORD:

Q   I'm going to go next.  I'm Nick Clifford.  I represent Boehringer Ingelheim VetMedica, so BI or BIVI.  Okay.

I'm going to try and ask you just a few follow-up questions that are specific to BIVI.

A   Okay.

Q   Okay.  I might say BI from time to time.

A   Certainly.

Q   So why don't we dive right in.  So you were told by counsel to assume that plaintiffs owned all the rights to the materials and data that were in the InfoDeli Software Platforms, is that correct?

A   I believe so, or -- yes, yes.

Q   And so, as you noted in paragraph three, that you understand that there is a disagreement regarding claims of ownerships and rights to certain data, right?

A   Correct.

Q   What is your understanding about that disagreement?

A   Merely that there is a disagreement.  I am not opining on any legal matters.  I'm not opining on any -- who should have done what.  I'm merely

Page 224

opining that if people did not have rights to materials that were used in building the replacement site, that there was benefit from that.

Q   Okay.

A   And then I'm opining on how long it would take without access to materials, but I'm not opining at all on who has rights or what's valid or -- that's outside my box.

Q   And you did not distinguish in your analysis among the various different categories of data and materials, correct?

A   Correct.

Q   In other words, if the judge or the jury some day decides that BI owns all the images and has full rights to those to provide -- to ask WRI and EMS to incorporate that into a replacement platform, how would your opinions change on your time estimates in this case?

MR. ROSEMERGY:  Objection to the extent that it calls for speculation, but you can respond.

A   Most of that's hypothetical.  I will answer that if the facts of the case change, for example, some items the defendants had rights to and others they did not, that certainly could affect my analysis.

Page 225

But I have not yet done that analysis.

Q   And you have made no accommodation in how you've written your report to account for some subset of the rights in your calculations, correct?

MR. ROSEMERGY:  Objection to the extent that it misstates the report.  You can respond.

A   Could you state that again?

Q   I'll reask that.  So in other words, at this time, yours is just an "all rights" type of analysis, correct?

A   Yes and no.  I didn't break it out by defendant, but I do break it out by technology.  So for example, it's very clear from my report that if only the rights to images changed, you would be able from my report to figure out what the effort would be, and therefore, other people might compute damages from that.  But, so my report is very modular, and certainly separates out different types of content and the application building.

Q   All right.  And so more specifically, you didn't distinguish between ownership of rights among the different defendants, correct?

A   No.  That was not within the scope of my report.

Q   Let me direct your attention in paragraph 8 of



your report, and in that paragraph you mentioned how you managed a successful clean room project before.  What was the name of that project?

A   That's for a case that settled so I can't -- I don't believe I can give the name.

Q   Okay.  That's the only clean room project you've worked on in your career?

A   That is correct.

Q   And that clean room project was only done in the context of litigation, correct?

A   That is correct.

Q   Put another way, you have no nonlitigation clean room experience, correct?

MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

A   I certain -- qualifier:  I have certainly discussed clean room solutions many, many times.  That is the only clean room solution I have implemented.  Did that answer your question?

Q   You've never worked on and implemented any nonlitigation clean room projects.

A   To the best of my memory.  I've worked on enough projects -- it's not inconceivable I forgot one, but to the best of my memory, no.

Q   Let me direct your attention to the Materials

Considered section beginning on page five.

A   Yes.

Q   Paragraph 16.  And then on the next page, top of page six, you say that you directly or indirectly reviewed certain documents, including documents produced by BIVI.  You see that?

A   Yes.

Q   What documents by BIVI did you review or indirectly review?

A   So I was doing searches, so we built a directory system of pretty much everything that was developed -- that was produced in the case.  So I'd do searches across that, and when I'm doing a search, I don't necessarily know -- I'll get results from different areas.  So I'm trying to remember.  I've seen a lot of the emails.  I'm trying to remember who was deposed or -- from -- I'm trying to remember who is at BIVI and who is at CEVA.  Pardon me, there is a lot of people in this case.  So I have looked at I believe emails from BIVI, and I'm trying to remember if there was a BIVI depo I would have read.

If you can name employees of BIVI, I could probably tell you if I've read that depo.

Q   I certainly can't name all of them, but I could

give you the name of several of the witnesses that were deposed.  Is that what you mean?

A   Yes.

Q   Michael Novac, Jodi Oliver, Judy Elliot, Judith Erickson.

A   Those are all familiar, but to be honest, I can't remember if I read their depos or if I just saw them in email.

Q   Okay.  And so what documents or testimony from BIVI witnesses affected your opinions?

A   I am not certain which opinions were based on BIVI documents.  None -- I don't recall citing any BIVI documents.

Q   You didn't.

A   Okay.  So I wanted to be inclusive in everything I considered, and I looked at a lot of emails.  I do not at this time recall the sender or recipient of every email.

Q   So does the fact that you didn't cite any BIVI documents or testimony suggest that you were not relying upon evidence from BI, produced by BI in forming your opinions in this case?

MR. ROSEMERGY:  Objection to the form.  You can respond.

A   I don't think it would be accurate of me to say it

that way.  Again, I wasn't drawing distinctions between BIVI and CEVA in terms of rights to materials.  That's beyond my report.  I was merely looking at materials that EMS had received primarily through WRI.

So while I am -- while I believe my opinion has been affected by materials produced by BIVI, I cannot at the top of my head point to specific ones, specifically especially because they weren't cited.  So that means that I was not using them for a particular point as I often do in my report.

Q   Did Mr. Burri or plaintiffs' counsel ever demonstrate the InfoDeli Literature Store to you?

A   I'm trying to remember.  I had -- I went through and have seen screenshots.  I can't quite recall if it was actually live or if I was watching something canned, and that's what I was -- I've been struggling with just because there's been a lot of information.

Q   When you say "watching something," what are you talking about?  You mean a WebEx or something?

A   Yeah, I'm trying to remember if we did a WebEx with that, so I'm just trying to give an accurate answer.  I believe I did, but I can't remember the exact date.

(913) 385-2699                                    mail@aaacourtreporters.com
AAA COURT REPORTING
Case 4:15-cv-00364-BCW   Document 695-1   Filed 05/31/19   Page 58 of 99

Page 230

Q And you understand that there are multiple versions of the InfoDeli Software Platform?

A Yes, I do.

Q What are they called, do you know?

A Do you mean by version number?

Q Sure. Whatever you know about the differences between them.

A Oh, okay. I'm -- sorry, I'm trying to remember. There was one that was being worked on at the very end. So I'm not recalling on the top of my head the different version numbers.

Q How many hours did Breht Burri spend on developing the InfoDeli Software Platform up through March 2014?

A Breht never had any documentation to indicate that. He gave an expression that he'd spent thousands upon thousands of hours, which would match all of the size of the code we've seen, but he didn't -- he did not have, to my knowledge, he did not share with me, nor did anyone else, a listing of hours for how long it took to develop.

Q You didn't do a lines of code estimate to determine how many hours Mr. Burri likely worked on in developing his code?

A Most of that was part of my analysis, and of

Page 231

course the thing is, when you've had a program that's gone for several years, because you have different versions, because you have a feature that comes in and comes out, the final version was what I described.

How many different versions or how many features had been added or subtracted before then, and more importantly when you're building a system organically, it's a different beast in terms of how much effort it is, that you make a change, users like it; you make a change, users don't like it. I do not offer an opinion on how many hours Breht Burri spent developing the InfoDeli system.

Q How many hours did Mr. Burri -- what percentage of the overall number of hours that Mr. Burri spent on developing the InfoDeli Software Platform was devoted to Boehringer Ingelheim Lit Store?

MR. ROSEMERGY: Objection. Foundation. You can respond.

A I cannot -- I do not offer an opinion on that and I cannot offer an opinion on that.

Q So did you ever see any demonstration of the BI Lit Store?

A I saw screenshots, and again, I may have seen a live demonstration. I'm just trying to remember

Page 232

exactly what I saw.

Q So with respect to paragraph 17, when you're giving a general description of the InfoDeli Lit Store, and you've got half a dozen bullet points, which of those features was in the Boehringer Ingelheim Literature Store?

A I believe most, if not all, but I cannot off the top of my head give that answer. I would need to confirm by looking at materials.

Q How many of the features that are listed in your paragraph 17 were put into the BI Literature Store at the request of BI?

A I have no opinion on that.

Q And so if BI -- strike that. Does it affect your opinion as to whether BI requested the feature or whether Breht Burri implemented it on his own into the BI Lit Store?

A No. Everything I've been talking about for the InfoDeli Lit Stores is about implementation, not design; that -- so the, you know, users request features all the time. How they're implemented might be where there is intellectual property involved. But I am making no claims that BIVI and CEVA don't have the rights to the features or -- I'm making no claims they don't have rights to the

Page 233

features or to a similar solution.

My only argument is that if the defendants don't have rights to access the InfoDeli systems, then they are not allowed to use those systems, and more importantly, content from those systems in developing a replacement.

Q All right. In paragraph 19, you've got a section called Curated Content.

A Yes.

Q What curated content was on the BI Literature Store?

A Oh, let me -- give me a moment. Literature Store. The BI Literature Store had 3,814 products, and there are images associated with those.

Q Can you tell us where you're reading from?

A Sorry, I'm reading from page 51, Footnote 32 from paragraph 122. So I'm looking at the products that have images, et cetera, associated with them. And then for the associated content, curated content files in sub -- in Footnote 35, I refer to the report of Jason Eaddy for the curated content files. I would have to look at his report to see if he split them up between BIVI and CEVA.

Q Do you know when the curated content was added?

A Could you rephrase the question?

Q  Yeah, sure.

Do you know when the curated content was added to the BI Literature Store?  Was it all at once or over the course of time?

A  No, my understanding is that while it may have been done in batches, it would have been done over the course of time.

Q  Specifically, how much time would have been spent, and by whom, in adding that BI Curated Content to the BI Literature Store?

MR. ROSEMERGY:  Objection.  Foundation.

A  That would be mostly speculation on my part.  I believe there would be some effort on BI's part in collecting materials, and then some effort, most likely on WRI's part, of inputting it into the system.  I can imagine there may have been situations where it was done somewhat differently. I haven't seen anything to indicate it, but I haven't seen anything to contraindicate that.

Q  How much did Boehringer Ingelheim pay TooBaRoo or InfoDeli for the development and implementation of the BI Literature Store?

A  That is not within my scope.

Q  Is it relevant to your opinions in this case?

A  I don't think so.  I may, I may change my mind,

but again, I wasn't tasked with trying to figure out what happened, which that payment would involve.  Because you might say if they paid a lot, then it was a lot of work, and they only paid a little, it was little, but that was part of an ongoing process, and more importantly, it wasn't just for the development but also for the maintenance and the serving of the system.

So I don't think it would affect my opinion. Depending on what you showed me, I might change my mind.

Q  Depending on what?  What factors would you need to know?

A  If there were line items that said:  For development of the Lit Store, and other line items that said for servicing of the Lit -- you know, I could imagine there would be comments in bills that might affect my opinion, but that's -- we're really into hypothetical now.

Q  So assuming for the sake of discussion that TooBaRoo invoiced -- Breht Burri's company, TooBaRoo, invoiced Boehringer Ingelheim for X number of hours of development time, and Y number of hours for hosting time related to the BI Literature Store, what would that X number and Y

number affect your opinions?

MR. ROSEMERGY:  Objection, vague, calls for speculation.  Incomplete hypothetical.

A  So it is a hypothetical, and I don't know if it would, because unless I had other information, that wouldn't tell me; is that all the effort that was spent in developing the InfoDeli Software Platform, was InfoDeli buying the work and charging less because they were going to sell it to other customers like CEVA?

That data alone almost -- I doubt if that data alone would be enough to change my mind, but given that it's a hypothetical, until I see what it is, I can't say.

Q  So assume for me that Breht Burri through his company TooBaRoo charged BI for some of his time on developing the BI Literature Store, but then other times would do work and not charge BI for -- strike that.  I didn't ask that very precisely.

Let's assume that BI -- that Breht Burri through TooBaRoo charged for some of his time on developing the BI Literature Store and didn't charge for some of his time on developing the BI Literature Store, how would that affect your opinion?

MR. ROSEMERGY:  Same objection.

A  That really is so beyond the scope of my report. I'm not trying to be difficult, but I don't think that -- again, there is always the possibility, but at this time, I do not see that affecting my opinion.  I'm not trying to be difficult, I'm just trying to be accurate.

My analysis did not involve history.

Q  So let's talk about history because you put a section called History in your report.

A  Certainly.

Q  On page 10.  If you would turn to that, please. And then the second paragraph, paragraph 23 of that section, you say, "In 2002, Breht Burri created the first iteration of the InfoDeli Software Platforms, which at the time contained a single software program called the Lit Store."

And then it goes on to say, "The Lit Store began operating for the Cattle Division of BIVI in early 2003."  So for whom did Breht Burri develop the first iteration of the InfoDeli Software Platform?

A  Again, that's -- I have the history section to give some context so that my report wasn't out of no where, but I'm really not commenting or opining

Page 238

on things that happened before. It was just to give some context that there is a conflict, many parties are involved, the parties were involved in a complicated way. There is a disagreement as to rights, but I'm not opining on any of that. But I just didn't want my report to be in a vacuum.

Q  You put it in your comments in your report, and I'm trying to understand the accuracy of them.

A  Okay.

Q  So was BI the -- strike that. For whom did Breht Burri create the first iteration of the InfoDeli Software Platform?

MR. ROSEMERGY: Objection. Foundation.

A  My belief is that it was for BIVI, but I do not have -- I'm not opining on that, and certainly, would be open to amend that opinion if -- after I check depositions and reports.

I worked under the assumption, and it did not affect my opinion, that BIVI was the first client.

Q  How long did the first version of the BI Lit Store take to develop?

A  I do not know.

Q  You mentioned in the last sentence of that paragraph, "Over the next few years, the Lit Store

Page 239

expanded to take similar orders for other BIVI divisions such as the Pet Division and Equine Division."

Do you know how much time was spent on those expansions?

A  I do not.

Q  You mentioned in paragraph 24, that at a certain point in time, BI switched from its original fulfillment provider D&O to WRI, do you remember that?

A  Yes.

Q  And was there extra time and expense charged by TooBaRoo to BIVI for the changing of fulfillment providers?

A  I do not know.

Q  So if you would move ahead to paragraph 28, please, on page 12.

A  Certainly.

Q  You make the general statement that, "The development of the InfoDeli Software Platforms as it existed in March of 2014 took many thousands of hours of developer time by Plaintiff Breht Burri and programmers he hired."

How did you come up with the estimate of many thousands of hours?

Page 240

MR. ROSEMERGY: Objection. Asked and answered. Go ahead.

A  That was based on conversations with Breht Burri, and after my analysis, given that I thought it would take thousands of hours only to get to the final version, given that this was done organically and that there were versions in between, and that there were certainly features that came and went, then thousands of hours, which is a rough number, is a relatively conservative description.

Q  And you don't know how much, how many of those thousands of hours was spent on the BI Lit Store version, correct?

A  I do not.

Q  And you don't know how much BI paid for those thousands of hours of developer time, do you?

A  I do not.

Q  And then, similarly, if you go down the page to the sentence that says, "Plaintiffs improved the InfoDeli Software Platforms from 2009 to 2014," you don't know how many hours plaintiffs spent on that improvement, do you?

A  No, I do not.

Q  You don't know how many -- whether those

Page 241

improvements were done at BI's request, do you?

A  I do not.

Q  You don't know how many hours were spent on the BI Lit Store for those improvements, do you?

A  I do not.

Q  And you don't know how much BI paid for those improvements on the BI Lit Store, do you?

A  I do not.

Q  Turning to paragraph 29, you say in the middle of that paragraph, "I am advised by counsel that the Burri defendants did not disclose to Breht Burri or InfoDeli their plan to hire EMS once it had begun, and in fact, acted surreptitiously to impede Breht Burri from possibly suddenly stopping his services, locking down the InfoDeli Software Platforms to prevent WRI from accessing them or from otherwise taking action to prevent them from replacing his software."

Did I read that accurately?

A  I believe you did.

Q  And what effect does that statement have on your opinions in this case?

A  It mostly -- it does not affect my opinion in terms of how much time it would take. It shows that there was pressure to develop a solution very

Page 242

quickly, that there was tension that the system could shut down. Again, I'm not opining on this but this gives an understanding of the context of the conflict, and therefore, the pressures the various parties may have felt, most of which I'm not opining on, but it gives the context of, that there was an urgency to develop a replacement for the InfoDeli stores.

Q So whether or not WRI or EMS acted surreptitiously does not affect your opinions, is that right?

A That -- if surreptitious means accessing materials they should not have accessed, that affects my opinion. In terms of how they communicated to Breht, et cetera, that does not affect my opinion. Again, I gave this for background for context, but my opinion is about, was it faster to build a replacement by accessing materials, and how long would it take if you didn't access materials, and would it cost more to do it quickly.

This gives some idea of why there was a potential need to do it quickly, but the fact -- and it goes to the -- it gives the context that there was tension, and therefore, you can imagine a scenario where, if everyone was happy and there was still a desire perhaps to change vendors for

Page 243

whatever reason, but there was the belief that everyone could communicate, that might not -- in that situation, you might not have the same time pressure as you do now, as apparently occurred in 2014.

Q Who or what conduct was the source of that tension?

MR. ROSEMERGY: Objection. Speculation.

A Oh, I have no opinion on -- I have no opinion on causes for the conflict. That is not within my domain.

Q You don't state here in paragraph 29 or anywhere else in your report that BI engaged in surreptitious conduct or impeded Breht Burri, do you?

A No, I do not.

Q So you have no opinions about surreptitious or other wrongful conduct by BI, do you?

A There is still the question of -- which is -- of access, which is, I'm not opining on rights, but if BIVI did not have rights and they accessed materials, then there is a conflict. But that's -- I'm sorry, could you restate your question?

Q I said, you don't have any opinions on whether BI

Page 244

acted surreptitiously or engaged in wrongful conduct, do you?

A I believe I have no opinion.

Q Take your time. I kind of need a yes or a no.

A Okay. Okay. Can you --

Q Let me have her read that question back.

MR. CLIFFORD: Would you, please.

(Question read back.)

A I have no opinions on whether BI acted surreptitiously. And wrong -- and in the -- and the only wrongful conduct that I might consider is, did they access materials they didn't have the rights to; the decision or definition of which is beyond the scope of my report.

Q Okay. So use whatever you -- definition you want, but did BI wrongfully access materials belonging to InfoDeli?

MR. ROSEMERGY: Objection. Outside the scope. Foundation.

A Yeah, that is not part of my opinion on the report. I'm working on the assumption that defendants did not have rights, and if they did access, would they have benefited, and what would it have taken to develop a replacement without accessing.

Page 245

I am not opining at all on whether or not they had rights to the material. That is not -- that is not an opinion I am --

Q So let me ask this question:

Your report proceeds under the assumption that if WRI or EMS utilize the InfoDeli database or data or files, then, you know, they -- then you have a number of opinions on what an alternative approach with a clean room or otherwise would have been, correct?

A Yes.

Q Okay. My question to you is about BI, not specifically about WRI or EMS.

Is your opinion in this case that BI -- strike that.

What opinions do you have about whether or not BI accessed InfoDeli files or data?

MR. ROSEMERGY: Objection. Scope. You can respond.

A Yeah, I did not differentiate between BI, CEVA and WRI in terms of access. So at this moment, I don't have an opinion about BI in particular.

Q Are you aware of any evidence that BI knew about WRI or EMS's use of InfoDeli materials?

MR. ROSEMERGY: Same objection.

Page 246

Q  Or data?

A  Yeah, again, that was not part of my report.  I was not differentiating between the defendants.

Q  Did you review the terms of use that were put on the Literature Stores on March 11, 2014?

A  Yes, I did.

Q  And how did the content of the terms of use document affect your opinions in this case?

A  Again --

   MR. ROSEMERGY:  Objection to the form of the question.  You can respond.

A  I am not opining on anyone's rights of use.  That I'm taking as an assumption, that they did not have rights.  That may be based on the terms of use, that may be based on other legalities.

   I am purely, like, if they did not have the rights to access the materials, and they did access the materials, did they gain a benefit in the production of the replacement, and my answer is yes.  And then I say, if you didn't have access to the materials, here is what it would take to build a replacement site.  I have no opinion on who had rights.  That's not my report.

Q  So you, just to confirm, you don't have any opinions about the nature and scope of the Terms

Page 247

of Use, correct?

A  I do not.

Q  You don't have any opinions on whether or not Boehringer Ingelheim agreed to the Terms of Use, do you?

A  I do not.

Q  And if the court or the jury determines that Boehringer Ingelheim did not agree to the Terms of Use, how would that affect your opinions, if at all?

   MR. ROSEMERGY:  Objection.  Incomplete hypothetical.  You can respond.

A  As I said, my opinion is not based on the Terms of Use.  I'm working purely on the assumption that for whatever reason, the defendants did not have rights to access the materials.  I did not give any consideration as to how that comes about.

Q  Did you give any consideration to whether or not there was a license agreement between Boehringer Ingelheim and InfoDeli, or TooBaRoo?

A  No.  Again, I'm working on the assumption that they did not have the rights, here is my analysis.

Q  Okay.  If you could turn to paragraph 40, page 18, please.

A  Certainly.

Page 248

Q  In paragraph 40, you have a half dozen examples of EMS and/or WRI accessing InfoDeli Software Platform websites, materials or output files, correct?

A  Correct.

Q  You do not state that Boehringer Ingelheim was involved in or knew of any of these activities, do you?

A  I do not.

Q  Why not?

A  A, I was not differentiating between the defendants.  I was primarily looking at EMS as the developer.

Q  Does it matter to you whether or not Boehringer Ingelheim was involved in or knew of any of the activities of EMS or WRI?

A  It doesn't affect my opinion on the -- how access of materials would accelerate development or what the cost would be if you did not have access to the materials.

Q  Let me turn your attention to paragraph 46, please.  Okay.  In paragraph 46, you state, "Given my understanding and assumption that the defendants did not have rights to the InfoDeli Software Platforms and were prohibited from

Page 249

reverse engineering, copying or creating, recreating the functionality of the Platforms, nevertheless, the defendants could have always proceeded via a clean room."

   You go on to explain that, correct?

A  Correct.

Q  So when you use the word "defendants," are you talking about all defendants in that paragraph or are you talking about specific defendants?

A  I did not differentiate between defendants, so I, in this paragraph, am talking about all the defendants.  That's -- but I had not made a distinction between defendants.

Q  You mention in paragraph 54, a National Geographic project that you worked on earlier in your career, correct?

A  Correct.

Q  That's not a clean room project, is it?

A  No, it's not.

Q  And this Laser Lords computer game project is not a clean room project, right?

A  No, it is not.

Q  Those are just a description of some quality control projects you worked on before?

A  Quality control and large amounts of data.

Page 250

Q   All right.  Let's move up to page 51.  And I think it's paragraph 122, and specifically, Footnote 32.

A   Certainly.

Q   You mentioned this earlier, where you were talking about products in the BIVI and CEVA Literature Stores, and then you gave us a very specific number of BIVI products, correct?

A   Yes, that is correct.

Q   All right.  So was it your -- in your analysis, where did you get the number 3814 for the number of products in the BIVI Lit Store?

A   It's from the SQL query Select Count from BI_lit_04032014.products, and that was part of the InfoDeli Data 00001 production.
        So that SQL query tells me how many rows are in the products table.

Q   And just to be clear for the ladies and gentlemen of the jury, what do you mean by "products" as you're using it in that paragraph?

A   I believe in this case, these are individual products available on the Lit Store, each of which would have different information associated with it.

Q   Okay.  So are we talking about different types of pharmaceuticals?

Page 251

A   Yes.

Q   We're not talking about pieces of literature.

A   No.

Q   We're talking about different, let's call them SKUs for different products sold by -- wait until I finish, please -- sold by Boehringer Ingelheim VetMedica, correct?

A   Correct.

Q   So at the time that you did this query, what timeframe is this number of 3,814 products coming from?

A   Oh, well, the production was at 04032014, I believe.  I would have to check if it -- how far back it went in time.  I believe it's -- I do not know off the top of my head the exact timeframe that this number comes from.

Q   Is it fair to say that your understanding is that that's a cumulative collection of products that were in the database as of April 3, 2014 in the InfoDeli BI Lit Store?

    MR. ROSEMERGY:  Objection to the form.  You can respond.

A   When you say "cumulative," you mean all products of all time?

Q   That's what I'm asking you.  Is that what it is?

Page 252

A   I believe it is.  What I don't know is if products were deleted or if all products were kept.  My understanding is that products were often kept in case they were brought back.  So even if they were not currently live, you kept them in the database because you might need them later.

Q   So how did that 3814 number affect your opinions in this case?

A   So mostly that affects my number in terms of when I'm talking about the effort necessary for repopulating the Literature Store content, the -- I just want to find the right phrase -- the Lit Store content creation.  So the Lit Store content creation was based off of the assumption that all of these products would have to be recreated because even old products might come back.
        I believe I may have given a qualifier about that, but I don't recall off the top of my head if that qualifier is in here.

Q   So is there a formula that you used to convert 3814 products into a number of hours that would be used in the replacement system?

A   Oh, yes, there is.  Now, I did combine that with the CEVA products, which were 538, to give me a total of 4352 products.  And then I go on to

Page 253

explain that, assuming you have 4352 products, and that each product has at least one image associated with it, at least some text material, and then a certain number of them, 1836 have -- or there are 1836 references to other marketing materials, it's possible one product might have several things.
        So, but of those 5000 products, there are 1800 links to other marketing materials, and all of that gets converted into my, it would take between 20 and 40 minutes per product to repopulate that content.

Q   Okay.  And you made no distinguish -- you did not distinguish among those 3814 BI products as to which were current in their portfolio of products as of April 2014, did you?

A   I did not.

Q   And so you don't know whether BI would have wanted all 3814 products in the replacement database, did you?

A   I do not.  I did consider it and was told that, by Breht Burri, that often products would go away and come back, so in general, there is value in having the old products.

Q   And you also didn't compare what was actually

Page 254

input into the EMS database to determine how many products were actually put into the replacement database, did you?

A  I did not. I believe, if I could look at the report of Jason Eaddy again for a moment.

I'm having difficulty finding it right now. I believe it was in the Eaddy report. I remember seeing numbers of two snapshots of the -- pardon me, I realize you asked for BIVI in particular.

Q  Yes.

A  I do not recall off the top of my head if I saw numbers of specifically the BIVI site.

Q  So put another way, the number of actual replacement -- the number of actual products in the replacement site was not considered for your opinion, correct?

