Reply Report of Michael Edge to the Expert Rebuttal Report of Melissa C. Snelson and

of the Expert Rebuttal Report of Steven R. Kursh

**Introduction**

1.  My name is Michael D. Edge. I provided my background in my initial report dated

    March 18, 2019 ("Edge Report").

2.  I have been retained to provide consulting expert services and testimony on behalf of

    the Plaintiffs, InfoDeli, LLC ("InfoDeli")[1] and Mr. Breht Burri in the matter of

    INFODELI, LLC, et al. v. WESTERN ROBIDOUX, INC., et al. Case No. 4:15-cv-

    00364-BCW. The corporate Defendants in this litigation are:

    a.  Western Robidoux, Inc. ("WRI")

    b.  Ceva Animal Health, LLC ("CEVA")

    c.  Boehringer Ingelheim Vetmedica, Inc. ("BIVI")

    d.  Engage Mobile Solutions, LLC ("EMS")

3.  I have been asked to offer a Reply to the Rebuttal Expert Report of Melissa C.

    Snelson ("Snelson"), dated April 19, 2019 and to the Expert Rebuttal Report of

    Steven R. Kursh ("Kursh") dated April 19, 2019.

---

[1] I understand that in late 2013, InfoDeli acquired all of the intellectual property assets of TooBaRoo, LLC by assignment. I further understand that TooBaRoo, LLC was the precursor to InfoDeli, LLC. For simplicity's sake, I will refer to either of these entities as "InfoDeli" unless the context requires otherwise.

**Snelson**

4. On page 7 of Snelson, she indicates that I assumed that the CEVA Lit Store was developed first. I did not make such an assumption.

5. In paragraphs 84 and 85 of my original report, I explained that the completed code bases for the BIVI and CEVA Lit Stores[2] are very similar and are made up mostly (nearly 90%) of identical code. In order to avoid double counting identical code, I counted the entire code of one code base (in this case, CEVA) and only the changed or added files from the other code base (in this case, BIVI), to give a total of all of the unique lines of code in the two implementations, without double counting the matching code. I also could have done so in the reverse manner, but the total would have been the same (i.e., the line count for the InfoDeli BIVI Lit Store is 164 lines fewer than the line count for the InfoDeli CEVA Lit Store, and the count for the BIVI to CEVA Diff is164 lines greater than the CEVA to BIVI Diff). Here is the breakdown of common and client specific code:

| Lit Stores | Common code | Specific code | Total |
|------------|-------------|---------------|-------|
| CEVA | 16,820 | 2,504 | 19,324 |
| BIVI | 16,820 | 2,340 | 19,160 |

| Lit Stores | Common code | CEVA specific code | BIVI specific code | Total |
|------------|-------------|--------------------|--------------------|-------|
| CEVA + BIVI | 16,820 | 2,504 | 2,340 | 21,664 |

---

[2] References to the "Lit Store" are to Plaintiffs' code bases. References to the "Marketing Stores" are to the Defendants' code bases.

2

For my analysis, I do not care which code base was completed first, and do not opine on such. In any event, I further understand that the EMS version of the vectrarebate.com website launched on April 1, 2014, the EMS version of the BIVI marketing store launched on May 15, 2014 and the EMS version of the CEVA marketing store launched on July 1, 2014. However, my analysis shifted to lines of code in the InfoDeli Platforms to provide a more conservative estimate since the InfoDeli Platforms had significantly fewer lines of code than the EMS-Magento based Marketing Stores and EMS vectrarebate.com website.

**Kursh - Value of the InfoDeli Software**

6. In paragraph 62, Dr. Kursh opines that "InfoDeli's software does not have any special sauce or uniqueness".  However, Cindy Burri touted many unique features of the InfoDeli Platform to CEVA in 2011[3], which Dr. Kursh fails to address or consider.

7. In paragraphs 62 – 72, Dr. Kursh argues that the InfoDeli Software Platform is "essentially an e-commerce site".  Dr. Kursh's position, in my opinion, is incorrect.