A  Correct.

Q  And then we turn over to the next page at the top of 52, you say there were "515,189 Product Related Records in the BIVI Lit Store Database," right?

A  Sorry, which paragraph?

Q  The very top line.

A  Sorry --

Q  Page 52.

A  Thank you. I was looking at the old.

Page 255

Yes.

Q  Okay. And so, how did that number of 515,189 affect your analysis in this case?

A  So I go on to explain that because the database is so large, that they wouldn't -- sorry, just let me find the right -- so those records help give an indication of the size and scope of an amount of database data that need to be added, and I made it clear that not every one of those records is something you would input directly, that many of them are calculated, but it gives a sense of the size of the database associated with the products.

Q  So you didn't actually take that 500,000 number and use that in a formula to calculate man hours.

A  No. No. The calculation for man hours was based on the number of products, not on the number of records.

Q  And so your analysis of the number of products in Footnote 32, 3814, did not account for obsolete products, did it?

A  As I said earlier, A, I was told that deleted products sometimes come back, and secondly, I do say in paragraph 129, "Assuming that this process is required for all 4352 products."

Q  And you use that assumption based on Mr. Burri

Page 256

telling you that sometimes products come back?

A  Yes. That there was value that -- you wouldn't necessarily look at what are the current products.

Q  So your assumption necessarily means that BIVI would have wanted all of its obsolete products put into the replacement platform; isn't that correct?

A  That is correct.

Q  Is that logical?

A  That's why I said "assuming." I was trying to give a range, but then I realized I had no basis for a range.

Q  So you just put them all in, rather than trying to come up with a reasonable estimate of the current products, correct?

A  You want to be very careful when giving estimates, so I said, "Assuming that this process is required for all 4352 of the products."

Could I have written more there? Certainly. But I was not trying to hide anything. I said: Assuming this is needed for all the products, this is what it would take.

Q  And you could have come up with a reasonable estimate of what the then current products would have been, couldn't you?

MR. ROSEMERGY: Objection. Calls for

Page 257

speculation.

A  There are many possibilities. I was trying to come up with what it would take to, as closely matched as possible within reason, what was on the preexisting system. My understanding is that some noncurrent products come back, and you don't necessarily know which ones, you want them in the system.

I already had a range in the amount of time it took for doing each product. Perhaps I should have done a range for the number of products, but I wasn't trying to hide. I said: Assuming that this process is required for all the products.

Q  Did you ask Mr. Burri, Breht Burri as to what he understood the current product line included as of April of 2014?

A  I did not.

Q  But you could have, couldn't you?

A  Obviously, I could have.

Q  All right. And assume -- that number would likely have been smaller than 3814, correct?

MR. ROSEMERGY: Objection. Calls for speculation.

A  I assume it would be a smaller number.

Q  And so therefore, given the reliance by another

Page 258

expert on your calculations, based on the 3814, the damages experts calculation is likely higher than it would have been if you had asked Breht Burri that question, isn't that correct?

MR. ROSEMERGY: Objection. Form. Foundation.

A  Could you state that again, sorry?

Q  The damages expert is relying on your calculation that arises out of the number 3814 BIVI products in Footnote 32, correct?

A  Out of the total of that and CEVA, because they were not broken apart.

Q  We'll get to that in a minute.

A  Okay.

Q  Let's just talk about BIVI. So he is relying at least in part on your calculation of 3814 BI products from the InfoDeli database, right?

A  That is correct.

Q  And so his damages calculation is based on that number at least in part, correct?

A  I would assume.

Q  And if you had asked Breht Burri that question of what the current line of BI products was as of April 2014, then that subset of 3814 would likely have been lower than the total of 3814. Right?

Page 259

A  If I had, that is -- if I had decided to use that number, that is correct.

Q  And therefore, the damages expert's calculation, if he had that current number of products, would likely have been lower, correct?

MR. ROSEMERGY: Objection to form and foundation. You can respond.

A  Again, we're -- this is all hypothetical. Not to rely on this too much, I said, assuming that this process is required for all 4352, I gave this estimate. My understanding was that old products came back, you would want to replace the entire set of products in order to have a new system that had the same functionality as the old system.

Whether or not all of those old products came back is something that happens in the future that you don't know. So my -- so again, I used the qualifier: Assuming that this process is needed for all of the products, here is the range of effort.

Q  Okay, Mr. Edge, that's not my question. My question was, if the -- if we had the data, because if you had asked the question about current products, and it was lower than the total of 3814, then the damages calculated by the

Page 260

damages expert would likely have been lower, correct?

MR. ROSEMERGY: Same objection.

A  But that's assuming the hypothetical, that I decided to go with that number as opposed to keeping with the total number because old products come back, and that was functionally needed for the new system.

Q  So if the damages were calculated based on the current number of products, it likely would have been lower than the full number of 3814, correct?

MR. ROSEMERGY: Same objection.

A  But damages aren't based on the current number of products. Damages are based on the effort needed to replace the InfoDeli system, and there is room for reasonable debate on what that means. In this case, I understood that trying to replicate deleted products into the system, so they could be brought back live quickly, was a feature and might be required.

In general, I've given a very conservative estimate. Maybe that is something I should reconsider, but for the moment, I am comfortable with what I have stated here, which is assuming that this process is required for all 4352

Page 261

products, here is what it would take.

Q  Wasn't one of your assumptions that WRI and EMS wanted to get a replacement BI Lit Store up as quickly as possible?

A  Yes.

Q  And wouldn't it have taken longer to add more products than fewer?

A  You could always start without having finished all of the data load.

Q  But you didn't do that calculation, right?

A  I did not do that calculation.

Q  If I could direct your attention to paragraph 145 on page 62.

A  Yes.

Q  So someone looking at this table would be unable to determine how many hours would be dedicated specifically to the BI Lit Store, correct?

A  That is correct.

Q  And you did not do calculations based upon a clean room solution for the BI Lit Store specifically, correct?

A  I did not.

Q  Why not?

A  To be honest, it didn't occur to me. I was -- I'm a programmer. I was told, assume the defendants

Page 262

did not have rights to these materials, what would it take to develop. I talked about that. I talked about how it would be faster and more efficient to develop the BIVI and CEVA Lit Stores together, along with Vectra Rebate all at the same time so you get the economies of shared functionality.

So if the goal is to replace the InfoDeli Software Platform, the fastest, most cost-effective way to do that is not to split up BIVI and CEVA, but to do it all essentially as one project. That doesn't mean it couldn't be split up and charges could be done in different ways. It doesn't mean that you couldn't do a split on the cost for a different database entry, content entry, but I did not consider that as part of my report.

Q Okay. And so therefore, we have no BI Lit Store clean room solution calculations in your report, do we?

A We do not have a separate calculation. There are certainly elements where such could be computed.

Q So from your report, there would be no way for us to actually do the clean room solution calculation for the BI Lit Store specifically based on what's

Page 263

in your report, right?

MR. ROSEMERGY: Objection. Form. You can respond.

A That's -- that was not my analysis. When you talk about doing it just for BI, you're now getting to a very hypothetical land because the Lit Stores share so much technology. So if you're to say, well, if CEVA did their own Lit Store and we did our own Lit Store, but now you're getting into a very different world, so, but I did not break out what it would cost just BI or what just BI's portion would be in terms of effort.

I did a development of what is the most efficient way to develop a replacement for the InfoDeli Software Platform which involved two Lit Stores and Vectra Rebate, but I did not -- but I believe the most effective, cost-effective and time-effective solution was to do it as a project to get the economies of scale of shared functionality.

Q As of this time, you have no plans to go back and do BI Lit Store clean room solution calculations, do you?

A I do not. If counsel direct me, but I have no plan to do such.

Page 264

Q On that table in paragraph 145, page 62, you give three different sets of clean room solution calculations, right?

A That is correct.

Q One for 14 to 16 -- 14 to 15 months, one for eight to nine months, and one for five to six months, correct?

A That is correct.

Q Are you going to make a recommendation to the jury in this case, if you testify at trial, as to which is the appropriate calculation the jury should utilize?

MR. ROSEMERGY: Objection. Scope. You can respond.

A I don't think that -- I currently have no intention. I will state that clearly, the 14 to 15 month timeframe has the highest likelihood of success. But I don't believe that -- so this is information I'm giving. I don't believe I am opining on which solution anyone should choose.

Q Okay.

A I'm merely stating what the costs and caveats are.

Q How did you calculate a 75 percent likelihood success for the first column, the 14 to 15-month solution?

Page 265

A So these are all approximately, and I went back and thought about literally 30 software projects I've been on, and I do define the likelihood of success being approximately, delivering the product as defined on time, or with either a very small slippage or a very small change in product spec, meaning drop one or two features, or bring them in later, and that was very consistent with products I worked on.

There were two products that were late enough that they had to be rescheduled. So I would call those outright failures. And then there were approximately five of the 30 projects where, oh, we made more changes to the spec than you would like; I wouldn't necessarily call that a success.

So the idea is that 75 means: Oh, the client's really happy. They made very minor changes. You know, another percentage, like, well, the product got done, but the client is not thrilled, and a few of the products got delayed significantly enough you don't consider it a success.

So that's an approximate figure based on my experience. But the way I will phrase that is

Page 266

that even for normal software projects with the regular timeframe, success is not 100 percent. There is, of course, anecdotal stories about how software is always late. That's not entirely true, but it is -- software projects are more likely to be late than many other projects that get estimates.

Q   And to put a finer point on these likelihood of success estimates, you did not distinguish between BIVI or CEVA in the likelihood of success of the BI Lit Store replacement or the CEVA Lit Store replacement, correct?

A   No, that -- I guess it's conceivable that one would work and one would not, based on content and data. I was -- for the timeframe, I'm more concerned about software development that would affect both. But I did not distinguish between BIVI and CEVA.

Q   And you also didn't distinguish between the likelihood of success for the Lit Store versus the Vectra Rebate, correct?

A   That is correct. I worked on the belief that doing -- that the most effective solution would be to do all three together.

MR. CLIFFORD: Okay. That's all I have.

Page 267

Thank you.

CROSS-EXAMINATION

BY MR. COLLIGAN:

Q   Mr. Edge, my name is Sean Colligan, and I represent CEVA and Shane Fairchild in this litigation. I have just a couple questions for you.

A   If I may ask, if it's really short, let's do it. If it's going to be long, I may need to take a break.

Q   You know what, I think it's going to be really short.

A   Okay. Let's do it.

Q   If we get to get long, you stop me.

A   Sounds good. Thank you. I appreciate it.

Q   All right. Let's look at page 11.

A   Page 11.

Q   Of your report. And in paragraph 25, you talk about, in 2011 when the new Lit Store for CEVA was provided by the plaintiffs and WRI, correct?

A   Yes.

Q   And you don't -- am I correct that you don't know how many hours it took Mr. Burri or InfoDeli to prepare that new Lit Store?

A   I do not.

Page 268

Q   And then paragraph 26, you talk about the creation of the Vectra Rebate website.

A   Yes.

Q   And am I correct that you don't know how many hours it took Mr. Burri or WRI to prepare that Vectra Rebate website?

A   I do not.

Q   Let's turn to page 34, please. And I'm looking at paragraphs 84 and 85, and this is where you do your comparison of the CEVA to BIVI Lit Store Lines of Code. Do you see where that is?

A   Yes, I do.

Q   Okay. And I want to try to understand what you're doing here a little better.
    I understand from the previous page, page 33, that each of the CEVA and BIVI Lit Stores by InfoDeli had about, a little over 19,000 lines of code, correct?

A   That's correct.

Q   And then, so on paragraph 84, for the InfoDeli line, are you saying that of those approximately 19,000 lines of code, all but 2340 are identical?

A   Let me think a moment. Yes.

Q   And the -- how did you determine that?

A   I used the Dif functionality in -- sorry, I am

Page 269

very tired. Just want to make sure I get the right name. CLOC. So CLOC allows you to set a Dif function. You look at two directories, and it will tell you just what the -- which lines are different.
    So the idea here being that the two stores are very similar, I didn't want to overcount all the lines of code that are essentially -- that were written once but used twice. So the idea here is that I ran a Dif to say, oh, this is how much extra effort was made, and it doesn't matter which order, but these are the differences between the two sites. So that's the additional code. That's the difference. That's code that's either added or changed.

Q   Did you say the program you used was called CLOC?

A   CLOC. It's a line counting program, but it has many features, one of which is: Just give me the differences.

Q   Okay. And so you're not saying that one or the other of the CEVA or BIVI Lit Stores is 2340 lines of code more than the other.

A   No. They are -- roughly, they are within 164 lines of code of each other. But some of the lines are different and some have -- and there is

Page 270

a few lines that one has that the other doesn't. But they are, you know, 2000 out of 20, they are roughly 90 percent the same. Or they share 90 percent of the same -- 90 percent of each of their code is the same, roughly.

Q How much difference in a line of code is required to make it a different line?

A Oh, a single character. So any difference in a line of code counts as a new line.

Q All right. So if a single character is different, that whole line gets lumped into the 2340?

A Right. And again, no desire to overcount, but the changing a line of code is work, you know, because it's not just changing that character. It's what is happening around it. So -- sorry, I'm talking too much.

The intent here was to give the most conservative estimate on the amount of effort that was required to building both sites by not double counting shared files and text -- and lines of code.

Q Then the actual numbers of lines of code that you used to calculate your hours estimates were the ones listed for InfoDeli in paragraph 85, correct?

A Yes, correct.

Page 271

Q All right.

A Again, because it was the smaller code base, I thought it would be the more conservative estimate.

Q And for the Vectra site, you had 1291 lines of code?

A Yes. So that is arguably an undercount because we didn't include the FileMaker Pro modules, but again, when in doubt, I went for the lower number so that the final numbers would be less.

Q Okay.

A And as I mentioned before, a lot of the heavy lifting in Vectra Rebate is on the database side regardless. So lines of code don't fully give the complexity of the site.

Q And that heavy lifting on the database side would have been reflected in the replication or the creation of the database numbers that you prepared, is that correct?

A That is partly correct. I just want to be accurate. It is reflected partly in the database numbers, and the estimate for the Vectra Rebate portion of this might be -- is arguably an undercount, which is consistent with my methodology.

Page 272

Q Vectra Rebate portion of which?

A I'm sorry, when I do the line counts, paragraph 85, you could argue that I was aggressive on all of the code I deducted for the InfoDeli version of Vectra Rebate. But when in doubt, I went for going for the lower number because I gave the more conservative estimate on the final number.

Q Okay. And you gave the FileMaker Pro lines of codes, as an example?

A And I said for FileMaker Pro, there was -- I could have tried estimating lines of code for FileMaker Pro, but I thought it was better just to discount it and not include it in the total.

Q But then in terms of the database, for example, if you were -- page 62, paragraph 145, does that get accounted for in the database entry for Vectra Rebate numbers that you prepared?

A Yes. And then the only caveat is, I explained that I don't think they would be able to replace all of the -- to re-implement the entire database. That would be prohibitively expensive. Instead I suggested that they would do this compromised solution. That would be much cheaper and probably be acceptable at least for getting the site up.

So I guess the way I would say it is, again,

Page 273

trying to give conservative numbers, I said, instead of doing the very potentially expensive task of trying to replicate all of that database, they would do a subset. And therefore, I gave what I believe to be a conservative estimate on the efforts needed to do that replacement subset.

Q How did you define that subset?

A It was based on the codes that had been printed out in the -- that were out in the wild, that were publicly available.

Q When you say the codes that were printed, you mean the ones that WRI had actually printed on coupons versus the two million codes?

A So WRI had images of all coupons that had been printed and sent out, and I believe that was a good starting base for doing a replacement database; that you would have to find a mechanism to collect that information. And that -- and I describe trying to do that mechanically so that would be less expensive, and I thought, okay, this, if I were bidding on this project, this is what I would suggest, that this would be a cost-effective way to get the site up and running. Again, my intent was to give a conservative estimate.

Page 274

Q All right. And that's where, if WRI actually had those rebate codes in a spreadsheet or saved on a computer, separately from the images, you didn't take that into account?

MR. ROSEMERGY: Objection. Calls for speculation. Incomplete hypothetical. Let me finish. Incomplete hypothetical. Continue.

A Sorry.
Yes, I was not aware of another system like that, so to the best of my knowledge, I describe what I thought the right solution would be. I also don't know what information might be available on such a database. That's a hypothetical I honestly can't answer.

Q And because you weren't aware of it or aren't aware of it, you didn't consider it?

A That is correct.

Q I don't have anything further.

                CROSS-EXAMINATION

BY MR. KNOPS:

Q Really very, very short.
I'm Peter Knops, Engage Mobile Solutions. Go to paragraph 145. You looked at that chart before, and you answered from personal experience how you get the 75 percent on the Likelihood of

Page 275

Success?

A Yes.

Q Moving over those next two, is that from personal experience of projects, when you moved it into the eight to nine-month category, that it's gone to 50 percent success?

A Eight to nine -- okay, so number one, just leaping ahead five to six months, I've never agreed to a schedule like that.

Q So that's just from your experience --

A From my experience, trying to compress a project that much, as I said, low. Again, I'm using the words "approximately" here.

Q I understand.

A This is based on my experience.
For the compressed, I've certainly done compressed timeframes. Usually what happens, you don't actually get an actual failure, is that you get the client to make -- that usually if the client's trying to get the project out that quickly, they agree to significant scope de-escalation. But that is very much an approximate value, that even -- because even on the high ones, when I say 75 percent, products come in late, and just, you never promise 100

Page 276

percent.

MR. KNOPS: Okay. That's all I have.

MR. ROSEMERGY: I don't have any questions. I do want to just make a note, something for the record. This Exhibit 626 is a hard drive that we provided today that was intended to and does in fact include the materials that he relied upon. It was the, basically all defendants' productions, and pleadings, and depositions, and whatnot. For whatever reason, the hard drive is not working. So we will endeavor to provide another copy that is accessible. But I just wanted to note that for the record.

MR. CLIFFORD: Can I make a suggestion that might be easier, or in the short term, that you provide a file directory as opposed to the actual full content of every party's document production and every party's deposition? If you could give us a list of everything that's on there, that would be a good starting point.

MR. ROSEMERGY: Assuming that that's something that's technically feasible, I'm certainly okay with that if everybody else is all right with that as well.

MR. BLEGEN: That's a good first step rather

Page 277

than another 2 terabyte hard drive.

MR. ROSEMERGY: Anyone disagree with that approach?

MR. KNOPS: I might want a terabyte, one that works. If you can get one of those that works, that would probably be better for me.

MR. CLIFFORD: Let's start with the directory, and then, at the same time, work on the solution to the server.

MR. BLEGEN: So you're withdrawing 626? That's not going to be attached to the transcript?

MR. ROSEMERGY: That was actually going to be my next question. In the light of the fact it doesn't work, you want me to just take it back, and we'll remove it, and we'll get a fresh one in there?

MR. BLEGEN: That sounds great.

MR. ROSEMERGY: I don't have anything else.
(Whereupon the deposition concluded at 5:15 p.m.)

Page 278

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

I, Lisa McDonald, Registered Professional Reporter Certified Realtime Reporter and Notary Public, in and for the Commonwealth of Massachusetts, do hereby certify that:

MICHAEL EDGE, the witness whose deposition is hereinbefore set forth, was duly sworn by me, that I saw a picture identification for him in the form of his driver's license, and that the foregoing transcript is a true and accurate transcription of my stenotype notes to the best of my knowledge, skill and ability.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal this 14th day of April, 2019.

_____
Lisa McDonald, RPR, RMR, CRR
        Notary Public
My commission expires: May 23, 2025

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

Page 279

DEPONENT'S ERRATA SHEET AND
        SIGNATURE INSTRUCTIONS

The original of the Errata Sheet has been delivered to Attorney Rosemergy.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record, and the ORIGINAL delivered to Attorney Blegen, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT
After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it.

DO NOT make marks or notations on the transcript volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

Page 280

ATTACH TO THE DEPOSITION OF MICHAEL EDGE
        CASE NAME: INFODELI VS. WRI, ET AL.
MARCH 9, 2019
                        ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction your testimony and the reason therefor on this sheet.  DO NOT make any marks or notations on the transcript volume itself.  Sign and date this Errata Sheet (before a Notary Public, if required).  Refer to Page 279 of the transcript for Errata Sheet distribution instructions.

PAGE    LINE

----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------
----    ---- CHANGE:  ----------------------
        REASON:  ------------------------------

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

-------------------------
        MICHAEL BLEGEN

**Exhibits**

**Exhibit 625** 4:11 10:10,11, 13 11:11,12

**Exhibit 627** 4:13 23:9,10

**Exhibit 628** 4:15 23:19,21 24:8

**$**

**$150** 110:15

**0**

**00001** 250:14

**04032014** 251:12

**06** 143:22

**1**

**1** 62:1 69:1,14

**1.8.0** 157:6,8

**10** 64:23 65:1,9 83:3 144:23 145:2,8,23 146:17 178:6 237:12

**10,000** 72:16 165:17 181:3,7

**10-power** 122:18

**10-to-15-day** 186:5

**100** 151:2 204:24 266:2 275:25

**101** 179:10

**105** 184:21

**106** 213:1

**11** 11:1 125:14,15 141:6,7 142:7 201:24 246:5 267:16,17

**110** 193:17

**111** 196:16

**116** 183:10

**119** 197:21,24

**11th** 142:15

**12** 119:12 143:22 239:17

**12,200** 72:16

**122** 199:21 202:14 203:16 233:17 250:2

**123** 200:8

**123a** 200:17,21,25

**124** 201:23

**125** 202:13,14 203:18

**126** 204:9,14 209:16

**129** 216:19 255:23

**1291** 163:9,12 271:5

**12:58** 143:1

**13** 97:22

**13/'14** 40:18,24

**130-odd** 220:4

**134** 216:2

**135** 210:12

**138** 148:25 149:2,13 150:12,15

**14** 72:17 73:12 75:5 125:11,12, 13 178:7 184:5 218:9 264:5,16, 24

**142** 212:1

**144** 167:24 197:22

**144,000** 168:3

**145** 79:8 81:5 184:10 211:16 215:1,3 217:23 261:12 264:1 272:15 274:23

**145,000** 163:11

**1450** 209:11

**146,000** 163:5

**14th** 125:7

**15** 72:18 75:5 184:5 264:5,17

**15-month** 73:12 218:9 264:24

**150** 184:13 209:25

**154** 75:22

**16** 98:8 119:21 227:3 264:5

**160** 211:21 212:2,3 216:15

**164** 269:23

**17** 122:17 232:2,11

**179** 163:1

**18** 148:24 213:18,19 247:23

**1800** 253:9

**1836** 202:22 253:4,5

**19** 100:7 233:7

**19,000** 268:17,22

**2**

**2** 62:1 211:1 277:1

**20** 145:23,24 146:1,18 208:23, 24 209:2,10 253:11 270:2

**2000** 181:6 270:2

**2002** 113:22 114:3,6 237:14

**2003** 237:20

**2009** 240:21

**2010** 40:18

**2011** 10:3 267:19

**2013** 38:5 45:16

**2014** 35:16 36:14 38:5 69:1 113:21 114:3,6 201:24 230:14 239:21 240:21 243:5 246:5 251:19 253:16 257:16 258:24

**2016** 43:15 44:16 121:19

**2017** 43:15

**2018** 15:16,18

**21,000** 73:3

**22** 111:12,14 112:8 167:25

**22,000** 150:6,7,11 153:16,21 169:2 170:3,6 176:23 177:1 193:24 194:12

**22,955** 153:18 168:7 169:2,14 170:18,20 177:4,5 197:12 215:16 221:9,11

**225** 184:5

**23** 111:19 121:19 143:5 203:16 237:13

**2340** 268:22 269:21 270:11

**24** 203:16 239:7

**2436-0001** 21:1

**25** 73:25 144:15,18 146:18,21 151:25 152:5 170:20 171:4 194:1,12 197:12,13 215:16 267:18

**26** 148:20 268:1

**26th** 138:25

**28** 113:8 239:16

**280** 185:2 215:3 216:1

**29** 241:9 243:12

**2900** 209:11

**3**

**3** 62:1 69:15 251:19

**3,814** 233:13 251:10

**3.5.1** 157:13

**30** 145:25 146:1,18 265:2,13

**300** 107:10

**31** 115:19

**32** 233:16 250:2 255:19 258:10

**320** 211:22 212:3 216:15

**320-hour** 213:1

**33** 115:1 125:13 268:16

**34** 268:8

**35** 111:19 112:4,8 115:16 233:20

**35,000** 148:2

**36** 117:6,25

**365** 26:9

**37** 123:25 124:13

**373** 162:22

**378,000** 162:19

**3814** 250:10 252:7,21 253:14, 19 255:19 257:21 258:1,9,16,24, 25 259:25 260:11

**4**

**4** 62:1

**4.1** 157:11

**40** 124:25 125:16 138:23 208:23 209:10 212:1,2 247:23 248:1 253:11

**4000** 106:19,20

**41** 128:3

**42** 129:18

**420** 185:2 215:4

**43** 184:21

**4352** 199:24 202:21 252:25 253:1 255:24 256:17 259:10 260:25

**44** 131:5

**45** 124:13

**46** 124:18 132:8 134:18 248:21, 22

**480** 193:16 194:23 215:9 216:1

**4th** 138:25

**5**

**50** 40:21 153:2 179:12 180:7 181:17 182:10 183:7,12,24 194:1,13 197:16,17 215:22,24 275:5

**50,000** 97:25 148:2,5

**500,000** 255:13

**5000** 253:8

**51** 233:16 250:1

**515,000** 199:25

**515,189** 254:19 255:2

**52** 254:19,24

**538** 252:24

**54** 249:14

**55** 123:25

**56** 143:9

**560** 174:12,19 175:2,7,13 177:21 178:17,18

**57** 143:18 147:4

**5:15** 277:20

**6**

**62** 79:8 184:10 211:16 261:13 264:1 272:15

**625** 10:10,11,13 11:12

**626** 21:10,13,15 276:5 277:10

**627** 23:9,10

**628** 23:19,21 24:8

**640** 193:16 194:23 215:9

**66** 143:9

**67** 153:9,15 171:8,25 173:17

**6th** 125:21

**7**

**7.6** 162:18

**70** 154:19

**71** 154:10,19 155:12,13

**72** 156:15

**73** 156:16

**7345.6** 170:25

**7346** 197:14

**75** 110:15 152:22,23 184:14 209:24 264:23 265:17 274:25 275:24

**79** 160:9

**8**

**8** 225:25

**80** 165:2

**84** 268:9,20

**85** 268:9 270:24 272:3

**88** 153:14,15 170:19 171:8,25 173:17 193:23 207:16 215:20

**89** 174:3

**9**

**9,900** 72:15

**90** 18:3 65:17 270:3,4

**90s** 7:23 8:14

**92** 153:10,13 174:3

**92746.jpeg** 107:23,25 108:9

**93** 179:3

**95** 143:22

**A**

**a.ii.** 197:24

**abilities** 15:23

**ability** 34:15 46:10 58:22 88:1 90:9 94:23 95:6,22 128:23 218:17

**absent** 89:16 92:9

**absolutely** 73:21 193:4 219:8

**abstract** 46:1 132:3 202:10

**academic** 86:25

**accelerate** 248:18

**accept** 211:15

**acceptable** 64:7 211:14 272:24

**access** 15:25 16:1 26:22 27:17, 25 28:1 29:24 46:12 49:16 53:9 58:21 59:24 60:22 61:4,14 71:24 72:12 74:20 75:17 77:1,9,22 79:19,21,24 80:1,23 85:24 87:15 88:20 94:23 95:13 96:5,10,14 97:1,9 98:4 105:23 106:16 110:4, 6 116:22,25 117:7,18,21,25 120:3 124:14 128:12,15,16 130:13 135:17 136:12 137:13,19 138:18,22 139:2,4,10 141:11 142:14 149:20,24 172:20 173:3, 11 189:4 192:16,18 196:7 198:18 200:13 205:1 213:17 219:17,25 220:7 224:7 233:3 242:18 243:20 244:12,16,23 245:21 246:17,18, 20 247:16 248:17,19