8. Firstly, Dr. Kursh's opinion cannot be correct because no commerce is transacted on the InfoDeli Software Platforms.  Nothing is bought or sold, no payments are made, and no credit card or online banking information is processed.  These functions are at the heart of and crucial to an e-commerce site.  Contrasted with a true e-commerce website is the core functionality of the InfoDeli Software Platforms, which enables sales representatives to research and collect marketing materials, and then send these

---

[3] See WRI_0032204.

materials to clinics and distributors, often as a batch of several recipients. In my opinion as a programmer, given the functionality required, this is software as a service, and is much more accurately described as a Sales Support or Sales Enablement Tool:

> Sales enablement is the process of providing the sales organization with the information, content, and tools that help sales people sell more effectively. The foundation of sales enablement is to provide sales people with what they need to successfully engage the buyer throughout the buying process. A big part of sales enablement involves equipping sales people with information they can use in sales cycles. This information might take the form of customer-facing content, sales best practices, and tools to name just a few examples.[4]

9.  Dr. Kursh claims that the InfoDeli Software Platform is essentially an e-commerce site where all of the materials have a cost of $0.00, i.e., free. Again, I disagree with his opinion. If Dr. Kursh were correct on this point, then anyone could visit the site and order or download whatever materials they wish. There are a myriad of websites that freely share digital materials yet have nothing to do with e-commerce.

10. Marketing materials do have transactional costs, but those costs are paid by CEVA and BIVI to WRI, and are not paid by the end recipient. WRI charged for sales enablement/support activities such as printing the literature, storing the literature, pulling the literature, packaging the literature, and shipping the literature. The backend of the Lit Store Platforms allowed WRI to calculate the monthly charges for storing, pulling, packaging and mailing literature for WRI's monthly billings. This is all consistent with sales support and enablement, not e-commerce.

---

[4] https://blog.topohq.com/sales-enablement-who-what-how-when-why/

**Field Cod**

4

11. One of the key (and highly desired) features of the InfoDeli Software Platforms is that users must log on before they may view materials on the site, and they have different authorization levels. A user's authorization level controls what specific materials she can view and download, and limits her selections to a pre-set ordering limit. In fact, much of how InfoDeli implemented this functionality was not understood by EMS, and Liz Corbin (an EMS contractor) had to ask WRI employees to explain to her how the access levels and ordering limits were stored in the database and how to interpret them and apply them to the new marketing stores.[5]

12. Because the InfoDeli Software Platforms are not e-commerce websites but instead highly customized sales support and enablement solutions for WRI, BIVI and CEVA, off-the-shelf e-commerce software like Magento cannot be used to rapidly recreate the InfoDeli Software Platforms' functionality, although this was the approach that Engage Mobile adopted.[6] A framework such as Magento can be used as a base, but substantial effort is required to extend it to provide the unique functionalities of the InfoDeli Software Platforms. Indeed, Ms. Corbin confirmed this on March 5, 2014 in an email to Nathan Haley (with copies to Steve Timperley and Darrin Clawson) wherein she stated:

> *For the record, the customization compared to out of the box is huge! Just about every piece of functionality has some sort of customization.* I did compare it against Magento, but if I had to guess, *all the customization would still apply to any of the other solutions I mentioned yesterday as options.* The key will be finding a great developer who can customize Magento, or the like.[7]

[5] Deposition of ELIZABETH H. CORBIN, Dec 19, 2016, pp.129 - 131
[6] Doc. #284-6, p. 22
[7] ENGAGE00103496-97 (emphasis mine).

5

13. In my opinion, Ms. Corbin was correct, contrary to Dr. Kursh's opinion.  For example, the InfoDeli Software Platforms include many features involving specific business knowledge that are not part of a generic e-commerce site, including (but not limited to):

    a. Customized access levels for users:

        i. Controls/limits on what materials a user can view/order.

        ii. Limits on order quantities, which includes both category wide limits and user assigned "multipliers" to allow specific users to have order limits different than their category.

        iii. Both of the above involve having attributes associated with each material, which can be used for filtering and searching.

        iv. The user interface changes/reconfigures based on access level.

    b. Separate interfaces and database access to provide different functionality (and information) to CEVA/BIVI than to Distributors of CEVA/BIVI.

    c. Report Generation:

        i. Allows managers to track the overall performance of sales reps

        ii. Allow managers to track whether sales reps are pushing specified products

        iii. Marketing Material Info:

            1. Popularity

            2. Velocity Report: (usage for marketing materials)

6

3.  Days to Zero (DTZ)

iv.  Reports on other sites:

1.  CEVA Lit Store generates reports regarding business information from VectraRebate.com

d.  Distribution Functionality/Support:

i.  Interface is personalized based on the sales rep or distributor organization.

ii.  Sales reps can choose 1 of each item on a page with a single click.

iii.  Sales reps can develop customized address books and lists of customers.

iv.  Sales reps can send orders to multiple recipients, and multiple lists of recipients, to enable faster marketing.  For example, they can order once, and then ship to some/all customers in their customized address book.

v.  Email blasts:  ability to send an email to multiple customers that includes links to downloadable PDFs, audio, image and video files.