**accessed** 15:1 16:9 141:13,15 242:12 243:21 245:17

**accessible** 93:20 127:3 276:12

**accessing** 125:2,20,24 126:20 128:9 139:5 241:16 242:11,17 244:25 248:2

**accident** 68:10

**accommodation** 225:2

**accomplish** 161:23

**accomplished** 86:15

**account** 119:19 132:1 134:11 176:23 225:3 255:19 274:4

**accounted** 272:16

**accounting** 24:4 25:1

**accuracy** 160:21 238:8

**accurate** 8:5 24:1,6 25:5,6 31:24 74:14 107:4 121:16 122:6 124:17 125:19 145:13 146:9 163:14 167:24 168:18 169:23 173:12 174:23 185:8 190:20 191:13 228:25 229:23 237:7 271:21

**accurately** 241:19

**acknowledge** 208:16

**acknowledged** 164:4

**acquire** 211:3,12 214:11

**acquired** 10:7,8 100:15

**acquiring** 83:12

**acquisitions** 20:10

**Acronis** 45:17 46:4

**acronym** 25:10,11 26:12

**acted** 241:13 242:9 244:1,9

**action** 217:6,13,18 241:17

**actions** 124:25

**active** 107:7

**actively** 15:19

**activities** 140:14 248:7,16

**activity** 127:10

**actors** 8:23 9:8

**actual** 25:20 27:17 43:5 44:1 55:13 66:7 72:5 91:10 123:3 159:8 193:22 198:11,19 204:15 254:13,14 270:22 275:18 276:16

**add** 30:15 34:9 101:11 204:11 261:6

**added** 21:7 157:10 165:15,21 231:7 233:24 234:3 255:8 269:15

**adding** 181:11 209:25 234:9

**addition** 74:24 99:12 159:25 162:8

**additional** 80:11 116:6 166:4,6 183:24 269:13

**additions** 28:8 29:14

**address** 69:23 101:20 122:12 158:22

**addressed** 131:11

**addresses** 85:19

**administrative** 24:14

**admins** 53:4

**adopt** 144:15

**advance** 168:13

**advances** 38:8,14

**advantage** 51:21 63:25 77:1 107:8,9 112:25 113:2 118:18 127:5 129:13,14 131:1 133:5 141:15,23

**advice** 112:14

**advised** 111:15 112:8,11 241:10

**advocating** 169:21

**affect** 214:21,23 218:7 224:25 232:14 235:9,18 236:1,24 238:19 241:23 242:10,14 246:8 247:9 248:17 252:7 255:3 266:17

**affected** 228:10 229:7

**affecting** 237:5

**affects** 242:12 252:9

**aggressive** 145:9 272:3

**agree** 33:19 38:4 247:8 275:21

**agreed** 89:13 115:4 247:4 275:8

**agreed-upon** 119:14

**agreement** 23:12,16 34:25 90:9 91:3 92:9 115:6,17,20 141:18 247:19

**ahead** 8:4 10:2 11:7 36:21 90:5 91:4 157:2 159:16 178:2 239:16 240:2 275:8

**aimed** 25:22

**algorithms** 102:20,21

**allowed** 56:7,11 124:15 128:10,24 129:18 133:18,21 233:4

**alter** 126:14

**alternative** 88:12 245:8

**alternatives** 87:8,9,21,22 90:2 109:4

**Amazon** 34:17 52:11,13

**amend** 238:16

**Amodeo** 12:3,21,22 13:20 21:6

**amount** 78:13 106:21 148:12 164:20 206:21 215:10 255:7 257:9 270:18

**amounts** 222:19 249:25

**analogies** 198:25

**analyses** 44:11 45:14 46:3,16, 19,21,25 156:24 181:16 220:19

**analysis** 36:4 42:19,24 43:9, 11,14 44:7,9,10,13 45:6 46:1,2 47:20 63:13 68:12 70:25 75:25 76:2 78:6 142:16 143:15 144:4,7, 11,14 146:10 147:2 149:8 150:8 152:9,15 153:15 156:19 159:2 160:4 161:11 164:8,19 165:3,13 166:7 168:8 169:16 171:1,8,16, 17 179:4 182:22 194:15 195:23 210:2 220:15 221:4 222:17,18 224:10,25 225:1,9 230:25 237:8 240:4 247:22 250:9 255:3,18 263:4

**analyze** 63:16

**analyzed** 172:21

**analyzing** 196:4

**ancillary** 50:17

**and/or** 45:24 248:2

**anecdotal** 44:25 45:9 266:3

**animals** 33:4

**answering** 5:24,25 6:25 11:6 48:14

**Answers** 6:4

**anticipate** 71:21

**anticipating** 68:21

**antistatic** 22:5

**anymore** 151:21

**anyone's** 246:12

**AON** 10:8 12:12,13,14 47:5

**apologies** 23:5 105:10 130:7 176:22

**apologize** 25:12 26:14,18 138:6 202:5 212:4

**apparently** 243:4

**appeared** 112:21

**appears** 112:24 113:1 125:19

**Apple** 48:3

**apples** 162:2,3 175:18

**applicability** 217:6

**applicable** 65:4 130:22

**application** 9:6 25:22 29:12 30:12,20 33:25 34:5 37:13 42:6 48:1,6,8,18 54:11 64:20 68:4 80:9 93:15,16,21,23,25 94:2,5 95:12 97:4,23 148:1 195:8 198:12 220:12,23 225:19

**applications** 7:25 8:12,18,24 30:2 31:9 33:5 70:18 155:4 159:20 198:11

**applied** 143:15 217:13

**applies** 217:18

**applying** 144:19 171:17

**approach** 40:7 77:5,6 195:25 245:9 277:3

**appropriated** 44:5

**appropriation** 88:9

**approximate** 265:24 275:23

**approximately** 148:24 194:1,8 202:22 265:1,4,13 268:21 275:13

**April** 251:19 253:16 257:16 258:24

**AR** 23:25 24:18

**arbitration** 41:9 44:17

**architect** 190:15 191:24 192:6 193:1,6

**architecture** 39:20

**areas** 15:12 41:19 53:9 127:2 227:15

**arguably** 27:14 42:25 135:23 199:17 271:7,23

**argue** 27:12 106:1 129:2 272:3

**argument** 18:22 90:8 115:10 118:12,14 233:2

**arises** 52:12 258:9

**arrive** 153:18 209:11

**art** 88:8

**articles** 143:18 210:5

**aspect** 87:13 205:22

**aspects** 15:5 77:11 101:23

**asserted** 10:24

**asset** 210:5

**assets** 77:7 83:12

**assistance** 18:7

**assume** 6:20 14:14 65:8 81:8 83:24 84:20 85:2 90:23 115:3 125:14 131:8 139:10 141:10 152:18,20 171:23 194:6,8,15 223:12 236:15,20 257:20,24 258:21 261:25

**assumes** 110:5

**assuming** 63:10 78:21 104:5 111:9 113:6 115:24 117:23 123:11 127:11 128:16 140:21 152:9 168:9 169:2 170:5 177:1, 20 213:16 235:20 253:1 255:23 256:9,16,20 257:12 259:9,18 260:4,24 276:21

**assumption** 84:9 85:16 105:19,21,24 109:21 110:3,5,25 115:8 116:2,7 126:10 134:19,24 152:19 196:11 199:12 208:11 213:24 238:18 244:21 245:5 246:13 247:14,21 248:23 252:14 255:25 256:4

**assumptions** 149:18 199:15 261:2

**assure** 187:6

**attached** 277:11

**attachments** 7:6 18:24

**attack** 172:10

**attacking** 129:3 171:13

**attempt** 17:2

**attempting** 92:20 162:13 177:10

**attention** 225:25 226:25 248:21 261:12

**attorney** 57:2 92:19

**attorneys** 21:8 55:9

**August** 201:24

**authored** 86:22

**authors** 199:18

**automate** 210:8,11

**automated** 209:18

**automatically** 88:14

**automation** 210:9

**average** 62:9 144:4 146:17 152:4,5,24

**averaged** 151:7

**averages** 153:4

**averaging** 220:4

**avoid** 60:16 137:5

**aware** 35:15 37:25 50:25 86:17 91:1 113:24 114:4 172:7, 17,18 173:21 188:1 210:3 214:13,15,18 245:23 274:9,15,16

**AWS** 104:23

---

## B

**back** 9:2 16:6 37:18 41:5,15 47:21 57:19 66:13 70:6 80:20 82:24 96:15 97:14 102:10 114:3 129:11 141:2 143:12 144:9 151:12,17,18 160:1 161:18 166:21 184:18 189:17 199:9,18 216:19 244:6,8 251:14 252:4,16 253:23 255:22 256:1 257:6 259:12,16 260:7,19 263:21 265:1 277:14

**background** 85:25 99:17 179:9 242:15

**backing** 90:3 154:16

**bad** 43:18 187:25

**bag** 22:5

**ball** 107:16

**ballpark** 174:24,25

**banking** 33:2

**bar** 188:21

**Bartech** 43:15,19 44:12

**base** 35:6 43:3 66:1 69:17 71:15 114:10 146:12 153:19

159:11 161:11 165:5 168:6,7 169:13 194:16 196:13,23 271:2 273:16

**based** 9:10 26:10 35:24 52:3 65:11,22 86:19 91:2 94:16 105:24 111:25 112:6,16 113:14, 21 115:7 117:14,15 133:24 136:12,22 141:11 142:19 146:1 156:19 157:6 158:9,10,13 159:2 169:10 179:18 184:1 185:5 193:17,19 194:18,20 197:5 201:7 208:11 219:9 228:11 240:3 246:14,15 247:13 252:14 255:15, 25 258:1,19 260:9,13,14 261:19 262:25 265:24 266:14 273:8 275:15

**baseline** 143:14

**bases** 42:20 69:16 157:4,5 165:4 167:5 196:14

**basic** 159:10 170:8

**basically** 44:23 45:20 71:11 98:14 102:19 147:21 148:23 220:18 221:17 276:8

**basis** 29:12 113:5 129:22 194:14,21 256:10

**batch** 121:6

**batches** 234:6

**bear** 74:9

**beast** 156:23 231:9

**began** 15:18 119:3 129:6 130:2 156:16 237:19

**begin** 129:18 130:8

**beginning** 82:24 83:9 97:15 129:9 186:4 187:7 189:24 207:15 227:1

**begins** 143:6

**begun** 241:13

**belief** 115:8 214:5 218:8 238:14 243:1 266:22

**believed** 14:25 36:10 159:19 164:23

**bells** 38:24

**belonging** 244:16

**benefit** 224:3 246:18

**benefited** 222:7 244:23

**benefits** 34:4

**BI** 223:4,9 224:15 228:21 231:22 232:11,12,14,15,17 233:10,13 234:3,9,10,22 235:24 236:16,17,18,20,22,23 238:10,21 239:8 240:13,16 241:3,6,7 243:13,18,25 244:9,16 245:12, 14,17,20,22,23 251:20 253:14,18 258:16,23 261:3,17,20 262:18,25 263:5,11,22 266:11

**BI's** 234:13 241:1 263:11

## BI_LIT_04032014. PRODUCTS 250:13

**bidding** 73:10 273:21

**big** 146:6 158:21 161:8 168:13 195:8

**bigger** 139:17 169:8

**bill** 25:7

**billed** 24:22

**billing** 34:10

**bills** 235:17

**binary** 42:22 160:3

**BIOS** 54:14,16,20

**bit** 8:21 32:18 42:1 71:19 81:17 90:3 95:3 102:10 123:9 135:22 163:25 180:14

**BIVI** 33:11,15 60:24 66:18 69:18 103:24 133:14,21 134:7 157:21 158:8,15 166:1,3,17,24 167:6 173:11 185:21 186:7 188:22 190:22 193:8 196:8 199:2,9,18 202:2 209:4 211:14 223:5,7 227:6,8,18,21,22,23 228:10,11,12,19 229:2,7 232:23 233:23 237:19 238:14,19 239:1, 13 243:21 250:5,7,11 254:9,12, 20 256:4 258:9,15 262:4,11 266:10,18 268:10,16 269:21

**blank** 154:9 155:10

**blanking** 25:12 26:14 44:2 50:11

**BLEGEN** 5:6 22:24 70:5 143:1,4 173:25 178:24 179:2 222:24 276:25 277:10,17

**blind** 190:9

**blueprint** 72:4 74:21,24 75:5 78:22,25 129:12 150:20

**BMS** 68:16

**Boehringer** 223:4 231:17 232:5 234:20 235:22 247:4,8,19 248:6,14 251:6

**boss** 12:13

**boss's** 12:13

**Boston** 10:5,6 76:16

**bother** 11:12

**bottom** 100:7 217:22

**bought** 26:25 27:11

**bound** 177:14

**bounds** 114:15 208:21

**box** 224:9

**boxes** 158:1 166:24

**brand** 200:13 207:24

**break** 143:2 151:11,16,18,20 173:24 178:24 222:21 225:11,12 263:10 267:10

**Breht** 12:1 14:9,10,17,21 15:9 16:7,17 17:23,24 20:7 50:25 51:7 83:15 98:21 99:11,15,19,24 111:24 112:17 113:10 119:23 120:3,4,11,16 122:13,18 128:3 163:8 220:22 221:21 222:17 230:12,15 231:13 232:16 235:21 236:15,20 237:14,20 238:10 239:22 240:3 241:11,14 242:14 243:14 253:22 257:14 258:3,22

**Breht's** 221:24

**bring** 10:19 24:19 58:25 74:9 121:15 158:22 265:7

**bringing** 81:13

**brings** 34:8

**broad** 84:3 98:9 172:17

**broadly** 47:4 48:14 57:25

**brochure** 203:2

**brochures** 53:22 59:5

**broke** 143:5

**broken** 258:12

**brought** 10:22 18:5 20:2 21:16 22:9,17 73:1 159:22 175:8 205:25 206:5,16,24 252:4 260:19

**bug** 97:5 134:3,5

**bugs** 31:7,17 38:22

**build** 26:2 36:17 55:5,7 109:11,22 119:11 137:3 173:5,9 180:20 185:25 186:1 189:23 190:9 211:3,4 242:16 246:22

**building** 40:17 80:13 94:12 108:24 119:3 160:5 190:16 196:2,3 198:5 222:2 224:2 225:20 231:8 270:19

**built** 8:10 40:11 70:18 152:6 158:15,16 172:11,12 180:21 185:13 220:6,23 222:1,4,5,6,11, 15 227:10

**bullet** 37:6,10,12 119:21 122:10,17 123:17 125:16,20,24 127:14 138:23 232:4

**bullets** 124:25

**bump** 150:1

**Burri** 12:1 14:9,10,17,21 15:9 16:7,18 17:23,24 51:7 83:15 98:21 99:11,15,19,24 111:24 113:10 119:24 120:3,4 122:13 188:15 220:22 221:21 222:17 229:12 230:12,23 231:13,14,15 232:16 236:15,20 237:14,20 238:11 239:22 240:3 241:11,14 243:14 253:22 255:25 257:14 258:4,22 267:23 268:5

**Burri's** 120:12 235:21

**business** 9:18,23 32:22 34:22 49:20 54:7 66:7 73:22 128:5 161:18 164:17 170:7,10 194:2 210:21 218:7

**businesses** 8:25

**but-for** 75:18

**buy** 25:21,24 26:1 30:9,25 34:18 74:12 164:11

**buying** 236:8

---

**C**

---

**cable** 22:4

**calculate** 184:24 217:2 255:14 264:23 270:23

**calculated** 200:5 255:11 259:25 260:9

**calculation** 184:19 194:7 255:15 258:2,8,16,19 259:3 261:10,11 262:21,24 264:11

**calculations** 124:20 208:19 225:4 258:1 261:19 262:19 263:22 264:3

**call** 15:14,17 19:8 45:21 76:8 94:25 95:1 98:15 107:1 113:25 148:5 149:5 198:12 251:4 265:12,15

**called** 5:3 48:4,12 135:23 147:18,20 155:23 230:4 233:8 237:10,17 269:16

**calls** 89:20 91:24 93:7 178:1 224:21 236:2 256:25 257:22 274:5

**campaign** 122:19

**campaigns** 9:9

**candidate** 188:2,3

**canned** 229:17

**canonical** 98:15

**cap** 201:23

**capture** 201:16

**cards** 33:2

**care** 18:21 105:12

**career** 226:7 249:15

**careful** 68:8 91:17 92:10 133:3 256:15

**carefully** 54:18

**Carey** 23:13

**Carlson** 12:5,8

**Carolina** 9:13,15,17

**Carolinas** 10:5

**case** 7:7 11:25 12:5,6,7 13:7,12, 18 14:8,23 15:15,19,21 16:19 18:13 20:25 21:1,4 23:15,24 24:7 33:9 36:5 38:2 43:2,9,10,15,17, 18 44:11,12,15 45:18 46:4 47:11 48:23 54:14 55:2,18 61:18,20 68:13 71:16,22 76:19 83:25 87:3 96:24 97:11,18 99:16 101:2 105:14 111:22 117:18 130:11 134:15 149:2,4 168:21 171:3,21 198:20 214:18,20,22 217:7,24 218:21 224:19,23 226:4 227:12, 20 228:22 234:24 241:22 245:14

246:8 250:20 252:4,8 255:3 260:17 264:10

**cases** 47:16 70:21 215:12

**categories** 98:9 117:24 224:11

**category** 101:21 102:17,18 275:5

**Cattle** 237:19

**caution** 11:4 16:13

**cautious** 92:18

**caveat** 23:25 51:24 63:10 81:10 192:14 272:18

**caveats** 204:1 264:22

**cc'd** 12:2

**CD** 27:11,13

**CD-ROM** 8:17 90:21

**cell** 200:1

**cells** 201:1

**central** 182:1

**cetera** 25:22 26:24 32:24 33:3 34:10 47:3 55:14 66:8 69:9 70:19 85:6 88:21 100:20,22 112:2 155:10 156:22 159:14,15 170:16 198:16 200:14 209:2 233:18 242:14

**CEVA** 33:12,13,15 60:24 66:18 69:18 103:25 122:23 123:5,6 133:18,21 134:7 157:21 158:8,15 166:1,3 167:6 173:12 185:21 186:7 188:22 193:8 196:8 199:2,9,18 202:2 209:4 211:14 227:19 229:2 232:24 233:23 236:10 245:20 250:5 252:24 258:11 262:4,11 263:8 266:10, 11,18 267:5,19 268:10,16 269:21

**CEVA's** 190:22

**chain** 180:22

**challenge** 39:12 87:25 88:2

**challenges** 39:1 132:14

**chance** 20:13 167:9

**chances** 151:21

**change** 32:1 51:9 73:3 105:14 121:22 122:14 153:21 154:25 166:20 191:1 192:19 193:24 224:18,23 231:10,11 234:25

235:10 236:12 242:25 265:6

**changed** 43:24,25 123:7 165:19 166:4,6 212:18 225:14 269:15

**changing** 148:14 239:13 270:13,14

**character** 270:8,10,14

**charge** 12:10 110:14,15,24 209:24 236:18,23

**charged** 236:16,21 239:12

**charges** 262:13

**charging** 236:9

**chart** 79:12 81:6 157:21 211:16 215:2 217:23 274:23

**cheaper** 272:23

**cheapest** 189:23

**check** 49:8 127:9 154:20 220:16 238:17 251:13

**chip** 55:3

**choice** 57:18 62:4 177:15

**choices** 129:10

**choose** 11:15 31:8 64:11 92:2 164:20 264:20

**choosing** 32:23 38:19

**chose** 146:17 220:23

**chosen** 63:23 176:24

**Chow** 122:2,4

**Christopher** 12:2,15,24 13:10,15

**chunks** 135:19

**Cindy** 188:15

**circumventing** 80:4

**citation** 99:6 121:21

**citations** 98:23

**cite** 7:10 118:4 120:1,23 122:1 128:24 143:18 147:3 171:22,23 172:5 177:21 228:19

**cited** 181:15 202:4 229:10

**citing** 99:7 117:19 228:12

**claim** 118:20

**claimed** 42:13 43:6

**claiming** 135:18

**claims** 38:20 223:18 232:23,25

**clarify** 33:10 47:1 57:20 95:18 120:22 132:18 133:1 161:3 175:10

**classic** 88:16

**clean** 6:1,10 47:6,12 54:8,9,10 58:6 62:20,22,25 63:10 64:17 65:4,7 66:21 72:13 75:2,18,23,25 76:4,7,8,11 77:5,6,17,23 78:2,16, 18 79:1,4,11,15,17,21 80:7,12 86:2,6,7,9,10,14,16,22,25 87:4, 10,20 88:8,13,19,24 89:2 90:2 92:3,5 95:25 106:3 110:5 112:1 124:19,23 132:10,13,20,21 133:2,5,8,9 138:7,13,22 139:19, 24 140:1,10 149:19 150:4 152:14,20 164:9 168:9,12 169:4, 19,24 173:7 175:4 176:1,3,5,24 177:20 179:5 192:7 195:3 204:10,12,16 219:9,11 220:11 226:2,6,9,12,17,18,21 245:9 249:4,18,21 261:19 262:19,24 263:22 264:2

**cleanest** 87:19

**cleanly** 131:24

**clear** 30:13 50:4 56:4 58:18 63:25 67:11 68:9 69:22 71:17 74:12 79:23 81:10,13 82:19 104:20 107:20 128:7 131:11 133:9 139:12 142:5 145:16 150:3 173:16 176:14 206:20 213:12 218:25 225:13 250:17 255:9

**clearest** 19:25 87:5 96:17 101:8

**clever** 60:11

**client** 21:4 24:3 28:9 62:3,15 67:17 73:24 92:14 110:18 191:21 213:14 218:13 219:6 238:20 265:20 275:19

**client's** 265:18 275:20

**clients** 8:12 9:1,4 74:7 179:18 189:16,21

**Clifford** 81:16 223:2,3 244:7 266:25 276:14 277:7

**clinics** 101:20 126:23

**CLOC** 155:25 156:9,11 269:2,

16,17

**clone** 54:15

**close** 82:16 174:13 221:8

**closely** 257:3

**co-located** 152:11

**Cocomo** 182:21,25 183:2,3 221:17

**Cocomo's** 221:7

**Cocomo-ii** 179:6 220:15,16, 19

**code** 13:22 27:18,21 29:24 32:1,2 35:8,25 36:9 42:16,20 43:2,7,22 44:1,13,14 45:2,21,22, 23,24 46:1,2 48:20 59:25 60:1 61:20 62:11 66:1 69:8,16,17 70:17,20 71:9,10,15,16 76:1,2,3 88:21 91:11 93:21 94:5 98:4,19 112:2 114:10,19,20,21 118:4,10, 13,14,17,19,20 121:21,23 135:19 137:2 139:6 143:8,16,20 144:5,8, 15,18,21,24 145:15,23 146:2,5,6, 12 148:9,10,25 149:2,6,8,9,13,20, 23,24 150:5,6,7,8,12,15,20,21 151:2,8,22,24 152:2,22,24 153:2, 16,19,23 154:11,22 155:5,10 156:17,19,22 157:1,4,5,9,10,15 158:2,3,5,6,25 159:3,14,18,21 160:4,17 161:23 162:9,12,14,25 163:3,5,11,21,23 164:11,14,16,17 165:4,5,15,17,18,20 166:3 167:5, 6,13,23 168:4,6,7,9 169:13,17,18 170:3,7,8,10,20 171:4,5,8,15 172:22 173:4 177:4,5 180:20,21 181:23 184:7,8 193:22 194:15 195:23 196:13,23 197:10,12 198:13 200:13 211:18 215:16,17 221:10,11 230:18,22,24 268:11, 18,22 269:8,13,14,22,24 270:5,6, 9,13,21,22 271:2,6,14 272:4,11

**coded** 61:9

**coder** 149:18,22

**codes** 119:22 120:2,5,6,7,10 121:13 122:6,11 160:24 210:13, 16 211:2 212:6,11 213:19 214:1, 8 216:12,16 272:9 273:8,11,13 274:2