14. Dr. Kursh also opines that the EMS solution had many more features than the InfoDeli Software Platform, but fails to describe or list any of these features.  As I explained earlier, because my estimate of effort required is based off of the LOC in the InfoDeli Platforms, the fact that EMS' solutions may have extra features is irrelevant.

7

15. Finally, Dr. Kursh never addresses why EMS incurred over 5,000 hours of consultant time[8] to develop the replacement sites, if the InfoDeli Software Platforms are "essentially an e-commerce site".

**Kursh - COTS vs Custom Software**

16. In paragraphs 73 – 83, Dr. Kursh states that I assumed "that the only option available to the Defendants was a custom scratch solution". Dr. Kursh's understanding of my report, my assumptions and my opinions is incorrect.

17. I stated in my initial report that I believed the correct option for the Defendants was to develop a clean room solution so that Defendants' products were not tainted with intellectual property from the InfoDeli Software Platforms. I would characterize such a clean room solution (in this case) as a custom solution, for the unique business knowledge-based features described above, as well as the many "custom added" features listed in paragraph 63 of the Kursh Report. But such a solution does not mean from scratch. In fact, one of the best methods to ensure that your software is independently developed is to use as many components as possible from third-party software, including frameworks, libraries and plug-ins.

18. In paragraphs 70 – 86 of my report, I described how I removed all code that was unrelated to core functionality for the Lit Stores and VectraRebate.com. I shall refer to all of this code removed from consideration as "Scaffolding Code". Dr. Kursh does not appear to have considered this in his analysis.

---

[8] EXPERT REPORT OF DANIEL S. LEVY, Ph.D. March 18, 2019, pages 5-6

19. My assumption was and continues to be that any new, independently-developed solution would require a large proportion of "off-the-shelf"/Scaffolding Code, and I chose the smaller of the two refined code bases when selecting my target for "core functionality" code. Given the above, my estimate on "core functionality" code size remains quite conservative.

**Kursh - Cleanroom Methodology is Flawed**

20. In paragraphs 84 – 93, Dr. Kursh makes several arguments why a clean room approach is not needed. I'll address these individually.

21. In paragraph 84, Dr. Kursh states "In my experience, a Cleanroom process is used to develop software that you can't readily find anywhere." First, Dr. Kursh does not explain what his experience is. More importantly, he provided a different definition in his earlier deposition that is consistent with my opinion. See Kursh Dep., pp. 327-29. Second, I disagree with Dr. Kursh's opinion that "a Cleanroom process is used to develop software that you can't readily find anywhere". Notably, he did not provide this opinion in his deposition. *Id.* The whole point of a clean room is to develop software with similar functionality to an already existing product, but not to incorporate any IP from the previous implementation. In addition to his sworn testimony, his citation to *The Software IP Detective Handbook: Measurement, Comparison, and Infringement Detection*, supports my understanding, not his:

> In this chapter I discuss the software clean room development process, a method for developing software in such a way that copyright infringement and trade secret misappropriation of a specific program do not occur. […] In a similar way, a software clean room is kept free of the source code of certain other programs that could contaminate it with copyrighted code or trade secrets from those other

9

programs. Software clean rooms are also often used as the result of a copyright infringement case or a software trade secret case when one party's IP was found to have been used without permission and the accused party agrees to remove the code in question and replace it with code developed independently.

22. Dr. Kursh then states that a clean room is used when a company has hired (or contracted) personnel from a company whose product is being reimplemented, and that the defendants did not hire any InfoDeli personnel, thus there is no need of a clean room process. This is an overly narrow view, which ignores the fact that WRI employees (e.g., Jill Williams and Deanna Greiner) had extensive experience with the InfoDeli Software Platform and had knowledge of specific details of implementation.