**coding** 77:10

**cold** 7:1,2

**collated** 70:24

**collect** 50:15 109:2 273:18

**collecting** 11:9 106:20 115:21 234:14

**collection** 99:9 109:9 186:6 251:18

**Colligan** 267:3,4

**colloquially** 28:18 60:17 74:3 202:24

**column** 215:19,22,24 264:24

**columns** 201:2

**combination** 37:15 103:22

**combine** 114:12 186:13 191:7 252:23

**combined** 9:10 74:19 83:2

**combining** 30:11

**comfortable** 76:10 260:23

**comment** 135:8,10,25 163:15, 18 222:16

**commenting** 135:6,11 176:12 237:25

**comments** 128:13 132:17 154:9 155:10 160:20 235:17 238:7

**commercial** 25:13,14,17,19 26:5

**common** 9:2 39:19 40:17,20 54:3,4 91:15 114:17

**commonly** 66:6

**communicate** 37:17 65:19 243:2

**communicated** 242:13

**communicating** 140:4 145:19

**communication** 8:24 73:5 136:23 180:2 181:1 218:24 221:13

**communications** 11:5 16:6,15 18:10

**community** 87:17 162:10

**compact** 48:4

**companies** 54:14,21 57:12 60:4

**collect** ... (see above)

**company** 7:22 8:9 9:24,25 10:1 42:7 52:22 54:13 188:24 235:21 236:16

**company's** 164:6

**comparable** 183:3,4

**compare** 44:14 63:13 69:10 158:2,5 253:25

**compared** 68:25 144:12 158:2 161:5 202:14

**comparing** 43:2 172:13

**comparison** 68:13 69:15,18, 19,20,25 82:9 131:22 166:23 169:6 179:5 221:2 268:10

**comparisons** 69:19 157:15

**compelling** 45:10

**competing** 16:3 43:20 55:15

**competitor** 35:16

**compile** 148:11

**complaining** 44:23

**complete** 26:3 169:19

**completed** 25:22 130:9 153:1

**complex** 54:7 145:4 186:23

**complexity** 36:10 51:5 163:25 194:11,16 271:15

**complicated** 49:16 149:22 173:5 196:18 197:3 238:4

**complicates** 185:23

**complications** 73:5

**compress** 182:2,3 275:11

**compressed** 275:16,17

**compressing** 182:4,9

**compromised** 272:22

**compute** 225:17

**computed** 262:22

**computer** 20:5,8 48:2 71:5 86:15 114:17 147:20 176:16,19 214:7 249:20 274:3

**conceivable** 176:3 266:13

**concept** 31:20 39:8 62:20 142:19 156:2 180:16

**concepts** 39:4

**concern** 52:18,24 61:20 88:1

**concerned** 21:2 266:16

**concluded** 277:19

**conclusion** 63:19,22 116:3

**conclusively** 44:1

**conduct** 243:6,14,18 244:2,11

**conference** 138:25

**confidence** 73:16

**confident** 206:3

**confidential** 21:8 41:21 44:17

**configuration** 164:16

**configure** 164:12

**confirm** 21:15 171:7 232:9 246:24

**confirmed** 57:1

**conflict** 87:12 238:2 242:4 243:10,22

**confused** 203:24 204:1 211:22

**confusing** 127:19 203:14

**confusion** 175:11

**conjecturing** 122:7

**connects** 108:1 201:20

**conservative** 92:18 145:21 146:13,15 160:5 162:14 164:23 165:13,21 167:16,21 168:6 169:14 170:18 177:13 197:4 211:13 220:24 240:10 260:21 270:18 271:3 272:7 273:1,5,24

**consideration** 247:17,18

**considered** 27:8,22 28:16 70:16 85:14 98:8 188:5 227:1 228:16 254:15

**consistent** 17:1 102:3 194:3 210:1,11 265:8 271:24

**constrained** 116:20

**constructive** 220:17

**consult** 92:19

**consultant-months** 148:24

**consultants** 52:15

**consulting** 7:22,23

**consumer** 27:13

**contact** 54:25

**contained** 237:16

**content** 8:2,5 15:6 16:5 47:2, 17 72:6 73:15 74:23,25 75:1 77:12,16 81:21 82:5 85:17 97:6 100:8,11 101:7,12,21,24,25 102:5,9,15,17 103:4,19 104:6,10 105:15 106:9 107:2 118:16 123:3,4,13,23 124:15 129:6 136:4,25 141:19 163:21,23 180:8,11,25 181:8 197:20,25 198:7,15,17,22 204:17 205:17,18 209:14 216:18,20 225:19 233:5, 8,10,19,20,21,24 234:2,9 246:7 252:11,13 253:12 262:15 266:14 276:17

**contention** 42:10

**contents** 118:5,7

**contest** 93:10

**context** 111:16,25 134:16 141:8 226:10 237:24 238:2 242:3,6,15,22

**continue** 111:19 274:7

**continued** 8:12

**continuing** 26:25 38:14

**contract** 42:2 56:22 57:15,17 119:11

**contracted** 73:4,20

**contractor** 76:13,14,18 77:2

**contraindicate** 234:19

**contrary** 123:15

**control** 31:11 58:21 103:20,21 107:6,8 110:11 249:24,25

**controlled** 49:9 101:24 102:2 107:2

**convention** 100:17 109:10 201:8 204:23 205:13

**conventions** 101:3

**conversation** 19:16 113:15 114:8 216:7

**conversations** 19:14 76:23 112:16 240:3

**convert** 252:20

**converted** 253:10

**converting** 98:5

**copied** 21:6,18 24:16 45:24 56:18 100:12 104:16 112:24 116:18 134:15 135:4,18,19 137:11 138:2 204:18 205:17,18

**copies** 7:15 85:3 120:24 213:3

**copy** 7:5 82:14 89:17 131:7 276:11

**copying** 72:5 74:23,25 77:15 80:3 81:20 82:16,21,22 91:10 134:21 136:9 249:1

**copyright** 43:5,6 44:3 89:9,10 90:7,25 91:6,8,10 92:2,12 93:1,3 118:20

**copyrighted** 93:4

**Corbin** 125:20 127:20,24

**cordon** 56:9

**core** 30:4,6

**Corporation** 45:17 147:20

**correct** 5:13 6:8 10:9,14,15,21 23:3 28:3 30:25 41:14 46:14 75:15 78:5 82:12 89:10,14,15,19 91:3,9 93:6 98:3 101:14,18 102:7 103:4 115:23 118:2,9 125:3,4,23 126:25 131:10 143:17,21 149:21 160:10,13,16 161:25 162:20,21, 24 163:6 166:22,25 171:2 179:7, 12,13 184:17 193:25 194:5 197:15,23 200:11,16,19 201:15, 18 204:13 205:12 208:14 212:9, 25 213:23 215:6,7,18,23,25 216:13,17,21,25 223:14,20 224:12,13 225:4,10,23 226:8,10, 11,13 240:14 245:10 247:1 248:4,5 249:5,6,16,17 250:7,8 251:7,8 254:16,17 256:6,7,14 257:21 258:4,10,18,20 259:2,5 260:2,11 261:17,18,21 264:4,7,8 266:12,21,22 267:20,22 268:4, 18,19 270:24,25 271:19,20 274:17

**corrected** 102:8 107:14

**corrections** 104:3

**correctly** 19:12 131:7 169:22 205:11

**correlated** 59:25

**corroborating** 15:11

**cost** 73:2 145:7 179:8,12 181:10,12 183:15,16,18 191:3 210:21 218:10,18 220:17 242:19 248:19 262:15 263:11

**cost-effective** 214:6 262:10 263:17 273:23

**costly** 181:6

**costs** 264:22

**COTS** 25:10,11

**counsel** 11:5,22,23,25 12:2 14:13,16 16:15 18:11 19:13,19 22:11 111:15,22 112:9,11,14 115:3 125:14 223:12 229:12 241:10 263:24

**counsel's** 12:1

**count** 65:10 102:15 148:3,18 150:1 161:15 166:10 170:18 250:12

**counted** 165:15 166:4

**counting** 150:9 159:18 200:1 269:17 270:20

**counts** 166:2 167:10 170:15 171:11 192:12 270:9 272:2

**couple** 7:19 53:18 155:24 267:6

**coupon** 119:22 120:2,5,6,10 121:13,23 122:11 126:22 210:13, 16 211:2,6 212:12 214:1,8 216:11,16

**coupons** 120:24 126:23 212:7, 17,24 213:3 214:1,2,12 273:12, 14

**courses** 86:18

**court** 5:21 247:7

**courtesy** 25:3

**cover** 124:13

**covered** 45:25 48:22 120:12 124:23 200:24 215:2

**covering** 174:5

**crazy** 145:22

**create** 80:5 82:5,14 135:15 164:24 206:19 238:11

**created** 113:22 119:23 177:5 205:19 237:15

**creating** 79:22 249:1

**creation** 82:17 216:18 252:13, 14 268:1 271:18

**credential** 61:3,4

**credentials** 127:15,20

**credit** 33:2

**CRM** 9:2,5

**CROSS-EXAMINATION** 223:1 267:2 274:19

**crossed** 140:9

**cumulative** 251:18,23

**curated** 15:6 77:15 81:20 100:8,10 101:7,12,20,23 102:5,9, 15,17 103:4,11 104:6 105:15 106:9 107:1 123:23 124:15 202:20 206:22 216:20 233:8,10, 19,21,24 234:2,9

**curating** 103:19

**curation** 100:23

**current** 44:15 45:5 187:16,19 199:4 214:5 253:15 256:3,13,23 257:15 258:23 259:4,24 260:10, 13

**cursory** 63:17

**curve** 52:8 64:13 222:8

**custom** 28:4,5,16,19,20 29:1, 7,18 30:12 40:2 63:2,3 70:17,23 170:10

**custom-coded** 62:21

**customer** 52:16 199:10

**customers** 9:5,11 122:24 199:4 212:7 236:10

**customization** 51:25 52:6 177:22

**customize** 28:12 175:2,13,19 176:7

**customized** 28:6 65:25 170:7 175:14 177:6

**customizing** 177:21

**cut** 179:11

**CV** 5:11 7:19 41:11

---

**D**

**D&o** 239:9

**damage** 217:3,5

**damages** 225:17 258:2,8,19 259:3,25 260:1,9,13,14

**Dan** 173:23

**Danis** 23:13

**data** 14:7 45:3,6 49:19 61:14 62:7 85:4,5 102:20 103:10 104:23 108:11,13 115:21,25 116:6,8 122:23 123:8 199:22 202:4 203:6,18 205:24 214:10 216:10,11 223:13,18 224:11 236:11,12 245:7,17 246:1 249:25 250:14 255:8 259:22 261:9 266:15

**database** 8:9 9:11 15:5 37:4, 17 38:19,24 61:11,23 77:8 85:5, 18 96:7,12,14 97:7,9 100:17,19, 23 101:4,6 102:1,4,9,13,14,15,16, 19,24,25 103:12 104:17,24 107:25 108:2,4,6,7,20,23 109:1, 5,11 110:16 113:1 121:22 122:19,22 123:10 130:14 136:3, 24,25 139:14 155:3 163:23,24 194:1,9,13,16 197:10,25 198:13, 15,18 199:1,13 200:2,9,14,20 201:2,5,19,25 202:8,11,16,25 204:5,8 205:6,9,14 206:12 207:2, 4,20,22 211:4,5,19 213:18,20 216:1,6,14 222:3,4 245:6 251:19 252:5 253:19 254:1,3,20 255:4,8, 12 258:17 262:15 271:13,16,18, 21 272:14,16,20 273:3,17 274:13

**databases** 16:25 84:23 85:10, 13 105:2,3 195:24 199:24,25 200:7 202:10 203:5,6 207:18,19 216:3

**Dataware** 8:7,9

**date** 24:7 73:17,18 121:17 125:8,25 142:16 143:23,24 201:24 229:25

**dates** 126:3

**day** 7:8,9 15:17 100:3 143:8,20 144:5,8,15,19,21,24 145:3,8,16, 23 149:1,2,13 150:13,16 151:2,8, 22 152:2,3,5,22,24 170:21 171:4,

5 181:24 185:9,18 189:15 197:13 215:17 220:4 224:14

**days** 24:18 125:7 151:18

**de-dup** 154:15

**de-escalation** 275:22

**dead** 129:8,10

**deal** 124:9

**dealing** 36:12 96:9 208:15

**dealt** 14:2 52:6

**debate** 260:16

**debugged** 151:4,25

**debugging** 128:11 134:10 155:4 220:1

**December** 15:14,16,19 121:19

**decide** 61:24 62:1 176:4

**decided** 146:11 152:13 168:5, 18 169:25 177:20 259:1 260:5

**decides** 224:15

**deciding** 30:22 31:13 146:10

**decision** 210:22 244:13

**decisions** 169:12

**decompiling** 42:22

**decrease** 74:8

**dedicated** 261:16

**deducted** 272:4

**deep** 138:4

**deepest** 187:16 188:23 189:7

**defendant** 42:13 177:16 225:11

**defendants** 15:22 38:1 46:10 105:15 113:6 115:8 126:11,13 134:15,19 135:3 141:10 218:1 224:24 225:23 233:2 241:11 244:22 246:3 247:15 248:12,24 249:3,7,8,9,10,12,13 261:25

**defendants'** 276:8

**defense** 132:15

**defensible** 54:23 167:17

**define** 136:14 174:17 265:3 273:7

**defined** 265:5

**definition** 40:4,20 93:12 139:13 180:17 244:13,15

**definitional** 135:22

**degrees** 86:13

**delayed** 265:21

**deleted** 252:2 255:21 260:18

**delivered** 44:20

**delivering** 265:4

**delivery** 189:8

**delta** 166:11,19 167:6 174:4

**deltas** 69:20

**demonstrate** 229:13

**demonstration** 125:17 138:24 231:22,25

**depend** 40:20

**depending** 34:20 51:5,24 53:9 102:23 122:15 123:7 136:2 148:3,4 172:11 235:10,12

**depends** 127:1 130:21

**depo** 117:15 227:22,24

**depos** 228:7

**deposed** 227:17 228:2

**deposition** 5:9,12 7:3 10:13, 18 11:7 12:6 17:5 21:17 24:20 35:9 276:18 277:19

**depositions** 36:1 112:20 238:17 276:9

**deprecated** 147:21

**depth** 17:10

**describe** 28:18 37:7,14 47:8 55:11,12 59:1 64:18 66:23 78:20 101:8 103:3,6 104:8,9 119:15 137:22 153:18,20 193:10 273:19 274:10

**describes** 55:11 67:16 119:17

**describing** 37:15 64:16 79:2 188:8 204:3

**description** 14:4 54:20 59:3, 13 71:2 82:2 232:3 240:11 249:23

**design** 55:7,10,16,19,24 56:1 57:6 63:2,6 66:3 67:19 71:25

72:1 77:10,14,23 78:3,15,20 79:10 80:24 102:19,20 103:1,3 119:1,5 122:23 123:1 128:9,18 129:1 130:10 133:13 137:9 140:23 141:2,17 169:11,12 173:6,13,14 176:6,11 180:18 185:7,9,14 186:18,24 188:13 189:18,19 192:24 193:13,16 194:7 195:1,2,10,11,12,25 196:6, 10,17,18,21 197:3 215:9 220:7 232:20

**designing** 78:23,24 79:3 119:20 195:20 215:12

**designs** 55:19

**desire** 195:17 242:25 270:12

**detail** 33:20 42:1 44:19 47:22 49:12 75:25 192:24 193:12 198:3 220:15

**detailed** 56:12 71:2 186:7

**details** 13:17 16:20 46:7 55:12 109:19 129:20,23 130:4 137:9 142:20

**determine** 15:22 46:9 76:3 94:1 230:23 254:1 261:16 268:24

**determines** 247:7

**develop** 8:22 9:8 15:23 35:14 46:11,13 54:10 55:4 57:6 65:2 67:22 73:11 74:21 94:19 97:1 109:24 116:11,23 117:1 124:15 177:17 190:21 193:2 196:20 219:24 220:12 230:21 237:20 238:22 241:25 242:7 244:24 262:2,4 263:14

**developed** 7:25 8:13 13:9 32:10 43:20 53:3,4,7,12 63:6 68:20 69:1 88:24 113:17 132:9 133:23 166:8 197:8 227:12

**developer** 42:3 47:24 52:16 63:5 89:8 90:10,11 113:10 169:24 239:22 240:17 248:13

**developers** 48:25

**developers'** 91:14

**developing** 8:12 29:12 40:22 53:11 56:12 59:14 64:6 65:21 66:22 67:2 80:8,15 97:4 129:6 159:19 230:12,24 231:13,16 233:6 236:7,17,22,23

**development** 7:24 8:2,6 9:22 29:18 40:7 47:17 53:2 54:23

62:21 70:23 72:2 80:8 113:9 118:24 128:19 129:9 130:3 133:12,13,24 179:11 180:8 187:5 191:9 195:4 209:14 218:18 234:21 235:7,15,23 239:20 248:18 263:13 266:16

**develops** 88:17

**devoted** 231:17

**dialogue** 19:9

**Dick** 120:7

**Dif** 155:23 157:1,4,8 165:14 268:25 269:3,10

**difference** 49:3 95:3 112:2 132:6 146:6 148:4 152:18 269:14 270:6,8

**differences** 32:17 33:16 230:6 269:12,19

**differentiate** 245:20 249:10

**differentiating** 246:3 248:11

**differently** 191:22 234:17

**difficult** 52:2 78:10 79:14 87:15 92:16 122:9 138:6 211:12 218:1 237:3,6

**difficulty** 6:25 254:6

**dig** 51:18

**Digital** 9:24

**direct** 5:5 130:17 131:22 225:25 226:25 261:12 263:24

**directed** 17:14 60:24

**direction** 12:1 13:2,8,11 14:12 21:7 57:22 138:3

**directly** 120:18 123:25 227:4 255:10

**directories** 71:3 108:19 109:18 153:24 204:20 269:3

**directory** 14:6 108:18 154:12 155:6 227:10 276:16 277:8

**disagree** 18:20 39:12 277:2

**disagreement** 223:17,22,23 238:4

**disassemble** 94:4

**disc** 48:5

**disclaimer** 21:9 24:17

**disclose** 11:4 241:11

**disclosure** 7:6

**discontinued** 147:23

**discount** 71:13 156:11 164:23 272:12

**discounted** 159:13,20 160:4 164:2

**discover** 95:9 195:12

**discovered** 38:23

**discuss** 47:13 121:22 144:9 150:22 195:6

**discussed** 86:9 124:10 153:5 197:5 226:17

**discussion** 115:1 131:17 153:15 201:12 212:5 235:20

**discussions** 19:1

**display** 48:12 159:10,12

**displayed** 90:25

**dispute** 42:2 44:20

**Dispute/scope** 84:16

**distinction** 142:24 220:13 249:13

**distinctions** 229:1

**distinguish** 224:10 225:22 253:13,14 266:9,17,19

**dive** 25:8 223:11

**divide** 142:12

**divider** 142:16

**dividing** 197:13

**division** 8:10 12:11 237:19 239:2,3

**divisions** 239:2

**doable** 213:13,14

**doc** 140:23 141:2 220:8

**document** 10:11 11:9 13:12, 22,24 14:2,4 19:2 23:10,19 24:8 55:16,19 56:21,22 57:5,7 58:1, 13,17 61:16 63:6 66:3,4 67:12, 13,16 78:19 96:1 100:25 119:1,7, 15 128:10 140:11 141:17 191:21 192:8,24 193:2,13 215:9 246:8 276:17

**documentation** 230:15

**documents** 13:13,14,25 18:25 19:22,24 22:17,19 23:2 36:9 83:2 85:19 98:23 99:1,5,7,9 101:15 103:8,11 105:16 143:19 201:4 227:5,8 228:9,12,13,20

**dollar** 217:17

**dollars** 217:13

**domain** 56:14 66:10 177:2 243:11

**DOSE** 48:12 97:23 147:13,16, 17 149:12 220:3

**double** 127:9 270:19

**doubling** 145:22

**doubt** 164:20 177:16 236:11 271:9 272:5

**download** 50:18 53:12,24 54:4 201:12

**downloaded** 206:10

**downloading** 108:14

**downloads** 201:16

**dozen** 232:4 248:1

**dozens** 59:11

**dramatically** 150:2

**drawing** 229:1

**drive** 10:22 18:4 20:2,17,18,23, 25 21:7,10,16,19,23 22:1,5,8,20 98:10,20 115:22 122:5 123:18,21 204:20 276:5,10 277:1

**drop** 9:14 83:11 265:7

**drops** 163:8

**Duces** 10:13

**duly** 5:4

**dump** 113:2 122:25 123:8 199:13

**dumped** 207:19

**dumps** 207:5

**duplicate** 155:18,21 156:11

**duplicated** 155:16

**duplicates** 156:14 162:22

## E

**E-COMMERCE** 32:4,7, 10,13,15,19,24 33:24 34:5,6 35:3 36:17 49:4,6,8,22,25 50:1,3,7 170:9 176:9

**Eaddy** 7:11 13:16 16:21,23 17:3,4,8,13,14 49:13 83:17 96:9 98:19 99:12,22 111:23 116:17 121:16 128:3,13 141:12 207:5,12 233:21 254:5,7

**Eaddy's** 100:6 109:19 117:14, 15 120:2,13 125:9 207:15

**earlier** 70:17 79:23 86:3 124:2 131:12 149:6 157:13 197:5 198:4 202:15 209:15 215:7 249:15 250:4 255:21

**early** 7:23 8:15 15:14,19 187:10 189:18 237:20

**easier** 5:22 29:6 64:9 83:8 117:22 180:12 186:14 191:7 192:7 276:15

**easily** 63:9 151:21

**easy** 6:1 170:17

**ebay** 9:14,19

**economies** 262:6 263:19

**Edge** 5:2,7 179:3 259:21 267:4

**edit** 80:6

**edited** 100:16

**editing** 110:17

**Editor** 48:13

**effect** 114:20 241:21

**effective** 179:22 210:21 263:17 266:23

**effectively** 47:14

**efficient** 64:17 72:19 130:18 141:21 169:3 177:11 180:24 190:4 196:21 197:8 219:2 262:4 263:14

**efficiently** 176:7 186:3

**effort** 16:2 25:5 71:1 72:8,9,20 74:22 75:1,6 77:7,9,11 109:7 110:9 113:19 143:7 146:16 150:9 156:21 164:1,3 165:22 168:24 174:4 175:8 177:17 178:5 179:4 180:7 196:4 209:17 210:2 211:9, 24 213:2 218:9 225:15 231:10 234:13,14 236:6 252:10 259:20 260:14 263:12 269:11 270:18

**efforts** 273:6

**eight-person** 211:24 212:2

**electronic** 213:2

**element** 123:1

**elements** 9:10 42:17 52:5 63:3 100:18 262:22

**eleven** 10:18

**Elliot** 228:4

**else's** 91:14

**Elysium** 9:24 23:13

**email** 11:24 14:10 18:10 20:10 112:19 127:22 228:8,18

**emailed** 12:1,2,4

**emails** 11:18,20,21,22,23 17:24 18:4,24 19:13,18 20:1,4,7, 12,15 129:24 204:25 227:16,20 228:16

**embedded** 106:15

**emphasize** 74:7 218:13 219:6

**employee** 43:19 187:15 188:22

**employees** 66:15 115:3 133:10,14,18,21 187:24 188:1,20 227:23

**employer** 147:24

**EMS** 69:2,5,13 70:10,11,12 71:1,9,23 77:8,22 80:17,22 81:7, 21 96:11,15 106:10 111:2 116:11,23,24 117:7,25 119:1 120:2,18 124:15 125:1 127:20 128:23 129:18 130:17,21 135:13 152:8 157:6 158:2,11,13 160:14 161:23 162:2 165:6 167:7,14,23 168:1 169:6,12,13 174:8 175:8 196:17 198:5 202:1 207:17 208:6,9 224:16 229:4 241:12 242:9 245:6,13 248:2,12,16 254:1 261:2

**EMS'** 68:16

**EMS's** 146:4 245:24

**encrypted** 22:1

**encryption** 22:2

**end** 37:3,18 62:3 134:1 145:8 153:5 154:10 159:17 160:1 161:15,18 179:3 184:3 189:14 230:10

**endeavor** 276:11

**ended** 132:24

**ends** 129:11

**Engage** 109:14,16 119:7 121:12 123:21 132:9 161:22 175:15 274:22

**engaged** 243:13 244:1

**engagement** 23:12,15

**engineer** 57:17 89:18 90:10, 12,22 91:7,20,22 92:13,20,22,25 93:5,20 133:6 195:25

**engineering** 90:17,24 91:2, 14 92:9 93:13,15 94:3,6,7,9,10, 11,20,25 95:9 96:24 97:2,19 134:21 135:1,21,24 136:7,10 249:1

**engineers'** 91:13

**enormous** 154:25

**entering** 110:16 173:10

**enterprise** 44:22

**entire** 48:6 102:13 154:12 259:12 272:20

**entity** 83:21,23

**entries** 201:5

**entry** 211:19 216:1,14 262:15, 16 272:16

**environment** 49:9 78:16

**environments** 64:12

**Equine** 239:2

**Erickson** 228:5

**error** 102:8 212:4

**escrow** 45:22

**essentially** 8:23 9:22 14:23 43:18 45:20 54:15 72:3 82:17 83:20 104:11 114:11 147:7 148:14 160:19,21 161:7,10 203:1 205:10 219:20 220:16 262:11 269:8

**estimate** 40:23 76:17 77:2,9, 16 78:2,14 146:1,13,15 160:6 162:14 164:24 165:22 167:17 168:14,16 169:15 170:18 171:18 173:13 174:21 177:14 197:4 211:13 213:7,14 230:22 239:24 256:13,23 259:11 260:22 270:18 271:4,22 272:7 273:5,25

**estimated** 143:19 184:6

**estimates** 216:24 218:12 219:9 224:19 256:15 266:7,9 270:23

**estimating** 76:4 164:21 272:11

**estimation** 77:11 143:7 171:20 179:8

**evaluate** 17:11

**evening** 10:25

**events** 14:24 141:6,7

**eventually** 133:25 134:6

**evidence** 15:12 20:25 44:25 88:20 109:23 113:12 118:10,25 120:17 122:7 123:14,20 206:14, 21 228:21 245:23

**exact** 106:19 113:16 181:2 190:9 229:25 251:15

**examination** 5:3,5 63:17

**examine** 68:9

**examining** 35:24 36:9 94:1

**examples** 45:23 125:1 141:14 248:1

**Excel** 24:16

**Excellent** 7:16

**exceptionally** 152:25

**exclude** 17:8

**excluded** 17:16 156:25 167:12

**excluding** 85:11 162:6

**exhaustive** 71:4 117:8

**exhibit** 7:20 10:10,11,19 11:11 21:10,12,13,15 23:9,10,19,21 24:8 41:6 72:8 276:5

**Exhibits** 7:6 70:9 83:5

**exist** 113:17 188:8 214:16

**existed** 68:25 80:17 118:11 239:21

**existence** 91:2 115:5

**existing** 23:17,18 47:18 48:18 58:15 64:14,18,19,20,22 65:3 66:16,19 72:3 79:5 169:17 186:19 190:2,14 191:23 195:24

**exists** 137:25

**expanded** 239:1

**expansions** 239:5

**expect** 19:10 21:22 134:6 151:3 152:4,23 180:6 195:20

**expected** 40:14 67:6 146:21

**expecting** 31:10 69:24

**expense** 239:12

**expensive** 30:8 31:3,5 210:19 218:5 272:21 273:2,20

**experience** 35:5 39:19 47:10, 23 48:24 53:2 66:8 86:20 144:13 179:18 181:15 182:13 185:6 194:19,20 195:19 209:13 222:19 226:13 265:25 274:24 275:4,10, 11,15