23. Dr. Kursh also does not discuss that the conflict over IP contamination often arises not from the hiring of ex-employees from the plaintiff, but by the knowledge that has been shared with business partners and contractors. In this case, WRI had in-depth knowledge of the implementation of the InfoDeli Software Platform system, as I have shown in my earlier report[9] and above[10]. The need for a clean room was to remove WRI's transfer of IP knowledge and files to EMS that ultimately found its way into the specifics of implementation of the replacement solution.

24. In paragraph 85, Dr. Kursh misconstrues the value of a clean room process. The question is not whether there was unique functionality in the InfoDeli Platform (though I cite above that Cindy Burri claimed there was), but that there is IP belonging to Plaintiffs in the specifics of how these features are implemented.

---

[9] Expert Report of Michael D. Edge March 18, 2019, pages 15 - 20
[10] Deposition of ELIZABETH H. CORBIN, Dec 19, 2016, pp.129 - 131

25. In paragraphs 86 – 88, Dr. Kursh again misconstrues my opinion on incorporating third party and Scaffolding Code into the new solution.

26. In paragraph 90, Dr. Kursh again misconstrues the value of a clean room process. I am very confident that if Google implemented a new word processing application and had people on the team who had insider knowledge of the specifics of how Microsoft Word was implemented, they would indeed employ a clean room process, (or, more likely, take steps to show that these individuals were walled off from that particular project). As an experienced project manager, I would notify management of my concerns that failure to use a clean room process in such a situation could risk legal action.

27. In paragraphs 91 – 92, Dr. Kursh again misconstrues my opinion on incorporating third party and Scaffolding Code into the new solution.

28. In paragraph 93, Dr. Kursh again misconstrues the value of the clean room process, as shown above.

**Kursh -- Lines of Code is Not an Appropriate Method for Measuring Value of Software**

29. In paragraphs 94 – 96, Dr. Kursh argues that Lines of Code is not an appropriate measure for measuring the value of software. Once again, Dr. Kursh misunderstands what my original report accomplished. I was tasked with measuring the **effort** required to replace the InfoDeli Software Platforms in a short amount of time – not the value of the software. I am not an economist and have not rendered any opinions

11

that require such a background. Dr. Kursh fails to appreciate that lines of code is an often used metric for analyzing the effort required for software development.

30. In paragraph 95 of his report, Dr. Kursh quotes some qualifiers from Steve McConnel's 1996 book *Rapid Development, Taming Wild Software Schedules* regarding limitations of LOC measurements. Dr. Kursh's quotation did not provide the reader with the full context of McConnel's views. McConnel's qualifiers concern comparing high level languages, (e.g. Java, Lasso and PHP) with low level languages, such as assembly code:

> Misleading information from lines-of-code measurements. Most measurement programs will measure code size in lines of code, and there are some anomalies with that measurement. Here are some of them:
>
> - Productivity measurements based on lines of code can make high-level languages look less productive than they are. High-level languages implement more functionality per line of code than low-level languages. A developer might write fewer lines of code per month in a high-level language and still accomplish far more than would be possible with more lines of code in a low-level language.
> - Quality measurements based on lines of code can make high-level languages look as if they promote lower quality than they do. Suppose you have two equivalent applications with the same number of defects, one written in a high-level language and one in a low-level language. To the end-user, the applications will appear to have exactly the same quality levels. But the one written in the low-level language will have fewer defects per line of code simply because the lower-level language requires more code to implement the same functionality. The fact that one application has fewer defects per line of code creates a misleading impression about the applications' quality levels.
>
> To avoid such problems, beware of anomalies in comparing metrics across different programming languages. Smarter, quicker ways of doing things may result in less code. Also consider using function points for some measurements. They provide a universal language that is better suited for some kinds of productivity and quality measurements.

12

31. I note that *Rapid Development, Taming Wild Software Schedules* is concerned with strategies for quick and effective development, and does not deal with software cost estimation. This is, in fact, the only reference to LOC in the entire book. More appropriately, in his 2006 book, *Software Estimation: Demystifying the Black Art*, Steve McConnel stated ten years after the quotes cited by Dr. Kursh[11]:

> My personal conclusion about using lines of code for software estimation is similar to Winston Churchill's conclusion about democracy: the LOC measure is a terrible way to measure software size, except that all the other ways to measure size are worse. [...] The LOC measure is the *lingua franca* of software estimation, and it is normally a good place to start, as long as you keep its limitations in mind.