**experiences** 126:24

**expert** 7:5 11:24 17:8 35:10,25 46:18 47:11 98:18,20 99:11,12, 14 132:19 208:22 217:2 258:1,8 260:1

**expert's** 259:3

**experts** 76:18,21 88:7 258:2

**explain** 25:23 147:15 151:5,14 249:5 253:1 255:4

**explained** 83:19 96:13 217:21 272:18

**explaining** 130:25

**explanation** 165:9 181:8

**export** 24:13

**exposed** 56:16 68:1,6 89:2 137:8

**exposure** 59:16 67:8,14

**express** 179:10 181:17

**expressed** 181:20

**expressing** 217:19

**expression** 230:16

**extensively** 66:16,19

**extent** 224:20 225:5

**extra** 187:4 239:12 269:11

**eyes** 21:8 218:23

### F

**face** 16:18 99:19

**facing** 118:8

**fact** 18:21 37:4 42:16 54:5 61:1 64:9 65:7,13 83:4 86:12 91:6,13 106:3 107:12 114:4 116:24 120:13 122:11 133:16 146:24 165:12 208:3 212:22 214:7 228:19 241:13 242:21 276:7 277:13

**factor** 31:12 217:24,25

**factors** 28:24 29:4 221:12,14 235:12

**facts** 214:15,16 224:23

**factual** 16:12 18:17

**fail** 182:1

**failed** 54:16

**failure** 45:7 275:18

**failures** 265:12

**fair** 57:14 123:9 148:12 156:14 162:4 163:25 178:19 214:25 251:17

**Fairchild** 267:5

**fairly** 49:16 91:15 185:20

**familiar** 6:15,16 25:10,11,13 27:5 32:4 57:6,8,9 86:16 156:2 188:16,17 221:23 228:6

**famous** 27:18 54:13

**farther** 94:7

**fast** 81:19 130:18

**faster** 60:12 82:14 131:6,18 141:25 186:18 219:24 242:16 262:3

**fastest** 262:9

**father** 9:16

**favorable** 177:13 196:12 220:18 221:14,18

**fear** 138:4

**feasible** 276:22

**feature** 65:2 231:3 232:15 260:19

**features** 49:5,6,24 50:6,9 63:13,15,18,20 64:23 65:1,10,24 66:3 68:22 69:10,12 191:6 231:7 232:5,10,21,24 233:1 240:8 265:7 269:18

**February** 138:25

**fed** 220:18

**feedback** 134:3,5,10

**feel** 36:3

**felt** 36:10 72:18 145:9 242:5

**fetch** 109:18 111:1 200:18 201:13 204:19 206:10

**fewer** 218:17 261:7

**fields** 61:22 123:2

**fight** 160:18

**figure** 51:11 138:14 153:12 225:15 235:1 265:24

**figures** 210:23

**figuring** 94:11 95:4 128:11 220:1

**file** 89:9 106:5,14 107:11,22 108:3 111:1 154:20,23 155:1,2,8, 9,16,19 156:6,7,8 162:19 200:18 201:17,20 276:16

**Filemaker** 39:25 40:2 160:1, 2,5,8 161:22 164:2,5,11,14,24 170:17 271:8 272:8,10,11

**filename** 106:13,15

**filenames** 109:10

**files** 42:22 43:22 70:10,15,16, 23 71:5,6,11 106:11 112:25 115:21,25 116:6,8 121:5 122:18 125:3 136:4 154:4,5,17 155:15, 18,21 156:5,11 157:8 160:3 161:5 181:3,6,7 201:14 211:3 233:20,22 245:7,17 248:3 270:20

**fill** 21:4

**filtered** 71:2

**final** 25:6 119:21 123:17 127:14 148:17 153:1 164:21 196:15 220:25 231:4 240:6 271:10 272:7

**finally** 45:16

**finance** 25:1

**financial** 32:16 33:1 34:3

**find** 38:10,21 51:8,16,17 100:17 101:5 110:7 171:12 181:22 199:10 252:12 255:6 273:17

**finding** 211:21 254:6

**finds** 103:23

**fine** 22:17 105:11 142:1 174:25 188:2 222:3

**finer** 266:8

**finish** 130:5 157:23 251:6 274:7

**finished** 165:1 261:8

**firm** 82:20

**fit** 109:3

**fix** 50:25 51:4,17 52:11,13,18 151:12 181:13

**fixed** 51:1

**flags** 150:23,25 182:8

**flash** 123:18,21

**flavor** 161:7

**fliers** 101:15 203:19

**focus** 33:1

**focused** 146:11 147:1

**folder** 99:14 106:11 107:9 108:14 206:11

**follow** 81:18 180:22

**follow-up** 19:1,8 223:7

**footnote** 83:11 233:16,20 250:2 255:19 258:10

**force** 218:16

**forget** 44:7 67:9 106:19 127:21 155:5 202:2,18 205:5

**forgive** 17:16 202:2,17

**forgot** 58:15 97:12 226:23

**form** 11:16 19:20 20:19 36:7 39:22 65:5 67:4 78:8 84:1 85:21 88:4 112:13 120:20 124:3 172:1 173:1 178:5 182:14 226:14 228:23 246:10 251:21 258:5 259:6 263:2

**formal** 86:7

**format** 48:19

**forming** 13:6 14:19,22 18:8, 14 99:2,16 228:22

**formula** 102:22 252:20 255:14

**forward** 16:14

**found** 31:7 105:15 109:4 181:23 221:2

**foundation** 231:18 234:11 238:13 244:19 258:6 259:7

**four-person** 73:13 212:1

**fourthly** 75:7

**framework** 65:12 70:22 158:9,11,17,18,21 162:7,9 170:8 177:7 198:21

**frameworks** 63:23 65:23 70:18 71:7 157:5 159:13 170:16

**Francisco** 8:20

**fraught** 133:4 140:7,15

**free** 50:19 53:13

**fresh** 277:15

**Friday** 23:24

**Friedberg** 21:2

**front** 37:3 121:18

**fulfillment** 239:9,13

**full** 106:11 108:14 130:10 190:20,21 224:15 260:11 276:17

**full-time** 187:15

**fully** 129:19,23 130:2 166:22 213:10 271:14

**function** 60:10 114:13 127:6, 8,12 269:3

**functional** 79:16 80:10 81:11 184:19,23,24 193:19 215:3

**functionalities** 137:11

**functionality** 30:6 65:17 119:9 128:5 134:22 135:7,9,12, 15 136:5,15,16 137:20,22,23 138:8,9,12,14,16 139:23 140:1,2 159:8 161:19 192:9 198:22 249:2 259:14 262:7 263:20 268:25

**functionally** 260:7

**functioning** 131:7

**functions** 59:7 114:11 137:10

**future** 259:16

### G

**gain** 118:17 246:18

**gained** 15:3,23 72:7 129:4 141:23 209:18

**gaining** 26:22

**game** 48:2 249:20

**gather** 189:12

**gathered** 20:16

**gathering** 11:1

**gave** 21:19 96:15 98:10 113:16 127:20 145:23 209:6 230:16 242:15 250:6 259:10 272:6,8 273:4

**general** 25:9 31:8 38:12,18 39:8 57:9 78:19 82:21 86:17 90:17 116:21 151:3 218:12,16 232:3 239:19 253:23 260:21

**generally** 37:15

**generate** 156:21

**generated** 120:16 159:22 169:19 179:6 213:20

**generates** 120:5,10

**gentlemen** 5:17 250:17

**Geographic** 249:14

**Gimme** 41:24

**give** 14:3 27:4 40:3 41:25 44:18 47:21 62:9,11 63:24 69:24 72:20 77:9,10 82:2 83:2 101:10 104:2 111:24 116:22 117:17 124:5 130:13 131:22 134:3,14 141:5,8, 14,15,19 142:11 147:1 152:15 166:22 167:16 173:12 177:13,16

179:14 192:15 200:6 208:8 213:13 226:5 228:1 229:23 232:8 233:12 237:24 238:2 247:16,18 252:24 255:6 256:10 264:1 269:18 270:17 271:14 273:1,24 276:18

**giving** 41:7 71:22 87:3,5 97:17 119:16 131:16 132:19 178:17 209:22 222:17 232:3 256:15 264:19

**glance** 35:2

**glanced** 17:9

**goal** 8:25 35:11 177:13 262:8

**good** 5:8 30:16 33:22 75:24 93:19 107:1 117:2 130:20 152:2, 10 178:25 179:25 189:24 191:18 222:14 267:15 273:16 276:20,25

**Google** 115:22 204:20

**government** 100:22

**grabbed** 204:22

**grabbing** 108:18,19 209:21

**grades** 61:25 62:1

**gratified** 221:5

**great** 6:12,24 7:4 38:20 40:11, 13 151:8 158:23 220:7 277:17

**greater** 187:13

**greatly** 61:7,9

**grew** 68:19 190:5,6

**grey** 95:20

**group** 54:25 75:15 103:17 146:24 152:24 191:14,16,17

**grouped** 98:25

**grow** 114:14 195:18

**guarantee** 20:12

**guaranteed** 75:13 218:4 219:7

**guarantees** 73:16

**guess** 39:4 40:8,16 64:5 88:22 109:4 177:19 178:12 186:17 198:24 206:7 266:13 272:25

**guest** 49:9

**guys** 196:9

### H

**hack** 176:11,15

**hacker** 176:17

**Hail** 74:3

**half** 179:11 180:6 181:18 182:11 183:7 184:13 232:4 248:1

**hand** 7:4,7 10:10 20:22 23:21 54:24 121:2

**handed** 20:24 57:5 139:20 212:7 217:12

**happen** 109:23,25 136:1 143:23 185:10

**happened** 9:7 14:24 45:3 93:17 109:21 110:1 111:25 112:21 142:7 176:9 235:2 238:1

**happening** 270:15

**happy** 242:24 265:18

**hard** 5:22 10:22 18:4 20:1,17, 18,22,25 21:7,10,16,19,23 22:1,4, 8,20 56:19 98:9 119:16 276:5,10 277:1

**harder** 168:3

**Harry** 120:7

**hat** 107:16,17,22 108:1,9,11

**head** 101:10 122:3 126:2 143:25 156:13 165:8 180:3 219:1 229:8 230:10 232:8 251:15 252:18 254:11

**hear** 74:1

**heard** 6:21 74:18 88:10

**heavy** 65:14 148:12 170:12 271:12,16

**helpful** 81:16,18

**helps** 66:11 120:22 148:20

**hesitant** 73:20 74:2

**Hey** 80:17

**hide** 256:19 257:12

**high** 9:17 24:4 73:16 75:14 119:10 153:5 174:5,7 218:10 220:20,25 221:3,12,18,21 222:10 275:24

**higher** 31:5 107:3 135:16 145:11 218:19 220:21 258:2

**highest** 72:20,21 264:17

**highly** 21:8 151:1 152:3,23

**hire** 241:12

**hired** 113:11 239:23

**historical** 144:13

**history** 14:23 41:16 111:14,22 114:3 141:8 237:8,9,10,23

**hit** 222:12

**holds** 146:21

**holes** 138:5

**honest** 21:3 36:3 94:24 96:16 167:21 168:5 228:6 261:24

**honestly** 38:7 103:6 274:14

**hosted** 26:22

**hosting** 37:4,16 235:24

**hours** 23:23 24:5,6,12,16,22 25:2 72:16,17 75:6 76:12,13,14, 18 77:2 78:3,14 79:13 113:10 142:13 170:21,25 174:12,19,21 175:2,13 176:23 177:1,21 178:6, 18 182:10 184:6 185:2 193:17 194:23 197:14 209:11 211:25 212:1,2 216:2 230:12,17,21,23 231:12,14,15 235:23,24 239:22, 25 240:5,9,13,17,22 241:3 252:21 255:14,15 261:16 267:23 268:5 270:23

**house** 59:6 104:24

**HTML** 136:4 137:1 156:22 158:25 159:14

**huge** 102:24 154:24 220:2 222:18

**huhs** 6:5

**human** 71:15 149:6 159:19 209:17

**hundred** 151:7,22,24 152:2

**hypothetical** 88:23 94:22 105:18 134:6 149:18,19,22 175:23,25 191:11 204:10 208:15 214:14 219:22 224:22 235:19 236:3,4,13 247:12 259:8 260:4 263:6 274:6,7,14

**hypotheticals** 87:7 152:17 173:11 197:1

---

**I**

---

**i.e.** 79:18 130:13 205:4

**IBM** 54:16

**ID** 207:24

**idea** 8:23 9:3 26:24 28:14 35:13 55:8 67:6 81:7 94:18 101:5 102:21 106:17 112:21 114:13 119:17 130:20 156:18 165:16 170:6 198:25 212:19 242:20 265:17 269:6,9

**ideal** 72:17 133:17 218:22

**ideally** 72:14 75:5 189:1 195:16

**ideas** 55:11

**identical** 161:6 171:14 185:24 268:22

**identification** 10:12 21:11 23:11,20

**identified** 41:5,7,11 101:4 124:25

**identifier** 205:5,8,10

**identifiers** 205:7

**identify** 23:9,22

**ignore** 66:25

**ill** 75:24

**image** 100:14,25 101:5 108:3, 10,15,16 109:5 110:17 112:25 121:5 205:12 207:1 211:3 253:2

**images** 58:25 100:14 105:25 106:20 107:12 108:14,18,19,22 109:2,12,19 110:18 200:18 201:3,7 202:19 204:6,22 205:7 206:3,4,15,22,25 207:3 209:1,5 211:1 224:15 225:14 233:14,18 273:14 274:3

**imagine** 8:17 19:22 62:14 85:12 86:8 87:6 88:23 110:19 112:4 142:21 149:10 150:3 177:10 234:16 235:17 242:23

**imagining** 177:9

**immediately** 38:17

**impact** 74:10 102:24 103:14 126:8 173:15

**impede** 241:14

**impeded** 243:14

**implement** 25:24 55:6 63:6, 23 107:5 164:10 168:17 172:23 177:11

**implementation** 40:6 47:6 55:1,12 58:19 59:12,13,19,21,22, 24 60:15 62:18 69:5 72:1 75:4 77:14,24,25 78:4,15,21 79:3,11, 18 80:24 86:14,16 95:22 101:2 103:1 127:7,9,13 129:19 130:17 132:13 137:9 138:9,17 140:2 157:16,18,19 162:17 180:18,19 193:15,23 194:14 197:11 204:16 215:10,16 232:19 234:21

**implementations** 69:11,25 168:20

**implemented** 47:12 60:19 61:6 69:2 80:3 86:11 96:19 104:3 125:6 130:13 133:10 161:20 169:20 192:5 226:19,20 232:16, 21

**implementing** 47:7 130:2 171:24 219:11

**implication** 62:6

**implies** 178:3

**imply** 62:25 63:1

**import** 121:21

**important** 101:25 114:17 178:12 189:11

**importantly** 27:20 45:3 73:3 100:18 118:15 129:7 141:24 153:3 183:13 199:3 221:4 231:8 233:5 235:6

**imprecise** 102:11

**improved** 240:20

**improvement** 240:23

**improvements** 241:1,4,7

**in-house** 209:8

**inappropriate** 130:8

**inartful** 58:10 68:24

**include** 11:18 18:10 59:18 66:12 100:10 115:20 271:8 272:13 276:7

**included** 42:17 98:20 103:12 122:19 156:23 157:20 159:17 162:12 208:18 257:15

**includes** 67:25 101:13,15 139:14 154:13 187:15

**including** 39:20 84:22 85:9 98:20 101:19 103:14 158:25 186:3 227:5

**inclusive** 228:15

**incompatible** 176:5

**Incomplete** 94:21 105:17 175:22 236:3 247:11 274:6,7

**inconceivable** 226:23

**incorporate** 42:6 110:15 224:17

**incorporated** 42:14,15 77:5

**increase** 179:12 180:7 181:17 182:10 183:25 197:16,17

**increases** 181:25

**incredibly** 210:19

**independent** 79:18 117:12

**independently** 16:7,22

**indication** 255:7

**indicative** 150:17 178:22

**indicator** 149:15

**indirectly** 227:4,9

**individual** 107:10 121:3 188:19 250:20

**industry** 32:5,8 41:24 143:6 171:24 172:5,7,16,18 181:16

**infecting** 81:12

**inflate** 145:2 210:23

**influenced** 90:16

**Infodeli** 15:4,8,24 32:12,20 34:11,20 35:5,12,16,19,20,21 36:2 37:14,25 39:10,20 49:3,5, 10,24 50:2,7,24 51:4 54:5 63:14 67:2 68:13,15,19,22 69:4,17 70:10,11,12 71:1,9,24 72:6,12 74:20 80:16,23 83:12,20,24 84:4, 5,6,12,15,24 85:3,7,8,18,20,23 96:4 100:13 103:15,25 104:4,7, 15,16,24 105:1,8 109:17 111:10, 11 113:9,21 116:8 117:6 119:3 120:9,19 134:15,20 135:4,13

137:4,6,11 139:10,13 146:12 157:19,21 158:5,7,10,16 160:15 161:20 162:1,17 165:5 167:7,18, 25 168:7,21,22 169:2 178:16 186:20,21 190:5,19,23 192:10 194:3 198:6 199:14 201:25 207:17 210:18 211:11 213:20 221:23 222:12 223:14 229:13 230:2,13 231:13,16 232:3,19 233:3 234:21 236:7,8 237:15,21 238:11 239:20 240:21 241:12,15 242:8 244:17 245:6,17,24 247:20 248:2,24 250:14 251:20 258:17 260:15 262:8 263:15 267:23 268:17,20 270:24 272:4

**Infodeli's** 51:9 146:3 149:20, 23,24 157:13,16 167:14 196:24 203:11

**information** 9:1,4,10 11:2 14:17,21 15:7 16:12 17:22,24 18:13,18 33:2 34:9,12 35:9,10 41:22 53:25 55:15,22 56:17,20, 21,23 60:3,4,12 62:5,12,13 67:15,23 68:2,10 77:8 81:14 84:11,22 85:10,11,12 95:14,19 96:14,15,18,19,21 97:8 101:19 102:23 106:16 108:16,23 109:13 111:21 112:7 119:22 120:25 121:25 140:5 142:22 179:9 187:2 189:12 198:8,9 199:1,7,11,19,20 200:9,14,21 201:1,21 202:7,17 206:12,23 207:2,16,23 208:1,13, 17 209:8 210:18 211:6,10 212:21 213:11,15 214:11,19,22 229:19 236:5 250:22 264:19 273:18 274:12

**infringement** 43:5

**infringing** 137:5

**Ingelheim** 223:4 231:17 232:6 234:20 235:22 247:4,8,20 248:6,15 251:6

**initial** 16:19 153:24

**initially** 17:17 145:25

**input** 104:2 200:4 254:1 255:10

**inputs** 93:24,25 221:9

**inputted** 85:18 102:6

**inputting** 234:15

**insane** 218:20

**inside** 213:20

**insight** 15:3,4 54:25 118:16 137:2 205:23 206:20

**installations** 172:14

**instance** 25:25 26:1 28:10 29:21 30:3 31:15 38:18 47:11 52:10 60:3 65:13 93:18 94:14 96:4 98:4 114:4 156:21 181:3 187:22 190:5

**instances** 31:18 41:12

**instruct** 14:12

**instructed** 115:2 125:14

**instructs** 14:14

**integrated** 177:6 204:25

**integrating** 27:2

**Intel** 55:3

**intellectual** 16:4 54:12 81:14 88:10,15 91:12 134:9 137:4,5 193:14 232:22

**intended** 6:22 276:6

**intending** 69:24 134:14,24 135:3 142:11 217:15

**intent** 8:22 270:17 273:24

**intention** 264:16

**intentional** 155:7

**interactive** 48:5

**interface** 31:23 42:5 192:11

**internally** 160:2

**internet** 8:15,17 53:24

**interruption** 176:18

**introduction** 15:13 16:19

**invoiced** 235:21,22

**involve** 52:7 54:12 62:21 235:3 237:8

**involved** 15:15,19,21 23:14, 16 37:19 47:1 48:1,5,7 52:9 53:11 56:7,15 60:5,15 66:21,23 89:1 103:19 134:1 187:14 193:3 210:9,16 213:8 232:23 238:3 248:7,15 263:15

**involves** 37:23 91:10 209:19

**involving** 32:16 207:21

**IP** 55:9,13 57:2

**irrelevant** 115:14 213:22

**isolated** 47:9

**issue** 33:9 39:11 54:3 83:25 87:18 95:8 103:23 111:17 122:12 128:6 143:16 152:8 172:24

**issues** 30:22 38:22 45:8 88:25 99:8 104:2 110:11 128:20

**item** 32:25 200:12 207:24

**items** 10:19 11:1,11,15 50:13, 16 76:8 118:3 224:24 235:14,15

**iteration** 237:15,21 238:11

**iterative** 185:16 186:9

**J**

**Jason** 7:10 16:21 49:13 83:17 96:8 98:19 99:12,21 100:6 109:19 111:23 116:17 120:12 121:15 125:9 141:12 207:5,12,15 233:21 254:5

**Java** 160:11 161:9

**Javascript** 159:1,18 161:9

**Jessica** 12:4,8

**Jill** 187:25 188:9,10,11,18

**job** 5:20,21 102:11 191:18

**Jodi** 228:4

**join** 10:4,5

**joined** 9:25 10:1,3

**jpeg** 106:12 107:10 201:3,6 206:10,13,15,22

**jpegs** 106:12,14 107:10 110:6 201:13 203:17 205:25 216:20

**judge** 224:14

**Judith** 228:4

**Judy** 228:4

**Julio** 12:3,20,21,24 13:20 21:6

**jump** 130:6

**junk** 7:17

**jury** 27:5 224:14 247:7 250:18 264:9,11

**K**

**keeping** 260:6

**key** 101:23

**kind** 5:14 13:25 33:17 35:18 43:10 46:24 53:21 57:22,25 63:8 90:8 95:10 111:24 124:24 131:5 139:19 143:14 179:9 182:7 184:1 201:6 244:4

**kinds** 22:8 46:19,21

**kit** 42:3

**knew** 60:3 168:6 205:2,4 245:23 248:7,15

**Knops** 274:20,22 276:2 277:4

**knowing** 61:12 170:16

**knowledge** 20:6,9,14 23:13 24:5 27:23 32:2,21,22 34:22 35:19 46:5 51:16 54:7 55:1,14 56:25 57:10,13 65:20 67:1 89:3,5 96:2,3 120:1 130:16 137:24 144:6 147:6 158:16 176:15,16 187:16,21,23 188:19,23 189:7 192:5 193:14 230:19 274:10

**L**

**labor** 106:22 149:7

**Laboratories** 147:25

**lack** 88:13 115:13

**ladies** 250:17

**laid** 186:5 209:16

**land** 263:6

**language** 48:6 90:21 98:1 148:5 161:9

**languages** 147:7 159:7,9 160:8,17

**large** 29:2,3 30:2 44:20 47:18 66:1 145:12 146:7 147:17 148:1 149:15 150:16 151:9 153:25 185:20 189:5 195:18 196:14 200:6 206:21 249:25 255:5

**larger** 42:6 55:6 73:19 104:18 116:18 145:16 146:4 196:23

**Laser** 249:20

**Lasso** 39:20,24 40:24 41:3,4 48:25 63:7 147:5,7,8 159:1,18 160:12,14,19,21,23 161:5,6 164:15

**late** 134:10 265:10 266:4,6 275:25

**latest** 38:15

**launch** 211:7,15

**lawsuit** 217:14

**lawyer** 14:16 17:21 87:16 88:6 93:9 115:15

**lawyers** 18:13

**lay** 176:15

**layer** 29:23 30:11 31:20,23

**layers** 51:25 54:6

**lead** 190:11

**leads** 206:14

**lean** 192:2

**leaping** 275:7

**learn** 51:9,18 52:1 80:2

**learned** 67:1

**learning** 52:7 64:13 222:7

**lease** 42:5

**leave** 98:13

**leaver** 43:18

**Ledge** 7:21 8:10

**left** 5:17 43:19 160:11 161:24 162:1

**legal** 17:19 18:22 56:13 87:25 88:2 92:8,17 126:13 132:17 223:24

**legalities** 88:2 246:15

**legally** 54:17 91:20,23 92:25 130:22 132:14

**lend** 160:3 164:7,18

**lengthy** 196:21

**level** 33:19 39:16 59:7 60:10 94:11,16 111:14 119:10 137:19 146:7 152:7 174:6 190:24 200:13 220:20,21 221:11

**levels** 59:24 61:1 94:23 95:7, 13,23 96:6,10,14 97:9 130:14

137:13

**libraries** 42:17,22 71:6 154:13 158:20,22 159:12 162:6 167:10 170:11,15

**library** 71:10 149:9 159:23 162:9,14 180:20,21

**license** 42:5 89:12,13 90:9 91:3 92:9 247:19

**licensed** 42:7

**life** 5:22 117:22

**lifted** 87:14

**lifting** 65:14 148:12 170:13 271:13,16

**light** 277:13

**likelihood** 72:20 73:7 75:11, 12 207:18 217:21 218:10 264:17, 23 265:3 266:8,10,20 274:25

**limited** 29:22 50:12 52:17,23 53:8 76:24

**limits** 34:15,21 50:13 180:3

**lines** 76:3 79:12 92:3 114:21 143:8,16,19 144:5,8,15,18,21,23 145:3,8,15,23 148:3,25 149:2,13 150:5,6,7,11,12,15 151:2,8,22,24 152:2,5,22,24 153:2,16 154:1,9, 11 155:9,10 157:1 160:24 163:5, 11,12 164:14 165:17,18,19,20 166:4,5 167:13 168:3 169:2,3,17, 18 170:3,20 171:4,5,8 172:22 177:4,5 181:23 193:22 194:12 195:23 197:12,13 215:17 218:24 220:4 221:9,11 230:22 268:11, 17,22 269:4,8,21,24,25 270:1,20, 22 271:5,14 272:8,11

**link** 42:23 122:4 144:1

**linked** 103:1 203:2

**links** 203:4 253:9

**Linux** 27:19 28:11,12 145:5,7

**list** 21:19 37:6,12 98:17 117:8 120:17 121:13 137:10,16,18 138:1 200:12 214:1,8 276:19

**listed** 180:1 232:10 270:24

**listing** 230:21

**lists** 37:10 70:10

**Lit** 138:24 157:16,19 158:8,13, 15 163:21 165:11,16 174:16,18

178:16 198:6 202:6 216:1,18 231:17,23 232:3,17,19 235:15,16 237:17,18 238:21,25 240:13 241:4,7 250:11,21 251:20 252:12,13 254:20 261:3,17,20 262:4,18,25 263:6,8,9,15,22 266:11,20 267:19,24 268:10,16 269:21