As described above, I went to great lengths to discount effort that would not have been appropriate for a LOC analysis, i.e., I kept the LOC estimation limitations in mind and appropriately accounted for those limitations in preparing my estimate.

32. I chose lines of code as the metric for several reasons. First, it is an objective, quantifiable metric (as opposed to subjective opinions from Dr. Kursh or me). Second, it is a reproducible standard (as I showed in my methodology section of my report for determining the appropriate code base for analysis). Third, it is one of the inputs for Cocomo II, which provided an external mechanism to "sanity check" my results.

33. Other metrics typically involve reviewing the entire code base and/or functionality by hand, and subsequently assigning subjective values of complexity to them.

---

[11] McConnell, Steve. Software Estimation: Demystifying the Black Art. Microsoft press, 2006, page 199

34. Most importantly, I reviewed two existing, working solutions that met the requirements for the systems and I chose to base my analysis off of the solution that had a significantly smaller number of lines of code, i.e., the Lit Store by InfoDeli.

35. In paragraph 96, Dr. Kursh quotes a "wiki" article to support his point. First, Dr. Kursh does not explain how this "wiki"[12] article is an accepted standard in the computer science industry. Second, Dr. Kursh ignores the very next sentence from his cited "wiki" entry:

> Many studies do show a rough correlation between LOC and the overall cost and length of development, and between LOC and number of defects.

**Kursh -- InfoDeli and EMS Are Not Comparable Systems**

36. In paragraphs 97 – 101, Dr. Kursh contends that the two systems are not comparable while simultaneously admitting that "they have similar functionality" and then claiming, "their design and overall functionality vary". Dr. Kursh does not cite to what he examined to reach these seemingly conflicting conclusions. Critically, his report does not indicate that he reviewed or examined the databases or code in Defendants' software platforms. For example, parts of the EMS database were influenced by / copied from the schema from the original InfoDeli database.[13] Database design has a huge impact on the design and functionality of the overall

---

[12] "Wiki" articles are generally untrustworthy because anyone can edit the content in them. See, e.g.:
https://en.wikipedia.org/wiki/Wikipedia:Why_Wikipedia_is_not_so_great and
https://en.wikipedia.org/wiki/Wikipedia:Wikiality_and_Other_Tripling_Elephants
[13] See, e.g., paragraphs 51 – 61 of the Second Expert Disclosure and Report of Jason H. Eaddy dated December 23, 2016.

system. It could be that Dr. Kursh's failure to examine these aspects of the accused systems is why he states, "I have not seen any evidence showing the two systems were functionally equivalent."

37. In any event, whether the systems are "overall" comparable is not relevant to my analysis. I chose the InfoDeli Lit Store solution as the basis for my analysis, as it met the requirements of the system and *was substantially smaller*, thus leading to a more conservative figure in terms of effort needed.

38. Lasso and PHP, while technically different, are both high level programming languages, and quite similar in structure. Given that the difference in size between the two code bases (Lit Store v. Marketing Store) was a factor of six, I did not delve into a more nuanced comparison of the line counts, but simply chose the substantially smaller code base.

**Kursh - Defendants Leveraged a Platform for Replacing the InfoDeli System**

39. In paragraphs 102 – 106, Dr. Kursh argues that I failed to consider that the Defendants leveraged a platform for replacing the InfoDeli Software Platforms. He is incorrect. As I explained earlier in this report, I subtracted Scaffolding Code from my analysis of effort needed to develop clean-room replacement platforms. More importantly, after concluding that the original InfoDeli Software Platform was the smaller, and therefore more conservative, code base, I did not consider the size or makeup of the EMS solution in my analysis. Dr. Kursh's conclusion in paragraph 104 that "This is important in light of Mr. Edge's analysis on the number of programmer

15

months it would take to create the unique code in The InfoDeli Software Platforms" is simply incorrect.