**literally** 150:21 265:2

**literature** 33:11,12,16,23 35:20,21 60:23 104:9,11,13 105:3,4 165:14 190:6 202:24,25 203:19 204:3 229:13 232:6,11 233:10,12,13 234:3,10,22 235:25 236:17,22,24 246:5 250:5 251:2 252:11

**litigation** 46:1 111:17 132:25 226:10 267:6

**live** 27:1 162:10 229:16 231:25 252:5 260:19

**Liz** 125:20 127:20,24

**load** 84:8 109:5 198:22 205:11 261:9

**loaded** 198:17

**Locator** 105:10

**locking** 241:15

**log** 49:7,10 127:21,23 154:5,20, 23 155:1,2,8,9 162:19

**log-in** 53:3,5,6 58:22 59:22,23 60:3,21 61:3,13

**logging** 61:12

**logic** 60:2,15 128:5 160:5 161:19 164:13,16,17 170:7,10,17 194:2 205:2

**logical** 176:8 256:8

**logistics** 18:12

**long** 45:19 93:3 99:25 119:16 131:23 144:23 148:7 151:16 153:11 168:16 171:18 172:23 173:4 179:25 183:5 189:14 192:20 195:11 196:10 208:7,10 210:19 213:10 215:4 224:6 230:21 238:21 242:17 267:9,14

**longer** 31:10 46:6 51:13 127:4 139:23 142:18 151:19 175:21 186:10 196:18 218:17 261:6

**looked** 16:25 42:9 63:15

68:15,18,22 69:5,7,8,15,16 98:16 119:2 144:11,20 145:15 158:14 181:20 227:20 228:16 274:23

**lookup** 13:12,23,24 205:10,13

**looping** 66:13

**Lords** 249:20

**lost** 54:17 95:2 220:13

**lot** 9:16 14:7 30:18 32:21 33:20 34:22 49:14,19 65:14 70:21 75:24 109:13 112:16,18,19 129:8 139:14 141:1 158:25 159:25 163:21,23 168:4 175:8 182:5 183:18 188:17 201:13 202:17 207:16 227:16,19 228:16 229:19 235:4 271:12

**lots** 44:25 60:4 162:9 201:20

**low** 73:8,25 75:12 144:24 183:20 275:12

**lower** 153:7,8 177:14 208:21 258:25 259:5,24 260:1,11 271:9 272:6

**Ls** 105:9,10

**lumped** 270:11

**lunch** 143:2,3,5

### M

**machine** 121:3 147:21

**Macintosh** 48:3

**made** 21:7 28:7,20,21 60:11 64:1,3 82:19 117:22 124:15 152:19 162:12 177:14 225:2 249:12 253:13 255:8 265:14,18 269:11

**Magento** 27:22,23 34:7 52:10,14,15 63:8,14,15,17 64:1, 2,7,8 65:14 157:6,8 158:3,4,14, 21 172:13 175:2,13,14,19 176:4, 7,25 177:21 178:3,9,10,15

**Magento-specific** 52:14

**magic** 64:8

**mail** 212:12

**mailing** 122:19

**main** 29:4 34:7 56:18 158:24 159:6

**maintain** 24:9

**maintained** 56:2

**maintaining** 37:16

**maintenance** 26:23 37:23 235:8

**majority** 71:9 75:22 104:9,10, 14 105:6 110:21 161:6 178:11 205:16 218:25

**make** 5:15,22 6:9 16:3 27:21 29:6,14,17 37:8 48:15 64:9,15 67:15,21 70:21 73:17 74:11 79:6, 19 81:12,13 89:6 93:11 95:14 101:12 102:20 105:11 121:11 124:6 129:10 130:5 138:19 142:3,5 146:10 148:10,14 154:6 157:2,23 161:8 163:15 169:13 170:2 175:10 182:6 189:9 190:13 200:23,24 201:9 203:13 205:22 206:8,18 215:1 216:5 231:10,11 239:19 264:9 269:1 270:7 275:19 276:4,14

**makes** 36:25 39:14 56:23 133:6 168:2 218:9

**making** 34:24 89:25 121:10 132:17 142:24 160:20 176:20 232:23,25

**man** 76:12 255:14,15

**Man-month** 182:2

**managed** 47:24 86:1 226:2

**managing** 48:25 52:25

**manipulated** 85:4

**manner** 40:15 110:7

**manpower** 73:2

**manual** 105:5

**manually** 209:19

**manufacturer** 203:7

**manufacturer's** 203:8,9 209:21

**map** 205:3

**March** 69:1 113:20 125:7,14, 15,21 138:25 141:6,7 142:7,15 230:13 239:21 246:5

**marginally** 161:14

**mark** 23:8

**marked** 10:11 21:10 23:10,19

**marketing** 32:23 35:1 53:22, 25 100:20 189:7 253:5,9

**marketing_data** 122:20

**marks** 197:25

**Mary** 74:3

**massive** 121:21

**Master** 115:16 141:18

**match** 30:3 101:3 108:20 109:11 230:18

**matched** 108:22 257:4

**matches** 167:19

**material** 42:18 104:15 154:3 245:2 253:3

**materials** 11:10 14:25 15:25 16:2,8,25 21:6,16 22:9 32:23 34:13,21 35:1 43:1 48:7 50:18,19 53:13,21,22,25 67:14 71:24 72:5, 10,13 75:4 79:19,22,24 80:2,4 84:21 85:7 88:18 98:8 99:8 100:19,20 104:17 105:23 109:16 110:4 111:10,11 113:7 116:10, 18,22,25 117:6,18 119:11 125:3 126:14 128:12,15,17 132:12 133:7 135:17 136:12 137:17 139:11,13 141:11,13,14 177:12 202:23 203:1 204:4 223:13 224:2,7,12 226:25 229:3,4,7 232:9 234:14 242:11,17,18 243:22 244:12,16 245:24 246:17, 18,21 247:16 248:3,18,20 253:6, 9 262:1 276:7

**matter** 21:5 24:23 29:10 44:16 45:13,14,16 46:2,16,19,22 47:5 115:6 166:7,11 179:15 217:20 248:14 269:11

**matters** 41:7 136:8 150:7 185:23 223:24

**md5sum** 156:2,4,6

**meaning** 222:16 265:7

**means** 100:15 130:15 152:11 218:3 229:10 242:11 256:4 260:16 265:17

**meant** 71:4 75:8 111:20 116:19 117:8 202:3 211:12

**mechanical** 148:8

**mechanically** 121:1 273:19

**mechanics** 156:10

**mechanism** 89:2,4 128:21 134:11 182:23 204:6 273:17

**mechanisms** 136:19

**Medge** 151:15

**media** 210:9

**medication** 7:1 105:6

**medium** 62:9

**meds** 203:20

**meet** 28:8 29:15 66:11 168:22 178:4 188:20 190:22

**meets** 29:17 30:7,10 31:1 68:3 185:25

**member** 12:3,4

**members** 12:25 51:4 67:7 103:15 134:6

**memory** 86:11 226:22,24

**mention** 54:13 133:16 147:6,8 169:9 189:2 209:24 221:22 249:14

**mentioned** 120:14 156:18 186:8 213:6 226:1 238:24 239:7 250:4 271:12

**merged** 74:17

**messaging** 9:4,9

**met** 38:25 168:6 178:11

**meta** 12:6

**metadata** 83:18 106:15 107:21

**method** 40:17 205:20,22

**methodology** 138:17 156:12 171:7,13 172:14 271:25

**methods** 47:8 172:9

**metric** 179:25

**Michael** 5:2 228:4

**Microsoft** 25:21 26:7,9 31:21,22,25 32:2

**middle** 241:9

**migrate** 147:25

**migrated** 20:11

**migration** 20:13

**million** 150:5 162:18 211:1 213:18,19 273:13

**millions** 154:1

**mind** 36:25 234:25 235:11 236:12

**mindset** 73:9

**Ming** 174:12,19 175:13,19

**minimal** 191:17

**minimum** 167:12

**minor** 73:17 265:18

**minute** 97:7 117:3 124:5 135:11 221:20 258:13

**minutes** 66:14 151:11 208:23, 25 209:10 253:11

**mirrors** 98:12

**misappropriated** 43:1,8

**misappropriation** 42:12, 25

**misinterpreted** 47:15

**misquote** 148:21

**missed** 21:25 104:20 167:10

**missing** 65:2 138:4

**misstates** 225:6

**Mist** 48:2

**mistake** 133:6 175:6 189:22 193:6

**misunderstood** 38:13

**misuse** 6:15

**mix** 30:2

**Mobile** 274:22

**model** 220:17

**modern** 76:14

**modifications** 29:14 70:22 71:8

**modified** 161:10 165:15

**modify** 28:1 121:23 178:8

**modifying** 28:21

**modular** 225:18

**modules** 127:16 271:8

**moment** 22:11 43:12 50:20 51:3 101:10 126:7 127:18 137:21 166:20 204:3 207:6 233:12 245:21 254:5 260:23 268:23

**momentarily** 174:1

**money** 74:12 75:10,11 191:3, 4,8

**month** 264:17

**months** 72:18,25 75:5 148:13, 15,19 178:8 183:1,2,25 184:4,5 195:16 218:2 219:4,7,21 264:5,6 275:8

**morning** 5:7,8 21:21

**mother** 9:15

**motions** 17:7,8

**motivation** 131:3,4

**move** 16:13 80:23 110:2 162:5 239:16 250:1

**moved** 9:12,14 77:24 81:7 112:5,6 275:4

**moving** 8:21 77:15 159:4 169:1 275:3

**MSA** 116:21

**multimedia** 7:21,24 151:10

**multimedia-based** 8:11

**multiple** 103:13 146:20 147:7 230:1

**multiplies** 170:20

**multiplying** 197:12

**myriad** 59:11

**Mythical** 182:2

**N**

**named** 108:19 205:3

**names** 43:24 51:3 85:19 127:19 187:25 188:9 207:21 209:23

**naming** 100:16 101:3 109:10 201:8 204:23 205:4,13

**narrative** 184:18

**narrow** 124:12 189:10

**National** 249:14

**nature** 246:25

**navigation** 34:12

**necessarily** 25:5 44:6 60:9 66:5 84:7 86:17 92:22 93:25 128:8 130:1,11 136:20 145:13 146:8,9 169:12 171:11 180:9,10 181:4,5 185:23 195:8 209:18 222:14 227:14 256:3,4 257:7 265:15

**necessity** 73:22

**needed** 28:2,10 30:19 36:16 53:4 136:23 137:25 174:14 179:4 199:1 256:20 259:19 260:7,14 273:6

**nervous** 26:18 159:5

**Nick** 223:3

**nickname** 151:15

**night** 21:18

**nil** 151:23

**nine-month** 275:5

**Nods** 6:4

**nominal** 221:1,12,19

**non-lasso** 163:3

**non-php** 163:3

**noncurrent** 257:6

**nonlitigation** 226:12,21

**nonprogram** 154:17

**normal** 266:1

**note** 115:19 122:22 196:16 276:4,12

**noted** 223:16

**notes** 11:19 126:9

**notice** 10:13,18 11:7

**Novac** 228:4

**November** 15:18

**nuance** 62:16,17

**nuanced** 54:5

**nuances** 49:20

**number** 21:1 46:9,12 49:7 59:11 71:23 74:19,23 75:2 77:2 87:10 103:23 106:20 119:17

120:8 121:4 145:1 147:1 160:24 167:24,25 168:1 170:14,21 171:5 174:23 179:17 184:6 194:9 207:24 209:3 215:17 217:3,5 230:5 231:15 235:23,25 236:1 240:10 245:8 250:7,10 251:10,16 252:7,9,21 253:4 254:13,14 255:2,13,16,18 257:11,20,24 258:9,20 259:2,4 260:5,6,10,11, 13 271:9 272:6,7 275:7

**numbers** 64:23 82:20 104:14 113:16 120:17,18 145:10,20 148:22 153:6,25 155:11,13 166:18 183:3 184:16 208:8,10 217:11 230:11 254:8,12 270:22 271:10,18,22 272:17 273:1

**numerically** 62:8

**numerous** 115:3

**O**

**obey** 14:16

**object** 14:11 65:5

**objection** 11:3,16 19:20 20:19 36:7,19 39:22 40:25 67:4 78:8 84:1,13 85:21 88:4 89:20 90:5,13 91:4,21,24 93:7 94:21 105:17 111:7 120:20 124:3 172:1 173:1 175:22 178:1,20 182:14 217:8 224:20 225:5 226:14 228:23 231:18 234:11 236:2 237:1 238:13 240:1 243:8 244:18 245:18,25 246:10 247:11 251:21 256:25 257:22 258:5 259:6 260:3,12 263:2 264:13 274:5

**objections** 10:24

**obligated** 132:19

**obsolete** 255:19 256:5

**obtaining** 127:15

**obvious** 7:21 38:17 99:10 100:13 137:13

**occur** 136:2 195:20 261:24

**occurred** 114:5 243:4

**occurring** 141:6,7

**occurs** 169:10

**off-the-shelf** 25:13,15,17,19 26:5 28:25 29:7,19,21 30:10,25 51:22 63:4,7,12 66:9 149:25

157:7,15 170:1,12 174:9 177:2,8 178:11,16

**off-the-shell** 25:14

**offer** 105:21 231:12,20,21

**official** 24:14,18

**older** 38:23

**Oliver** 228:4

**ongoing** 34:24 235:6

**opaque** 96:10

**open** 27:15,17,22,23 28:6,21,25 29:5,8,11,13,16 30:4,7 31:1,15, 25 32:2 36:18 51:21 52:3,9 62:23,24 63:4,8,11 65:8 149:25 169:25 170:11 238:16

**operating** 237:19

**opine** 16:1 39:13,15 72:11 118:12 134:25 135:3 136:11 168:4 208:4,5

**opined** 72:24 178:14,15

**opining** 41:20 96:22,23,25 109:15,20,25 110:1 111:3,5,6 112:22,23 113:5 118:21 135:21 140:20 141:3,9 142:1,20 188:18 192:23 221:24 223:24 224:1,6,7 237:25 238:5,15 242:2,6 243:20 245:1 246:12 264:20

**opinion** 11:24 16:24 18:8,21 35:7 36:23 56:13 69:24 76:7,8,11 80:22 81:20,23 84:10 85:15 87:3, 5 93:10 97:17,21 99:2 105:21 110:25 113:5 115:6,7,24 117:17 122:14 123:5,16,22 124:19 126:8,15,17 128:2,7 131:16 132:9,19,21 134:14 135:10 141:5 142:10 150:12 152:7 153:20 161:12 163:16,17,19 171:3 175:1,21 177:22 178:5,17 179:10,14 181:19,21 184:2 185:5 192:25 199:8 208:22 210:15 211:8 214:21,24 217:5,15,19,25 218:8 229:6 231:12,20,21 232:13,15 235:9,18 236:25 237:6 238:16,19 241:23 242:13,14,16 243:9 244:3,20 245:3,14,22 246:22 247:13 248:17 254:16

**opinions** 13:7,9 14:19,22 18:15,18 36:5,13,15 71:21 74:15 75:16,17,23 76:25 77:14 97:20 99:16,24 104:6 105:14 111:25

114:16 124:1,10 217:24 224:18 228:10,11,22 234:24 236:1 241:22 242:10 243:17,25 244:9 245:8,16 246:8,25 247:3,9 252:7

**opportunity** 67:19 190:7

**opposed** 27:11 29:6 37:23 68:15 86:12 107:4 119:4 149:9 164:16,24 165:8 188:7 195:24 205:19 260:5 276:16

**optimistic** 220:24

**option** 26:6,9 73:22 95:7 109:6 212:10

**options** 52:17,23 95:5

**order** 17:7,11 25:24 29:14 34:22 39:17 53:17,19 59:5 60:23 92:3 101:16 109:24 116:25 126:21 148:6 150:15 165:13 166:12 210:11 211:1 259:13 269:12

**ordered** 144:1

**ordering** 43:24

**orders** 127:25 198:16 239:1

**organically** 68:20 190:5,7 231:9 240:7

**organization** 189:5

**organized** 110:7 111:21 213:4

**Oriented** 48:12

**original** 8:22 48:7 55:20 60:9 80:5,16 106:23 113:22 163:13 184:5 199:18 209:21 239:8

**originally** 48:3

**orthogonal** 79:20

**OTS** 31:20

**output** 23:23 24:11,14,15,18 125:3 155:2,3 248:3

**outputs** 93:16,24 94:1

**outright** 265:12

**overcount** 269:7 270:12

**overestimated** 164:22

**overhead** 220:10

**overlap** 63:20 176:18

**overly** 47:4 48:14 84:3

**owned** 83:24 84:6,11,14,21 85:20,23 223:12

**owner** 93:24

**ownership** 225:22

**ownerships** 223:18

**owns** 84:4,6,15 85:3 224:15

---

**P**

---

**p.m.** 277:20

**package** 25:24 26:2,5,25 27:19 29:7 30:5,7 31:6 37:24 42:4

**packages** 31:8 66:6 158:14

**packs** 158:6

**pages** 119:16 162:16 207:1

**paid** 235:3,4 240:16 241:6

**paper** 22:9 121:3

**paperclip** 23:8

**paperwork** 89:9

**paragraph** 79:8 81:5 84:16 85:25 97:22 98:8 100:7 111:12, 14 113:8 115:1,16 116:20 117:5, 24 124:18,25 125:11,12,13,16 128:3 131:5 132:8 134:18 138:23 143:18 147:4 153:9 154:10 155:1 160:9 165:1 170:19,23 171:7,8, 25 173:17 179:3,8,10 183:10 184:10,21 193:17,23 196:16 197:21 199:21 200:8 204:9 207:16 209:16 212:1 215:3,19 216:2,19 223:16 225:25 226:1 227:3 232:2,11 233:7,17 237:13 238:25 239:7,16 241:9,10 243:12 247:23 248:1,21,22 249:8,11,14 250:2,19 254:21 255:23 261:12 264:1 267:18 268:1,20 270:24 272:2,15 274:23

**paragraphs** 75:22 111:18 112:4 122:1 123:25 124:8,13 143:11 149:7 184:24 268:9

**parallel** 160:22 180:23

**parallelization** 181:9

**pardon** 44:2 66:11 101:9 203:14 227:19 254:8

**part** 13:8 17:4 20:9 23:17,18 31:3 34:24 35:18 37:11 40:16

47:23 53:8 55:23 60:9,10 63:9 68:12 78:17 82:7 96:12 100:23 103:3 107:1 114:8 134:9 135:20, 23 136:1 137:9 139:25 147:1 154:23 155:5 163:16,17,18 186:24 207:9 208:6 218:8 220:9 221:25 230:25 234:12,13,15 235:5 244:20 246:2 250:13 258:16,20 262:16

**participate** 133:11,15,19,22 188:25

**parties** 44:18 71:14 89:1 103:22 105:4 189:13 238:3 242:5

**partly** 62:24 99:3 130:25 271:20,21

**partner** 151:14

**party** 55:8 57:1 67:12 163:12

**party's** 276:17,18

**Pascal** 147:19 148:10

**pass** 222:24

**passed** 9:15

**password** 22:1

**pasted** 24:16

**patents** 45:25

**path** 164:19,23 189:10 191:14

**pathways** 210:10

**pattern** 54:21

**Paul** 83:15 112:17

**pause** 50:20 137:21

**pay** 187:12,13 234:20

**paying** 32:25

**payment** 235:2

**PC** 54:16

**PDF** 201:4 203:3

**PDFS** 104:12 105:16 201:13 216:20

**peer** 173:18

**pending** 22:15

**people** 9:18 12:10 36:16 38:22 40:1 51:2,6,10 53:12 54:22 56:6, 15 58:1 59:14 60:17 66:21 67:22, 25 68:7 73:14 77:8 85:23 86:19 87:14 90:15 91:16,19 92:2

101:16 103:14 104:2 114:18 118:12 127:20 133:1 137:8 144:21,22,25 145:19 151:13 153:4 179:20 181:6,24 182:4 185:12 186:6 187:14 188:4,11 190:1 191:15 192:4 193:8 202:10 210:7 212:17 216:10 218:17,21, 23,24 219:4 222:14 224:1 225:16 227:19

**percent** 18:3 40:21 65:17 73:25 174:20 179:12 180:7 181:17 182:10 183:7,12,24 184:5,13,14 197:16,17 204:24 215:22,24 264:23 266:2 270:3,4 274:25 275:6,24 276:1

**percentage** 36:16 40:4 105:7 205:18 208:25 231:14 265:19

**perfect** 83:8 113:15 190:3

**perfectly** 61:17

**perform** 7:2 44:12

**performance** 45:12

**performed** 41:18 44:11

**period** 8:14 36:14,15 40:19,24 72:6 111:13 114:5 148:13,15 150:16

**Perq** 147:19 148:9

**person** 24:10 49:20 52:4,24 67:13 149:9,13 150:6 156:20 176:24 181:7 186:6 187:18 188:5,8 189:3,5,6 193:9,12 222:12

**personal** 29:10 274:24 275:3

**personally** 24:22

**pessimistic** 221:7

**pet** 105:5 239:2

**Peter** 274:22

**pharmaceuticals** 250:25

**phase** 56:16 72:1 80:11,25 119:5 128:18,25 130:10 133:12, 13,15,19,22 176:11 186:8,24,25 187:12 189:11,18,21,24,25 190:11,12 191:24 193:16 194:7 195:1,6,10,11,25 196:6 197:11

**Phoenix** 54:14,18 55:2

**phone** 19:8

**photo** 209:22

**photograph** 106:22 208:24

**PHP** 147:7,8 159:1,17 160:11, 14,19,20,21,22 161:5,7,10 164:14

**phrase** 15:6 17:16 36:24 37:22 64:5 168:11 180:15 252:12 265:25

**picture** 106:5,6,11 107:15,16, 22 108:8,11 190:20,21

**pictures** 85:19 101:13 103:8, 11 104:13 105:16,25 106:19 110:8,12 111:1 209:20

**piece** 30:9,11 40:18 64:14,18, 25 96:5 97:8 142:16 206:9

**pieces** 7:20 8:24 9:9 30:3,9 33:7 101:16 102:13,14 108:1 172:20 180:19 195:22 203:19 206:9 251:2

**pint** 162:3

**place** 70:20 102:7 127:25

**places** 98:24 120:14 155:17

**Plaintiff** 239:22

**plaintiffs** 16:5 44:22 84:21 113:6 129:20 223:12 240:20,22 267:20

**plaintiffs'** 127:15 229:12

**plan** 55:4,6,7,9,10,25 133:24, 25 176:21 241:12 263:25

**plans** 263:21

**platform** 15:8 28:11,12 32:12 36:17,24 37:1,11,14,20,22 44:21, 22 48:4,9 52:22 80:23 84:10 85:7 98:1,6 103:2 135:4,14 137:12 166:8 190:22 198:12 224:17 230:2,13 231:16 236:8 237:22 238:12 248:3 256:6 262:9 263:15

**platform's** 128:4

**platforms** 15:4 26:11 32:20, 21 68:14 84:24 90:16 127:21 134:16,20 167:8 190:23 194:3 223:14 237:16 239:20 240:21 241:16 248:25 249:2

**platforms'** 125:2

**player** 48:5

**pleadings** 276:9

**plugins** 162:11 163:7,12 170:2

**point** 6:16 7:13 12:11 67:21 82:15 86:12 94:20 100:19 103:10 108:17 117:2 118:22 119:21 120:6 122:17 123:17 125:16,20, 24 127:15 129:3 138:23 140:8, 10,11 141:5 142:23 149:12 161:8 173:24 175:14 178:10 179:24 184:3 203:9 229:8,11 239:8 266:8 276:20

**pointed** 105:2,4,7

**pointer** 203:1

**points** 50:15 96:17 104:17 232:4

**polishing** 148:17

**polluted** 67:25

**pondering** 146:18

**poor** 57:18

**pop-up** 221:16

**port** 48:12 147:12 148:6 220:3

**ported** 47:17 48:4 97:25

**portfolio** 253:15

**porting** 48:17 97:23 150:19 219:20

**portion** 199:14 263:12 271:23 272:1

**portions** 136:24 137:1

**posited** 88:11

**position** 188:7,21

**positive** 114:23

**possession** 111:2 116:1

**possibilities** 257:2

**possibility** 29:20 122:15 151:1 169:7 186:17 196:17 214:13 237:4

**possibly** 31:5 214:6 241:14

**posted** 142:8

**potential** 118:20 182:8 242:21

**potentially** 273:2

**powered** 84:23

**powerful** 38:6 39:10

**practice** 9:7 68:8 91:15 92:24 193:8

**practices** 92:24

**pre-exists** 65:1

**pre-internet** 8:16

**precise** 54:19 102:12

**precisely** 236:19

**preexisting** 58:2 71:10 158:3,6 257:5

**prefabricated** 156:17

**preference** 29:10,13

**preparation** 14:13

**prepare** 267:24 268:5

**prepared** 271:19 272:17

**preparing** 14:18 18:15 99:23

**presentation** 125:17 138:24

**pressure** 72:23 241:25 243:4

**pressures** 218:15 242:4

**pretty** 7:21 43:25 54:3 98:12 142:4 153:11 227:11

**prevent** 241:16,17

**prevented** 130:23

**previous** 45:5 55:1 59:16 138:18,20 168:19 187:2 193:15, 22 196:13,23 212:20,21 216:7 268:15

**previously** 129:21 215:14

**price** 187:13

**primarily** 7:24 8:18 13:12,22 18:24 46:2 86:19 96:8 104:11 111:22 112:3,6 113:14 124:9 127:3 186:9 229:5 248:12

**primary** 8:25 87:7

**primer** 5:15

**principles** 25:9

**printed** 120:24 211:2 212:23 213:21 214:2,7,12 273:8,11,12, 15

**printing** 59:7

**printout** 24:1

**prior** 47:10 48:24 125:18,21 141:6 157:16,18

**privilege** 22:16 55:14 57:10

**privileged** 56:20,25 62:13 67:15 96:2,3

**privileges** 24:4

**Pro** 160:1,2,5 161:22 164:2,5 170:17 271:8 272:8,10,12

**probability** 73:25 74:11 183:14,17,19

**problem** 50:24 51:17 52:6,9 65:10 87:11 92:10 96:11 107:13 133:3 140:18,20 212:15 213:25 214:9,17

**problematic** 96:21

**problems** 38:11 52:15,18 174:11 182:9

**procedures** 107:6

**proceed** 16:16

**proceeded** 249:4

**proceeds** 245:5

**process** 56:6,7 66:22,24 79:12, 15 80:8 103:20 126:22 130:3 139:24 169:11,20 172:3,6,8 173:6,16,18 185:16 186:9,11 187:5,20 188:25 191:12 195:6,7 196:9,10 197:8 211:4 215:4 235:6 255:23 256:16 257:13 259:10,18 260:25