**Kursh - InfoDeli's LOC is Overestimated**

40. In paragraph 107 Dr. Kursh opines that he has not seen evidence that the InfoDeli Code was "refactored" and then claims that I failed to consider that fact. However, Dr. Kursh's report does not indicate that he reviewed the InfoDeli code, nor reviewed any documentation, to support that opinion. However, a review of one of InfoDeli's version logs[14] reveals references to refactoring:

> version 1.4.8 (10/16/10) … [line 106]
> …
> an internal refactor of the code, for easier future development and modularity [line 117]
> version 1.3 (9/21/09) … [line 230]
> …
> refactoring of entire codebase [line 238]
> …
> refactored docs [line 241]

41. In paragraph 108 Dr. Kursh opines "given the development processes, timeframe, and relatively small team that worked on the InfoDeli software, it is highly likely that someone starting with a fresh slate could write a custom program with fewer lines of code than found in the InfoDeli application." Dr. Kursh's opinion is somewhat vague, but if he is claiming that a new *larger* team would recreate the InfoDeli software in substantially less time *and* in fewer lines of code, then I believe Dr. Kursh is mistaken in this opinion. As I state clearly in my report, nothing can replace time on a project,

---

[14] INFODELI00399036-bf943d7ce8c287d9df18000666234bc6-AEO

16

and that a small team with a longer development schedule is vastly more efficient (and therefore writes cleaner, smaller code) than a large team with a short time frame. I think it highly unlikely that a new larger team, on a much shorter time frame, would develop a smaller code base (unless features were cut in order to make the schedule). This is supported by the fact that the code base that EMS developed was substantially larger (6X) than the InfoDeli code base. Bear in mind that the code base I used for my analysis discounts all duplicated and Scaffolding Code, and I assume that a new solution would require a similar amount of "off the shelf"/Scaffolding Code.

**Kursh - Flaws with Edge's LOC Methodology**

42. In paragraphs 109 – 110, Dr. Kursh again assumes that I did not consider third-party Software in my analysis, which, as explained above, was indeed considered and accounted for. Dr. Kursh's opinion that "Mr. Edge incorrectly assumes that a software developer would have chosen to replicate the Plaintiffs' software development process" is similarly flawed, as my opinion is based off the new software developer following the same path as Engage Mobile, i.e., using a combination of standard software frameworks (like Magento and plug-ins for Magento) along with supplemental code modifications. Either way, as Liz Corbin explained, "I did compare it against Magento, but if I had to guess, all the customization would still apply to any of the other solutions I mentioned yesterday as options."[15]

**Kursh - Flaws in Mr. Edge's Analytical Framework**

---

[15] ENGAGE00103496-97.

43. In paragraphs 111 – 119, Dr. Kursh posits that my analytical framework is flawed, because the LOC of the EMS solution is allegedly impossibly high. Dr. Kursh misapprehends my opinion: a rate of 170+LOC/day is highly unlikely, ***unless the developers have access to materials from the previous system***, and more importantly, ***access to individuals with insider knowledge of how the system was implemented***. Most of the time developing a new application is not "typing" code, it is designing, implementing, and debugging code. Often there are unforeseen problems with a particular line of attack on a problem, and the developer must backtrack and start again. Most or all of that is averted when using a working system as a blue print.

44. A specific example is when EMS did not understand how authorization levels for reps were represented in the database that had been exported from the InfoDeli System. Instead of spending days to weeks developing and debugging their own methodology for classifying the pieces in the marketing store, assigning authorization limits and ordering limits to the full range of users for the new Marketing Stores, WRI provided EMS with the implementation details of the InfoDeli System, which allowed EMS to insert InfoDeli's schema into the accused marketing stores[16]. In sum, the ability to use InfoDeli's schema, files and data provides a significant multiplier to the LOC/Day that are possible.

**Kursh - Detailed Analysis**

---

[16] See, e.g., paragraphs 51 – 61 of the Second Expert Disclosure and Report of Jason H. Eaddy dated December 23, 2016 and Deposition of ELIZABETH H. CORBIN, Dec 19, 2016, pp.129 – 131; WRI_0057491 and ENGAGE0263220; WRI_0057765-66.

18

45. In paragraphs 120 – 131, Dr. Kursh argues that I failed to consider other methodologies, such as Agile. He again misunderstands my opinion.

46. In my report, I state that Defendants could attempt to use a methodology such as Agile, but that it would be imperative that no one participate in the development process that had insider knowledge of the InfoDeli system. This means that there would still need to be the initial specification phase as described in my report because without that, the programmers would have no idea what they were building or whether the software works for its intended purposes.