**processed** 121:6 123:11 181:4

**processing** 212:10

**produced** 154:2 214:18,20,22 227:6,12 228:21 229:7

**product** 27:13 42:17 43:20 54:24 55:15,21 67:19,23 94:13 95:15 100:14 101:6,13 108:4,23 109:24 110:14 134:2 185:13,14, 15 199:21,25 200:2,12,13,15 201:6,7,21 202:17 203:2,17 205:5,7,8,9 206:23 207:24 208:23,24,25 209:10,25 215:13 218:19 253:2,6,11 254:19 257:10,15 265:5,6,20

**production** 210:6,9 246:19 250:14 251:12 276:17

**productions** 98:15 153:22 276:8

**products** 34:13 50:17 60:5 94:17,18 100:22 101:4 106:21



198:9 199:24 200:9 201:3 202:22 204:4,7,11 207:21 209:1,5 216:11 233:13,17 250:5,7,11,16, 18,21 251:5,10,18,23 252:1,2,3, 15,16,21,24,25 253:1,8,14,15,19, 22,24 254:2,14 255:12,16,18,20, 22,24 256:1,3,5,14,17,20,23 257:6,11,13 258:9,17,23 259:4, 11,13,15,19,24 260:6,10,14,18 261:1,7 265:9,10,21 275:24

**profession** 92:17

**program** 22:2 29:19 41:3 42:24 47:17,18 80:2 88:17 95:4,6 97:25 100:24 102:21,25 114:21 119:23 121:14 147:18 149:4 151:4,7,11,16,21 154:4 155:23 165:22 168:13 169:18 180:3 186:1,2,14 191:7 194:12 219:1, 14,16 220:18 231:1 237:17 269:16,17

**programmatic** 99:4

**programmatically** 205:11

**programmed** 47:24 55:3 160:22

**programmer** 60:8 143:20 151:6 152:4 170:21 174:21 176:19 179:22 181:12 197:14 198:17 222:1,5,6 261:25

**programmers** 64:11 113:11 119:19 146:20,22,23,25 147:10 148:16 152:1,8,10,25 179:21,23 181:11 222:4 239:23

**programming** 8:1,2,5 9:20 26:4 147:4 159:7,9 160:8 168:24 176:21 180:7,12 181:10

**programs** 47:18

**prohibited** 134:21 138:12 248:25

**prohibition** 91:1 92:8

**prohibitively** 272:21

**project** 36:12 47:24 73:10 87:18 144:22 146:16 149:16 150:16 153:1 154:11 171:9 182:25 187:7 195:20 196:3,15 226:2,3,6,9 249:15,18,20,21 262:12 263:18 273:21 275:11,20

**projects** 47:25 86:9 141:22 144:10 145:17,18 150:22 171:10 182:3 185:6 186:23 194:24,25

195:5 226:21,23 249:24 265:2,13 266:1,5,6 275:4

**promise** 275:25

**properly** 7:3 56:2 106:25 111:21 199:3

**property** 16:5 54:12 85:7 88:10,15 91:12 104:7 134:9 137:4,5 193:14 232:22

**proposal** 86:10

**proposals** 86:8

**propose** 87:8

**proprietary** 68:2

**protect** 60:20 92:4 133:5

**provide** 11:2,13,15 13:4 78:13 116:22 125:1 147:12 224:16 276:11,16

**provided** 7:5,23 8:21 15:7 16:12 91:8 100:3,4 106:3,5 123:5 129:21 267:20 276:6

**provider** 212:18 239:9

**providers** 239:14

**providing** 8:11 37:16,19 45:22

**proxy** 169:18 196:12

**public** 66:10 118:7

**publication** 173:19

**publications** 86:22 181:16

**publicly** 66:10 127:2 136:20 177:2,7 273:10

**published** 173:18 184:1 194:22 210:3

**pull** 58:14

**pulling** 7:17

**purchase** 34:24

**purchased** 8:10

**purely** 115:7,11 128:18 136:22 246:16 247:14

**purport** 70:9

**purpose** 66:7 87:7 123:6 140:1

**purposes** 76:19 85:16 104:5 110:25 115:24 194:7

**push** 179:19 189:17

**put** 20:16 21:12,20 24:12 33:6 39:11 51:25 58:16 77:13 103:2 118:23 120:8 139:1 143:14 152:13 179:20 180:22 182:23 206:1 214:3 226:12 232:11 237:9 238:7 246:4 254:2,13 256:5,12 266:8

**putting** 18:11 20:17 58:1,12 94:14 120:15

**Q**

**QC** 213:3

**QC'D** 106:17 107:17

**qualification** 82:13 222:13

**qualifications** 86:21

**qualified** 188:7

**qualifier** 20:9 203:21 226:16 252:17,19 259:18

**qualify** 82:6 116:4

**qualities** 38:20

**quality** 31:5,11 44:23 72:21 74:10 101:24 102:1 103:20,21 107:2,6,8 110:11 135:16 152:15, 18 218:11,19 249:23,25

**quantification** 81:5,6

**quantified** 210:6

**quantify** 81:2,23 82:3,10

**quarter** 184:14

**query** 250:12,15 251:9

**question** 5:23 6:20,21 7:14 19:7,21 22:14,16 30:17 36:8 38:13 39:2,23 40:16 47:4,16 51:14 52:20 54:11 57:23,25 58:4, 10 63:11 65:6 67:5 68:21,24 69:4 77:19 78:1,9,11 81:2 82:8 85:14, 22 87:13 88:5 90:7 95:11,16 97:12,13,14,16 104:19 111:18 115:5 120:21 121:9 129:16 132:11 134:24 137:15 138:2 139:2,17 140:16,24 142:10 151:15 157:24,25 168:25 172:2 173:2,3 178:13 182:15 191:20 197:24 207:9 208:4 217:11,14,23 226:15,19 233:25 243:19,24 244:6,8 245:4,12 246:11 258:4, 22 259:21,22,23 277:13

**questioning** 16:11

**questions** 5:16,18,19,20 6:25 7:19 11:6 19:4 36:11 129:25 130:12 137:15 177:19 223:7 267:6 276:3

**quick** 22:22 173:24

**quicker** 31:18

**quickly** 15:24 46:11 51:11 72:2,24,25 74:4,22 77:15,24 80:24 81:3,7 97:2 109:22 110:2 116:23 117:1 124:16 128:11,22 129:7 135:16 137:3 174:10 213:12 242:1,19,21 260:19 261:4 275:21

**quotation** 197:25

**quote** 125:8 144:23 145:1 153:7 174:11

**quoted** 75:6 125:9 153:6

**quotes** 116:20 145:8

**R**

**rabbit** 138:5

**race** 157:2 159:16

**raise** 150:23,25

**ran** 28:11 157:4 165:13 269:10

**random** 52:4 108:18 120:8

**range** 15:7 73:1,2 93:14 110:19 143:19 145:10,24 146:1, 2,5,6,7,19 153:7 167:22 195:13 209:6 256:10,11 257:9,11 259:19

**ranges** 76:11 145:12

**rasa** 81:9

**rate** 45:7

**rates** 182:22

**re-enter** 120:25

**re-examine** 142:23

**re-implement** 35:12 272:20

**re-implemented** 64:21

**re-implementing** 47:2 48:1,17 219:13

**reaching** 41:15

**reaction** 19:14

**read** 57:19 100:1,5 121:3 124:6 203:12 210:5 227:22,24 228:7 241:19 244:6,8

**readily** 20:4,7 30:23

**reading** 233:15,16

**real** 60:22 196:5 218:15

**reality** 176:13

**realization** 63:20

**realize** 92:21 102:10 186:12 254:9

**realized** 146:20 176:6 256:10

**realm** 151:1

**reask** 225:8

**reason** 6:24 24:25 29:5 80:6 126:12,13 243:1 247:15 257:4 276:10

**reasonable** 40:6 66:12 74:5 75:21 95:14 146:25 169:15 180:5 191:13 209:3 219:21 256:13,22 260:16

**reasons** 17:19,20 144:25 218:7

**rebate** 14:2 33:13 69:14,15,16, 17 116:12 119:23 126:9 157:12, 14 158:10,12 161:19 163:22 190:6 211:18,19 212:5 216:11,14 262:5 263:16 266:21 268:2,6 271:13,22 272:1,5,17 274:2

**rebates** 32:23

**rebuild** 141:19

**rebuilding** 48:5 208:6

**recall** 7:11 17:9 51:3 53:5,10 114:7 122:4,5 126:7 166:14 188:4 228:12,17 229:15 252:18 254:11

**recalling** 230:10

**receive** 14:17,21 18:12

**received** 18:24 19:19 229:4

**receiving** 34:25

**recent** 144:2

**recess** 70:4 117:4 143:3 222:23

**recheck** 122:9

**recipe** 172:18

**recipient** 228:17

**recognize** 154:22

**recollection** 32:11 38:3 41:17 131:14

**recommend** 183:21

**recommendation** 264:9

**recommended** 188:21 221:5

**recommending** 218:21

**reconsider** 123:15 260:23

**record** 61:25 62:1 70:3 114:9, 24,25 161:13 179:1 200:3 276:5, 13

**records** 61:23 113:16 200:1 213:19 254:20 255:6,9,17

**recreate** 72:9 75:1 89:18 109:12 135:14 138:14 139:23 216:3

**recreated** 106:2 136:11 252:15

**recreating** 134:22 135:6,8,10 136:2,6,14,16 138:11,16 139:5 249:2

**recreation** 138:8

**redeem** 212:8,17

**redeemed** 214:4

**redeeming** 126:22

**redesign** 35:11

**redo** 106:18

**reduce** 64:12

**reduced** 75:7

**reducing** 114:20

**refactoring** 113:25 114:5,9, 10,19,20

**refer** 7:8 10:25 11:9 56:11 58:5,8 143:12 201:7 202:24 207:20 233:20

**reference** 48:11 79:5 150:14

**references** 144:12 145:6 202:22 253:5

**referred** 199:6 209:15

**referring** 85:1 203:17,18

**refers** 122:18

**reflect** 24:24 163:24 164:3 176:13

**reflected** 208:21 271:17,21

**reflection** 25:5,6 103:5

**reflective** 24:2

**reflects** 198:16 220:11

**refreshed** 131:13

**refunds** 45:4

**regard** 121:12 131:16 210:15

**regular** 266:2

**reinvent** 31:2

**reiterate** 174:15 219:23

**relate** 75:22 124:1

**related** 13:14 194:2 200:1,2 235:24 254:19

**relates** 122:22,23

**relationship** 34:25

**relative** 187:23

**relevance** 214:23

**relevant** 36:4 208:2 214:19 234:24

**reliance** 257:25

**relied** 14:18,22 15:9 18:7,14, 20,22 19:23 99:1,21 113:18 276:7

**reload** 199:1

**rely** 13:6 17:12,14 19:18 99:15 117:19,21 128:14 259:9

**relying** 17:12 116:15,17 128:6 144:5 228:21 258:8,15

**remember** 14:1 43:6 46:8 48:10 53:19 66:25 119:6 125:8 126:3 127:1 148:18 155:25 156:9,10 163:20 207:4 227:16, 17,18,21 228:7 229:14,22,24 230:8 231:25 239:9 254:7

**remembering** 46:6

**remove** 154:3,21 156:16 162:14 277:15

**removed** 154:8 155:18 162:25 163:3,7 170:15

**removing** 154:16

**rename** 109:12

**renamed** 100:21

**reordering** 126:23

**rep** 49:15

**repair** 51:12 52:4

**repeat** 217:9

**repetitive** 28:7

**rephrase** 80:10 131:21 200:22 233:25

**replace** 178:16 190:8 259:12 260:15 262:8 272:19

**replacement** 16:3 46:11 116:11 117:1 135:15 136:17,21, 22 137:3,22,24 149:23 177:11,18 190:18,24 198:6 204:18 218:14 224:3,17 233:6 242:7,17 244:24 246:19,22 252:22 253:19 254:2, 14,15 256:6 261:3 263:14 266:11,12 273:6,16

**replacements** 15:24

**replaces** 74:8

**replacing** 241:18

**replicate** 77:7 210:17 211:9 260:17 273:3

**replication** 128:4 271:17

**reply** 16:23

**repopulate** 199:19 213:10 253:12

**repopulating** 197:20 198:7 199:15 252:11

**report** 14:13,18 17:13,15 18:15 25:8 36:25 37:6,10,12 47:8,11 49:12,13 54:13 69:23 70:7,9 78:1,14 82:20,25 83:9 84:17 85:2,16 89:24 96:9 98:18, 20,24 99:11,15,21,23 100:6 105:22,24 109:20 111:9,23 112:10 115:10,11 116:17 117:14, 15,23 120:2,12,13 121:15,19 122:2,13 125:8,9 130:24 135:20 141:12 142:11,18 143:6 144:1 165:7 169:9 177:15 182:17,20 197:6 198:4 204:2 207:5,10,11, 15 209:15 211:22 213:16 219:24 221:25 225:3,6,13,15,17,24 226:1 229:3,11 233:21,22 237:2,

10,24 238:6,7 243:13 244:14,21 245:5 246:2,23 254:5,7 262:17, 19,23 263:1 267:18

**reporter** 57:18 176:18

**reporter's** 5:21

**reports** 7:10,14 16:20,23 17:3 35:10,25 83:17 99:12,14,24 111:23 141:12 238:17

**represent** 79:12 223:4 267:5

**representation** 202:3

**representative** 45:11 187:20

**represents** 170:6

**reprocessing** 48:8

**reproduce** 90:10

**reps** 49:15,18 137:14 140:6,7

**repurposed** 118:19

**repurposing** 118:17 203:23

**reputation** 73:23

**request** 22:18,19 232:12,20 241:1

**requested** 232:15

**require** 194:6,8 212:11

**required** 16:3 47:2 53:3 72:19 88:3 118:17 146:17 150:10 177:17 193:4 213:2 255:24 256:16 257:13 259:10 260:20,25 270:6,19

**requires** 139:19

**reread** 174:7

**rescheduled** 265:11

**research** 83:22 86:25 117:13 147:24

**researched** 39:16

**reseller** 199:10

**resellers** 198:9

**resize** 106:24

**resized** 106:17 108:21

**resizing** 209:2,22

**Resource** 105:10

**resources** 38:4 39:9 74:9

**respect** 16:11 87:23 121:24 232:2

**respective** 188:24

**respond** 11:17 16:10 19:21 20:20 36:8,22 39:23 41:1 65:6 67:5 78:9 84:2 85:22 89:22 90:14 91:25 93:8 94:22 105:18 111:8 120:21 124:4 172:2 173:2 175:23 178:21 182:15 224:21 225:6 226:15 228:24 231:19 245:19 246:11 247:12 251:22 259:7 263:3 264:14

**response** 19:4,7,13

**responsible** 52:21,24 120:16

**responsive** 6:22 22:18,19

**restate** 52:20 106:8 243:23

**restriction** 129:15

**restrictions** 219:10

**restricts** 90:9

**result** 60:6 138:8

**results** 13:4 191:12 221:2 227:15

**retained** 41:12 46:18

**returns** 27:7

**reveal** 68:4 134:9 187:1

**revealed** 60:13

**revealing** 206:23

**reveals** 59:3 134:5

**reverse** 89:18 90:10,12,17,22, 24 91:1,7,14,19,22 92:8,13,20,25 93:5,12,14,20 94:3,6,7,8,10,11, 20,25 95:9 96:24 97:2,18 134:21, 25 135:21,24 136:7,10 249:1

**review** 17:4,7,11 35:18 45:2, 21 227:8,9 246:4

**reviewed** 173:18 227:5

**reviews** 35:8 67:12

**revolves** 212:22

**rewrite** 164:10

**rid** 155:20

**rights** 24:14 34:14 49:11,15,20 50:10 53:8 54:6 68:11 81:15 84:21 85:6,13,24 89:12 90:18,22, 24 92:15,21 94:10 96:20,22

105:20,23 111:3,10 112:23 113:4,7 115:9,11,13 116:7,9 126:11,14,17,18 130:1,18 132:12 134:20 136:13 137:7 139:3,8,10 140:13,17,18,21 141:4,11,20 142:1,2,20 192:15,17,18,22 208:14 211:11 219:19 223:13,18 224:1,8,16,24 225:4,9,14,22 229:2 232:24,25 233:3 238:5 243:20,21 244:13,22 245:2 246:12,14,17,23 247:16,22 248:24 262:1

**ring** 189:20

**Rivers** 147:20

**road** 191:4

**Robidoux** 66:15 119:8 125:1 133:10 187:18,24 208:16 212:23

**Robidoux's** 187:20

**robust** 38:5 39:10

**ROM** 27:11,13

**room** 47:6,12 54:8,9,10 58:6 62:20,23,25 63:10 64:18 65:4,7 66:21 72:13 73:6 75:3,18,23,25 76:5,7,8,11 77:5,6,17,23 78:2,16, 18 79:1,4,12,15,17,21 80:7,12 86:2,6,7,9,10,16 87:4,11,20 88:8, 13,19,24 89:2 90:2 92:3,5 95:25 106:3 110:5 112:1 124:19,23 132:10,13,20,22 133:2,5,8,9 138:7,13,22,25 139:19,24 140:1, 10 149:19 150:4 152:14,21 164:9 168:9,12 169:4,20,25 173:7 175:4 176:1,3,5,24 177:20 179:5 189:20 195:3 204:10,12,16 219:10,11 220:11 226:2,6,9,13, 17,18,21 245:9 249:4,18,21 260:15 261:20 262:19,24 263:22 264:2

**rooms** 86:14,23 87:1

**Rosemergy** 5:19 11:3,16 14:11 16:10 18:16 19:20 20:19 22:14,22,25 36:7,19,22 39:22 40:25 65:5 67:4 70:3 78:8 84:1, 13 85:21 88:4 89:20 90:5,13 91:4,21,24 93:7 94:21 105:17 111:7 114:24 120:20 124:3 130:5 157:23 172:1 173:1,23 174:2 175:22 178:1,20 182:14 217:8 222:22 224:20 225:5 226:14 228:23 231:18 234:11 236:2 237:1 238:13 240:1 243:8 244:18 245:18,25 246:10 247:11 251:21

256:25 257:22 258:5 259:6 260:3,12 263:2 264:13 274:5 276:3,21 277:2,12,18

**rough** 174:24,25 213:6 240:10

**roughly** 45:7 72:16 148:25 180:6 184:16 201:22 211:1 269:23 270:3,5

**round** 64:23

**rows** 201:2 250:15

**Rucinski** 12:3,15,17 13:10,15

**rule** 82:22

**run** 13:21 27:25 28:12 35:20,21 36:2,6 49:4 69:7 97:6 182:21

**running** 9:18 103:25 147:18, 19 151:9 153:10,13 155:3 273:23

**runs** 27:20

---

## S

**SAAS** 26:12

**safe** 94:8 171:22

**safest** 87:19

**Sai** 122:2,4

**sake** 235:20

**sales** 49:14

**sample** 35:22

**San** 8:20

**sanity** 220:16

**SAS** 26:19

**sauce** 60:17,18

**save** 187:4 190:10 191:3,4,8

**saved** 75:1 81:21,24 82:18 140:23 274:2

**saving** 75:16 77:16

**savings** 77:3 78:7 82:11

**scale** 35:13 180:9,11 209:19 263:19

**scan** 211:4 213:2

**scanning** 214:12

**scenario** 65:4 177:9,10 208:20 209:16 242:24

**scenarios** 183:23 208:21

**schedule** 221:6 275:9

**schema** 61:21,22 102:16,18 103:3 122:22 123:1

**schema/design** 102:25

**science** 114:18

**scientist** 86:15

**scope** 10:25 35:13 36:12,20 40:25 41:23 89:21,24 97:19,21 113:18 130:24 193:19 217:8 225:24 234:23 237:2 244:14,19 245:18 246:25 255:7 264:13 275:21

**scraped** 118:4,7

**scraping** 127:14

**scratch** 28:15,19,21 30:8 31:4 36:17 65:22 78:23,24 79:22 80:14,16 81:8 106:18 107:5 108:25 109:1 149:3,16 150:18 168:10,11 175:4,20 206:19 208:8,11

**screen** 59:23 139:1 201:23

**screenshot** 202:6 221:15,16

**screenshots** 35:9 69:8 229:15 231:24

**script** 121:23

**scripts** 13:21

**SDK** 42:2,7 65:12

**Seagate** 20:24

**Sean** 267:4

**search** 227:14

**searches** 227:10,13

**searching** 99:5

**seconds** 83:3

**secret** 44:8,9 55:13 60:16,18

**secrets** 44:4,8 91:11

**section** 78:2 84:17 85:25 111:16,19 112:3 117:5 123:24 124:18,22 131:6,13,17 132:8 143:6,9,13,14 153:9 171:25 174:3,5,7 203:15,22,24 204:1 212:16 227:1 233:7 237:10,14,23

**select** 34:16 50:12,13,18 250:12

**selected** 32:25

**sell** 9:18 236:9

**selling** 26:21

**send** 59:6

**sender** 228:17

**sense** 29:18 35:13 39:14 41:19 79:6 112:18 113:18 138:19 145:12 200:6,23 218:10 255:11

**sentence** 113:8 116:3,19 238:24 240:20

**separate** 79:25 81:6 83:6 99:9,13 128:2 140:2 198:19 200:20 262:21

**separately** 200:5 201:19 274:3

**separates** 225:18

**separation** 55:25

**sequence** 14:24

**series** 5:16

**server** 98:14 104:24 105:7 204:7 277:9

**servers** 84:23 104:7,15,16,18 105:8 109:17 111:10,11 116:8

**service** 26:16,17,20 27:8,13 90:19 198:11 199:4

**services** 7:24 8:11 9:23 37:5, 18 115:17 129:20 141:18 241:15

**servicing** 235:16

**serving** 235:8

**set** 70:19 83:7 98:25 99:5 119:7 134:23 139:18 206:17,18 218:23 220:25 221:1,3,11,14,18,19,22,24 222:9,10 259:13 269:2

**sets** 158:6 264:2

**setting** 65:15 95:7 221:15

**settings** 221:18

**settled** 226:4

**Seventy** 154:18,19

**shakes** 6:4

**Shane** 267:5

**share** 230:20 263:7 270:3

**shared** 96:19 262:6 263:19 270:20

**Sharepoint** 31:21,22,25

**shaved** 118:23

**sheets** 121:3

**shelf** 178:4

**shield** 192:6

**ship** 73:17,18

**shipping** 42:16

**shop** 9:14

**short** 43:20 74:13 205:15 267:8,12 274:21 276:15

**shorten** 179:19 183:25

**shorter** 31:10 182:21 197:7

**show** 6:5 43:25 47:14 88:9 89:2 99:6 140:6 149:12 183:22 190:14 191:23 192:10,17,18,19,20 202:3 221:16

**showed** 42:14 43:21 45:6 99:20 150:8 235:10

**showing** 42:23 182:22 192:3,21 202:6 222:18

**shown** 123:14

**shows** 97:9 141:22 177:15 178:3 241:24

**shrink** 180:6

**shrink-wrapped** 37:24

**shrinking** 181:12

**shut** 242:2

**side** 33:23 45:22 100:23 161:5,6 180:8,25 188:13 192:2 271:13,16

**sides** 67:20 153:23

**Siemens** 147:24

**significant** 275:21

**significantly** 170:3 265:22

**similar** 8:13 13:21 42:10 43:13 45:23 48:10 65:17 69:12 75:3 80:13 94:12 114:12 119:4 136:18,19 147:10 165:12 171:10 181:23 185:7 191:6,15 194:15,16,25 195:1,4 203:25 221:3,6 233:1 239:1 269:7

**similarities** 42:21 207:17

**similarly** 240:19

**simplest** 37:21 156:1

**Simply** 9:12 210:17

**single** 146:25 237:17 270:8,10

**sit** 50:21,23

**site** 15:6 32:19,24 33:13 34:12, 20 35:4,12 49:8,22 50:3,8 53:3,6, 7,12 54:5 65:21 72:3 85:4 92:11 97:6 100:13 116:23,25 119:18 125:17 126:9,25 127:4 128:15,17 136:17,19 138:18,20 139:5 140:17,19,21,22,24 141:18 158:12 159:8,11 163:20,22,25 170:9 176:10 177:12,18 192:10, 16 197:21 198:8,19 199:2,19,20 204:19,22 205:19,25 206:2,16 208:6 213:11 224:3 246:22 254:12,15 271:5,15 272:24 273:23

**sites** 15:24 34:11 47:2 49:25 50:1 53:4,18,23 60:24 101:16 128:9 129:5 139:3,4 140:4 165:23 199:14 204:18 210:18 269:13 270:19

**sits** 170:10

**sitting** 65:25

**situation** 66:14 72:14,17 87:4 134:4 168:15 243:3

**situations** 62:14 234:17

**size** 145:17 146:2,16 156:7 168:19 169:13 185:7 194:11,25 195:21 230:18 255:7,12

**sizes** 100:16 146:6 148:4 209:22

**sketch** 173:6

**skill** 152:7 220:25 221:1,3,11, 18,19,22,24 222:9,10

**skilled** 153:1 220:20

**skills** 86:19 171:15

**skimming** 124:24

**skimp** 189:21

**skip** 128:25 154:6

**skipped** 11:12 128:17

**SKUS** 251:5

**slang** 176:20

**slight** 220:10

**slightly** 73:18 131:24 186:19

**slippage** 73:7 265:6

**slow** 81:17

**slower** 181:5

**small** 42:4 105:7 146:2 205:21 265:6

**smaller** 146:4,12 164:20 165:6 169:9 187:12 196:13 211:9 257:21,24 271:2

**smart** 132:12 187:3

**smarter** 132:21,24

**snapshots** 68:23 254:8

**software** 7:23 15:4,8 25:14, 16,17,19,21 26:1,15,17,19,20,21 27:1,8,12,19 28:4,5,16,19,20,21, 23,25 29:1,11,13,16,22 30:1,5,7, 10,19 31:1,21 32:4,7,10,12,21 33:4,7,8 35:6,19 36:2,6,24,25 37:11,14,16,19,20,22 38:4,8,15 39:9,11,21 40:18 42:3,4,19,24 44:21,22 46:11 47:23 50:24 51:1, 5,22 52:16,22,25 56:8,11 57:6,9 58:2,5,8,14,15 62:21,23,24 63:2, 3,12 64:11,19,20,22,25 65:3,9,11, 25 66:9,10,11,16,19 67:2 84:4, 10,24 85:3 89:8,14,17 90:10,11, 12,20 91:7,13,15,20,22 92:25 93:5,13 94:16,19 96:4 101:1 103:2 105:2 114:1,14 116:11 120:15 124:14 125:2 127:16 128:4 129:9 130:9 133:22 134:7, 16,20 135:4,14 143:7 149:25 150:2 164:6 169:17 170:1,12 172:21 177:2,3,6 190:14,15,16, 18,19,22 191:24 193:1 194:3 195:25 223:14 230:2,13 231:16 236:7 237:16,17,21 238:12 239:20 240:21 241:15,18 248:2, 25 262:9 263:15 265:2 266:1,4,5, 16