47. I also believe that Agile would be less effective, given that the members of WRI that had used the InfoDeli system would not be allowed to participate in the development phase. The techniques that Agile emphasizes (individuals and interactions over processes and tools, Customer collaboration over contract negotiation) go against the requirements of a clean room process: clear documentation to prove that there was no contamination from the original implementation.

48. Dr. Kursh quotes several sources citing the supposed popularity of the Agile Methodology over the Waterfall Methodology. First, he never addresses whether Agile is appropriate for clean room development. As I've stated above, the techniques that Agile emphasizes go against the necessary documentation requirements of a clean room process. Second, Dr. Kursh fails to consider the entire context of the articles he cites. For example, from https://www.imaginarycloud.com/blog/did-agile-kill-waterfall/:

Field Cod

19

- … However, it's a mistake to ignore such a high percentage of developers who use Waterfall. We wouldn't say, as an analogy, that Huawei is an irrelevant brand because it has just 14.6% of market share in the mobile phone business, behind Apple and Samsung.
- No one is bragging about their Waterfall processes, every business, from marketing and economics to software design and development, wants everyone to know that they're Agile, even if they don't know themselves what it means. That's what's causing the whole fallacy supporting the argument that Waterfall is now irrelevant.
- Everyone seems to be missing the point: neither Waterfall is dead nor Agile is the universally superior methodology for software development. Adopting one over the other for the sake of being better is just an illusion that often masks the inexistence of a proper process.

The last quote is particularly relevant, as the whole point of a clean room is to have a documented, "proper" process.

**Kursh - Functional Specification Phase**

49. In paragraphs 132 – 135, Dr. Kursh again contends that I did not consider third-party Software in my analysis and he is again incorrect. Specifically, I assume that incorporating third-party Software is part of the solution, and that determining which elements of the solution can be solved by existing third-party Software is part of the Specification Phase. This phase includes any appropriate gap analyses.

**Kursh - Detailed Design Phase**

50. In paragraphs 136 – 138, Dr. Kursh disagrees that a detailed design document is necessary, because "an existing platform would be used as a starting point." Dr. Kursh's opinion actually supports and reinforces my opinion - EMS skipped the design phase, and accelerated development, because it used the existing InfoDeli Software Platforms and vectrarebate.com website as blueprints. I've been instructed

20

to assume that Defendants did not have a legal right to do so, and my analysis is based upon that assumption.

**Kursh - Code and Database Implementation**

51. In paragraphs 139 - 140, Dr. Kursh opinions regarding the redevelopment effort remain incorrect, for the reasons cited above.

52. In paragraph 141, Dr. Kursh once again conflates custom development with development "from scratch". Dr. Kursh states that "It is my opinion that any code written by the Defendants was only for customizing an existing COTS, SAAS, or opensource software platform." Defendants spent over 5,000 hours of consultant time developing the replacement sites[17]. As Liz Corbin stated[18], "For the record, the customization compared to out of the box is huge! Just about every piece of functionality has some sort of customization." Dr. Kursh is incorrect when he states, "The Defendants work was not a custom software development."

**Kursh - Repopulating the Content of the Site**

53. In paragraphs 142 – 147, Dr. Kursh states what I believe are legal opinions regarding the ownership and rights of the content of the sites. I am not offering any legal opinions in my report; therefore, no rebuttal is possible.

---

[17] EXPERT REPORT OF DANIEL S.LEVY, Ph.D. March 18, 2019, pages 5-6
[18] ENGAGE00103496-97

21

**Kursh – Cocomo II**

54. In paragraphs 148 to 150, Dr. Kursch claims that Cocomo II is irrelevant because the Defendants were using an e-commerce platform for their solution. He is incorrect.

55. Dr. Kursh once again conflates "custom software solution" with "from scratch". As stated earlier in the report, I am assuming the use of "off-the-shelf" / Scaffolding Code in the solution, but the LOC input to Cocomo II had those elements removed from the effort calculation.

**Materials Considered**

56. In reaching my opinions expressed in this reply report I considered all documents and information discussed in this report. I have also relied upon my experience and training. I have also directly or indirectly reviewed various documents listed in my original report.

My analysis in this matter is ongoing, and I reserve the right to supplement this report as new information is made available to me during the course of this matter.

Signed under the pains and penalties of perjury, this 6th day of May, 2019

/s/ Michael D. Edge

Michael D. Edge