**sold** 9:13 251:5,6

**solution** 16:4 26:3 27:3 28:23 34:7 38:16 47:7 63:10 64:7 86:10 87:19 88:8,11 120:23 124:19 131:7 150:4,5 167:19 169:3,6,8 172:24 177:3,5 178:11 190:2,4

194:17 211:2 212:22 213:13,14 214:5,6 219:25 226:18 233:1 241:25 261:20 262:19,24 263:18, 22 264:2,20,25 266:23 272:23 274:11 277:9

**solutions** 129:20 167:13 219:3 226:17 274:22

**solve** 122:12 174:11 214:9,16

**solved** 97:8 212:15

**solving** 87:6 213:25

**sort** 16:2 45:4 52:7 62:6,16 112:7,25 119:1,4 128:17 152:12 159:14 164:8,18 179:23 202:4,7 209:15 210:1

**sorts** 43:13 156:23

**sound** 25:13

**sounds** 174:23 182:1 267:15 277:17

**source** 27:15,16,17,18,21,22, 24 28:6,21,25 29:5,8,11,13,16,24 31:15,25 32:3 35:8 36:18 42:16 45:22 48:7 51:21 52:3,9 62:23,24 63:4,8,11 65:8 66:10 69:8 88:21 93:21 98:19 106:2 112:2 118:4 122:13,16 139:6 149:25 153:23 155:5,17 156:17 169:25 170:11 199:9 210:11 214:10 243:6

**sources** 80:6 106:23 120:11 144:6

**South** 9:14,17

**speak** 22:11 161:2

**Speaking** 20:22

**spec** 193:2 265:7,14

**specialized** 86:13

**specific** 12:7 19:7 49:5,24 58:4 59:12,13 69:25 86:20 98:23 99:7,8 120:6 130:12 137:10 138:17 223:7 229:8 249:9 250:6

**specifically** 70:8 78:17 136:16,18 207:20 225:21 229:9 234:8 245:13 250:2 254:12 261:17,20 262:25

**specification** 54:24 55:9,16, 17,20,24 56:1,6,7,12,15,23,24 57:4,15 58:1,9,13,17,19 59:14,15 61:16 62:18 63:5 66:4 67:7 68:3 77:10 78:19 79:16 80:11 81:11

95:1,8,21,23,24 96:1 119:13,15 128:18,25 130:10 133:12,15,19, 25 136:22 139:20 140:11 141:1, 16 173:14 176:6,10 180:17 184:19,23,24 185:25 186:8,11,25 188:12,13 189:15,19 191:21,24 193:5,11,20 195:1,2,6 196:6 215:3

**specifications** 58:6 67:2 119:9 167:19 168:23 173:8

**specificity** 98:10

**specifics** 12:5 37:13

**speculation** 89:21 91:25 93:8 178:2 224:21 234:12 236:3 243:8 257:1,23 274:6

**speed** 72:7

**spell** 12:17,22

**spells** 105:11

**spend** 132:2 140:25 156:20 187:4,9 230:12

**spent** 24:6 82:16,21,22 174:12 175:13 208:6,9 230:16 231:13,15 234:8 236:7 239:4 240:13,22 241:3

**split** 233:23 262:10,12,14

**spot** 175:3,20

**spreadsheet** 213:5 274:2

**sprint** 186:5

**SQL** 250:12,15

**staffing** 221:6

**stake** 71:16

**stakeholder** 189:1

**stakeholders** 185:12,22

**standard** 40:6 51:10 144:16, 19 162:25 169:25 170:1 171:24 172:5,7,14,16,18 184:1

**standardized** 51:22

**standards** 143:7 147:3 194:22 210:3

**start** 5:23,24 71:3 72:2 77:21 173:10 176:24 177:20 180:23 185:16 195:8,10 207:8 261:8 277:7

**started** 7:22 9:25 81:8 128:10 145:22 162:18 166:17 175:4

**starting** 28:15 31:4,16 77:23 100:7 107:5 111:12 132:8 153:9 175:19 179:24 184:21 210:12 273:16 276:20

**starts** 124:18

**startup** 8:20

**state** 77:19 78:11 88:7 141:8,16 148:17 197:25 198:7,14 199:6 225:7 243:12 248:6,22 258:7 264:16

**stated** 260:24

**statement** 239:19 241:21

**stating** 264:22

**station** 148:2

**step** 94:7 154:15 155:14,15 165:2 276:25

**stepped** 23:4

**steps** 77:18 115:20 154:6,18 204:10,14

**sticker** 20:25 21:12

**sticky** 134:4

**stock** 34:19 209:21

**stolen** 88:18

**stop** 41:10 117:3 133:8 212:10 267:14

**stopped** 42:8

**stopping** 117:2 173:24 241:14

**store** 33:11,12,23 35:20,21 60:23 125:21 157:16,19 158:8,15 165:17 174:16,17,18 186:20,21 202:6 204:12 216:18 229:13 231:17,23 232:4,6,11,17 233:11, 12,13 234:3,10,22 235:15,25 236:17,22,24 237:17,18 238:21, 25 240:13 241:4,7 250:11,21 251:20 252:11,13 254:20 261:3, 17,20 262:18,25 263:8,9,22 266:11,20 267:19,24 268:10

**stored** 61:10 62:5,8,10,12 102:23 104:6,15,16,23 105:6 160:2 200:14 202:7,25 203:11 204:6 206:11 209:1

**stores** 33:16 61:11 138:24 157:22 158:13 163:21 165:11,14 178:16 190:6 198:6 216:1 232:19 242:8 246:5 250:6 262:4 263:6,

16 268:16 269:6,21

**stories** 45:9 266:3

**straight** 162:16 215:19

**stretch** 183:20

**strictly** 16:12 18:17

**strike** 232:14 236:19 238:10 245:15

**strong** 63:22

**Stroz** 10:7 21:2

**structure** 15:3 48:13 104:24 118:15 121:22 159:10

**structured** 129:5

**struggle** 101:22

**struggling** 229:18

**students** 61:24

**stuff** 8:15,16 22:8 112:8 139:14 159:11 200:17

**sub-pieces** 200:17

**subfolder** 162:10,11

**subject** 13:14

**subsection** 123:17

**subset** 211:5 225:3 258:24 273:4,6,7

**subsets** 61:14

**substantial** 159:21

**substitute** 211:14

**subtotal** 167:1

**subtracted** 231:7

**success** 72:21 73:7,25 74:11 75:11,13 183:14,17,19 217:22 218:11 264:18,24 265:4,16,23 266:2,9,10,20 275:1,6

**successful** 86:1 226:2

**suddenly** 219:20 241:14

**sued** 91:16,18

**sues** 88:17

**suggest** 74:2 228:20 273:22

**suggested** 87:24 210:25 272:22

**suggesting** 121:1 210:23

**suggestion** 276:14

**summarize** 71:20

**summarizes** 131:5

**summary** 74:14

**Sun** 148:1

**supervised** 47:5,25 134:12

**support** 37:5,23 52:18,23 122:10

**supporting** 13:15

**supports** 182:12

**supposed** 116:22

**surprised** 40:5,9

**surprises** 189:16

**surreptitious** 242:11 243:14,17

**surreptitiously** 241:13 242:9 244:1,10

**surrounds** 111:17

**suspect** 55:21,25

**swapped** 166:24

**swear** 144:3

**switched** 239:8

**sworn** 5:4

**Symantec** 45:16

**Synthespia** 8:19,20

**synthetic** 8:23

**system** 9:5 15:13 20:10 24:12, 13,21 26:22 37:25 40:11,13 43:22,23 44:24 45:1,4,5,6,7,8,12 48:12,13 51:9,11,18,19 56:17 57:13 58:21 59:5,6,17 61:2 63:24 64:4,6 67:17 69:4 71:24 72:6 74:20 79:5 85:18 96:9 102:6 108:25 109:3 120:9,19 127:23 137:7,23,24 145:2 147:13,16,17, 21 148:17 167:18 172:11 174:9, 13 187:3,16,19 189:2 190:19 191:23 193:2 205:4,23 209:25 210:11 211:11 212:16,18,20 213:5 214:3 218:2 219:19 220:5, 6,7 227:11 231:8,13 234:16 235:8 242:1 252:22 257:5,8 259:13,14 260:8,15,18 274:9

**systems** 8:22 137:25 138:1 145:4 168:21,22 172:12 233:3,4, 5

---

**T**

---

**table** 7:17 122:20 194:16 200:2,20 201:2,19 205:10,13 208:1 250:16 261:15 264:1

**tables** 123:2 194:2,9,13 208:1

**tabula** 81:9

**tainted** 68:1 193:13

**taints** 79:24

**takes** 35:14 109:7 110:9 139:21 144:23 151:18 170:19 180:1 183:7,12 197:21 209:23 215:5 220:12

**taking** 48:18 72:17 169:17 175:6,7 197:11 209:19 241:17 246:13

**talk** 25:9 36:14 59:4,19 60:22 70:7 77:4 81:19 86:1 90:1 103:7, 10 106:1 112:10 113:8 114:19 115:16 131:23 139:12 142:14 144:21,22 161:18 162:6,8 174:19 183:6 199:24 202:18,19 213:18 237:9 258:15 263:4 267:18 268:1

**talked** 49:3 57:14 66:13 71:19 76:21 77:6 86:2 123:23 124:1 127:14 134:25 137:19 156:17 160:8 162:7 164:1 193:20 197:17 201:16 205:1 215:7,14 216:15 262:2,3

**talking** 18:16 33:23 37:3 47:22 48:16 57:16 59:21 60:21 62:16,17 64:17 65:23,24 66:2,5,7 68:25 70:17 75:5 79:10 84:17 92:23 95:21 97:11,23 105:9 127:16 131:17 138:7 139:18 145:4,17,18 146:20 147:15 152:17 158:18 166:19 174:8 176:17,19 181:25 185:16,20 195:3 199:21 200:8 201:1,9 202:12,13,14,16 203:4,23 206:9 208:7 210:12 216:5,10 222:14 229:21 232:18 249:8,9,11 250:4, 24 251:2,4 252:10 270:15

**talks** 83:18

**tangent** 97:16

**target** 8:21 119:14 167:21 168:12,20,23 195:9

**targeted** 9:3

**task** 161:16 273:3

**tasked** 17:2 198:5,7 235:1

**tax** 27:7,9,10

**taxes** 33:3 34:10

**team** 12:3,4,24 23:18 47:9 54:19 55:4,6 67:7,25 73:5,13,19 152:12,15,20 181:11 185:11,20 196:17,25 218:21

**tech** 9:17

**techies** 193:11

**technical** 6:13 17:20 51:16 87:16 185:11 186:6 193:9

**technically** 150:24 200:23 276:22

**Technologies** 8:7,8,9

**technology** 38:14 64:21 147:25 225:12 263:7

**techy** 22:7 81:19

**Tecum** 10:13

**telling** 44:17 256:1

**tells** 100:24 250:15

**ten** 151:10

**tend** 31:8 64:11 74:1 92:17 162:10 195:2

**tension** 242:1,23 243:7

**terabyte** 277:1,4

**term** 105:12 114:18 134:10 135:5 276:15

**terminology** 6:14,15 50:11 64:15 76:15 95:2 102:4 139:25

**terms** 32:19 43:13 49:14 50:9 65:15 78:20 79:2 90:19 91:3 92:12 93:2,5 115:2,4,6,9,14 125:5,18,21 126:5,12 135:5 142:7,15 146:15 150:9 172:3 175:9 177:16 180:2 181:24 184:12 192:8 194:10 218:10 220:19,25 229:2 231:9 241:24 242:13 245:21 246:4,7,14,25 247:4,8,13 252:9 263:12 272:14

**terrible** 44:24 45:1

**test** 127:25 151:9

**tested** 31:7 106:25 108:20 151:4,24 152:5

**testified** 5:4,12 46:15

**testify** 39:17 156:12 217:15 264:10

**testimony** 41:7,8,13,18 228:9,20

**testing** 133:22 220:1

**tests** 104:1

**text** 200:9 253:3 270:20

**themes** 219:23

**theory** 58:3 193:5,7

**thing** 28:17 33:17,18 48:19 56:18 57:4 58:7 63:8 74:7 95:10 97:18 129:8 131:25 132:12 135:22 147:9,11 154:3,7,16 158:24 159:6 160:23 163:20 165:10 180:13 181:2 190:10 195:23 203:13 218:13 219:15 231:1

**things** 9:19 12:6,7 18:12 25:20 29:22 34:8 37:2,6,10 50:15 58:14 66:5 71:5,12 78:25 79:1 80:1 98:16 99:19 101:25 104:12 112:5,9,15 113:25 114:12 117:10,24,25 118:23 119:12 128:12,21,23 130:12 137:2 138:1 139:15 140:5 141:8 150:1 154:4, 5,8,14 158:20 160:7 161:13,14, 23 163:4 167:11 171:10 175:15 180:1,22 181:13,23 186:3,12 189:25 190:25 191:2 192:5 195:12 201:10 212:13 216:8 220:1 238:1 253:7

**thinking** 39:3 58:13 127:18 145:5,24,25 165:8 190:1 194:10, 24,25 195:4 196:22 198:10 207:13 213:1 216:7

**thinks** 185:8

**third-party** 105:2 163:7

**Thirdly** 72:11

**thought** 15:1 42:4 101:9 141:25 144:25 145:21,24 167:17, 22 169:14 187:6 191:17,18 196:24 197:2 203:21 213:8 240:4 265:2 271:3 272:12 273:20

274:11

**thoughts** 36:13,15

**thousands** 49:17 109:18 113:9 206:15 230:17 239:21,25 240:5,9,13,17

**thousands-plus** 49:18

**threw** 71:4 157:9

**thrilled** 265:21

**time** 6:16 7:13 8:14 21:20,23 24:11 27:7 31:11,12 36:14,15 40:18,24 46:12 53:5,10 68:20 72:7,9,23 74:8 75:1,16 76:4 77:16 78:11 79:10 80:4 81:21,23 82:4,10,15,17,21,22 86:5,7 91:16 108:21 111:13 113:10,12,23 114:5,7 118:24 119:10 122:1,7 132:2,3 140:23 141:1 142:23 148:7 150:17 151:19,20 154:8 171:15,19,20 174:4 178:8,25 179:4,11 181:12,13,17,18,25 182:11,17,19,22 183:7,16,18 184:3,13,15 187:4,7,9 190:7,11 192:17 196:21 208:5,9,22 209:23 210:15,20 213:8 215:10 216:9,24 218:14,18 219:15,18 220:11 222:25 223:9 224:18 225:8 228:17 232:21 234:4,7,8 235:23, 24 236:16,21,23 237:5,16 239:4, 8,12,22 240:17 241:24 243:3 244:4 251:9,14,24 257:9 262:6 263:21 265:5 277:8

**time-effective** 263:18

**timeframe** 43:21 50:14 73:4, 8,13,20 74:6,13 75:8 179:19 180:5 182:9 217:22 251:10,15 264:17 266:2,15

**timeframes** 182:24 183:4 275:17

**times** 5:12 19:6 20:11 46:24 170:20 191:5 197:12 215:16 226:17 236:18

**tinker** 40:12

**tired** 269:1

**title** 12:10 174:3,16

**today** 6:24 10:20 11:2 21:17 65:11 103:5 151:24 276:6

**told** 15:9 16:8 83:24 126:13 223:11 253:21 255:21 261:25

**Tom** 120:7

**Toobaroo** 83:12,19,20 84:5, 6,11,14 234:20 235:21,22 236:16,21 239:13 247:20

**tool** 133:8 149:10 150:18 156:21 159:22

**tools** 38:4,8 39:9,25 51:10 148:8 149:5 159:13

**top** 29:23 30:11 31:20,23 33:19 52:1 59:7 60:10 65:25 84:17 94:11 111:14 122:3,17 126:2 143:25 148:20 156:13 170:11 177:6 184:14 216:23 227:3 229:8 230:10 232:8 251:15 252:18 254:11,18,22

**topic** 112:14 183:5 210:4

**topics** 6:13 15:10

**total** 132:6 150:1 154:18,19 160:9 167:8 184:7 185:2 193:23 211:18,21 215:24 252:25 258:11, 25 259:24 260:6 272:13

**totals** 216:22 217:1

**toys** 40:12

**tracked** 23:23 134:12

**tracking** 24:12

**trade** 44:4,7,8,9 55:13 91:11

**training** 86:13

**transaction** 34:3,23 35:22

**transactions** 32:16 33:2

**transcript** 6:1,5,9 277:11

**transcripts** 112:19 117:16

**transferred** 89:3,5

**translated** 211:25

**translating** 149:4

**translation** 148:9

**transliterate** 150:21

**treatise** 182:1

**treatises** 181:16

**tree** 155:17

**trial** 41:9 142:11 264:10

**trigger** 61:13

**trivial** 62:2,9 82:23 178:22

**trouble** 182:5 211:21

**true** 14:9 39:6 79:3,17,18 145:13 146:8,22 219:12,14 266:5

**truth** 63:16

**Turbo** 27:9,10

**turn** 79:7,8 211:16 237:12 247:23 248:21 254:18 268:8

**turned** 217:12

**Turning** 241:9

**turns** 139:21

**tweaks** 172:15

**type** 158:25 159:2 200:13 225:9

**types** 18:12 33:8 44:10 45:13 46:3,15 53:25 159:7 225:19 250:24

**typical** 143:20

**typically** 19:1 25:20 27:20 29:10 30:12 34:6,17 37:22 55:4,6 56:14 57:1,11 59:15 62:16 67:6 80:7 94:3 149:14 152:11 181:1 199:6 203:2

---

**U**

**uhs** 6:5

**ultimate** 169:24

**unable** 261:15

**unanswered** 36:11

**unclear** 176:22

**uncommon** 39:24

**under-count** 167:11

**undercount** 271:7,24

**underlying** 149:17

**understand** 6:1 10:24 17:15 24:21 33:6 35:2 37:9 40:8 41:21 51:17 56:5 57:3 61:8 74:18 76:17 77:13 81:19 83:22 99:18 114:18 121:8,11 129:23 140:16 151:3 191:25 214:23 217:1 218:6 223:17 230:1 238:8 268:13,15 275:14

**understanding** 16:20 17:19 19:12 25:18 26:17 41:23 56:14

83:13,14 84:3,5,9,15 88:6,7 90:15 91:5 103:13,17 104:1 105:1,22 107:3 109:16 110:21 114:2 116:24 119:2 120:4,9,11 121:11 126:4 129:19 130:2 134:18,23 136:12 138:10 182:6 204:17,21 205:16,24 213:23 223:21 234:5 242:3 248:23 251:17 252:3 257:5 259:11

**understood** 6:7,11,18,21,23 11:8 16:17 36:10 50:9 77:20 84:19 87:17 105:13 113:20 142:6 169:22 221:13 257:15 260:17

**undertaken** 204:15

**unique** 60:7

**Universal** 105:10

**unknown** 209:7

**unmodified** 157:1

**unreasonable** 139:9

**unusual** 40:2,4,15,22 152:3

**upload** 123:9

**uploaded** 85:17 213:5

**uploading** 115:21

**upset** 151:13

**urgency** 242:7

**URL** 105:3 202:25

**URLS** 104:10,11,13 105:4,9

**user** 49:11 50:12,13 52:19 66:8 89:13 94:16 95:7,22 126:24 198:16

**users** 25:23 49:10 50:14,16,18 53:6 58:21 95:13 101:19 212:20 231:11 232:20

**utilize** 245:6 264:12

---

**V**

**vacuum** 238:6

**vague** 111:7 178:20 236:2

**valid** 224:8

**values** 95:5 220:25

**vanilla** 157:5 172:13

**varied** 110:19

**variety** 70:23 104:1 112:15 114:16 120:11 183:22 212:13

**vary** 61:6,9 90:18 101:2 219:17

**vast** 104:8,10 146:5 161:6 205:16

**Vectra** 14:2 33:13,17 69:14, 16,17 116:11 119:23 126:9 154:24 157:12,14 158:7,10,12 161:19 162:17 163:11,20,22,25 167:7 190:6 211:19 216:11,14 262:5 263:16 266:21 268:2,6 271:5,13,22 272:1,5,16

**Vectrarebate.com** 125:25 126:5,21,22 159:25

**Vectrarebate.com.zip.** 118:6

**Vending** 41:25

**vendors** 242:25

**Vendsys** 41:25

**verbal** 6:4 41:13 112:14

**verify** 16:7,22 17:2 21:21

**version** 28:10 85:5 113:21,22 114:2 129:12 151:23,25 157:13 158:11 219:20 230:5,11 231:4 238:21 240:6,14 272:4

**versions** 68:18 69:14 114:1 230:2 231:3,6 240:7

**versus** 36:18 41:25 45:17 62:18 70:10 95:21 141:6 157:8 175:19 266:20 273:13

**veterinarian** 126:23

**Vetmedica** 223:4 251:7

**video** 201:13

**view** 28:16 130:8 139:22

**viewed** 114:22

**violate** 16:4 88:25 91:8 134:8

**violated** 133:7

**violating** 93:4 94:9

**violation** 88:14

**virtually** 65:21 147:9 151:23

**virtue** 108:5

**voluntarily** 123:4

**volunteered** 19:15

---

**W**

**wait** 97:7 186:12 251:5

**walk** 127:23

**wanted** 9:15 24:19 61:2 132:18 147:25 167:16 197:3 201:9 202:10 208:3 228:15 253:18 256:5 261:3 276:12

**wanting** 134:22 142:3

**watching** 229:16,20

**waterfall** 180:15

**ways** 27:2 30:18 59:11 129:3 155:24 166:13 262:13

**web** 26:10 90:20 159:11

**Webex** 229:21,22

**webpages** 125:25 126:21

**website** 26:2 27:6,10,12 37:3 59:19 65:15,16 80:18 116:12 118:4,8 119:12 126:6 132:10 155:2 170:13 191:3 198:20 203:8,9 209:21 212:11 268:2,6

**websites** 9:9 40:23 65:18 119:3 125:2 128:24 137:1 248:3

**week** 212:2,3

**weeks** 178:7 185:8 195:15 211:24 212:1,2

**well-connected** 152:10

**Western** 66:15 119:8 125:1 133:10 187:18,20,24 208:16 212:23

**whatnot** 276:9

**wheel** 31:2

**whistles** 38:25

**who've** 66:15,18

**wide** 93:14

**wild** 273:9

**Williams** 188:9,10,11

**win** 220:2

**window** 221:16

**winnowing** 114:14

**withdrawing** 277:10

**withstand** 87:24 88:1

**witnesses** 228:1,10

**wondered** 5:11

**word** 25:21 26:7 44:3 57:17 60:16,22 174:16 176:15 189:19 249:7

**Wordpress** 157:11 158:11, 12 162:25 172:13

**words** 96:25 190:17 224:14 225:8 275:13

**work** 13:2,4,6,8,10,21 37:18 44:24 48:9 49:14 62:6 67:17 73:15 76:9 92:17 93:17 109:3,9 110:22 123:9 148:2,15 151:17 152:16 160:1,2 164:12,21 168:22 176:11,20 190:11 204:21 205:22 206:4 213:7 219:5 235:4 236:8, 18 266:14 270:13 277:8,14

**worked** 31:17 32:7 35:23 51:6,19 57:12 66:15,18 96:12 137:2 140:5 148:25 185:6 194:24 226:7,20,22 230:9,23 238:18 249:15,24 265:9 266:22

**working** 51:2 87:17 97:5 105:19 109:20 110:3 126:10 129:11 141:1,11 174:13 196:11 199:12,16 218:2 219:16 220:5 244:21 247:14,21 276:10

**workings** 15:8

**works** 24:21 30:5 36:6 40:12 58:23 94:12 95:4 126:25 127:4, 24 129:13 167:18 188:12 189:2 198:14 277:5,6

**world** 9:20 75:18 77:23 93:13 113:15 173:10 175:5 190:3 196:5 197:1 212:6 218:15 263:10

**worlds** 77:3

**worse** 95:20 146:23

**wow** 40:12

**wrapper** 29:20

**WRI** 71:23 80:17 96:13 103:15,18,24 105:22 110:13,14, 21 116:21 127:16 130:4,12,14,16 133:21 134:7 136:24 140:4 169:12 173:11 185:21 186:7 187:15 188:1,6,20 190:22 192:4 193:7 196:7 209:7,24 224:16

229:5 239:9 241:16 242:9 245:6, 13,21,24 248:2,16 261:2 267:20 268:5 273:12,14 274:1

**WRI's** 234:15

**write** 29:23 30:8 31:23 54:19 63:1 102:24 149:13 152:1 164:13 172:23 186:2

**writing** 31:20 65:20 130:9 149:3 219:19

**written** 25:3 41:13 48:3 71:14, 15 99:20 112:13 139:20 147:18 149:6,8,10,16 150:6,18 151:4,7, 22 155:19 156:20 159:19 163:8 167:5,6,7,13 168:10,11 177:4 181:16 182:7 194:21 225:3 256:18 269:9

**wrong** 17:16 130:1 139:4 181:14 244:10

**wrongful** 243:18 244:1,11

**wrongfully** 244:16

**wrote** 96:13 149:2 167:23 168:2

---

### Y

**Yao** 174:12 175:13,19

**Yao's** 174:19

**year** 27:7 73:14 179:21,22 218:22 220:5,6

**years** 9:17 23:14 31:6 53:15 107:7 209:14 231:2 238:25

**Yup** 193:21

---

### Z

**zip** 122:5

**zone** 95:20